| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE EASTERN DISTRICT OF VIRGINIA |
| 2 | Norfolk Division |

3    - - - - - - - - - - - - - - - - - -
                                        )
4    BASF PLANT SCIENCE, LP,            )
                                        )
5          Plaintiff,                   )
                                        )
6    v.                                 )
                                        )
7    COMMONWEALTH SCIENTIFIC AND        )
     INDUSTRIAL RESEARCH                )
8    ORGANISATION,                      )
                                        )
9          Defendant.                   )
     _____)              CIVIL ACTION NO.
10                                      )                 2:17cv503
     COMMONWEALTH SCIENTIFIC AND        )
11   INDUSTRIAL RESEARCH                )
     ORGANISATION, GRAINS RESEARCH      )
12   AND DEVELOPMENT CORP., AND         )
     NUSEED PTY LTD.,                   )
13                                      )
         Plaintiff-Counterclaimants,    )
14                                      )
     v.                                 )
15                                      )
     BASF PLANT SCIENCE, LP, and        )
16   CARGILL, INC.,                     )
                                        )
17    Defendants-Counterdefendants.     )
                                        )
18   - - - - - - - - - - - - - - - - - -

19

20                    TRANSCRIPT OF PROCEEDINGS
                      **(Jury Trial - Day 11)**

21                       Norfolk, Virginia

22                       October 31, 2019

23

     BEFORE:  THE HONORABLE HENRY COKE MORGAN, JR.
24            United States District Judge, and a jury

25

2004

```
 1    APPEARANCES:

 2                 HOGAN LOVELLS US LLP
                   By:  Nitya Anand
 3                      Arlene L. Chow
                        N. Thomas Connally, III
 4                      Una Chiao-Yi Fan
                        Thomas B. Hunt
 5                      Takashi Okuda
                        Jared Schubert
 6                      Anna K. Shaw
                        Ernest Yakob
 7                 Counsel for BASF Plant Science, LP

 8                 VANDEVENTER BLACK LLP
                   By:  Richard H. Ottinger
 9                 Counsel for Defendants, Third-Party
                   Plaintiffs, and Counterclaimants
10
                   KOBRE & KIM LLP
11                 By:  Jonathan E. Barbee
                        Hugham Chan
12                      Matthew I. Menchel
                        Michael K. Ng
13                      Hartley M.K. West
                        Daniel A. Zaheer
14                 Counsel for Commonwealth Scientific and
                   Industrial Research Organisation
15
                   PORTER HEDGES LLP
16                 By:  Miranda Jones
                        Megan Mon-Ting Luh
17                      Erin C. Villasenor
                   Counsel for Grains Research and
18                 Development Corporation

19                 WILEY REIN LLP
                   By:  Alexander Owczarczak
20                      Teresa Summers
                        Lawrence M. Sung
21                 Counsel for Nuseed Pty Ltd

22                 FISH & RICHARDSON PC
                   By:  Ahmed J. Davis
23                      Christopher R. Dillon
                        Elizabeth Flanagan
24                      Daniel R. Gopenko
                   Counsel for Cargill, Inc.

25
```

2005

| NO. | PAGE |
|-----|------|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I N D E X

E X H I B I T S

NO.                                                    PAGE

 JX-069                                                2008

```
 1              (Proceedings commenced at 9:56 a.m.)
 2              THE COURT:  All right.  I received proposed amended
 3     instructions from CSIRO.
 4              It's not necessary for you to stand up.
 5              The parties were told the day before the charging
 6     conference that the Court was particularly interested in
 7     instructions on this subject because it was unique to the
 8     case.  We had our charging conference.  Any instruction such
 9     as this should have been submitted prior to the scheduling
10     conference.  This instruction is not timely or appropriate.
11              I asked counsel yesterday if they had anything
12     further to offer, and they didn't, and we closed the
13     instruction conference.  You can't come in and put something
14     in evidence after that's closed and all the instructions have
15     been agreed upon by the parties.
16              Apparently, the proponents want their damage expert
17     to be in the court.  Is there any objection to that?
18              MR. DAVIS:  For clarity, Your Honor, it's -- well, I
19     think --
20              THE COURT:  Or is it the opponents?
21              MR. DAVIS:  It's the opponents, and it's not our
22     damages expert, it's Dr. Gromov, who is a Cargill fact
23     witness.  He was scheduled to testify in phase 3, and I just
24     wanted to ask for the Court's guidance about whether he could
25     stay for closing.
```

1            One thing I would say is that Cargill has not

2    designated, to date, a corporate witness, and so if that

3    would resolve the issue, we would make him the corporate

4    witness for Cargill for the proceedings, and then that would

5    resolve it, as the other corporate witnesses have stayed in

6    the court.

7            THE COURT:  Is there any objection to him being in

8    the courtroom?

9            MR. NG:  If he's being designated as a corporate

10   representative, then no.

11           THE COURT:  All right.  Are we ready for the jury?

12           MR. ZAHEER:  Yes, Your Honor.

13           MS. SHAW:  Your Honor, just one minor thing.

14           We have -- the parties have agreed to a stipulation

15   of undisputed facts, and I've got it marked as an exhibit to

16   submit to the Court.

17           THE COURT:  Is that the one from the pretrial order?

18           MS. SHAW:  Yes, Your Honor.

19           THE COURT:  Okay.

20           MS. SHAW:  I have multiple copies.  I don't know how

21   many you need.

22           THE COURT:  Well, I think the parties previously

23   advised the Court that they were going to prepare it as an

24   exhibit.

25           MS. SHAW:  Your Honor, just for the record, it's

```
 1    JX-069.
 2              THE COURT:  All right.
 3              (Exhibit JX-069 received in evidence.)
 4              THE COURT:  All right.  Bring in the jury.
 5              (The jury entered the courtroom.)
 6              THE COURT:  Good morning, ladies and gentlemen.
 7              As we discussed yesterday, we've reached the portion
 8    of the trial where the Court will give you its instructions,
 9    setting forth the law applicable to this particular case.
10    After the Court reads you the instructions, counsel will have
11    an opportunity to argue.  I'm not sure how long it will take
12    to read all the instructions -- there are quite a few of
13    them -- but it's probably going to take more than an hour.
14    So I'll probably tell you somewhere in the middle of the
15    instructions to stand up and move around because it's
16    difficult just to sit there and listen, without anything else
17    going on, for so long.
18              The attorneys on both sides have the right to make
19    an opening argument, as well as a rebuttal argument.  The
20    Court has allotted each side an hour and 15 minutes to argue,
21    so it will probably be sometime after lunch before you begin
22    your deliberations, just for your information.
23              All right.  Now that you've heard all the evidence,
24    it is the Judge's duty to give you the instructions of the
25    Court concerning the law applicable to this case.  It is your
```

1    duty as jurors to follow the law as the Judge states it to

2    you and to apply the law to the facts as you find them from

3    the evidence in the case.  You must not base your verdict in

4    any way upon sympathy, bias, guesswork, or speculation.  Your

5    verdict must be based solely upon the evidence and the

6    instructions of the Court.

7          Counsel may quite properly refer to some of the

8    governing rules of law in their arguments.  If, however, any

9    difference appears to you between the law as stated by

10   counsel and that stated by the Judge in these instructions,

11   you, of course, are to be governed by the instructions.

12         If any reference by the Judge or by counsel to

13   matters of evidence does not coincide with your own

14   recollection, it is your recollection which should control

15   during your deliberations.

16         You're not to single out one instruction alone as

17   stating the law but must consider the instructions as a

18   whole.  Neither are you to be concerned with the wisdom of

19   any rule of law stated by the Judge.  Regardless of any

20   opinion you may have as to what the law is or what the law

21   ought to be, it would be a violation of your sworn duty to

22   base a verdict upon any view of the law other than that given

23   in the instructions of the Judge, just as it would also be a

24   violation of your sworn duty as judges of the facts to base a

25   verdict upon anything other than the evidence in the case.

1           Justice through trial by jury must always depend

2    upon the willingness of each individual juror to seek the

3    truth as to the facts from the same evidence presented to all

4    of the jurors and to arrive at a verdict by applying the same

5    rules of law as given in the instructions of the Judge.

6           Both the parties and the public expect that you will

7    carefully and impartially consider all of the evidence in the

8    case, follow the law as stated by the Court, and reach a just

9    verdict, regardless of the consequences.  As stated earlier,

10   it is your duty to determine the facts, and in so doing you

11   must consider only the evidence the Court has admitted in the

12   case.

13          Remember that any statements, objections, or

14   arguments made by the lawyers are not evidence in the case.

15   The function of the lawyers is to point out those things that

16   are most significant or most helpful to their side of the

17   case, and in so doing to call your attention to certain facts

18   or inferences that might otherwise escape your notice.

19          It is the duty of the lawyer on each side of the

20   case to object when the other side offers testimony or other

21   evidence which the lawyer believes is not properly

22   admissible.  You should not draw any conclusions or be

23   prejudiced against a lawyer or the party he or she represents

24   because of the making of an objection.

25          There are, generally speaking, two types of evidence

1    from which a jury may properly find the truth as to the facts

2    of the case.  One is direct evidence, such as the testimony

3    of an eye witness or the admission of a document.  The other

4    is indirect or circumstantial evidence, the proof of a chain

5    of circumstances pointing to the existence or non-existence

6    of certain facts.  As a general rule, the law makes no

7    distinction between direct and circumstantial evidence but

8    simply requires the jury find the facts in accordance with

9    the evidence of all -- in accordance with a preponderance of

10   all the evidence in the case, both direct and circumstantial.

11          There are some issues that you must decide by clear

12   and convincing evidence, as opposed to the preponderance of

13   the evidence.

14          Now, the Court has said that you must consider all

15   of the evidence.  This does not mean, however, that you must

16   accept all of the evidence as true or accurate.  The evidence

17   in the case consists of the sworn testimony of the witnesses,

18   regardless of who may have called them, and all exhibits

19   received in evidence, regardless of who may have produced

20   them, and all facts which may have been admitted.

21          Any evidence as to which an objection was sustained

22   by the Court and any evidence which the Court may have

23   stricken must be entirely disregarded.  Anything you have

24   seen or heard outside the courtroom about this case is not

25   evidence and must be entirely disregarded.

1          You are to consider only the evidence in the case,

2     but in your consideration of the evidence, you are not

3     limited to the bald statements of the witnesses.  In other

4     words, you're not limited solely to what you see and hear as

5     the witnesses testify.  You are permitted to draw from the

6     facts you find have been proven such reasonable inferences as

7     you feel are justified in the light of experience.

8          All corporations and business entities are entitled

9     to fair and impartial treatment in this court, regardless of

10    country of origin, relative size, and for-profit or

11    nonprofit.  Just as in the case of individual persons, your

12    decisions must not be based upon sympathy, bias, or prejudice

13    for or against any persons -- no.  Excuse me.

14         Just as in the case of individual persons, your

15    decision must not be based on sympathy, bias, or prejudice

16    for or against any corporate entity.  The case should be

17    considered and decided by you as an action between parties of

18    equal standing in the community, of equal worth, and holding

19    the same or similar stations of life.  All persons and

20    corporations, foreign or domestic, stand equal before the law

21    and are to be dealt with as equals in a court of justice in

22    the United States.

23         You, the jurors, are the sole judges of the

24    credibility of the witnesses and the weight their testimony

25    deserves.  You may be guided by the appearance and conduct of

1    the witness, or by the manner in which the witness testifies,

2    or by the character of the testimony given, or by evidence to

3    the contrary of the testimony given.  You should carefully

4    scrutinize all the testimony given, the circumstances under

5    which each witness has testified, and every matter in

6    evidence which tends to show whether a witness is worthy of

7    belief.

8           Consider each witness's intelligence, motive, state

9    of mind, and demeanor and manner while on the stand.

10   Consider the witness's ability to observe the matters as to

11   which he or she has testified and whether he or she impresses

12   you as having an accurate recollection of these matters.

13          Consider also any relation each witness may bear to

14   either side of the case, the manner in which each witness

15   might be affected by the verdict, and the extent to which, if

16   at all, each witness is either supported or contradicted by

17   other evidence in the case.

18          Inconsistencies or discrepancy in the testimony of a

19   witness or between the testimony of different witnesses may

20   or may not cause the jury to discredit such testimony.  Two

21   or more persons witnessing an incident or a transaction may

22   see or hear it differently, and innocent misrecollection,

23   like failure of recollection, is not an uncommon experience.

24   In weighing the effect of a discrepancy, always consider

25   whether it pertains to a matter of importance or an

1   unimportant detail and whether the discrepancy results from

2   innocent error or intentional falsehood.  After making your

3   own judgment, you will give the testimony of each witness

4   such credibility, if any, as you may think it deserves.

5            You may, in short, accept or reject the testimony of

6   any witness, in whole or in part.  Also, the weight of the

7   evidence is not necessarily determined by the number of

8   witnesses testifying to the existence or non-existence of any

9   fact.  You may find that the testimony of a single witness or

10  a small number of witnesses as to any fact is more convincing

11  than the testimony of a larger number of witnesses to the

12  contrary.

13           A corporation may act only through natural persons

14  as its agents or employees.  Generally, any agents or

15  employees of a corporation may bind the corporation by their

16  acts and declarations made while acting within the scope of

17  their authority delegated to them by the corporation or

18  within the scope of their duties as employees of the

19  corporation.

20           During the trial, certain testimony has been

21  presented by way of deposition.  The deposition consisted of

22  sworn, recorded answers to questions asked of the witness in

23  advance of the trial by attorneys for the parties in the

24  case.  Such testimony is entitled to the same consideration

25  and is to be judged as to credibility and weighed and

1    otherwise considered by you, insofar as possible, in the same

2    way as if the witness had been present and had testified from

3    the witness stand.   The Court ordered that the deposition

4    videos be edited by the parties before they were presented to

5    you to remove objections by counsel that are not of your

6    concern.

7            The rules of evidence may limit the ability of

8    witnesses to testify as to opinions or conclusions.   Greater

9    latitude is given to those whom we call expert witnesses.

10   Witnesses who, by education or experience, have become

11   experts in some art, science, profession, or calling may

12   state an opinion as to relevant and material matters as to

13   which they possess expertise and may also state their reasons

14   for the opinion.

15           The experts in this case were:  One, Dr. Ljerka

16   Kunst on behalf of the proponents; and, two, Dr. Denis Murphy

17   on behalf of the opponents.   Opinion testimony by qualified

18   expert witnesses is competent evidence.   You should consider

19   each expert opinion received in evidence in this case and

20   give each such opinion the weight you find it deserves.

21           You may disregard an expert opinion entirely if you

22   should decide that any expert is unqualified or lacks

23   objectivity or credibility, or if you should conclude that

24   the factual basis or reasoning given in support of the

25   opinion are not proven or sound, or that the opinion is

1    outweighed by other evidence.

2           During the course of a trial, the Judge occasionally

3    asks questions of witnesses in order to bring out facts not

4    then adequately explained by their testimony and to expedite

5    the presentation of evidence.  Do not presume that the Judge

6    holds any opinion on the matters to which the Judge's

7    questions may have related.  Remember at all times that you,

8    as jurors, are at liberty to disregard all questions by the

9    Judge regarding the facts in determining the weight of the

10   evidence, but you are governed by the Judge's instructions as

11   to the law applicable to this case.

12          Nothing the Judge says, nor any ruling of the Judge,

13   nor any remark which the Judge has made is to be taken as an

14   indication that the Judge has any opinion of the facts of the

15   case or what that opinion may be.  It is the Judge's function

16   to determine the law.  The determination of the facts and the

17   weight of the evidence is your function.

18          When one of the parties testifies unequivocally to

19   facts within their own knowledge, those statements of fact

20   and the necessary inferences from them are binding upon them.

21   They cannot rely on other evidence in conflict with their own

22   testimony to strengthen their case.  However, you must

23   consider their testimony as a whole, and you must consider a

24   statement made in one part of their testimony in the light of

25   any explanation or clarification made elsewhere in their

1    testimony.

2          During the trial, evidence was introduced that a

3    witness had previously made a statement (given testimony)

4    that was inconsistent with his or her testimony at this

5    trial.  The only purpose for which that evidence was admitted

6    was its bearing on the witness's credibility.  It is not

7    proof that what the witness may have said earlier is true.

8          Certain exhibits have been shown to you during the

9    trial that were illustrations.  We call those types of

10   exhibits "demonstrative exhibits" or sometimes just

11   "demonstratives" for short.  Demonstrative exhibits are a

12   party's description, picture, or model to describe something

13   involved in this trial.  If your recollection of the evidence

14   differs from the demonstrative, you should rely on your own

15   recollection.  Demonstrative exhibits are not evidence, but

16   the witness's testimony concerning the demonstrative evidence

17   may be evidence, if you find that they accurately illustrate

18   the evidence to which they are directed.

19         A preponderance of the evidence in the case means

20   such evidence, when considered and compared with the evidence

21   opposed to it, has more convincing force and produces in your

22   mind a belief that what is sought to be proved is more likely

23   true than not true.  To illustrate, if you were weighing the

24   evidence on a scale and the scale tilted in favor of the

25   person with the burden, then that person has proven his or

1   her element or claim by a preponderance of the evidence.  In

2   determining whether any fact in issue has been proven by a

3   preponderance of the evidence, the jury may, unless otherwise

4   instructed, consider the testimony of all the witnesses,

5   regardless of who may have called them, and all exhibits

6   received in evidence, regardless of who may have produced

7   them.

8           It does not make any difference as to whether the

9   exhibits are marked for the proponents or for opponents.  The

10  test is not which side brings the greater number of witnesses

11  or presents the greater quantity of evidence, but which

12  witnesses and which evidence appeal to your minds as being

13  most accurate and otherwise trustworthy.

14          Clear and convincing evidence is evidence that

15  produces in your mind a firm belief or conviction as to the

16  matter at issue.  Clear and convincing evidence involves a

17  greater degree of persuasion than is necessary to meet the

18  preponderance of the evidence standard.  This standard does

19  not require proof to an absolute certainty, since proof to an

20  absolute certainty is seldom possible in any case.

21          I will now summarize the issues that you must decide

22  at this stage of the case and for which I will provide

23  instructions to guide your deliberations.  You must decide

24  the following issues:

25          Number one, whether proponents have proven by a

2019

1  preponderance of the evidence that opponents' products

2  infringe claim 20 of the '541 patent.

3         Two, whether opponents have proven by a

4  preponderance of the evidence that they are co-owners of the

5  patents-in-suit.

6         Three, whether opponents have proven by clear and

7  convincing evidence that the patents-in-suit are invalid.

8         Before you can decide many of the issues in the

9  case, you will need to understand the role of patent claims.

10 The patent claims are the numbered sentences at the end of

11 each patent.  The claims are important because it is the

12 words of the claims that define what a patent covers.  The

13 figures and text in the rest of the patent are intended to

14 provide a description and/or examples of the invention and

15 provide a context for the claims, but it is the claims that

16 define the breadth of the patent's coverage.  Each claim is

17 effectively treated as if it was a separate patent, and each

18 claim my cover more or less than another claim.  Therefore,

19 what a patent covers depends in turn on what each of its

20 claims cover.

21        You will need to understand what each claim covers

22 in order to decide whether or not there is infringement of

23 the claim.  The law says that it is the Judge's role to

24 define the terms of the claims, and it is the Judge's role to

25 apply the Judge's definitions to the issues that you are

1    asked to decide in the case.  Therefore, as explained to you

2    at the start of the case, you have been provided definitions

3    of certain claim terms.  You must accept these definitions of

4    certain words in the claims as being correct.  It is your job

5    to take these definitions and apply them to the issues that

6    you are deciding, including the issues of infringement,

7    invalidity, and enforcement.

8              I will now explain how a claim defines what it

9    covers.  A claim sets forth in words a set of requirements.

10   Each claim sets forth its requirements in a single sentence.

11   If a device satisfies each of these requirements, then it is

12   covered by the claim.

13             There can be several claims in a patent.  Each claim

14   may be narrower or broader than another claim by setting

15   forth more or fewer requirements.  The coverage of a patent

16   is assessed claim by claim.  In patent law, the requirements

17   of a claim are often referred to as claim elements or claim

18   limitations.

19             When a thing, such as a product or a process, meets

20   all of the requirements of a claim, the claim is said to

21   cover that thing, and that thing is said to fall been the

22   scope of that claim.  In other words, a claim covers a

23   physical object, product, or process where each of the claim

24   elements or limitations is present in that physical object,

25   product, or process.

1          Sometimes the words in a patent claim are difficult

2     to understand, and, therefore, it is difficult to understand

3     what requirements these words impose.  It is my job to

4     explain to you the meaning of the words in the claims and

5     requirements those claims impose.  As I just instructed you,

6     there are certain specific terms that I have defined, and you

7     are to apply the definitions that I apply to you.  By

8     understanding the meanings of a word in a claim and by

9     understanding that the words of a claim set forth the

10    requirements that a product or process must meet in order to

11    be covered by that claim, you will be able to understand the

12    scope of coverage for each claim.  Once you understand what a

13    claim covers, you are then prepared to decide the issues that

14    you will be asked to decide, such as infringement,

15    invalidity, and enforcement.

16          All right.  I think this would be a good time to

17    take a little rest, stand up and move around, and so forth,

18    while I organize the rest of the claims.  You can stand, if

19    you want to.

20          (There was a pause in the proceedings.)

21          THE COURT:  All right, ladies and gentlemen.  The

22    Judge will now explain to you the meanings of some of the

23    words of the claims in the case and explain some of the

24    requirements of these claims.  You must accept these

25    definitions of the words in the claims as correct.  For any

2022

1   words in the claim for you that are not provided -- for any

2   words in the claim -- excuse me.  There's a grammatical error

3   here.

4           For any words in the claim for which you are not

5   provided with a definition, you should apply their common

6   meaning.  You should not take the definitions of the language

7   of the claims as an indication that the Judge has a view

8   regarding how you should decide on the issues that you're

9   being asked to decide, such as infringement, invalidity, and

10  enforceability.  These issues are yours to decide.

11          The meanings of the words and group of words from

12  the patent claims so provided are as follows.  Now, again, I

13  remind you that you'll have this all in writing.

14          There's a term that says "at least [X]%."  The X

15  will be a number, and since the numbers are different, that's

16  why I put "[X]%."  This term generally has its plain and

17  ordinary meaning.  Whether an upper limit is included depends

18  on the context of the exact claim.  The Court will determine

19  whether such claim should be read into the asserted claims.

20          (There was a pause in the proceedings.)

21          THE COURT:  I'll repeat that definition.

22          This claim generally has its plain and ordinary

23  meaning.  Whether an upper limit is included depends on the

24  context of the exact claim.  Less than [X]%, this term

25  generally has its plain and ordinary meaning.  Whether a

```
 1    lower claim is included depends on the context of the exact
 2    claim.
 3              Includes [X]%, that means the term means the same as
 4    comprises [X]%.
 5              The next is a sequence number.  You might remember
 6    that when the patents were being reviewed, it had S-E-Q ID
 7    number so and so, like 60-something or 100-something.  That
 8    means sequence ID number, but it's abbreviated.  No
 9    construction is necessary; this term means what it says.
10              The next term is "operably linked to one or more
11    promoters that are capable of directing expression in the
12    cell/seed."  This term requires no construction.
13              The next is "a desaturate or an exogenous
14    desaturate."  This term has its plain and ordinary meaning.
15              Let me see counsel at the bench.
16              (The following was heard at the sidebar:)
17              THE COURT:  I don't know how this instruction got
18    through.  Nobody amended it.  It doesn't include any of the
19    definitions that I gave which are in the materials that the
20    jury has.  We'll just have to do this instruction over.
21              Josh, this has to have the definitions that were
22    given to the jury.  Do you have access to those?  Do you have
23    the jury book?
24              THE LAW CLERK:  I have the jury book right here.
25              THE COURT:  This has to be changed right now.
```

2024

1          THE LAW CLERK:  Judge, my book does not contain the

2    defined terms.

3          THE COURT:  Aren't the definitions in the book?

4          THE LAW CLERK:  Claim construction number 14.  So

5    which ones are we discussing?

6          THE COURT:  Let me look at that.

7          THE LAW CLERK:  This is an identical copy to what

8    the jury has.

9          THE COURT:  There should be another page here.

10          THE LAW CLERK:  Is it in the back?

11          THE COURT:  No.  That does not contain the claim

12    construction that I gave.  That's wrong.  You're going to

13    have to find the claim constructions that I gave somewhere.

14          THE LAW CLERK:  Okay.  I'll pull them.

15          THE COURT:  Is that the way it is in all the jury

16    books?  Because if it is, it's wrong.

17          (The following was heard in open court:)

18          THE COURT:  Sorry, ladies and gentlemen, but the

19    chart that is in your jury book is the same chart that is in

20    that instruction, and I'm now investigating it, because it

21    appears that your chart in the jury book is not complete.

22          So we have to make that correction first to your

23    jury book and then insert it in the instruction.

24          Counsel can be working on that at the same time Josh

25    is.  It's wrong in the jury book.  It's only one page long.

Carol L. Naughton, Official Court Reporter

1        It leaves out a number of constructions.

2               All right.  We'll move on.

3               This case involves two types of patent claims:

4        independent claims and dependent claims.  An independent

5        claim sets forth all the requirements that must be met in

6        order to be covered by that claim.  Thus, it is not necessary

7        to look at any other claim to determine what an independent

8        claim covers.

9               In this case, for example, claim 1 of the '880

10       patent is an independent claim.  The remainder of the claims

11       in the '880 patent are dependent claims.  A dependent claim

12       does not itself recite all of the requirements of the claim

13       but refers to another claim for some of its requirements.  In

14       this way, the claim depends on another claim.  A dependent

15       claim incorporates all the requirements of the claim to which

16       it refers.

17              Here, claim 2 depends from claim 1.  The dependent

18       claim then adds its own additional requirements.  To

19       determine what a dependent claim covers, it is necessary to

20       look at both the dependent claim and any other claim to which

21       it refers.  A product that meets all the requirements of both

22       the dependent claim and the claim to which it refers is

23       covered by that dependent claim.

24              If that sounds confusing, remember you'll have it to

25       read in the jury room, so you can straighten out that meaning

1   in your own mind.  What it means is that claim 1 stands all
2   by itself as its own independent requirement.  That's called
3   an independent claim.  A dependent claim is an addition to
4   claim 1, such as claim 2, which adds a requirement.  But
5   claim 2 incorporates all the claims in claim 1, plus what it
6   says, if that's any clearer than what I read to you.
7           As I did at the start of the case, I will first give
8   you a general summary of each side's contentions in this
9   case.  I will then provide you with detailed instructions on
10  what each side must prove to win on each of its contentions.
11          As I previously told you, proponents alleged
12  opponents by making, using, selling, offering for sale in the
13  past and in the future the seeds, oils, and plants containing
14  what is called elite event LBFLFK --
15          Okay.  We've heard initials that mean something,
16  like PUFA, which means polyunsaturated fatty acid.  All
17  right.  This line of letters means nothing.  It's just an
18  arbitrary group of letters that somebody picked by computer
19  or something.  But, anyway, they're not an abbreviation for
20  anything.
21          -- including plant lines by the name of -- and these
22  don't have any meaning other than for identifying
23  something -- 17PH9093, 17PH9095, 17PH9096.  All of these
24  plant lines and the elite event are alleged to infringe the
25  following claims.

```
 1              Okay.  Group A.  Remember we talked about Group A,
 2    B, D, and E.  I don't remember any Group C, but we talked
 3    about Group A, B, D, and E.  I'm only going to give you the
 4    last three numbers of the patent, because that's how we've
 5    been referring to them.
 6              Group A contains claim 1 and claim 33 of patent
 7    '357.  Secondly, it contains claim 5 of patent '579.  Third,
 8    it contains claim 5 of patent number '033.  Four, it contains
 9    claims 2 and 10 of patent number '880.
10              All right.  Moving on to Group B, which is a group
11    of one, it contains patent number '792.
12              Group D, also a group of one, contains claim 20 of
13    patent number '541.
14              And Group E contains claim 1 of patent number '084.
15              I will refer to these claims collectively as the
16    asserted claims and the patents collectively as the
17    patents-in-suit.
18              BASF's elite event, LBFLFK, and Cargill's plant
19    lines 17PH9093, 17PH9095, and 17PH9096 are the products
20    accused of patent infringement.  I will refer to these
21    products collectively as "the accused products."
22              Opponents argue that the asserted claims are invalid
23    or unenforceable.  The opponents also argue that the accused
24    patents do not infringe claim 20 of the '541 patent.  It is
25    your job to decide whether the asserted claims of the
```

```
 1   patents-in-suit are infringed by the accused products and are
 2   valid and enforceable.
 3          All right.  Now, instruction 20 contains a further
 4   description of the patents and tells you something about how
 5   to find them in your book.  And I'm not going to read all the
 6   numbers, because you're going to have all the numbers in the
 7   instruction which is given to you.
 8          All right.  Before you decide whether the
 9   proponents' -- CSIRO, Nuseed, and GRDC -- patents are invalid
10   or whether BASF and Cargill has infringed the claims of these
11   patents, you will have to understand the patent claims.  The
12   patent claims are numbered sentences at the end of the
13   patent.  The patent claims here are -- and we've got the
14   exact page to go to, and, in addition to that, these
15   assembled claims are highlighted in blue, I hope, in the
16   copies of the patent contained in your binders.
17          The yellow claims highlighted in the copies of your
18   binders are not themselves asserted but are claims from which
19   an asserted claim depends.
20          Now, remember, if it's a dependent claim, then it's
21   included in any claim which depends on it.  So if you have a
22   dependent claim, you must look at both the dependent claim
23   and the independent claim on which it depends to get all of
24   the requirements of the claim.
25          These claims are intended to define in words the
```

1   boundaries of the inventors' rights.  Only the claims of the

2   patent may be infringed.  Neither the written description nor

3   the drawings of a patent can be infringed.  Each of the

4   claims must be considered individually.  You must use the

5   same claim meaning for both your decisions on infringement

6   and your decisions on invalidity and enforceability.

7           To determine infringement under claim 20 of the '541

8   patent, you must compare each of the accused products with

9   that claim using the Court's instructions as to the meaning

10  of the claim.  A patent claim is infringed only if one or

11  more of opponents' accused products include each and every

12  element or method step in the patent claim under

13  consideration.

14          If opponents' accused products do not contain one or

15  more elements or method steps recited in the claim being

16  considered, then the respective company does not infringe

17  that claim.  The accused products should be compared to the

18  invention described in the patent claim if it is alleged to

19  infringe.

20          The accused products should not be compared to the

21  embodiments of proponents' patent in determining

22  infringement.  The same element or method step of the accused

23  product may satisfy more than one element of a claim.

24          The question is, "What about Group C, patent '346,

25  claim 13?"

1          That patent is no longer part of the case.  Somebody

2     is very observant, but that patent is no longer part of the

3     case.

4          BASF and Cargill contend that the claims of the

5     patent at issue are invalid because the claimed inventions

6     are obvious.  A claimed invention is obvious if it would have

7     been obvious to a person of ordinary skill in the art of the

8     claimed invention as of the date of invention.

9          What instruction number is that?

10          THE CLERK:  22.

11          THE COURT:  Prior art to all of the patents-in-suit

12     may include items that were publicly known or that had been

13     used or offered for sale, publication, or patents that

14     disclosed the claimed invention or elements of the claimed

15     invention.  To be prior art, the item or reference must have

16     been made, known, used, published, or patented either before

17     the invention was made or more than one year before the

18     filing date of the patent application.  However, prior art

19     does not include a publication that describes the inventor's

20     own work and was published less than one year before the date

21     of the invention.

22          The date of invention is either when the claimed

23     invention was reduced to practice, which can be the date the

24     invention was fully described in a patent application that

25     led to the asserted claim, was filed, sometimes referred to

1    as a constructive reduction to practice, or when conceived,

2    provided the inventor was diligent in reducing the invention

3    to practice.

4         Diligence means working continuously but not

5    necessarily every day.

6         Conception is the mental part of an inventive act,

7    that is, the formation in the mind of the inventor of a

8    definite and permanent idea of the complete and operative

9    invention as it is thereafter to be applied in practice, even

10   if the inventor did not know at the time that the invention

11   would work.

12        Conception of an invention is complete when the idea

13   is so clearly defined in the inventor's mind that if the idea

14   were communicated to a person having ordinary skill in the

15   field of technology, he or she would be able to reduce the

16   invention to practice without undue research or

17   experimentation.  The requirement does not mean that the

18   inventor has to have a prototype built or actually explain

19   his or her invention to another person, but there must be

20   some evidence beyond the inventor's own testimony that

21   corroborates the date on which the inventor had the complete

22   idea.

23        Conception may be proven when the invention is shown

24   in its complete form by drawings, disclosure to another

25   person, or other forms of evidence presented at trial.

1              A claimed invention is reduced to practice when it

2    has actually been constructed, used, or tested sufficiently

3    to show that it will work for its intended purpose or when

4    the inventor files a patent application.  An invention may

5    also reduce to practice, even if the inventor has not made or

6    tested a prototype of the invention, if it has been fully

7    described in the filed patent application.

8              What qualifies as prior art on whether a patent

9    properly claims priority back to its initial application or

10   the prior invention date of the patented claim, if proven.

11   Therefore, different patents may have different priority

12   dates.  In this case, the opponents, BASF and Cargill, claim

13   the following items of prior art:

14             As to the '579, '357, '033, and '880 patents, Olga

15   F. Sayanova and Jonathan A. Napier --

16             All right.  This next word requires a little study

17   to pronounce.

18             MR. DAVIS:  Aikosa Penta Einoic.

19             THE COURT:  What?

20             MR. DAVIS:  Aikosa Penta Einoic --

21             THE COURT:  -- acid, biosynthetic roots, and the

22   potential for synthesis in transgenic plants,

23   65 Phytochemistry 147-158, 2004, which is later referred to

24   as Sayanova 2004.

25             Mercifully, I won't have to try to read that word

1    again.

2             Frederic Domergue, et al., Acyl Carriers Used As

3    Substrates By the Desaturase and Elongases Involved in Very

4    Long-Chain Polyunsaturated Fatty Acid Biosynthesis

5    Reconstituted in Yeast, 278 (37 J Biol Chem.) 35115 to 35126,

6    2003, which is called Domergue 2003.

7             C, Production of Very Long Polyunsaturated Fatty

8    Acids in Oilseed Plants, International Publication No.

9    WO2004/071467, which is called Kinney 2004.

10             As to the '792 patent, Sayanova 2004 and Kinney

11   2004.

12             The first factor in deciding obviousness based on

13   prior art includes the following items introduced during the

14   trial.

15             Now, I just told you that two of those apply to the

16   '792 patent, and all three are claimed by the opponents to

17   apply to '579, '357, '033, and '880.

18             All right.  The first factor in deciding obviousness

19   based on the prior art includes the following items, the ones

20   I just read:  Sayanova, which is identified as Joint

21   Exhibit 39; Domergue, which is described as Joint Exhibit 66;

22   Kinney, which is described as Joint Exhibit 67.

23             Joint Exhibit is JX.  That's the way the exhibit is

24   marked.

25             A prior art reference may be considered if it

discloses information designed to solve any problem or need addressed by the patent.  A prior art reference may also be considered if it discloses information that has obvious use beyond its main purpose and if a person of ordinary skill in the art would reasonably examine that reference when trying to solve any problem or need addressed by the patent.

The second factor you must analyze is whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art as of the dates in the third factor.  Those are the dates of application or invention, and I'll give them to you later.

Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the claimed invention as a whole and not merely some part of it.

In analyzing the relevance of the differences between the claimed invention and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the claimed invention.  You may consider the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention.

For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill

1    in the art at the time of the invention, then this evidence

2    would make it more likely that the claim was obvious.

3          On the other hand, if the combination of known

4    elements yielded unexpected or unpredicted results, or if the

5    prior art teaches away from combining the known elements,

6    then this evidence would make it more likely that the claim

7    successfully combined those elements and was not obvious.

8          Importantly, a claim is not proven obvious merely by

9    demonstrating that each of the elements was independently

10   known in the prior art.  Most, if not all, inventions rely

11   upon building blocks long known and claimed discoveries,

12   almost of necessity, will likely be combinations of what was

13   already known.  Therefore, you should consider whether a

14   reason existed at the time of the invention that would have

15   prompted a person of ordinary skill in the art in the

16   relevant field to combine the teachings in the way the

17   claimed invention does.

18          The reason would come from the prior art, the

19   background knowledge of one of ordinary skill in the art, the

20   nature of the problem or need to be addressed, market demand,

21   or common sense.  If you find that a reason existed at the

22   time of the invention to combine the elements of the prior

23   art to arrive at the claimed invention and there would have

24   been a reasonable expectation of success for doing so, this

25   evidence would make it more likely that the claimed invention

1    was obvious.

2          Similarly, you may consider the possibility that a

3    reference teaches away from the claimed invention.  A

4    reference teaches away from the invention when it would have

5    discouraged a person of ordinary skill in the art, as of the

6    dates in the third factor, from practicing the claimed

7    invention or when such a person would be led in a different

8    direction when practicing the claimed invention.  You must

9    undertake this analysis separately for each claim that

10   opponents contend is obvious.

11         The third factor provides that the question of

12   invalidity of a patent is determined from the perspective of

13   a person of ordinary skill in the art in the field of the

14   claimed invention as of the dates below.

15         Remember, we said in the prior instruction that you

16   had to consider the dates in the third factor.  These are the

17   dates you have to consider.

18         Claim 5 of the '579 patent, claim 5 of the '033

19   patent, claims 1 and 33 of the '357 patent, and claims 2 and

20   8 of the '880 patent, the date is in dispute.  BASF/Cargill

21   assert that the date should be no earlier than April 2, 2004.

22   CSIRO, Nuseed, and GRDC, the proponents, assert that the date

23   for claim 1 of the '357 patent and claim 2 of the '880 patent

24   should be February of 2003.  Claim 4 of the '792 patent, the

25   date should be no earlier than November 18, 2008.

1          When determining the level of ordinary skill in the
2     art, you should consider all of the evidence submitted by the
3     parties including evidence of, number one, the level of
4     education and experience of persons actively working in the
5     field as of the dates listed above, including the inventors
6     and the scientists employed by the proponents and opponents;
7     two, the types of problems encountered in the art as of the
8     dates listed above; and, three, the sophistication of the
9     technology in the art as of the dates listed above, including
10    the rapidity with which innovations were made in the art as
11    of the dates listed above.
12         The fourth factor provides that before deciding the
13    issue of obviousness for each claimed patent of the patents
14    at issue, you must also consider certain factors which may
15    help to determine whether the invention would have been
16    obvious.  No factor alone is dispositive, and you must
17    consider the obviousness or nonobviousness of the invention
18    as a whole.
19         Certain of these factors include:  Were CSIRO,
20    Nuseed, and GRDC's products covered by the claim commercially
21    successful due to the merits of the claimed invention rather
22    than due to advertising, promotion, salesmanship or features
23    of the product other than those found in the claim?
24         Two, was there a long-felt need for solution to the
25    problem facing the inventors which was satisfied by the

1    claimed invention?

2         Three, did others try but fail to solve the problem

3    solved by the claimed invention?

4         Four, did others copy the claimed invention?

5         Five, did the claimed invention achieve unexpectedly

6    superior results over the closest prior art?

7         Six, did others in the field or other opponents

8    praise the claimed invention or express surprise at the

9    making of the claimed invention?

10        Did others accept licenses under the patents at

11   issue because of the merits of the claimed invention?

12        Answering all or some of these questions "Yes" may

13   suggest that the claim was not obvious.  These factors are

14   relevant only if there is a connection or a nexus between the

15   factor and the invention covered by the patent claims.

16        Even if you conclude that some of the above factors

17   have been established, those factors should be considered

18   along with all the other evidence in the case, determining

19   whether the opponents have proven that the claimed invention

20   would have been obvious.

21        There are also factors which can support obviousness

22   in the invention.  For example, independently made,

23   simultaneous inventions are evidence that the claimed

24   invention was the product of one of ordinary skill in the

25   art.

1              The patent law contains certain requirements for the

2    part of the patent called the specification.  BASF and

3    Cargill, the opponents, contend that the claims at issue are

4    invalid because the specification of the patents at issue do

5    not contain an adequate written description of the invention.

6    To succeed, opponents must show by clear and convincing

7    evidence that the specifications fails to meet the law's

8    requirement for written description of the invention.

9              In the patent application process, the applicant may

10   keep the originally filed claims or change the claims between

11   the time the patent application is first filed and the time a

12   patent is issued.  An applicant may amend the claims or add

13   new claims.  These changes may narrow or broaden the scope of

14   the claims.  The written description requirement ensures that

15   the issue claimed corresponds to the scope of the written

16   description that was provided in the original application.

17             In deciding whether the patent covers this written

18   description requirement, you must consider the description

19   from the viewpoint of a person having ordinary skill in the

20   field of technology of the patent when the application was

21   filed.  The written description requirement is satisfied if a

22   person having ordinary skill, reading the original patent

23   application, would have recognized that it describes the full

24   scope of the claimed invention, as it is finally claimed in

25   the issued patent, and the inventor actually possessed that

1    full scope by the filing date of the original application.

2           The written description requirement may be satisfied

3    by any combination of the words, structures, figures,

4    diagrams, formulas, or other similar descriptive information

5    contained in the patent application.  The full scope of a

6    claim or any particular requirement in a claim need not be

7    expressly disclosed in the original patent application if a

8    person having ordinary skill in the field of technology of

9    the patent at the time of filing would have understood that

10   the full scope or missing requirement is in the written

11   description in the specification of the patent.  The written

12   description requirement does not require proponents to prove

13   to the skilled reader that the invention worked.

14          An inventor may file continuation patent

15   applications.  A continuation patent application is an

16   application that claims priority to an earlier filed patent

17   application, which is referred to as the original patent

18   application for the parent patent application.

19          Continuation patent applications must share the same

20   specifications, as well as inventors, as the original patent

21   application.  Thus, continuation patent applications receive

22   the benefit of the invention date of the original patent

23   application, and any new claims must be supported by the

24   specification from the original patent application.  Any

25   patent that ultimately issues from a continuation patent is

1    subject to the same period of patent protection as the patent

2    that issues from the original patent application.

3         There is nothing improper, illegal, or inequitable

4    about filing a continuation patent application in order to

5    obtain the right to exclude a competitor's product from the

6    market or to amend or insert claims intended to cover a

7    competitor's project that the application or its attorney

8    have learned about during the prosecution of a patent

9    application.

10        The fact that a patent is a continuation patent does

11   not render it inherently more likely to fail the written

12   description requirement, and it does not change the burden of

13   proof with respect to invalidity.  However, it is improper to

14   file such additional or amended claims if they are based upon

15   information obtained in violation of a legal duty.

16        On March 1, 2008, BASF and CSIRO entered into a

17   contract, the Materials Transfer and Evaluation Agreement, or

18   MTEA, in order to collaborate to jointly evaluate their

19   respective genetic developments to see if there were options

20   for further enhancing the levels of omega-3 fatty acids in

21   canola.

22        Although the MTEA contract terminated by its terms

23   in 2010, several provisions survived the termination; that

24   is, several requirements of the MTEA continued to bind the

25   parties, even though the contract terminated and they were no

1   longer working together.

2          Among the provisions that continued to bind the

3   party after the termination of the MTEA contract are the

4   ownership provisions.  In order to succeed in their ownership

5   claim, BASF must show by a preponderance of the evidence that

6   there was a legally enforcing obligation between CSIRO and

7   BASF, that CSIRO breached that obligation, that BASF is

8   entitled to a remedy as a result, and that the appropriate

9   remedy is co-ownership of CSIRO's patents.

10          CSIRO denies it breached the contract.  Under the

11  MTEA, BASF and CSIRO retained ownership of their separate

12  materials, even if they were shared under the MTEA, and could

13  use their own materials for their own purposes outside the

14  MTEA, but during the collaboration under the MTEA contract,

15  jointly treated new generic materials, jointly created

16  genetic lines, and joint research results were jointly owned

17  by BASF and CSIRO immediately upon their creation.

18          If you find from a preponderance of the evidence

19  that any such genetic materials, genetic lines, or research

20  results were incorporated into any of the asserted patents,

21  then BASF is a co-owner of such patent, and you must find

22  that the opponents do not infringe upon any such patent.

23          All right, ladies and gentlemen.  That completes the

24  Court's instructions.  I will have a brief instruction for

25  you after the attorneys finish their argument, but it's time

Carol L. Naughton, Official Court Reporter

2043

```
 1    for our morning break, so you may step into the jury room for
 2    your recess.
 3              (The jury exited the courtroom.)
 4              MR. DAVIS:  Your Honor, whenever the Court is ready,
 5    I need to raise one point.
 6              THE COURT:  Well, instruction number 17 does not
 7    contain any of the Court's constructions, and I know that
 8    some of the constructions I made as a result of the Markman
 9    hearing were rendered obsolete by the patents that the
10    proponents chose to assert, but I know that there was one in
11    there about -- the one you wanted me to reconsider, about
12    the --
13              MR. ZAHEER:  The vertebrate limitation?
14              THE COURT:  Huh?
15              MR. ZAHEER:  The vertebrate issue?  Yes.
16              THE COURT:  Is that included in any of the patents?
17              MR. ZAHEER:  It is.  It says -- it's the term on the
18    page that refers to an Acyl-CoA desaturase.  That is in the
19    patents that are asserted.
20              Your Honor, we've -- taking the Court's
21    instructions, we've gone through and proposed a revision to
22    the table that does two things:  One, takes out sort of the
23    legal commentary that was in the chart; and, number two,
24    looks at the agreed glossary or definition of terms that the
25    parties came up with and just inserts those in the relevant
```

1    places.  And I can hand up -- hand that up to Your Honor.

2           THE COURT:  All right.  Well, they should be in the

3    jury's book, too.

4           MR. ZAHEER:  Yes, those are in the jury's book, as I

5    understand it.

6           THE COURT:  They are?  Well, we didn't find them

7    when we looked for them.

8           MR. DAVIS:  While counsel is conferring behind me,

9    Your Honor, Your Honor got two paragraphs into instruction

10   number 22 and then made an edit to "cutoff date" and changed

11   that to "date of invention," and then I think Your Honor

12   passed that instruction to Mr. Lang.  I just wanted to point

13   out that further down in 22 the words "cutoff date" appear

14   two more times, so Your Honor may need to make that

15   additional change in those other places.

16          THE COURT:  Instruction number 22?  I think that's

17   one that we made another correction in.

18          MR. DAVIS:  So that in instruction 22 the second

19   sentence that ended in "person of ordinary skill in the art

20   of the claimed invention as of the cutoff date," Your Honor

21   red-lined "cutoff date" and read "invention," which is fine,

22   but the words "cutoff date" appear at the end of the

23   subsequent paragraph and also appear in the line --

24          THE COURT:  So we should change that to "date of

25   invention"?

2045

```
 1          MR. DAVIS:  And also at Line 3.
 2          THE COURT:  Wait a minute.  Let me deal with one at
 3     a time.
 4          MR. DAVIS:  Yes, sir.
 5          THE COURT:  That should be as of the date of
 6     invention.  I've changed it.  There's one in the second
 7     sentence, and I'm now changing the one in the third paragraph
 8     as to "the date of invention."
 9          MR. DAVIS:  And then it appears one other time at
10     the arabic number 3 at the end of that line, as well.
11          THE COURT:  Okay.  All right.  Now --
12          MS. FLANAGAN:  Your Honor, I -- on the claim
13     construction, what was --
14          THE COURT:  I'm sorry?
15          MS. FLANAGAN:  Your Honor, proponents just handed up
16     a revision on the claim construction that is still not
17     accurate.  I have hand marked what needs to stay.
18          THE COURT:  Well, do the proponents agree with your
19     change?
20          MR. ZAHEER:  My understanding is that opponents are
21     indicating that there are some terms that were omitted from
22     what I handed up to you, and I believe that they were omitted
23     from the earlier chart, as well.  And so I believe that we're
24     fine with reinserting those, the ones that were omitted.  I
25     think we're just checking to make sure that we agree on
```

1    everything.

2              THE COURT:  Okay.

3              (There was a pause in the proceedings.)

4              MR. ZAHEER:  So, Your Honor, we are in agreement

5    about -- there, I think, are three terms that were pulled off

6    the list that should not be pulled off the list.

7              THE COURT:  And we also should have the definitions.

8              MR. ZAHEER:  Yeah, so the terms are there, and then

9    the Court's construction is there, and I don't think any of

10   these require additional definitions from the glossary.  It's

11   just three items that --

12             THE COURT:  Is the glossary of definitions in the

13   jury's book?

14             MR. ZAHEER:  Yes, it is.  It's called "List of

15   Defined Terms," I believe.

16             THE CLERK:  Yes, sir.  It's on tab 1.  Yes, sir,

17   it's right here.  Tab 1.  It's a list of defined terms.

18             THE COURT:  Okay.

19             MR. ZAHEER:  And so I think we can just hand this up

20   to Mr. Lang, perhaps, and we'll get those back in.

21             We're happy to address it with Mr. Lang, as well, if

22   that would be helpful.

23             THE COURT:  All right.  You want to add "promoter"?

24   "Seed preferred promoter" should be in there.

25             MS. FLANAGAN:  Correct.

1           THE COURT:  And "promoter" -- this promoter language
2    goes with the statement, "This term requires no
3    construction."  That is in there, right?  Where it says,
4    "Promoter, a DNA sequence that determines..." that's supposed
5    to be in there?
6           MR. ZAHEER:  So that's the definition from the
7    glossary.  We had understood Your Honor wanted to include
8    what you had called decoding the jargon in there for the
9    jury's benefit.
10          THE COURT:  All right.  Then we should have the
11   "desaturase" definition, with two of the definitions beside
12   it.  You want those in there?
13          MR. ZAHEER:  It's Your Honor's preference.  The
14   actual construction of the Court is what is provided at the
15   top, and if it's Your Honor's preference to include the
16   glossary definition, that's what we understood you wanted us
17   to do, and so that's why that's included.
18          THE COURT:  Well, I think it makes sense to do that.
19          MR. ZAHEER:  And we're fine with that.
20          THE COURT:  Okay.
21          MS. FLANAGAN:  Same for opponents.
22          (There was a pause in the proceedings.)
23          MR. ZAHEER:  Your Honor, "includes" is actually not
24   in any of the asserted claims, so I think the easiest
25   resolution may be just to remove the "includes" line.

```
 1              THE COURT:  Do you agree with that, remove the
 2    "includes" line?
 3              MS. FLANAGAN:  We can remove the "includes" line.
 4              THE COURT:  All right.  Now, this -- what's
 5    contained in this instruction -- of course, this goes at the
 6    end, too, that one little paragraph.  We need a copy of this
 7    for each of the jury books, right?
 8              All right.  Well, that stipulated construction
 9    should go in there, too, right?
10              MS. FLANAGAN:  We have --
11              THE COURT:  The stipulated construction where it
12    says, "Brassica plant" --
13              MS. FLANAGAN:  Right.
14              THE COURT:  -- that goes in there?
15              MS. FLANAGAN:  Correct, as well as the "about."
16              THE COURT:  Okay.  We'll take a 15-minute break.
17              (Recess from 11:49 a.m. to 12:16 p.m.)
18              MR. ZAHEER:  Your Honor, we also prepared a revised
19    version of the chart that's agreed between the parties.  It's
20    probably the same thing as what I'm being handed.
21              THE COURT:  Did you pass them back their model, too?
22              THE LAW CLERK:  Yes, Judge.
23              THE COURT:  Okay.  Well, just make sure that the
24    instruction comports with the model.  Does it?
25              MR. ZAHEER:  I think we're checking right now, but I
```

```
 1    can hand this up, as well, if that's more efficient.
 2            I'm told that it may not be the same.  While we're
 3    looking at that, I also wanted to go back to instruction
 4    number 22 and just alert the Court that you didn't finish
 5    reading the instruction.  You only read the first two
 6    paragraphs but not the remainder of 22.
 7            THE COURT:  All right.  Okay.
 8            (The jury entered the courtroom.)
 9            THE COURT:  All right, ladies and gentlemen.  You'll
10    recall that I was reading what is instruction number 17 to
11    you when I discovered it was missing some parts.  Okay.  The
12    parts that are missing are the last tab in your jury book.
13    I'm having those duplicated now, and you can substitute what
14    I'm giving you for the last tab in your jury book, because
15    that's incomplete.  And that's the reason why the instruction
16    was incomplete, so I'm going to reread part of the
17    instruction for you.  And when we finish duplicating it, I'm
18    going to give you a replacement for the last tab in your
19    book, which are definitions that appear in the patent terms.
20            And so this is instruction 17:
21            The Judge will now explain to you the meaning of
22    some of the words of the claims in this case and explain some
23    of the requirements of the claims.  You must accept these
24    definitions of these words in the claims as correct.  For any
25    words in the claim for which you are not provided with a
```

1    definition, you should apply their common meaning.

2         In other words, I didn't write a definition of any

3    terms.  We only defined those terms which we felt like needed

4    defining, which were not that many, actually.

5         You should not take the definitions of the language

6    of the claims as an indication that the Judge has a view

7    regarding how you should decide on the issues that you are

8    being asked to decide, such as infringement, invalidity, and

9    enforceability.  These issues are yours to decide.  The

10   meanings of the words and the groups of words from the patent

11   so provided are as follows.  And we have the chart.

12        Now, I'm not going to try to read the chart to you

13   because it would just be confusing just to read it.  You have

14   to look at it.

15        And then at the end of the chart it says, the use of

16   the term plain and ordinary meaning or common meaning, with

17   respect to the Court's claim construction in the case, refers

18   to the meaning of a term as viewed from the perspective of a

19   person having ordinary skill in the art.  So that's the way

20   you should interpret these terms -- and all the terms -- in

21   the patents.

22        Now, let's go to instruction 22.  Now, there was

23   a -- I didn't read the entire instruction to you because

24   there were some typographical errors in the instruction, so

25   I'll reread instruction 22.

1              BASF and Cargill contend that claims of the patent

2    at issue are invalid because the claimed inventions are

3    obvious.  A claimed invention is invalid as obvious if it

4    would have been obvious to a person of ordinary skill in the

5    art of the claimed invention as of the date of invention.  In

6    deciding obviousness, you must avoid using hindsight; that

7    is, you should not consider what is known today or what was

8    learned from the teachings of the patent.  You should not use

9    the patent as a road map for selecting and combining terms of

10   prior art.  You must put yourself in the place of a person of

11   ordinary skill in the art as of the date of invention.

12             The following factors must be evaluated to determine

13   whether BASF and Cargill have established that the claimed

14   invention is obvious:  The scope and content of the prior art

15   relied upon by BASF and Cargill.

16             Number 2, the differences, if any, between the

17   claimed invention of the patents at issue that BASF and

18   Cargill contend is obvious and the prior art.

19             Number 3, the level of ordinary skill in the art as

20   of the date of the invention.

21             And, number 4, additional considerations, if any,

22   that indicate that the invention was obvious or not obvious.

23             Each of these factors must be evaluated, although

24   they may be analyzed in any order, and you must perform a

25   separate analysis for each of the claims.  I will now explain

```
 1    each of the claims in the four patents in more detail, which
 2    I did in the following instructions.
 3            So that is all of instruction number 22.  I have
 4    your question here, and you want to know if you can leave as
 5    soon as closing arguments are completed because you have
 6    family obligations with respect to Halloween.  The answer to
 7    that is, "Yes."  When the closing arguments are over, we may
 8    adjourn, and you can come back tomorrow morning and begin
 9    your deliberations.  It's not on your own.  You said can you
10    do it on your own tomorrow morning.  You may not begin your
11    deliberations until you're convened in the courtroom and the
12    Court says, "Please retire and begin your deliberations."
13    That's to prevent any accident, such as talking about the
14    case before all the jurors are not present, or whatever.  So
15    don't talk about the case until the Court calls you in and
16    then you adjourn to the jury room to begin your
17    deliberations.
18            All right.  We're now going to begin with the
19    closing arguments beginning with the proponent.
20            MR. NG:  May it please the Court.
21            Ladies and gentlemen of the jury, good afternoon.
22    Again, I'm Michael Ng, representing the proponents, CSIRO,
23    BASF -- sorry -- CSIRO, GRDC, and Nuseed.
24            On behalf of all of our team, on behalf of our
25    clients, and on behalf of the opponents, we want to say thank
```

1    you.  Serving on a jury is an extremely important public

2    service, but we recognize that it's a sacrifice; that it's

3    taking you away from your families, from your friends, from

4    your jobs, and we recognize that that's a burden, and we

5    appreciate your time, and we certainly appreciate your

6    attention.  That's been noticed, and we want to take that

7    into account and say thank you.

8         We've learned a lot over the last three weeks, and I

9    think one of the things that we all agree on is that this

10   technology is groundbreaking.  Mr. Zacharias said, on the

11   first day of testimony, that it's a game-changer.  The world

12   is running out of omega-3 fatty acids, and this technology

13   will fix that.  It's important because it's going to relieve

14   the pressure on our oceans, on the wild fish that live there,

15   and it's going to help us grow healthy, vibrant fish in a

16   farmed environment, and that's all going to provide a health

17   benefit for people of all ages.

18        There's been a race to solve this important problem.

19   CSIRO, Nuseed, GRDC, Cargill, BASF, they were all in the

20   race.  There were others in the race; Dow, DuPont, Monsanto.

21   Everyone wanted to teach plants to make omega-3 fatty acids,

22   to grow them in a crop, but one thing is undisputed.  CSIRO

23   was the first to get a patent on the invention that allowed

24   canola to grow omega-3s, to get all the way to DHA.  That's

25   undisputed, and that should be the end of the story.

1          That's how patents work.  You get a patent to

2     protect your technology, and if you win that race, you get

3     protection for a limited amount of time.  Those are the

4     rules.  That's the whole point of our patent system, and that

5     system is written right into our United States Constitution.

6          But rather than respect CSIRO's rights, BASF and

7     Cargill made a choice.  They decided to simply ignore CSIRO's

8     patents and move ahead with developing canola that they now

9     admit uses CSIRO's technology.

10         You heard that they were invited to try to work out

11    a deal with Nuseed, CSIRO's commercial partner, but they

12    didn't do that.  They never got permission.  Instead, they

13    filed this lawsuit, again, where they admit infringement but

14    offer up a smattering of after-the-fact excuses they hope

15    will convince you that it's okay to trample on our rights.

16         So now it's up to you.  Are BASF and Cargill going

17    to get away with it, or do they, too, have to play by the

18    rules?

19         Mr. Boles, can we put up slide 2, please?

20         Here's what you're going to be asked to decide.

21    Your Honor just instructed you.  The first issue is

22    infringement, validity, as two components, and then the issue

23    of ownership, co-ownership.

24         Let's take a quick look at these before we go

25    through them in detail over the next hour.

1           Let's start with infringement.  Infringement is our
2    burden, and it might be hard to believe there's anything easy
3    in this case, but this one is actually an easy one.  For six
4    of seven patents that are left in the case, they stipulate
5    that they infringe.  There's only one left, and Dr. Kunst
6    explained to you why there's infringement of that, and
7    Dr. Murphy didn't offer any opinions in opposition to that,
8    so we think that will be a relatively easy conclusion.
9           The rest of these are opponents' burden.  They have
10   to prove them to you.  For validity, they have to prove it by
11   clear and convincing evidence.  That's a higher burden.
12          So what do they say?  What are their excuses?  Well,
13   they said we mostly admit that we infringe, but the patents
14   aren't valid because they're obvious.  Well, if they were so
15   obvious, why did they, and all the other companies that were
16   working on it, not solve this problem back in the early
17   2000s, when CSIRO did?
18          All these other companies tried other approaches,
19   and they failed.  They certainly wanted it.  They wanted to
20   win the multi-billion-dollar race, but they didn't, because
21   it wasn't obvious.  And it wasn't obvious to BASF, either.
22   They said in opening that they were the first to get DHA in
23   plants, and it may be true that they got a smattering of DHA
24   in the leaves, maybe even a tiny bit in the seeds, but
25   there's no BASF patent that they've asserted as prior art.

1    In fact, they've admitted -- they've walked us through an
2    article that says that in 2005 they hadn't solved one of the
3    critical problems that the CSIRO patent solves.  That's the
4    bottleneck problem.  So even after we filed our patent, they
5    were still working on it.  They didn't have the blueprint.
6    They admit that.
7            Next opponents are going to say that the patents are
8    invalid because they lack what's called written description.
9    We've talked a lot.  We spent a lot of time in this trial
10   talking about whether CSIRO had proven that its invention
11   worked in canola prior to filing its invention.  That's not
12   relevant.  It's not relevant for the issue of written
13   description.
14           Your Honor just instructed you that it is not
15   relevant to written description to show, to prove in the
16   patent, that the invention works.  We're going to walk
17   through Dr. Kunst's testimony, where she points out where, in
18   the hundreds of pages of the specification, all of the
19   written description necessary to meet this requirement can be
20   found.
21           Finally, opponents are going to say that the patents
22   are unenforceable because they're co-owners under the MTEA,
23   the Material Transfer and Evaluation Agreement.  The reality
24   is that nothing BASF shared with CSIRO under the MTEA made it
25   into CSIRO's patents.  CSIRO's witnesses told you that, and

1    if you look closely at what BASF witnesses say, they'll tell
2    you that, too.  They know that.  They know the facts aren't
3    there.
4            You heard from Dr. Murphy, their expert, their
5    technical expert.  They could have asked him to go through
6    and look at the patents, look at the material that was shared
7    in the MTEA.  They didn't even ask him to do it.  Why not?
8    Because they know there's nothing there.
9            The claims -- at least with respect to the 2004
10   patents, the Group A patents, which are the first four that
11   you have, don't even make sense.  Those patents were filed in
12   2004, and CSIRO submitted its final application in 2005.
13   That means that forevermore the boundaries of that patent
14   were defiled; they couldn't be moved.  So it's impossible
15   that information that BASF gave them three years later, in
16   2008, somehow makes it a co-owner of those patents.  The
17   contract itself says, and BASF acknowledged, that the patent
18   applications were CSIRO's property.  It's what they went
19   into.  They agreed and they acknowledged that they don't own
20   them, and yet here we are today, in court, with them making
21   that exact claim.
22           Mr. Boles, can we go to the next slide, please?
23           There's a lot of variation, and the Court walked you
24   through some of it.  You're going to see this in the verdict
25   form, so it will make it a little easier for you.  I'd like

1    to share with you the summary here.

2            For infringement, all but one of the patents are

3    stipulated.

4            For validity, based on written description, they

5    aren't contesting Group D.  That's the '541 patent.

6            For obviousness, they're not contesting D or E.

7    That's the '541 and the '084.

8            There's some things that you don't have to decide.

9            Mr. Boles, can we go to the next one, please?

10           Co-inventorship.  At the beginning of the trial that

11   was an issue.  They're not claiming they are co-inventors

12   anymore.  That's been dropped.  That's fine, that's their

13   right, but it's not an issue that you have to decide,

14   co-inventorship.  The only thing you have to decide is

15   whether they are co-owners under the MTEA, under the

16   contract.

17           Anticipation.  It's a legal word, but what it means

18   is that the patents are invalid because there's a single

19   piece of prior art out there that has everything that the

20   invention has in it.  They're not making that claim.  They're

21   showing you three different pieces that they say you have to

22   put together to get to obviousness.  But there isn't a single

23   piece of prior art -- not a product, not an article, not a

24   patent, nothing -- that had everything that CSIRO's invention

25   has in it.

2059

1          Next is enablement.  Dr. Murphy was asked about
2     this.  Enablement has some aspects requiring that the patent
3     tell a reader how to make the invention work.  That's also
4     not an issue.  Their issue is written description, and for
5     written description, there is no requirement that the patent
6     owner show that it made the invention work.
7          Next is Nuseed's products.  We've heard a lot about
8     Nuseed's product.  That's also not relevant.  Whether Nuseed
9     is practicing the claims, that it's practicing every claim of
10    the invention, but that's not an issue that the jury needs to
11    decide, that you need to decide.
12         Finally, BASF's -- or, sorry, second-to-the-last --
13    BASF's high throughput transformation.  We've heard a lot
14    about that; that BASF taught CSIRO how to get the genes into
15    canola.  That's also not at issue anymore.  You don't need to
16    decide whether it was the high throughput transformation
17    techniques that were shared that created somehow some joint
18    results.  That's off the table.
19         And, finally, Group C.  The Group C patent is also
20    out of the case.  That's also something you don't need to
21    decide.
22         So let's walk through these issues.
23         The first issue is infringement.  Once again, most
24    of the claims are stipulated to, six of the seven patents, so
25    the only issue to be decided -- and this, again, will be

1    reflected on your verdict form, so it will be clear to you in

2    that -- is whether the '541 patent, claim 20 of the '541

3    patent, is infringed.

4            Now, again, Dr. Kunst walked us through that.  She

5    spent a lot of time, and she had a hard job at the beginning,

6    and we're grateful for your patience.  She had to teach us

7    about the technology, all of the details.  She had to go

8    first.  So we're grateful for your patience in listening to

9    that, but it's important to understand the technology and how

10   it works.  Because if you look at the details, you can see

11   why CSIRO's positions are correct.

12           Dr. Murphy put in testimony about why claim 20 of

13   the '541 patent is infringed.  We're going to take a look at

14   that in a second.  Dr. Murphy put in none, so on balance,

15   this is what you have to consider.

16           The issue with that claim is whether particular

17   levels of the oil are found, and really the only dispute is

18   this:  It's for the LFK, for the elite event, and the

19   evidence establishes that those levels were met for 2017.

20   The only issue is whether they were also met for 2018 and

21   2019, and you heard testimony.  You heard testimony that the

22   levels would be the same.

23           Again, Dr. Murphy didn't offer you any evidence in

24   contrary to what Mr. Horton said, and so we submit that this

25   would be a relatively straightforward analysis for this one

1    remaining infringement issue.

2         Next let's look at opponents' next excuse, validity.

3         Mr. Boles, can we go to slide 13, please?

4         Again, there are two components:  One is

5    obviousness, and the other is written description.  For both

6    of these opponents have the burden of proof, and it's not a

7    regular burden of proof, it's clear and convincing evidence.

8    If you find their case unclear, you can stop and answer on

9    the verdict form that the patents are valid.  If you find it

10   not convincing, you can stop and answer on the verdict form

11   that the patents are valid.

12        Why do we get this deference?  We get this deference

13   because the PTO looked at these, and under the law we're

14   entitled to deference because they're the experts who have

15   reviewed this.

16        Now, with respect to these patents, they've looked

17   at them very closely and for a long time.  Remember that for

18   the Group A patents, there are nine issued patents in the

19   group.  That meant that this went through the PTO nine

20   separate times, and they had the prior art in front of them.

21   Sometimes the PTO doesn't get the prior art.  They don't find

22   it, for whatever reason, nobody's seen it yet, so they don't

23   have it.  And the question is, do we go back and sort of

24   reconstruct what they might have done?  Did they make a

25   mistake?  Would they have done something different if they

1    knew about it?

2         That's not the case here.  The prior art was right

3    in front of them, and written description is something that

4    the PTO examiners are good at, because written description

5    requires that you look at the patent itself.  You compare the

6    claims, and you look to see whether there's written

7    description.  There's nothing outside that they need to look

8    at, so they had all the tools that they needed for written

9    description.  That's why we get the deference, and we submit

10   that they did not make a mistake on any of these multiple

11   times that they reviewed the patent.

12        So let's take a look at obviousness.

13        Slide 16, please, Mr. Boles.

14        Your Honor just said that you can apply two tools

15   that are very helpful as jurors.  And why we submit these

16   issues to jurors is because we're bringing together all of

17   your collective life experience and your collective common

18   sense.  Yes, these issues are highly technical, and, yes,

19   we've had to have explanations from people who have lived

20   their lives in these scientific fields, but at the end of the

21   day we submit them to the jury because it's your life

22   experience and your common sense that sifts through that, and

23   that's what our Constitution says how we decide these issues.

24        What is common sense, and what does real-life

25   experience say?  There were a lot of players in the race to

1    solve this problem; Cargill, Nuseed, Dow, the British
2    Consortium -- that's at the bottom of that -- Monsanto,
3    DuPont.  They all wanted to win this race.  A lot of
4    resources went into it on all sides.  Some people thought it
5    couldn't be done.  You heard Dr. Kunst say it was a pie in
6    the sky when she first heard about it.
7            They all tried different strategies, and they all
8    got -- most of them failed.  It wasn't obvious to them.  If
9    it had been obvious to them, they would have all converged on
10   this and would have all done this in the early 2000s.  They
11   tried, and they failed, and the ones who are succeeding are
12   the ones who are using CSIRO's invention.
13           So let's look at the prior art itself.  There are
14   only three pieces of prior art that have been asserted.
15   They've searched the world, they went to all these scientists
16   and all these people who live this every day, and these are
17   the three best that they could come up with.  And remember
18   again, there isn't a single one of these that discloses all
19   of what's in CSIRO's invention.  These are Sayanova, Kinney,
20   and Domergue.  Dr. Murphy admits, opponents admit, that each
21   one of those is missing a piece, so you have to put them
22   together.  That's the only way you get there.
23           Now, we're looking at this 20 years later,
24   approximately 20 years later, and looking back it may be
25   easier for us to see, okay, those are three you might put

1    together, but there's a lot of literature out there.  People
2    were studying them.  So we have to guard against what we call
3    hindsight bias; that in retrospect, out of all of the
4    different options that were available out there, that it's
5    easier now to see that you might pick three pieces and put
6    them together, but at the time people were looking at all
7    sorts of different pieces.
8           And you saw that all of those companies tried and
9    all those companies failed, because it wasn't obvious at the
10   time how to put these puzzle pieces together in this
11   particular way to create this particular blueprint, and it
12   wasn't -- again, it wasn't obvious to BASF.
13          Mr. Boles, can we go to slide 20, please?
14          BASF told us this.  Their own witness described this
15   paper, the Wu paper, in 2005.  In the Wu paper they say a low
16   level of DHA was produced, and it's because it might be due
17   to limitation in the host plant's ability to release EPA into
18   the Acyl-CoA pool.  That's this shuttling problem that we
19   show here.  That's the bottleneck.
20          How did CSIRO solve it?  They solved it using
21   Acyl-CoA type desaturases that worked on the green side,
22   taking you back to the very first day of trial.  They figured
23   out how to make it all work on the green side so you wouldn't
24   have to have the shuttling back and forth.  In 2005 BASF
25   wrote a paper and said that they hadn't solved this problem

1    yet; they simply didn't get there first, and it wasn't
2    obvious.
3              So let's look at what Dr. Murphy does have on his
4    list.
5              Let's go to slide 23, please, Mr. Boles.
6              Sayanova.  This paper is actually helpful to us
7    because it's a paper that takes a look at -- it doesn't
8    publish its own research, it takes a look at everything that
9    exists out there and sort of summarizes it.  And what does
10   Sayanova say?  It's skeptical about the possibility of this
11   problem being solved.  It points out that DHA had not yet
12   been solved; that it was a future goal.  And it doesn't point
13   out the use of the Acyl-CoA solution.  It doesn't have it in
14   there.  It's a survey.  It looked around to all the different
15   research that was being done, everything that was known, but
16   didn't find Acyl-CoA solution.
17             And you heard His Honor say -- talk about teaching a
18   way.  It actually says that using bifunctional desaturases,
19   the enzymes that work on two different points in the
20   pathway -- that that wasn't a good idea, that that shouldn't
21   be done.  That's teaching a way.  So, rather than teaching
22   about doing this, what CSIRO did, it says, no, that's
23   actually a bad idea.
24             Let's go to the next one, please, Mr. Boles.
25             Kinney.  This is the one that's in soybeans.  It's a

1    patent.  It's a patent that was assigned to DuPont.  It was
2    part of their research program.  DuPont never released a
3    product.  They were one of the ones who tried and failed.
4    And the results have never been duplicated.  You heard
5    Dr. Kunst say that they were unreliable.  She was talking
6    about the gene gun.  They've never been replicated.  It,
7    again, did not use the Acyl-CoA pathway, the expressway.  It
8    didn't use bifunctional desaturase at the delta-5 and
9    delta-6, and it never produced DHA in seeds.  These are
10   somatic embryos, if you will recall that.  So Kinney didn't
11   have all the pieces.
12            Let's go to the next.
13            Domergue wasn't even a piece of the blueprint.  It
14   was in yeast.  It was just a couple of steps; it wasn't a
15   whole chain.  He used human DNA.  As we know, it was off
16   limits.  And Domergue identifies the bottleneck as a problem
17   but doesn't have the solution.  In fact, if we look outside
18   of this and we look at what they said the next year, the same
19   authors, even the next year they said there's a bottleneck in
20   our approach.  They hadn't solved it, either.
21            And you know how we know that BASF didn't solve it?
22   Do you know how we know that it wasn't obvious to them?
23            Mr. Boles, can we go to 22, please?
24            There's no patent.  There's no BASF patent that's
25   cited as prior art.  You heard that patents are important to

1    them, you heard that it's part of their strategy.  If they
2    had fought to get there, if they were really the first ones
3    there, they would have gotten a patent.  There are no BASF
4    patents cited as prior art.
5              Now, we talked about how the Patent Office had
6    access to each of these three pieces of prior art.  They knew
7    about them.  They were in the patent.  Why would CSIRO do
8    that?  CSIRO did that because it wanted to explain to the
9    Patent Office why its invention was different, how it was an
10   improvement over the prior art.  That's why you discuss it.
11   They were very open.  All three of those were in there.
12             Mr. Boles, can we go to that slide where we show
13   that?
14             Over and over, Sayanova, Sayanova and Napier.  We've
15   got them all in there.  We asked Dr. Murphy about this, and
16   what did Dr. Murphy say?  He said that he didn't see Kinney
17   or Domergue in there at all.  And then my colleague asked him
18   the question.  He admitted, oh, yes, the patent also
19   discusses Kinney.  It also discusses DuPont.  They're in
20   there, the Patent Office had them, but Dr. Murphy didn't
21   study the patents closely enough to acknowledge that.
22             Now, Dr. Murphy is obviously a very credentialed
23   scientist, he's held a lot of important positions, but we
24   think we saw two different Dr. Murphys.  We saw Dr. Murphy on
25   direct who gave answers, spoke up, could be heard, and on

1    cross, we saw a different kind of Dr. Murphy.  He had a

2    different posture.  He didn't speak up.  He didn't speak

3    clearly.  There was a reason for that.  The reason for that

4    is because the opponents were asking him to do something that

5    he couldn't do, which is to support his findings with

6    evidence, with facts.  If you look at these articles, if you

7    look at these prior art references, what they say is in there

8    isn't there, and it wasn't obvious because BASF itself told

9    us it wasn't, showed us that it wasn't.

10           There's one more issue that you'll be asked to

11   address, and it affects two claims.  This is claim 1 of the

12   '357 and claim 2 of the '880.  Again, this will be in your

13   verdict form, so you don't have to memorize it now.  The

14   question on those is whether Dr. Singh came up with the

15   concept in February of 2003, when he had his light bulb

16   moment.

17           Now, he described in testimony that he had all the

18   pieces in the pathway, conceived that.  Now, remember

19   conception is an idea.  It was fixed in his head.  He

20   corroborated that in a piece of writing when he submitted his

21   application for funding for the program.  That was based on

22   him already having that idea.  And then we also saw lab

23   notebooks.  We saw an order for the zebrafish to get the

24   genes.  There's lots of written corroboration that shows both

25   that Dr. Singh had that idea and that between the time that

1    he had that idea and the time that he filed his patent

2    application, he was working diligently and continuously on

3    that.  That's why he brought Dr. Petrie into the project in

4    March, so that he could be unfettered to work on this

5    project.

6         So we submit that that conception happened in 2003,

7    and defendants have not offered any real evidence in

8    opposition to that.  And if you find that that's the correct

9    conception date for these two claims, you're entitled to

10   ignore the combinations of prior art which include

11   publications that came after that date.  That's the way the

12   rules work.

13        Now let's talk about written description.

14        And can I get a time check, please?

15        THE LAW CLERK:  49 minutes and 31 seconds.

16        MR. NG:  Thank you.  I'm at 49 minutes?

17        THE LAW CLERK:  49 minutes, 26 seconds.

18        MR. NG:  Let's talk about written description.

19   Again, written description does not require that the

20   proponents prove to the skilled reader that the invention

21   works.

22        These are voluminous disclosures, hundreds of pages.

23   All the information is in there.

24        Dr. Kunst -- there were three issues.  First, did

25   they disclose the use of canola?  The answer is yes.

1    Dr. Kunst walked you through that.  It's right there, first
2    on the list.  In fact, it says, more preferably, the oilseed
3    should be canola.  That was disclosed.
4           There's a reason that you use these big lists, and
5    the reason that you use these big lists is so that you can
6    have the benefit of all the different plants that this could
7    go into.  BASF did the exact same thing.  You saw that right
8    there.  Salad vegetables, artichoke, mango, it's all in
9    there.
10          Second, she said that -- or, sorry -- Dr. Murphy
11   said that it didn't disclose recombinant plant cells.  That's
12   sort of the opposite argument, that the list wasn't long
13   enough.  The list was long enough.  We just saw that.
14          She said that there weren't certain enzymes
15   disclosed.  And Dr. Kunst walked you through this.
16   Ostreococcus, right in there, in both places.
17   Thraustochytrium, right in there.  Pavlova lutheri, right in
18   there.  And then, finally, there's an allegation for the '084
19   that certain oil levels weren't disclosed.  She also showed
20   you exactly where those are, right in the table.
21          Now let's turn to co-ownership.  This is, in many
22   ways, the meat of this case, and it's a contract.  So let's
23   look closely at the contract.  Remember my colleague,
24   Mr. Menchel, described this as what's yours is yours, and
25   what's mine is mine.  It's only the joint materials that get

1    shared.

2         CSIRO's new materials are the constructs containing

3    only CSIRO genes, BASF's new materials are those containing

4    only BASF's genes, and the only ones that are joint are the

5    constructs, those combinations of genes that contain both

6    CSIRO and BASF genes.  Those are the only ones.  Ladies and

7    gentlemen, those constructs are not in the CSIRO patents,

8    period.

9         Number 2 --

10        MR. MENCHEL:  Sorry to interrupt.

11        Can we just have a time check?  I don't think that

12   was correct, and Counsel is rushing.

13        THE LAW CLERK:  I have 46 minutes and 44 seconds.

14        THE COURT:  The time he's giving you includes the

15   time for rebuttal.

16        THE LAW CLERK:  Correct.

17        MR. MENCHEL:  Oh, that's how much time he has left?

18        THE LAW CLERK:  Yes.

19        MR. NG:  Okay, the time left.  Thank you.

20        MR. MENCHEL:  That was confusing to us.

21        THE LAW CLERK:  I'm sorry.  That's how much is

22   remaining.

23        MR. NG:  It makes a little bit of a difference.

24   Thank you for the clarity.

25        How do we know that these constructs weren't used?

1    These are the constructs.  These are the 12.  At the end of
2    the project, BASF sent CSIRO a summary, and it says these are
3    the 13 that we looked at.  Only four of them, the ones down
4    here -- Oops.
5            Mr. Boles, can you get that back, please?
6            The ones down here are for DHA.  Did CSIRO use
7    these?  No.  Did BASF use them?  No.  No constructs were
8    identified with commercial levels of EPA and DHA.
9            Now, remember that the whole point of this agreement
10   was so that the parties could look at whether it made sense
11   for them to work together, and if it didn't make sense for
12   them to work together, to walk away.  Mr. Menchel described
13   it as a prenuptial agreement.  What's yours is yours, what's
14   mine is mine, only what we have together is ours.  And so if
15   we decide to walk away, we have clarity; we know what it is.
16   So with respect to the new materials, we know that these
17   constructs weren't pursued by BASF and they weren't pursued
18   by CSIRO.  Both sides walked away, and they did their own
19   thing.
20           So let's look at the next ownership clause.  These
21   are transformed lines.  Transformed lines are the plants that
22   got the constructs into them.  Who did that?  BASF did that
23   in Germany.  CSIRO never got them, so we know that the
24   transformed lines aren't something that CSIRO used.
25           So let's look at joint results, because this is

Carol L. Naughton, Official Court Reporter

1    something that they have pointed to.  Joint results are
2    results data information derived from the information from
3    the time period that they were looking at things together.
4            Excuse me.
5            See that right up top?  But, importantly, the joint
6    results are results with respect to joint transformed
7    lines -- those are the plants -- and joint new materials.
8    Those are the constructs that they put together, those 13
9    constructs, only four of which were DHA constructs.
10           It's not everything that they exchanged, it's not
11   all conversations that they had, it's not all information
12   that they might have talked about, it's only information with
13   respect to transformed lines, which CSIRO never got.  And the
14   joint constructs, those are those 13 that CSIRO never used.
15           Mr. Boles, could we go to slide 69, please?
16           Dr. Petrie told us this.  He explained what CSIRO
17   actually did, and I think if you look at Dr. Petrie, and you
18   listen to both he and Dr. Singh, they were honest and
19   truthful people.  When they were asked hard questions, they
20   thought about it, and they gave the right answers.  They
21   didn't shy away from them.  They were forthright, they were
22   forthcoming when they answered both the Court's questions,
23   our questions, and also opposing counsel's questions.  Part
24   of your job is to evaluate the honesty of the witnesses, and
25   if you look at Dr. Singh and Dr. Petrie, you'll conclude that

```
 1    they are not people who would deceive or misrepresent the
 2    truth.
 3            And this is what he said:
 4            "So is it your testimony, sir, that by November of
 5    2008, CSIRO had already identified the gene combination that
 6    it would continue to use for the next several years and is
 7    using today?
 8            "Answer:  Yeah, that's correct.  This is it.
 9            "Question:  And are all of these CSIRO genes?
10            "Answer:  Let me have a look.  Yes, they are.
11            "Question:  And just to remind the jury about time,
12    was this before or after CSIRO received the results from the
13    MTEA evaluation of BASF?
14            "Answer:  Oh, a long time -- oh, long before.  So we
15    had our own parallel track going," he goes on to explain.
16            The program that they pursued, the strategy they
17    pursued, the patents that they pursued, the constructs that
18    they pursued were using CSIRO genes, and they had a parallel
19    track going, and he explains further that we kept them very
20    separate.  CSIRO knew that if it didn't -- if the parties
21    didn't decide to go forward with the partnership that they
22    weren't going to be able to use the joint materials, the
23    joint constructs, and the joint results.  So they knew they
24    had to do something separate to keep their program going
25    forward, because they weren't sure that BASF was going to say
```

1    yes to a partnership.  And, in fact, they didn't.  So what
2    they did was they had a parallel track, and that's what they
3    used.
4          Mr. Boles, can we pull up the confidentiality
5    provision, as well?
6          Now, what was not covered?  There's an information
7    about -- there's a provision about confidential information,
8    and it makes a specific exception.  The information that's in
9    the public domain, except through a disclosure contrary to
10   this agreement -- that means that one of them put it in the
11   public domain even though they weren't supposed to -- or is
12   independently developed by the recipient.
13         Now, there's been talk about using BASF genes.  BASF
14   genes were public, and we're going to get to that in a
15   second.  But what's important to remember is that CSIRO was
16   already working with some of those genes because it knew
17   about them.  In Australia, you're allowed to use things for
18   research purposes.  They were in a public gene bank, and they
19   had some BASF genes.
20         Dr. Petrie told that he talked to Dr. Bauer about
21   that, and he had no problem with it.  It's okay.  They're in
22   the public domain.  Does that mean that CSIRO could develop a
23   commercial product using those genes?  The answer is no, they
24   can't.  Are they allowed to use it and analyze it and
25   experiment with it?  The answer is yes.  Dr. Petrie told you

1    he told Dr. Bauer about it, and Dr. Bauer had no problem with

2    that whatsoever.

3           Mr. Boles, can we go back to slide 50, please.

4           Now, this one is a little bit ironic because the

5    parties, in order to make sure that things were clear about

6    what they came into it with, what was CSIRO's coming in and

7    what was BASF's going in, wrote out a list of some of those

8    things just so they could be sure.  And each side signed the

9    agreement with that list in front of them.  That was part of

10   the agreement.  It was CSIRO saying these things are mine,

11   BASF saying, these other things are theirs, and each side

12   signed the agreement and acknowledged that.  They

13   acknowledged what the separate materials were, the background

14   materials going in.

15          What did CSIRO list on there?  The patents.  Second

16   at the bottom of that list are the patent applications that

17   were used to develop all of the Group A patents.  They led to

18   all of them.  That patent application had already been

19   submitted, and BASF acknowledged that it was CSIRO's

20   property.

21          And Dr. Bauer himself acknowledged that.  He said

22   that he couldn't go back in time; that information that he

23   provided in 2008 couldn't have been used in the 2004 patent

24   application.  And remember that CSIRO's boundaries were

25   closed.  By the time it submitted its final application in

1    2005, it could never expand the boundaries of that patent

2    family.  It could get continuations, but the boundaries were

3    set forever.  And so when it received information from BASF

4    in 2008, it couldn't go back and add that on, expand the

5    rights that it had, and Dr. Bauer acknowledged that.

6              "Question:  And you're still asserting that you were

7    a co-owner in the patents that occurred before the meeting --

8    the agreement that you had?

9              "Answer:  Yeah.  I'm not a patent lawyer, so I don't

10   know how these timelines work with the patents, but if it

11   would be before, then it would not be a part.  It wouldn't be

12   a part of the joint materials or the joint results."

13             What they gave them in 2008 could not have been

14   something that was jointly owned in the 2004 and 2005

15   patents.  It's simply impossible.

16             And so what do we know about what was shared and

17   what made it into the patents?  We heard from Dr. Singh.

18   Nothing.  Not a thing.  What did he say?  Let's read this,

19   because it's important:

20             "Dr. Singh, you mentioned on cross that you cannot

21   put into a commercial product without a license something

22   that is owned by BASF; is that right?

23             "Answer:  Yes, ma'am.

24             "Question:  Did you?

25             "Answer:  Never, no.

1           "Question:  Did CSIRO?

2           "Answer:  No.

3           "Question:  Did CSIRO ever use any BASF material in

4     a product?

5           "Answer:  Absolutely not.

6           "Question:  Did CSIRO ever use any BASF materials in

7     its inventions?

8           "Answer:  Absolutely not.

9           "Question:  Did CSIRO ever use any of the joint

10    results in its inventions?

11          "Answer:  No, ma'am."

12          There is no reason to believe that Dr. Singh was

13    being anything less than 100 percent truthful when he said

14    this.

15          But we asked our technical expert to look at this.

16    We asked our technical expert to go through all the materials

17    she had in this case, what BASF said that they had, all the

18    back-and-forth with the MTEA, and to look at the patents.

19    And what did she say?

20          "Question:  Dr. Kunst, in your research of the

21    evidence that you reviewed in this case, have you seen any

22    evidence or any information that leads you to find that CSIRO

23    used any BASF information, methods, gene combinations, or

24    results in CSIRO's patents?

25          "Answer:  I have not."

1              That stands in stark contrast to what BASF told us.

2     There are two people who could have told us what materials on

3     the BASF sides, what materials from the collaboration made it

4     into the patents.  That's Dr. Bauer, who ran it, and

5     Dr. Murphy, who is their technical expert.  Let's look at

6     what they said.

7              Dr. Bauer said he's never even studied the patents

8     or read all of them.

9              "Question:  But you're asserting that you should be

10    a co-owner over the ones that are at issue in this case,

11    correct?

12             "Answer:  I've seen some of those patents, yes.  I

13    have not gone through all the patents.

14             "Question:  About how many have you seen, sir?

15             "Answer:  Maybe four.

16             "Question:  Now, am I right, Doctor, that you

17    haven't even carefully studied the patents that are at issue

18    in this case?

19             "Answer:  Yes."

20             He didn't look.  This is Dr. Bauer.  He's got

21    patents of his own.  He's in a field where people read

22    patents all the time.  He knows how to do it.  It's part of

23    his job.  It's part of what he does professionally.  He knows

24    exactly how to do this.  Why didn't he do it?

25             He didn't do it because he knows there's nothing

1    there.  This is a $200 million project on each side.  He's
2    claiming that he's a co-owner of the patents that protect
3    that project.  He didn't even look, because he knows there's
4    nothing there.
5           Dr. Murphy.  He could have done what Dr. Kunst did.
6    He could have gone through all the materials, put them side
7    by side and said, okay, I see this piece over here and this
8    piece over there.  They didn't even ask him.  Why didn't they
9    ask him?  Because they know there's nothing there.
10          And so what does Dr. Bauer tell us?
11          "Question:  The truth is, Doctor, that the most you
12   can actually say in this case is that you think that -- well,
13   that CSIRO might have used information from the MTEA in its
14   patents; isn't that true?
15          "Answer:  Yes.
16          "Question:  You don't really know for sure?
17          "Answer:  No, I don't know for sure.  I know that we
18   shared the information, but I don't know what -- what extent
19   was used of it."
20          He's got the patents that he says he's a co-owner
21   of.  He could have read them.  He didn't, because he knows
22   there's nothing there.  He didn't even try.  I think we can
23   stop right here with the whole MTEA claim.  The most that
24   they can say is that he didn't look.  There's nothing there.
25   "Might."  "Might" is not enough for BASF to become a co-owner

1    of CSIRO's patents.

2              May I have a time check, please?

3              THE LAW CLERK:  32 minutes, 9 seconds remaining.

4              MR. NG:  Thank you, sir.

5              Now, we've heard a lot about how certain BASF

6    genes -- remember that genes goes to the enzymes, the Geenen

7    codes, the enzymes.  Sometimes we use those interchangeably,

8    but the BASF genes are in the CSIRO patents.  Yeah.  They've

9    been there from the beginning.  So let's take a step back and

10   look at the patents and how they're structured so I can

11   explain why.

12             Remember that CSIRO invented a blueprint, a process

13   for how you get all the way to DHA.  And there are certain

14   steps, and it's different from what other people did.  And

15   you just saw that the Acyl-CoA desaturase is doing it all on

16   the Acyl-CoA side of the pool with something different than

17   anybody else did, but the other aspects of it, too, using

18   bifunctional enzymes.

19             So what did CSIRO do when it wrote its patent?  It

20   said, we're patenting the idea, we're patenting the

21   blueprint, the concept, the pathway, but there are lots of

22   genes that are out there, lots of enzymes that go with those

23   genes that can accomplish this.  And so the inventors went

24   and looked in the literature.  They looked in the patents

25   that were out there.  They looked at everything that was

1   publicly available, and they said, here are the genes and
2   enzymes that can do step number 1, in purple; step number 2
3   in, I guess, green; step number 3, in yellow; step number 4,
4   in blue; step number 5, in red.  It listed them all out.
5   Some of those were in the public domain.  Some of them were
6   owned by people like BASF.  Some of them -- they also said
7   that you could use homologs.  That's the word that means the
8   ones that are similar to this.  Some of them weren't even
9   known yet.
10           A big part of the project that CSIRO was doing was
11  saying, we know that these exist; let's go out and find some
12  that work better.  But that's not their invention.  Their
13  invention isn't the specific genes.  Their invention is the
14  pathway.  And they've admitted that there were multiple ways
15  to do this.  In fact, that's one of the values of this
16  invention; there were different genes that you could use,
17  different enzymes.
18           Was it claiming in there that it owned BASF genes?
19  No.  It acknowledged that these were BASF's.  It said right
20  there.  It listed the source.  They're publicly known,
21  because you have to put them in the gene bank.  There's a
22  library where you can go look them up.  There's literature
23  about them.  But CSIRO wasn't making a claim that they owned
24  those genes, absolutely not.
25           So we walked you through this in testimony.  We saw

```
 1    that there were some that ended up on the MTEA, but those
 2    were in the patent from the beginning, because they were part
 3    of that list.  And, again, CSIRO wasn't saying that they
 4    owned them.
 5           In the MTEA, when BASF listed those out and CSIRO
 6    signed the agreement, it was acknowledging that those were
 7    BASF's genes.  It said, yeah, those are yours.  We can't do
 8    our method, our pathway, using your genes without your
 9    permission.  But they were in there.  They were in there for
10    a reason.
11           Some of the other ones that come down the line, like
12    Ostreococcus tauri, that was published a little bit later by
13    Domergue, and those find themselves in some of the later
14    patents, all publicly known, but this is not a claim by CSIRO
15    that they owned them.
16           It's the same thing that BASF does.  Remember,
17    Dr. Andre testified about what we see down here in the
18    bottom.  That's a chart showing BASF's patented construct
19    that it uses for its elite event, LFK.  They went to the
20    Patent Office, and they disclosed all the different genes
21    that they used, all the specifics of their LFK elite event.
22    It's right there in the patent.
23           And you'll remember that he said that it uses genes
24    that came from other places.  They aren't the owner of the
25    patents on there, but -- to make a commercial product, they
```

1    had to go out and get a license, but they're not the owner of

2    the patents on there.  They're in there, and they're

3    acknowledged, because as he acknowledged and as we said and

4    His Honor said in slightly different words, an invention can

5    be, and often is, a combination of previously known things.

6            You can take the previously known, even previously

7    patented, genes, and if you put them together in a different

8    way, you can get a patent on that.  That's exactly what

9    Dr. Bauer said.  If you take the patented gene and you use it

10   in a new way, you can get a patent on that.

11           Now, again, are we claiming that we own those genes?

12   No.  And, to be totally clear, CSIRO and GRDC and Nuseed

13   aren't using BASF's genes.  They're not.  That's what

14   Dr. Petrie testified about.  But if we did, we'd need their

15   permission.  They've got a patent on the genes; we've got a

16   patent on the blueprint.  We need their permission, but it's

17   a two-way street.  If they want to use their genes in our

18   blueprint, in our invention, they need our permission.  It

19   goes both ways.

20           We talked about continuation patents, and Your Honor

21   just instructed us -- His Honor just instructed us that

22   there's nothing wrong with continuation patents.  In fact,

23   they're good business.  You'll see that CSIRO, as soon as it

24   got its original patent application issued in 2010, went back

25   to the Patent Office and said, we've got this property.  We

1    own everything inside of these boundaries, so now we'd like

2    to be specific about the different pieces that are in there

3    so we're claiming it with more particularity.

4            The jury instruction that you have in your book will

5    say that there's nothing wrong with that.  In fact, there's

6    nothing wrong with doing that to protect yourself against a

7    competitor's product that has recently come onto the market.

8    It's right there.  There's nothing improper, illegal, or

9    inequitable, which is this Court's instruction about filing a

10   continuation patent application in order to obtain the right

11   to exclude a competitor's product from the market or to amend

12   and insert claims intended to cover a competitor's product

13   that the applicant or its attorney has learned about during

14   the prosecution of the patent application, as long as you

15   didn't get it in an improper way.  That's at the end.  I want

16   to acknowledge that.  But you're allowed to do it.

17           Remember, Mr. Menchel showed you this analogy:  The

18   blueprint.  When you have the blueprint and it says 2x4s and

19   nails and bricks and paint, there's nothing wrong with going

20   back and specifying the 2x4s might be oak or pine or maple or

21   cherry.

22           Now, let's imagine that somebody comes onto the

23   market.  I actually looked this up.  It's actually a panted

24   one.  Somebody put a patent on what's called Fat Head

25   Technology on a new kind of nail.

1           Could the patentholder go back to the Patent Office
2    and get a continuation and say, one of the kinds of nails
3    that can be used in my blueprint is this Fat Head nail?
4    Absolutely.  That's allowed.
5           Is it a claim that they own the Fat Head nail?  No.
6    Is it a claim that they don't have to pay the Fat Head nail
7    Company if they use Fat Head nails?  No, but it's a
8    clarification that within the boundaries of the patent in the
9    group of nails, Fat Head nails is one of those.  That's
10   perfectly fine.
11          And so when CSIRO went out and got a claim that
12   covers some of BASF's genes -- and, again, I want to be
13   clear.  This is not one of the combinations in the MTEA.
14          But when they went out and got this, these are four
15   genes that BASF owns and they're using.  It's like the Fat
16   Head nails.  They're allowed to do it.  They're allowed to
17   say, within -- one of the kinds of genes that do this, one of
18   the kinds of delta-6 desaturases, is this sequence ID number
19   30, the BASF gene, just like saying one of the kinds of nails
20   is the Fat Head nail.
21          Did CSIRO get this information from the MTEA?  No.
22   Neither BASF or CSIRO used the combinations, the constructs
23   from the MTEA.  They went in a different direction, so it
24   would be useless for them, because that's not what is in
25   BASF's commercial product.  How do we know what's in BASF's

1    commercial product?  Because they told the world.  You heard
2    about Andy Beadle's presentation in 2010.  This is CX-0699.
3    In that presentation, he told the world, this is what we're
4    using, and so CSIRO rightfully went and wrote a claim that
5    claimed that particular combination.  They did it again in
6    their patent.
7                In the '327, the one that we were just talking about
8    that covers the LFK, they gave all the details about it.
9    That's the bargain you strike with the Patent Office.  You
10   give the detail, and you get protection.  This is on their
11   particular LFK eventually.  By 2016 that was public, and so
12   when CSIRO filed the continuations that are at issue in this
13   case, it knew that information, not from the MTEA but from
14   the presentation and from the patent itself, because that was
15   public.
16               Can I get a time check again, please?
17               THE LAW CLERK:  22 minutes, 17 seconds remaining.
18               MR. NG:  Thank you.
19               You heard Dr. Andre talk about this document,
20   CX-0104.  BASF is a sophisticated company.  It knows what
21   it's doing.  It knows how to protect itself.  In fact, even
22   in its partnership with Cargill, it acknowledged that they
23   may not want to be completely transparent.  I asked Dr. Andre
24   about that.  He acknowledged this is what they do.  Again,
25   there's nothing wrong with this; smart business.  When you're

2088

1    talking to someone like a CSIRO or a Cargill, they may become

2    a competitor.  You have to take care of yourself.  You have

3    to make sure that you're not giving confidential information

4    unless you're protected by a patent or something else.  They

5    knew how to take care of themselves.

6           I want to touch quickly on this.  That's an issue

7    because they're not talking about the transformations

8    anymore.

9           But you heard in opening that CSIRO needed BASF to

10   learn how to get their product into canola.  Simply not true.

11   You heard that they didn't get a drop of oil until 2010 --

12   drop of DHA.  Why not?  Because CSIRO took a very different

13   approach to its commercialization.  BASF decided, because it

14   had this canola factory, this high throughput transformation,

15   that they'd transfer it to canola, and then they would

16   optimize, do all the hard work of optimization once they were

17   already in canola.

18          CSIRO said, we've got to work smart, so we've got to

19   do something different.  So they optimized first before they

20   pushed the button on canola.  And what happened when they

21   pushed the button on canola?  Was it hard?  No, they got it

22   on the first try.

23          The reason they didn't have a drop of oil until 2010

24   wasn't because they didn't know how to do it, it was because

25   they weren't yet trying because they were in the optimization

```
 1    phase.  They decided to work smart instead of going to canola
 2    and having a brute force approach.
 3              And how did this work out for CSIRO?
 4              Mr. Boles, can we go to slide 88, please?
 5              Worked out pretty well.  Right now they're able to
 6    achieve 17.3 percent DHA to BASF's and Cargill's
 7    approximately 1 percent.
 8              When they focus on EPA -- and I want to be clear,
 9    this is in a different seed.  When they're focused on a seed
10    that maximizes for EPA, they're still beating BASF's 16.6 to
11    somewhere around 7 percent.  That optimization strategy
12    worked out pretty well for CSIRO.
13              I want to wrap up, before I pass to opponents'
14    counsel, on the issue of ownership and how we can be sure.
15    After seeing the evidence, after seeing that they can't
16    identify anything in the patents that came from them, how can
17    we be sure?  How can we reassure ourselves that that's
18    actually true?  Because for more than a decade BASF was
19    monitoring CSIRO, and they never alleged that they were
20    co-owners until this year, two years into the case.  Even
21    after they filed this case, they still didn't claim that they
22    were co-inventors.  It's something they came up with in
23    January.
24              Look at the details.  Dr. Bauer, in 2016, received
25    an e-mail -- sorry.  This is Dr. Bauer sending an e-mail
```

 1  saying that he was surprised today that he got to participate

 2  in a presentation by Jonathan Napier and James Petrie at a

 3  conference.

 4         "Dr. Petrie presented their canola results, showing

 5  12 to 18 percent DHA with little EPA and other products."

 6  This is Dr. Bauer, the head of the project in the MTEA,

 7  listening to Dr. Petrie say that they've gotten the results.

 8  They've gotten some fantastic results.

 9         What does Dr. Bauer do?  Does he claim -- does he

10  say, wait a second, that's mine?  I'm a co-owner of that.

11  That came out of the MTEA.

12         Does he send a letter to Legal?  Does he send a

13  letter to his higher-ups?  Does he say, We have to spring

14  into action; this is a problem for us, that's ours?  No.

15  Read through the exhibit, CX-1287.  "A surprising twist."

16  That's what he says.  He didn't say they took something

17  that's ours.  He didn't say they used something that they

18  shouldn't have.  Not once did they raise this.

19         Remember, they have all the information.  Dr. Andre

20  said they read the patents within one week to one month of

21  them issuing.  They monitor CSIRO's commercial progress.

22  They've been doing it for years.

23         In 2013, they had an obligation, an obligation to

24  get freedom to operate, to analyze CSIRO's patents.  Did they

25  raise the issue then?  No.  Did they raise the issue when

1    they went to get their own patent?  No.  At no point prior to
2    January of this year, even after the lawyers filed this
3    lawsuit, did they claim to be co-inventors.  There's a reason
4    for that.
5         The reason for that is because the facts aren't
6    there.  We haven't seen a single BASF e-mail, a single BASF
7    memo, a single BASF analysis saying, hey, wait a second,
8    that's ours, identifying what in the CSIRO patents is theirs.
9    It doesn't exist.
10        So what happened when BASF found out about this?
11   Not only did Dr. Bauer say nothing -- slide 96, please -- he
12   complimented CSIRO.  In 2012 -- I'll just read this:
13        "Dr. Bauer was kind enough to obtain the reference.
14   Did you have any further interactions with anybody from
15   BASF?"  This is what Dr. Petrie says:
16        "Yeah.  One stands out, which was in 2012, mid-2012,
17   after we had presented our GX7 construct results.  At that
18   stage it was in Arabidopsis that we talked about, and we
19   showed the first time that you would get fish oil like levels
20   of DHA in the seed.  And we had Ernst Heinz, who was a very
21   senior BASF researcher.  He actually came up and sought
22   Surinder and I out, and he shook our hand and said very
23   elegant work, well done, you know, someone's been able to do
24   it."
25        Not we showed you how to do it, not that information

```
1    came from us, not you're doing it in a way that mixes up ours

2    and yours.  Nothing.  They shook his hand and said well done.

3            I'll reserve the remaining amount of time for

4    rebuttal.  Thank you.

5            THE COURT:  All right, ladies and gentlemen.  I

6    think it's about time to take our luncheon recess, so let's

7    come back at 2:30.

8               (The jury exited the courtroom.)

9            THE COURT:  We'll be in recess until 2:30.

10              (Recess from 1:29 p.m. to 2:25 p.m.)

11           THE COURT:  Counsel, you'll notice that the jury has

12   been ready every time after the break.  So I want to make

13   sure that we are, too, because if we do it, then the jury

14   will follow suit, and vice versa.

15           We won't take an afternoon break, we'll just

16   complete the arguments and then let the jury go, and then we

17   can accomplish a few housekeeping issues.

18           All right.

19              (The jury entered the courtroom.)

20           THE COURT:  Ladies and gentlemen, at this point

21   we'll have the initial opening statement of counsel for the

22   opponents.

23           MR. CONNALLY:  May I proceed, Your Honor?

24           THE COURT:  You may.

25           MR. CONNALLY:  Thank you.
```

```
 1              Ladies and gentlemen, thank you.  Thank you.
 2     There's one thing Mr. Ng and I can agree on, which is that
 3     your service is important, and we value it very much.  Your
 4     service is important to this court, it's important to the
 5     patent system, and it's important to BASF and Cargill.  And
 6     we've seen how diligent you've been, how focused you've been,
 7     and Lord knows you've been patient.  That's deeply
 8     appreciated.
 9              A trial is a search for the truth.  A trial is a
10     search for the truth.  All these witnesses, all these
11     exhibits, all these binders, these plants, these rules, these
12     sidebar conferences, the white noise, the objections, the
13     arguments, all of it is to help you all find the truth.  So
14     let's talk about what's true.
15              At the beginning, in the middle, and at the end of
16     this case, I told you we'd show you three things:  First,
17     BASF was the true innovator who first got omega-3s from
18     canola; second, CSIRO couldn't get omega-3s from canola until
19     it learned how from BASF during the MTEA collaboration; and,
20     third, CSIRO and Nuseed were gaming the patent system, and
21     they're using joint results from the collaboration with BASF
22     to do so.  So let's talk about each of those.
23              Now, you know it's true that BASF is the innovator
24     in canola because you heard it from Carl Andre, and you heard
25     it from Joerg Bauer.  You heard about the decades of work,
```

1    the $200 million of investment -- thank you, Mr. Sparks --

2    the dozens of patents we have in omega-3 technology in

3    plants.  BASF was the first to get omega-3 from canola in

4    2004.  And in 2005, based on that 2004 data, they published

5    those results, that remarkable achievement to get omega-3

6    from canola in one of the leading scientific journals in the

7    world, "Nature Biotechnology."  They published on their

8    achievement, getting omega-3 from a crop plant, getting it

9    from canola, in the gold standard of scientific journals, at

10   the same time CSIRO is talking to you about its internal

11   grant applications.

12          Let's look at the timeline that I showed you

13   earlier.  BASF, as Dr. Andre explained, got omega-3 fatty

14   acids from Arabidopsis, the model plant, the lab rat plant,

15   in 2002, along with linseed, an oilseed plant.  And then they

16   got fatty acids from Brassica, from the canola, in 2004.

17          Now, our friends at CSIRO, they got omega-3s from

18   the lab rat plant, from Arabidopsis, in 2004.  And at that

19   time, they filed this provisional application with the Patent

20   Office saying they had come up with the blueprint, as they

21   call, the blueprint to get omega-3s, not just from

22   Arabidopsis but from every plant in the world.  Every plant

23   in the world.  That's what they were claiming, we've invented

24   a way to get omega-3s from every plant in the world.

25          The problem is they couldn't do it -- certainly,

1   couldn't do it in canola.  They were trying for five years.
2   They're going to try and tell you -- or they did try and tell
3   you, well, we weren't really trying, we were just working in
4   the model plant, and we were trying to work smart.  We were
5   trying to work smart.
6            Well, they didn't actually get omega-3s from canola
7   on their own until the spring of 2010.  Spring of 2010.  This
8   is their timeline.  I put the red circle around it, but it's
9   undisputed that they couldn't get omega-3s from canola on
10  their own until 2010, six years after they claimed they had
11  the blueprint for getting omega-3s from every plant in the
12  world.
13           But we saw the progress report that Dr. Singh
14  submitted to GRDC, trying to get more funding from them.  And
15  while he said -- and Mr. Ng just said -- well, the first time
16  we tried the combination that worked, it worked the first
17  time.  Okay.  But they tried a lot of first generation
18  constructs that failed to produce LC PUFA.  They tried on
19  their own and failed.  That's what they told GRDC.
20           And then what did they also tell GRDC -- this is in
21  2009.  We worked with BASF and came up with a second
22  generation construct made up of our genes and their genes.
23  And they ran it through our high throughput system, and, lo
24  and behold, they were finally able to get DNA from canola.
25  So the first time they were able to get DHA from canola was

1    in the collaboration with us.

2           And then after the collaboration with us, once they

3    learned how to do it, once they learned what combinations

4    worked, they were finally able to do it on their own in 2010,

5    even though they supposedly had the blueprint, this magic

6    blueprint, since 2004.

7           Now, at the time in 2009 -- let me back up.   In

8    2004, this blueprint, they claim, is the proof of concept.

9    It's the proof of concept to get omega-3s from every plant in

10   the world.   It's the proof of concept to get omega-3s from

11   canola.   That's what they told you; that's what they told the

12   Patent Office.

13          But then look here what GRDC thought in 2009.   They

14   were trying to decide whether they were going to continue to

15   invest in this program, and they knew that proof of concept

16   hadn't been achieved in canola, and they were expecting or

17   hoping that CSIRO might be able to get proof of concept in

18   canola by June of 2010.   That was what they were hoping.

19          But they were planning -- GRDC, their investment

20   partner, one of the people suing BASF and Cargill, they were

21   planning for the possibility that CSIRO would fail.   They

22   would fail; proof of concept in canola would not be achieved,

23   in which case GRDC would pull the plug.   It would pull the

24   plug on its investments.

25          And then what was CSIRO itself thinking?   What was

```
 1   CSIRO itself thinking?  This is a SWOT analysis that they
 2   did -- and Ms. Chow went over this with Dr. Singh.  A SWOT
 3   analysis is a strengths, weaknesses, opportunities, and
 4   threats analysis.  It's a typical business tool that you use
 5   to analyze a program or a project, right?
 6           And so CSIRO itself analyzed the weaknesses of the
 7   omega-3 project, and what did they point to?  That proof of
 8   concept was not achieved in their target crop.  This whole
 9   case is built on a claim that they got the blueprint, they
10   achieved proof of concept back in 2004, including the concept
11   to get omega-3s out of canola, and yet in 2009 they're
12   acknowledging in their own internal weaknesses analysis that
13   proof of concept had not been achieved in canola, their
14   target crop.
15           And Ms. Chow asked Dr. Singh exactly this during
16   this trial, two days ago:
17           "In 2005 you had obtained proof of concept in the
18   Arabidopsis model plant; isn't that right?
19           "Answer:  Yeah, that's correct."
20           And then she said, "But as of May 2009, proof of
21   concept had not been achieved in the target crop, canola;
22   isn't that right?
23           "Yeah, that's right," he said.  "Yeah, that's
24   right."
25           CSIRO itself, its lead inventor, chief scientist on
```

1    the project, acknowledges that they didn't have proof of

2    concept in canola in 2009.

3            Now, we also told you we'd show you that CSIRO and

4    Nuseed are gaming the patent system.  How do we know that's

5    true?  Well, they told you.  They told you.  They said so in

6    their own internal documents.  In their own internal IP

7    strategy meeting, they talk about war-gaming the commercial

8    spaces in the oil.  So they told you.  And let's see what

9    war-gaming looks like, all right?

10           This is an e-mail from Rob de Feyter.  He's the head

11   of IP strategy at CSIRO.  He did not testify in this case.

12   He's the general in charge of war-gaming.  All right?  And

13   here he says -- and he's talking about a feature of their

14   '357 patent at issue here.  He says, "One of the features of

15   that patent is remarkably useful because it's so hard for the

16   patent examiner to find in the prior art."

17           So a feature of the '357 patent is remarkably useful

18   because it makes it hard for the United States Patent and

19   Trademark Office to do their job.  Concealing information

20   from the Patent Office is a remarkably useful feature of the

21   '357 patent.

22           All right.  Let's take a look back at 2005.  Now,

23   this came out in the examination of Dr. Singh, but I don't

24   think the import of it was clear at the time.  This is an

25   e-mail from Dr. Green, who is the big boss of the omega-3

1    program.  Dr. Singh is the lead inventor, and he's the

2    technical lead, he's the day-to-day scientist, but Dr. Green

3    is the business and scientific head of the program.

4          And on February 14th, 2005, Valentine's Day 2005, he

5    said to Dr. Singh, "We should be sure that we have records in

6    our lab books of our intention to express our LC PUFA genes

7    in Arabidopsis, canola, linseed, soybean, and Lupins."  And

8    then he goes on to say, "If you don't have lab book notes

9    around these intentions, could you add in a brief paragraph

10   yesterday?"

11         Now, this is going to be important when Mr. Davis

12   talks to you about conception and their claim that somehow

13   they invented this way back in 2003.  They came up with a

14   blueprint in 2003, and they're going to point you to their

15   lab notebooks.  These lab notebooks are like medical records;

16   they're serious scientific records.  Patent litigation, other

17   rights, depend on the validity of these records.  Here's the

18   head of the whole program, talking to the scientific lead,

19   telling him to tell his team to backdate their lab notebooks

20   regarding their intentions to express their genes in crop

21   plants.

22         And here's the part you can't make up.  All right?

23   Where do we find this e-mail?  Where do we find this e-mail?

24   We find it in Diana Hall's lab notebook.  She's Dr. Singh's

25   technical assistant in the lab.  So the directive to backdate

 1    lab notebooks she has tucked into her lab notebook.  All

 2    right?  You can't make that up.

 3              Let's talk about our friends at Nuseed.  They're not

 4    very good at growing canola.  They're certainly not good at

 5    selling canola.  But what they apparently do focus on is

 6    threatening people with CSIRO's patents.  And so in 2016,

 7    when Cargill was getting close to coming to market, Nuseed

 8    sent them a letter listing all these patents that they and

 9    GRDC and CSIRO have together and essentially saying, Cargill,

10    look, we're throwing a big obstacle for you to get to market;

11    you've got to deal with us.  All right?

12              So what does our side do?  What do the opponents do?

13    BASF files this lawsuit.  We say those patents aren't any

14    good.  They're not enforceable.  They're not valid.  So we

15    bring this lawsuit to challenge them.

16              So when you hear Mr. Ng talk about why didn't we

17    speak up, why didn't we say anything, well, first of all,

18    Dr. Bauer left the program in 2010, so he wasn't on the

19    omega-3 program from 2010 on.  And, more importantly, the

20    first time they tried to assert any of these patents against

21    us, we brought this lawsuit.  Not only did we object, we

22    brought a lawsuit in federal court.  So, yeah, we objected.

23              Now, the interesting thing is none of these patents

24    in this letter -- and both Mr. Davis and I talked about this

25    earlier.  None of these patents in this letter are before you

1    in this case.  They're not presenting any of these patents to

2    you, not a one.

3          What they are doing, and what they did in response

4    to our lawsuit, is they filed a bunch of new patents.  They

5    filed a bunch of new patents, all but one filed after this

6    litigation commenced, and all of them issued in 2018.  All of

7    the patents you're deciding on were issued in 2018, during

8    this litigation -- during this litigation.  So that's what

9    we're talking about here.

10          In response to our lawsuit, they filed a bunch of

11   new patents, and they filed them targeting our inventions and

12   our product, not to protect their own technology -- not to

13   protect their own technology.  They did it for competitive

14   reasons, and they used information they got from the MTEA

15   collaboration to do it.

16          And let me try to explain to you what I'm talking

17   about.  This is a little simplistic, so I apologize.  Let's

18   pretend that getting omega-3 from canola is like building a

19   house.  Okay?  BASF built their house in 2004.  Now, at the

20   same time, your friends at CSIRO, they had done research on

21   Arabidopsis, and they had gotten omega-3 from Arabidopsis,

22   the lab rat plant, and they filed this provisional patent

23   application saying that they invented a way to get omega-3

24   from every plant in the world -- every plant in the world.

25          And so they put up a patent fence around BASF's

house, right, our ability to get omega-3 from canola, but
they couldn't do it themselves.  They couldn't do it
themselves, right?  They couldn't do it.  It wasn't until
2010, with our help and after the collaboration, that they
finally were able to build their own house, despite having
the blueprint for six years, the magic blueprint.  For six
years they couldn't do it, until we showed them how, and then
they built their own house.

        Then they threaten us with the patents, and we come
after them to get rid of those patents; we filed this
lawsuit.  And what happens?  They're not talking about that
patent fence anymore.  They're not talking about those
patents.  What they are talking about are these new patents,
this new fence, this new fence that they put up around our
product.

        But here's the thing:  These patents target BASF's
and Cargill's product.  Their product isn't inside the fence.
Their Aquaterra product doesn't use the technology they're
claiming to invent in these new patents.  It's different
technology.  This is a patent created to target our product,
not to protect their product.  They're trying to keep us off
the market.  That patent is aimed at BASF's and Cargill's
product.  It doesn't protect the Aquaterra product, because
the technology is different, and I'll show you what I mean.

        So here are -- here, on the right, is the MTEA and

1    genes that were identified as belonging to BASF in the MTEA

2    collaboration, including the Thraustochytrium, the delta-6

3    desaturase, and the P patents, delta-6 elongase.  And this --

4    I always get confused on the numbers, too.  This is the '579

5    patent, in Group A, and Carl Andre explained this.  Dr. Andre

6    explained this.

7            So this is what we disclosed in the MTEA, on the

8    right, and here is now what they're claiming to have

9    invented, starting in 2017, on the left.  They're saying, We

10   invented the way to get omega-3 from Brassica, from canola,

11   using a delta-6 elongase, the P patents, and the delta-5

12   desaturase from Thraustochytrium.

13           So they're saying they invented the way to get

14   omega-3 from canola using our genes, genes we disclosed to

15   them eight years earlier in the MTEA collaboration.

16           Same thing in the '792 patent.  This is a Group B

17   patent.  Again, here are the BASF genes that are identified

18   in the MTEA and the fact that we're using those genes in

19   Brassica, Brassica napus, the Kumily line that you've heard

20   about.  And they filed the '792 patent years later claiming

21   that they've invented the way to get omega-3 from canola

22   using our genes -- using our genes.

23           One more.  Again, you've got the Thraustochytrium

24   desaturase identified as belonging to BASF in the MTEA, and

25   then you've got Dr. Singh's lab notes from July 3rd, 2017,

1   about four days before he files three of the patents at issue
2   in this case, and he talks about using a delta-5 desaturase
3   from Thraustochytrium.  And then that shows up in the '033
4   patent.  That shows up in the '033 patent.  So they're using
5   what they learned from us in the MTEA collaboration to target
6   our products in their patents.
7           Now, we also have this exhibit, right?  We know it's
8   true they're using the joint results because Dr. Singh has
9   the summary of the joint results from 2009 on the right, the
10  summary of the joint results of the MTEA collaboration tucked
11  into his 2017 diary when he's coming up with the patents at
12  issue in this case.  He's got the summary of the joint
13  results of the MTEA collaboration from 2009 tucked into his
14  diary in 2017 at the exact time he's filing the patents, the
15  patents created to target our products, the patents filed
16  after this litigation started in 2017.
17          And what's his explanation for how this
18  eight-year-old document gets into his diary right at the time
19  when he could use it to target our patents?  I have a messy
20  desk.  That's what he said.  That's what his lawyer said, I
21  have a messy desk.  It just fell in there.  I don't know --
22  sometimes I wonder what people expect you're going to
23  believe, but I think you can draw your own conclusions on the
24  messy desk defense.
25          And let's talk about Nuseed's product, right?  So

1   here's the '792 patent that they filed, and look at all these

2   genes of BASF that it uses.  So these are our genes.  They

3   can't use these genes without our permission.  They're

4   claiming to have invented the way to get omega-3 from canola

5   using all our genes, when they can't actually do this

6   themselves without our permission.

7          So their product, the Nuseed product uses none of

8   these genes.  They're patenting an invention that we

9   practice.  They're patenting what we and Cargill are trying

10  to do.  That's what they're doing.  They're not trying to

11  protect anything they're doing.  Mr. Ng was quite open about

12  it.  They'll try and tell you, oh, it's okay, the law allows

13  it, it's not -- no, it's not that bad.  Well, when you use,

14  improperly use, when you breach the MTEA, when you come after

15  us using information that you got from us, that we shared

16  with you in 2009, you're darn right that's improper.  You

17  can't target our products using the information we gave to

18  you.  You can't do it.

19         All right.  Mr. Davis and I -- Mr. Davis talked

20  eloquently about the two bargains in this case.  The one is

21  the contractual bargain between BASF and CSIRO under the MTEA

22  contract.  It's a contract, it's a regular civil obligation.

23  I'm going to talk to you about that, and that's what I'm

24  focusing on.

25         Mr. Davis is going to talk to you about the bargain

1    that CSIRO and Nuseed and GRDC struck with the Patent Office

2    when they pursued patent protection for their claimed

3    inventions and how they failed to follow those rules, but I'm

4    focused on the MTEA bargain.

5            And the question you're going to be asked to

6    answer -- and this is in your verdict form -- is do you find

7    that BASF has proven by a preponderance of the evidence that

8    BASF is a co-owner of any of the following patents-in-suit?

9    And then there will be a chart with all the patents, and you

10   can check "Yes" or "No."  All right.  What do we need to

11   prove that?  I'm going to talk about that in a minute, but

12   first I want to address the burden of proof.  All right?

13           On this contract issue, the burden of proof is the

14   regular standard, which is who do you believe more?  Who do

15   you believe more, us or them?  It's that simple.  The scales

16   of justice.  Right?  If you believe us a little bit more, we

17   win.

18           Now, I think the evidence is like this.  Right.  It

19   weighs heavily in our favor.  And I think Mr. Davis is going

20   to point out how very clear and very convincing the evidence

21   is for our side.  But even if it were a closer question, all

22   you have to figure out is who is more right, us or them?

23   That's all you have to do.

24           And let's talk about the MTEA itself.  You know, for

25   a contract between sophisticated companies going across

1    international lines, it's really pretty simple.  Usually you

2    have a lot of lawyerly gobbledygook in these things.  This

3    one is very clear.  It's very clear.  Joint results are going

4    to be jointly owned by CSIRO and BASF Plant Science, and any

5    intellectual property subsisting in those joint results is

6    owned immediately upon creation, jointly, by CSIRO and BASF.

7    That intellectual property includes patents, so if those

8    patents are based on joint results, we're a co-owner.  It's

9    that simple.  It's that simple.

10            And let's remember the summary of the joint results

11   tucked into Dr. Singh's diary in 2017, when he's coming up

12   with the patents at issue in this case.  Now, it's almost

13   comical, but it's not funny.  It's not funny.  This is the

14   United States Federal Court, this is important patent

15   litigation, and when they cooked up these patents to target

16   our product, using BASF's information, using the joint

17   results of the MTEA collaboration, and when they got caught

18   red-handed, when they got caught, their excuse was a messy

19   desk.

20            Well, I don't think we've got to say a lot more

21   about that, but there is one thing we can do about it.

22            This is your verdict form.  It's real simple.

23            (Indicating.)

24            Trial is a search for the truth.  I think you all

25   know what's true, and I think you know what to do.

1              Thank you.
2              MR. DAVIS:  One of the things, ladies and gentlemen,
3      that you are not privy to, but those of us here in the front
4      of the bar, as well as the Court, is privy to, is that there
5      was quite a wrangling when this case began about who it was
6      that would go first.  It's part of the reason why we've been
7      referring to each other as proponents and opponents, because
8      there are claims going both ways.  But there was quite a
9      wrangling, and it turns out that my colleagues on the other
10     side of the bar got to go first.  And as I've been listening
11     to the testimony, and as you've been listening to the
12     testimony, what I've been struck by is a proverb that I think
13     is compelling.  And the proverb says this:  It says, The
14     person who speaks first in a lawsuit seems to be right until
15     someone comes and cross-examines.
16             And I think that bit of Solomonic wisdom has
17     absolutely borne itself out here over the last two weeks.  As
18     you heard in the jury instructions, and as you will take care
19     of back in the room, that ultimately, though there are many
20     people in this room, it is the 11 of you, and only the 11 of
21     you, that are judges of credibility.
22             Judge Morgan has instructed you on the law, but you
23     are the ones who can decide who is credible and who is not.
24     You are the ones who can decide who to believe and how much
25     to believe, and that is based on the evidence that you have

Carol L. Naughton, Official Court Reporter

1    seen here.  And I told you in the beginning -- I asked you in

2    the beginning, two weeks ago, to pay careful attention to

3    what was said before this lawsuit began and what you heard in

4    this lawsuit, because there was going to be an important

5    difference.

6          We're going to talk about some of those things and

7    some of those credibility issues in a moment, but first let's

8    just reflect on what you've heard.  I won't retread the

9    ground that we just heard from Mr. Connally, but let's just

10   be clear.  BASF did this first, and what Mr. Ng wants you to

11   focus on is whether there was a BASF patent.  But there's no

12   question, the testimony is unequivocal, that BASF had it in

13   Arabidopsis first, and they had it in Brassica first.

14         You heard that from Dr. Andre, and you also heard

15   that from Joerg Bauer.  You heard from Cargill witnesses, who

16   told you all the great things that Cargill is doing.  You

17   heard from Mark Christiansen.  Mr. Christiansen is here

18   still.  He went home to Minneapolis, and he came back for

19   this case.  You heard from Dr. Willie Loh.  He went home and

20   came back for this case because this is important to Cargill.

21   You heard from Keith Horton.  Mr. Horton wasn't able to get

22   back, but that's because Mr. Horton is out harvesting the

23   seeds out in Montana right now.  I think he testified that

24   there was some snow in Montana, and so the harvest came late,

25   or he would have been back here, too.  This case matters to

1    our client, and it matters to our client because ultimately
2    it matters to people.
3         We talked about all the work that Cargill does with
4    the testing and how they have the fish feed trials and
5    ultimately what this omega-3 product is going to mean.
6    Mr. Horton said it's an awesome thing, how good Cargill's
7    products are.  Dr. Loh talked to you about how Cargill even
8    today is still innovating with their Boost technology.  And
9    the reason that's important, ladies and gentlemen, is because
10   that is why there's not infringement for the '541 patent on
11   the Cargill products.  And they're not even pushing that
12   anymore.
13        You see, what Mr. Connally explained is correct.
14   What they did was put a fence around the property as they
15   understood it, and they did that based on the genes that were
16   submitted to the USDA.  But the problem with the '541 is
17   recall that that patent related to percentage allocations of
18   ALA, oleic acid.  They didn't realize that as Cargill
19   continued to do its work those percentages were going to
20   change.  And so it would have been that the '541 patent fell
21   within that scope, as well, but they're not even pursuing
22   that anymore.
23        So let's talk about some of CSIRO's testimony.  I
24   won't belabor this, but you heard Mr. Connally tell you a
25   moment ago Dr. Singh came in here and said that their work in

1    canola worked in the first go.  But, actually, CX-1359, the
2    report that they filed in 2009 with GRDC, showed that it
3    didn't; that it failed.
4            Dr. Singh came here -- and what you see on the
5    left-hand side there is -- that's actually a statement of
6    counsel, which is not evidence, but counsel told you in
7    opening that there really wasn't going to be any evidence of
8    inventorship, but what you heard was evidence of ownership.
9    And that's what Mr. Connally talked to you about, that
10   Dr. Singh admitted for the '792 they're using BASF's
11   products.
12           Same thing with Dr. Petrie.  Dr. Petrie came here
13   and said that they were using BASF's O tauri to find other
14   genes.  There's no question that they were using BASF's
15   products.  And why were they doing that?  Why is that okay?
16   I don't know.  But we do know there's evidence that
17   Dr. Petrie thinks what's happening in this case and what this
18   technology is about is important enough that if $500 million
19   were on the line, that maybe, perhaps, that's just worth a
20   bit of obfuscation.  And that's at CX-0796.  You'll see that
21   in the evidence that you have.
22           You heard testimony from Nuseed that was in
23   conflict.  The first witnesses out of the gate -- remember
24   Mr. Zacharias, who wanted to set the stage and tell you how
25   much this was worth?  The last witness that we put up via

1   video was his second in command who reported directly to him,

2   the global general manager, Ms. Benita Boettner, and what did

3   she say?  There are no sales of Aquaterra, there's no

4   contract, there's nothing.  We don't even have a strategic

5   plan.

6           And Nuseed doesn't practice the claims, and that's

7   because they drafted the claims to cover these products.  And

8   we'll talk about why that's a problem from a patent

9   standpoint later.

10          But the truth is the reason why these patents are

11  invalid is because they broke their bargain.  They promised

12  the PTO something, and they didn't do it.  I wrote down what

13  Mr. Ng said.  When he was talking about the patent

14  application in 2004, what Mr. Ng said is the boundaries were

15  set forever.  He's absolutely right.  The boundaries were set

16  forever in 2004, and that means in 2017, you can't file a

17  patent application that claims something that's not within

18  those boundaries.

19          That is exactly what this is about, and you heard

20  that from Dr. Murphy.  Dr. Murphy is an expert in LC PUFA.

21  He's an expert in LC PUFA synthesis.  He testified at length

22  about his views in this case.  And, ultimately, you're going

23  to have to make a credibility determination between

24  Dr. Murphy and Dr. Kunst.  And Dr. Kunst said she is not an

25  expert in this area.  I didn't say that, she said that.  She

1    said it in her deposition.  She fought about it here, and

2    then when she was confronted with her actual statement, she

3    said, oh, it's just semantics.

4           Do you recall what Mr. Menchel said during the

5    second opening?  Details matter.  It's not semantics.  She

6    came in here to convince you of something, and she doesn't

7    even believe she's an expert in the area of these patents,

8    and she's got credibility issues left and right.

9           We were on the second day of trial -- do you

10   remember this, CX-0197?  This is the protocol that she said

11   was absolutely reliable and she trusted.  When you go back in

12   the jury room, ladies and gentlemen, I would ask you to look

13   at it, because it's black, page, after page, after page.  And

14   she said it was reliable, but then in the end she said that

15   as a reviewer for scientific journals, this is not even

16   something that she would have accepted, a partial protocol.

17   And yet she relied on it in this case.

18          So, now, proponents have the burden of proof on

19   infringement, and it's a preponderance, and they have not met

20   it.  You'll recall at the very beginning there were two

21   patents at issue; the '346 -- as you heard, that's no longer

22   at issue.  What remains is the '541, claim 20, and they're

23   not asserting that against the Cargill product anymore.  The

24   9093, that's the only one that Dr. Kunst talked about, and

25   now they're not asserting that.  The only thing that they're

1    asserting it against is the LFK.

2           Well, first of all, let's just be clear.  Dr. Kunst

3    hadn't even seen the seeds from Cargill, and Mr. Horton told

4    you he sent them to Nuseed's counsel, who was Mr. Sung.  He

5    didn't know his name, but that's where he sent them.

6    Dr. Kunst never tested those seeds.

7           And as it relates to the product from BASF, remember

8    that this patent, ladies and gentlemen, issued in April of

9    2018.  And so what they need to show, what they need to

10   establish, is that BASF's LFK met these two limitations after

11   April of 2018, and there is no evidence of that.  What they

12   looked at was 2017 data, before the patent issued.  In light

13   of that, they can't meet their burden on the '541 patent.

14          So when you're back in the jury room, ladies and

15   gentlemen, and you get to this question, which I believe is

16   the first question on your verdict form, we would ask you to

17   check "No," that there is not a preponderance of the evidence

18   that the opponents have infringed claim 20 of the '541

19   patent.

20          The proponents also bear the burden of establishing

21   that earlier conception date, that February 2003 date, that

22   they're pushing for two of the claims.  That's their burden.

23   And I think I heard Mr. Ng talk a little bit about that, but

24   he didn't show you a lot of evidence.  He just said it's been

25   corroborated.  What the law requires is that the

1    corroboration, number one, corroborate the entire invention,

2    everything that's claimed -- not just an order form for a

3    zebrafish, but everything -- and "corroborated" means there's

4    got to be some independent evidence.  It can't be the

5    inventor's own notebook, unless it's been actually signed by

6    someone else at the time.

7            And what I would encourage you to do, ladies and

8    gentlemen, when you go back in the room and actually look at

9    the evidence -- I've got it right here.  What they're relying

10   on for corroboration, and CX-184, CX-182, and CX-337, those

11   are all in evidence.  And when you look at those, you're not

12   going to see a signature in a laboratory notebook from

13   anyone.  And it's not going to be around the time that it was

14   written down.  So the only thing that you have to rely on is

15   Dr. Singh's testimony about these 15-year-old documents now

16   that there's a lawsuit.  We would submit to you that that's

17   not enough to establish corroboration.

18           So when you go back in the jury room and you look at

19   question number 3 -- I think it's question number 3; it may

20   be question number 2 on the verdict form -- whether the

21   proponents have established with corroborating evidence that

22   claim 1 of the '357 patent or claim 2 of the '880 patent were

23   conceived by the inventors as of February 2003, that the

24   answer to both of those questions should be, "No."

25           Now, let's talk about the lack of written

1    description.  Now, Dr. Kunst also -- I think she said she
2    spoke to the inventors for eight minutes.  Eight minutes.
3    Everything that's at stake in this case, all the hundreds of
4    hours that she worked, and the fact that they put an expert
5    here in court to support this opinion, and she talked to the
6    inventors for eight minutes -- it took the Judge an hour and
7    a half to read you the instructions in this case.  That's a
8    problem, ladies and gentlemen, and you can draw a conclusion
9    from that.
10          Now, as is often the case, when you represent the
11   patentee, what you want to do is carry the banner that the
12   patent is entitled to a presumption of validity, and that's
13   because the examiners are intelligent, and they're smart, and
14   they're wise, and they're hard-working.  And they may be all
15   of those things, but they're not infallible, and that's why
16   we call it a presumption, and that's why it's rebuttable.  In
17   the same way that in a criminal case the defendant is
18   presumed innocent until proven guilty, a patent is presumed
19   valid until it is shown otherwise.
20          The difference there, though, is important, because
21   sometimes jurors aren't used to the notion of clear and
22   convincing evidence.  I want to be very clear.
23          You've probably all heard the standard that's used
24   in criminal cases of beyond a reasonable doubt.  That is a
25   higher standard than clear and convincing evidence.  If

```
 1    you're taking away somebody's liberty, you have to have
 2    beyond a reasonable doubt.  What clear and convincing
 3    evidence means is that there is a firm conviction in your
 4    mind of a fact.  We want to submit to you that there is
 5    absolutely clear and convincing evidence of invalidity here.
 6           The Patent Office -- you saw this in the video at
 7    the very beginning.  The Patent Office makes mistakes, and
 8    important information may have been overlooked.  And I want
 9    to submit to you in this case that important information
10    maybe wasn't provided, like telling the Patent Office, hey,
11    by the way, the sequence IDs that we're claiming here in
12    patent '792, we got those from BASF.
13           The Patent Office didn't know about that.  The
14    Patent Office didn't get to watch the cross-examination of
15    Dr. Singh and Dr. Petrie and Dr. Kunst and look at all the
16    documents and the evidence here.  The Patent Office didn't
17    have that.  That's why you, ladies and gentlemen, have an
18    opportunity to render a verdict of invalidity here.
19           Now, there's been a lot of talk about the laundry
20    list.  There's been a lot of talk about this, and what you
21    need to take away -- and there's an example here from JX-10
22    at columns 39 and 40, but I just want to remind you the
23    specification of the Group A patents is identical, so you'll
24    be able to find this laundry list in each one of those
25    patents.
```

1          But it's not enough to just write the word down.
2     It's not enough to take the word "canola" and say it's there,
3     we have it.  They had Arabidopsis, but what they wrote was a
4     laundry list of all these things.  And what you can do,
5     ladies and gentlemen, even though, as you heard Mr. Ng say,
6     and as you heard in the instructions, the law may not require
7     them to have actually done it, the question for written
8     description is whether a person of ordinary skill in the art
9     at the time, in 2004, would have recognized that they
10    actually possessed the full scope of the invention --
11    actually possessed the full scope.
12          It's entirely proper for you to look at later
13    documents from their files before this case began that speak
14    to that issue.  PX-0191, which is going back with you, is a
15    2008 document.  They're minutes from a meeting taken from
16    CSIRO from their business records in which they admit that
17    Arabidopsis is not predictive of canola, Arabidopsis results
18    don't perform well in canola.
19          In 2009, GRDC, when considering whether to actually
20    give them more money, expresses, There are three exit ramps
21    here.  Two of them have us paying more money and continuing
22    to invest in this, but one of them, the first one, is an
23    off-ramp, and we might want to take that, because proof of
24    concept hasn't been achieved yet.  Why would their funder say
25    that in 2009 if they had already done it and if a person of

1    ordinary skill in the art would have expected that it be

2    done, if it was -- boom -- on the first go we know it's going

3    to work.  That's the very hindsight that is problematic, that

4    they are not allowed to take, unless you be misled and think

5    that somehow there was an epiphany between 2009 and now, even

6    last year in 2018, in a draft paper that the inventors wrote,

7    there was a note.

8          This is a draft, and if you have ever done a draft

9    on a Word document, you know you can add comments and

10   redline.  This is a redline from one of the inventors from a

11   paper last year, and they said to each other, don't mention

12   in the paper that canola is more difficult than Arabidopsis.

13   This is their document, PX-0236.  When you're considering

14   this issue, you can look at this and see the context back in

15   your room.  Mr. Menchel told you that context matters, and it

16   actually does, and for years what they have been saying is

17   this is a problem.

18         Dr. Kunst acknowledged that there is no data, there

19   are no experiments, there are no figures, there's nothing

20   related to canola at all in the 2004 disclosure, except that

21   in the laundry list it appears either first or second, and

22   since it's listed in a laundry list first or second, it must

23   be there.  They must have it.  That's not the standard.  They

24   have to show actual possession, and they haven't.

25         Remember when I was asking Dr. Kunst about those

1    claims that relate to the recombinant plant cell?  We also

2    talked about whether those claims required a single

3    construct, and I asked her, and she gave an answer.  I wanted

4    to just double down and make sure I heard her right, so I

5    said, Let me ask you again, just so everybody in the

6    courtroom reorients themselves.  Are you saying that you

7    believe the claims of the '880 are directed to and limited to

8    a single construct?  She said, I do.  She was unequivocal

9    about that.

10            And the problem that they have with that is that

11   Dr. Petrie testified that it wasn't until long after they

12   filed these patent applications that they were even trying to

13   get it in a single construct, because it was too hard.  And

14   if they didn't have a single construct until 2010, but their

15   own expert says that the claims are limited to a single

16   construct in 2004, they have a problem.

17            Let's talk about the sequence IDs.  You'll remember

18   this, and I won't belabor this long, but I want you to

19   remember that Dr. Kunst's position was that the four sequence

20   IDs that are actually claimed in the claims at issue, in the

21   '792, they were adequately described just because they were

22   identified in the patent.  And I know it kind of bogged down

23   because you have to dig deep in the patent, but we walked

24   through each one of those, and I showed her, Yeah, it kind of

25   mentions those Seq IDs as a part of this laundry list, but

1   there is no teaching and no disclosure anywhere that a person

2   of ordinary skill in the art would have understood that this

3   specific combination was contemplated by the claims.  And

4   that makes perfect sense, because they weren't even thinking

5   about this until they saw it in BASF's product.

6          And so what did they do?  They drafted claims to

7   cover it.  The problem is they didn't have that in 2004, and

8   that means they've got a problem from a written description

9   standpoint.

10         Now, quickly, with respect to the '084, there was a

11  written description issue, you may recall, that related to

12  the percentages of DPA in the '084, claim number 1.  This is

13  the claim, if you recall, that, I believe it was,

14  Mr. Zacharias called DHA the gold standard, and apparently

15  gold wasn't worth very much when they filed this claim,

16  because this actually sets a cap on the DHA at 2 percent.

17  And the problem is that they still don't have any information

18  showing that they possessed this invention in 2004.

19         What they tried to do was walk through Table 10 and

20  Table 12 and Table 17 and try to match up the various

21  percentages.  But what you never saw, what was not presented

22  as evidence in this case, was anything showing that the seeds

23  in those tables covered both ranges; 1 to 16 percent for DPA,

24  and less than 2 percent for DHA.

25         If they didn't have it in the original application

Carol L. Naughton, Official Court Reporter

1    and the boundaries for set forever, that means that when they

2    filed this claim in 2017, it was invalid.  So when you go

3    back in the jury room, ladies and gentlemen, and you get to

4    the question about written description, you'll see that the

5    claim is broken out -- excuse me, the question is broken out

6    by claim.

7         We believe the evidence shows clearly and

8    convincingly that these patent claims are invalid, and so we

9    want you to check, yes, the opponents have proven by clear

10   and convincing evidence that the following patent claims are

11   invalid for lack of written description.

12        Let's now move to obviousness.  That, too, is our

13   burden, and I want to suggest to you that we have absolutely

14   met that burden and that the evidence supports it.

15        First of all, Dr. Kunst conceded that there was a

16   motivation to combine these references.  She said there's

17   really no dispute that a person of ordinary skill in the art

18   would have been motivated to look at these references and

19   work towards producing DHA in a seed, and that's specifically

20   using the blueprint that they talked about for two weeks.

21        You heard a lot about the Kinney reference.  That's

22   persuasive prior art.  The Kinney reference is JX-0067.  This

23   is the patent that was -- the work that was done by DuPont.

24   And there's been a whole bunch of attorney argument and some

25   questions about whether DuPont actually commercialized that.

1    I want to suggest to you, ladies and gentlemen, that you

2    could spend all day tomorrow reading the Judge's instructions

3    about obviousness, and you're not going to see anything that

4    says that whether a product was commercialized is relevant to

5    whether a patent about that issue speaks to the obviousness

6    point.

7            The fact that DuPont didn't do it does not mean that

8    a person of ordinary skill in the art, looking at Kinney,

9    wouldn't have been led to this invention.  Quite the

10   contrary, the evidence is that Kinney discloses results in

11   seeds from plants.  This is Table 8 that we're looking at.

12   There's been a lot of talk about the somatic embryo, where

13   Kinney got this DHA, but there's a table for seeds in there,

14   as well.  Table 10 shows both EPA and DHA.

15           And you might recall that Dr. Kunst really kind of

16   struggled to answer the question fairly, I think, when I

17   asked her if she thought Kinney disclosed or showed

18   possession, because Kinney had a list.  There was a long

19   pause, and she struggled with that, and, in fact, what she

20   said was -- well, we'll get to that slide in a minute, but

21   what we heard was that Dr. Green, whose video we played, the

22   person who hired Dr. Singh, admitted that Kinney was relevant

23   art.  He admitted that it teaches the delta-6 pathway.  He

24   admitted that it teaches the combined levels of EPA and DPA,

25   and that's in total agreement with what you heard from

Dr. Murphy.

Dr. Green agrees with Dr. Murphy, but Dr. Kunst doesn't agree with any of them. And she acknowledged that, but she said, I can only vouch for myself. But, ladies and gentlemen, I want to submit to you that when an inventor on the patents-in-suit, and the person that hired Dr. Singh, is in complete alignment with what you heard from Dr. Murphy and Dr. Kunst here now, not an expert in this field, disagrees, that you absolutely have the right to decide who to believe and whose testimony you should not.

It's not just them. Dr. Singh recognized that Kinney was the most impressive example in the article that he wrote shortly after that. It's PX-0196 in evidence. He said, "The most impressive demonstration of LC PUFA synthesis in plants has recently been described in reports by Kinney." It's right there. It's on Page 3 of PX-0196.

And in his slides in 2006 -- these are their internal slides. Thirteen years ago, before their lawsuit came up, what Dr. Singh was saying was that Kinney had it. Kinney had it. That's PX-0324. These are Dr. Singh's slides.

But Dr. Kunst, as I said, couldn't commit to saying whether Kinney actually possessed canola. She said she'd have to look at more evidence. She just wasn't sure.

Let's talk about Sayanova. Sayanova discloses the

1    conventional pathway.  How do we know that?  Sayanova is

2    JX-39 in evidence.  We know that because it says it.  The

3    major or conventional aerobic pathway starts with a delta-6

4    desaturation.  And Sayanova is very clear.  He says, This is

5    the most obvious approach.  And the way they want to

6    distinguish Sayanova is by saying, oh, well, this isn't

7    actually independent research, what this is is a compilation

8    of what other people were doing.  That doesn't matter.  This

9    is a reference that is prior art that a person of ordinary

10   skill in the art would have been aware of at the time.

11        And guess what?  Dr. Green agrees with Dr. Murphy

12   again on Sayanova.  He says that Sayanova describes that

13   conventional pathway, that it teaches the delta-6 desaturase

14   pathway, and that following Sayanova would have produced

15   transgenic plants whose seeds produce 20 percent, by weight,

16   of LC PUFAs.  This is one of the inventors on the

17   patents-in-suit and a CSIRO employee, agreeing with

18   Dr. Murphy.

19        But again Dr. Kunst disagrees, and she says, Well,

20   you know what, I have to acknowledge that Sayanova calls it

21   conventional, but I think that was just an unfortunate use of

22   that word.  But, remember, I showed her in the patent where

23   the inventors used the same word.

24        And were there any doubt -- were there any doubt --

25   recall that the laundry list of genes that are shown in the

1    patents-in-suit in 2004, that original application, it listed
2    the genes in the same order.  And you'll see it's not
3    alphabetical, so that's not per force, just the way it should
4    have been listed.  It's in the same order as in Sayanova.
5           Lastly, let's talk about Domergue.  Domergue is
6    JX-66, and there's no dispute that Domergue teaches the use
7    of the Acyl-CoA pool.  Now, what they want to say is, well,
8    it doesn't really -- you know, it's in yeast.  But Dr. Petrie
9    used yeast, and a person of ordinary skill in the art would
10   have understood that these references could be combined.
11   When you look at JX-0066, which is Domergue, you'll see that.
12          And Domergue not only identifies the problem, it
13   suggests the solution.  So where are we left at the end of
14   the day?  There is a blueprint that they have been discussing
15   this entire case that's the delta-6 pathway to DHA, Acyl-CoA
16   desaturases, bifunctional enzymes, DHA production in seeds in
17   Brassicaceae.  Sayanova, Kinney, and Domergue show that, and
18   a person of ordinary skill in the art absolutely would have
19   been led to combine those references.
20          And let me just leave you with this.  You may have
21   heard this in the instruction.  When you go back and you look
22   at the jury instructions, what you'll see is -- I think it's
23   called factor 4 -- that there's something called secondary
24   considerations.  These are things that might undermine the
25   view of obviousness, and Dr. Kunst admitted that she hadn't

1    considered any of those.  There's no evidence of commercial

2    success.  There's none of those things here to suggest that

3    there is objective indications that this is not obvious.

4            The fact that someone didn't actually do it doesn't

5    answer the obviousness question.  If that were the case, we

6    would be talking about anticipation.  What obviousness means

7    is that a person of ordinary skill in the art, in 2004,

8    looking at these references, would have been led to the

9    claimed invention, and there's no doubt, based on the

10   evidence that's before you that you will consider, that that

11   is true.

12           And so when you go back to deliberate, we would ask

13   you to get to the question that asks about obviousness and

14   whether the opponents have proven by clear and convincing

15   evidence that the following asserted claims are obvious, that

16   you would check "Yes."

17           I'll be back and reserve my last five minutes.

18   Thank you.

19           THE LAW CLERK:  Your last five?

20           MR. DAVIS:  Or so.  How much do I have?

21           THE LAW CLERK:  You have 10 minutes 41 seconds.

22           MR. DAVIS:  There you go -- or 5.

23           THE COURT:  All right.  We'll hear the rebuttal

24   argument from the proponents.

25           MR. NG:  I'm going to respond to a few of the things

Carol L. Naughton, Official Court Reporter

1    that opponents said.

2         I agree with them, this is a search for the truth,

3    and I agree with my colleague, Mr. Menchel, that context

4    matters and details matter.

5         One of the documents that you were shown was

6    CX-1359.

7         Mr. Boles, can we pull this up?

8         You were shown this document, and you see in the

9    first paragraph -- or the second paragraph -- that it

10   references a disappointing result.  That disappointing result

11   was not about the CSIRO invention that's at issue in this

12   suit, that was about a different project that was done by a

13   Ph.D. student, a plan B.  It operated in a completely

14   different pool.

15        You heard Dr. Singh testify about this.  And, by the

16   way, they didn't show this document to Dr. Singh, the author

17   of the document, they showed it to other folks.  But

18   Dr. Singh, fortunately, had already testified to it, and what

19   Dr. Petrie corroborated was that the disappointing result

20   which is described in this first paragraph -- it's called the

21   first generation, but it was a completely different project.

22   And, yes, it didn't work.  It was not a good plan B.

23        Plan A was what at the time CSIRO was working on

24   with -- had been working on that at the time was part of the

25   MTEA.  And what did they say?  "In 2009, we have tested both

1    single and dual EPA/DHA construct strategies in canola.  12

2    single EPA/DHA second generation constructs were assembled

3    for transformation in canola.  These constructs contained

4    various combinations of CSIRO and international collaborator

5    genes" -- that was BASF -- "and the objective was to

6    transform all of those into canola and Arabidopsis to enable

7    us to identify the best gene set for maximal EPA/DHA

8    synthesis."

9            That was the invention, but they were careful.  Note

10   what else he says here.  And he's talking to GRDC as

11   potential collaborator.  "Under the terms of the

12   collaboration, all results have been shared by both parties,

13   and the canola material is not to be further worked on by

14   either party."

15           They were acknowledging that the joint results

16   should not be used.  They were being straightforward and

17   honest, and they were honoring the terms of their contract.

18           And then if you go down to the bottom he says, "It

19   is comforting to know that CSIRO-only genes comprised one of

20   the gene sets that is able to drive maximal ALA and DHA

21   synthesis in canola seeds."

22           So what did they do?  "At CSIRO, a dual construct

23   strategy comprising an EPA and DHA component" -- you remember

24   Dr. Petrie talking about that; they put it in two plants and

25   then bred them together -- "has been adopted in order to keep

```
 1    the insert size below 20 kilobytes, KB" -- sorry -- "the dual
 2    construct compromise of CSIRO-only genes..."
 3            I won't read further.
 4            They recognize, and they told GRDC, we're working on
 5    something with BASF, but we can't use the joint results, but
 6    it's okay, we have a back-up.  And that's what Dr. Petrie
 7    said, We had a parallel track.  That's what they used.
 8            Mr. Boles, can we please go to our slide 65, please.
 9            We heard again about targeting, about how it might
10    be improper to draft a patent claim that focuses on a
11    product -- a competitor's product that is actually in the
12    marketplace.  Again, I'll show what the Court has instructed.
13    The Court has expressly instructed that there is nothing
14    improper, illegal, or inequitable about filing a continuation
15    patent application in order to obtain the right to exclude a
16    competitor's product from the market.
17            The Court has given us the rules that we have to
18    apply, the law that we have to apply, and that's the rules.
19    That's the law that we're to apply.
20            "...or to amend or insert claims intended to cover a
21    competitor's product that the applicant or its attorney has
22    learned about during the prosecution of a patent
23    application."
24            Again, you can learn new information after the fact
25    and use it to focus on that, so long as it's not obtained
```

```
 1    improperly or it's in violation of a legal duty.
 2                Mr. Boles, can we please go to slide 71?
 3                Again, the MTEA constructs, the combinations that
 4    CSIRO and BASF worked on, were not pursued by either side.
 5    That's not what's in their commercial product.  So if CSIRO
 6    was going to target what had been in the MTEA, they would
 7    have been aiming at the wrong thing, because that's not
 8    what's out there in the market.  How did CSIRO know what was
 9    in the market?  Because BASF told the world.  It told them in
10    2010 in Dr. Beadle's public disclosure at the conference, and
11    then it told them again in a patent application that was
12    published in 2016.  All the details were in there.
13                CSIRO not only didn't need to go to the MTEA, if it
14    had gone to the MTEA, it would have been aiming at the wrong
15    thing.
16                Mr. Boles, can we go to slide 59?
17                So what have they done?  They've pointed out that
18    some of the genes, the enzymes that go with it, are listed in
19    the MTEA.  That's what you have on the left there.  Those
20    genes and enzymes were in the CSIRO patent application from
21    the beginning, from 2004 on.  Again, unless they have a time
22    machine, CSIRO didn't learn them in the MTEA, they learned
23    them because they were public.
24                And, again, CSIRO is not claiming that it owns
25    BASF's genes.  They were on the list, along with every single
```

```
 1     other known gene that accomplished the functions that CSIRO
 2     was describing in its pathway, and CSIRO was not saying we
 3     own it -- it was acknowledging the fact in the MTEA that it
 4     doesn't -- what it was saying is these are some of the
 5     examples of what can be used in the pathway.
 6               So, Mr. Boles, can we go to PX-198?
 7               We've heard a lot about Dr. Singh's diary and the
 8     summary that was tucked in there and the conspiracy theory
 9     about what it might say or why it might have been there.
10     Again, there was no reason for Dr. Singh to have gone back to
11     the MTEA, because all of the information about BASF's actual
12     product was public.
13               Let's look at the evaluation, the summary that was
14     actually tucked in there.
15               Mr. Boles, can we pull up the second page, please,
16     and focus on the second bullet, or the first actual bullet?
17               What was the conclusion from the evaluation?  That
18     CSIRO's delta-5 elongase, EPA to DPA, is currently the only
19     suitable candidate for this step in the pathway.  The project
20     actually found that CSIRO's was working the best.
21               Mr. Boles, can we go down several pages to the
22     alternative strategy, please.
23               The next one, please.  Well, let's focus on those
24     two, please.
25               And what did CSIRO say at the end?  It said that
```

1    there were two alternatives; one worked between BASF and

2    CSIRO, and if that doesn't work out, we've got an

3    alternative, CSIRO-only genes.  That's what was in

4    Dr. Singh's notebook.  There's no conspiracy.  There's no

5    secret.  That's what this document actually says.

6            I'd like to look at another document that you were

7    shown.

8            Can we please turn to Exhibit CX-0796, please?

9            And can I get a time check, please?

10           THE LAW CLERK:  6 minutes, 8 seconds.

11           MR. NG:  Left?

12           THE LAW CLERK:  Left, remaining.

13           MR. NG:  They showed you the sentence starting, "It

14   would be pretty unscrupulous, but $500 million is, after all,

15   $500 million and worth a bit of obfuscation."  This is from

16   Dr. Petrie.

17           Look at the sentence before.  He's not talking about

18   what CSIRO should do, he's commenting on what BASF is doing.

19   "I am concerned that BASF may publish something dodgy" -- a

20   bit of Australian slang -- "to cloud the area to steer the

21   patent examiners down the path, and they aren't necessarily

22   Acyl-CoA.  It would be pretty unscrupulous for BASF to do

23   that, but I guess $500 million is worth a bit of

24   obfuscation."

25           He's not talking about what CSIRO should do, he's

1     talking about what they did.  Details matter; context

2     matters.

3            Let's talk about the written description.

4            Can we pull up CX-1091?

5            And while we're doing that, Counsel made a point

6     about how much time Dr. Kunst spent talking to our inventors.

7     Now, remember that she reviewed voluminous depositions, she

8     reviewed voluminous statements.  She had a lot of

9     information.  Written description is determined from the four

10    corners of the patents.  You're not supposed to go outside of

11    it to determine whether written description is fulfilled.

12    She did this the right way.  She wasn't supposed to go and

13    fill it in with what the inventors said.  She did it the

14    right way, applying the correct legal standard.

15           Can we look at the section that says, "Arabidopsis

16    results do not predict canola," please?

17           This is a statement that Dr. Bauer made.  CSIRO made

18    notes and reported on what Dr. Bauer said.  This is not an

19    admission on their own part, that's them saying this is what

20    Dr. Bauer said.  They obviously disagreed, because, after

21    all, CSIRO's strategy --

22           Let's take that down now, Mr. Boles, and can we put

23    up the -- slide 77?

24           Remember that CSIRO had a different strategy;

25    optimize first, then go to canola.  So this entire idea that

1    we heard about again that we didn't know how to do it until

2    they told us, is completely nonsense.  There is no evidence

3    in the record at all that CSIRO tried to take this invention

4    and put it into canola before 2009.  And, remember, it takes

5    a year to grow, so it was 2010 when they got it.

6            CSIRO optimized first and went to canola second.

7    They pushed the button, and as it turns out, that was a

8    pretty smart strategy.

9            I'd like to just wrap up with this:  I'd like to say

10   thank you, again.  I'd like to thank you for your time and

11   your attention and your patience.

12           Cargill and BASF made a choice.  They know they

13   infringed, but they decided that they'd go ahead with their

14   product anyway.  They decided against cutting a deal and

15   getting permission.  They decided they'd file this lawsuit to

16   see whether they could get away with it.  That issue is in

17   your hands now.  We'd ask that you send the message and tell

18   them that they can't get away with it.

19           And I'm going to return to what Mr. Menchel said

20   last week when he talked to you in our second opening.  We're

21   going to ask you to protect these patents.  We're going to

22   ask you to protect the investment that GRDC made on behalf of

23   their farmers, their grain farmers.  We're going to ask you

24   to protect them because they're vital to Nuseed's continued

25   existence.  As you heard from Mr. Zacharias, this is a

1   best-of-company proposition.  And, most of all, we're going

2   to ask you to protect the life's work of Dr. Singh and

3   Dr. Petrie and the others on their team.  Their life's work

4   is now in your hands.

5          So, again, we thank you, and we look forward to your

6   verdict.

7          THE COURT:  All right.  I believe the opponents have

8   what amount?

9          THE LAW CLERK:  I have 10 minutes, 41 seconds.  I

10  believe they reserved five minutes.

11         MR. CONNALLY:  No, we'd like to use the whole ten

12  minutes, if we could.  I can't deprive Mr. Davis of an

13  audience.

14         We are just switching over here.  Just a moment.

15         All right.  So, very quickly, this notion that they

16  didn't try a first generation in canola and fail and that

17  this was some grad school project, if this was just some grad

18  school project, why is it in their project progress report

19  submitted to their investor, GRDC, a fellow Australian

20  government entity that's funding their program?

21         They're reporting -- Dr. Singh and Dr. Green are

22  reporting on the progress of the omega-3 program, and they're

23  talking about failure of their first generation.  The notion

24  that this was some parallel track or some grad student

25  project is ridiculous.  It's ridiculous.

1          All right.  Joint results.  The joint results,

2    probably they're in their product, but I can tell you

3    absolutely those joint results are in their patents.  Those

4    joint results are in the patents they filed after this

5    lawsuit started.  Those joint results guided them in

6    targeting their patents to go after our product.  Absolutely,

7    they're using joint results in their patents, and absolutely,

8    we're a co-owner.

9          Now, Mr. Ng talked about the patent race and winners

10   and losers.  Well, there's cheaters, too.

11         MR. DAVIS:  So, ladies and gentlemen, when you go

12   back into the jury room, you'll have a copy of the jury

13   instructions.  They're numbered.  I just want to call out

14   jury instruction number 7, the last sentence.

15         It says, "You may disregard an expert opinion

16   entirely if you should decide that any expert is unqualified

17   or lacks objectivity or credibility or if you should conclude

18   that the factual basis or reasoning given in support of the

19   opinion are not proven or sound or that the opinion is

20   outweighed by other evidence."

21         And perhaps, maybe, you're not persuaded by the fact

22   that Dr. Kunst was willing to come here and rely on a

23   blacked-out protocol, and perhaps you're not persuaded that

24   she wouldn't answer the Kinney question, and perhaps, maybe,

25   even you're not persuaded by the fact that at her school that

```
1   an 85 is an A+.  But you should be persuaded by this:
2           Dr. Kunst worked in Dr. Singh's lab, and 15 or 16
3   years before she showed up on the scene in this case, when
4   she had never even seen the patents, she had already made up
5   her mind.  She had decided that what Dr. Kunst -- excuse
6   me -- she decided that what Dr. Singh had done was
7   groundbreaking.  She had decided that it was new and useful
8   and nonobvious, and she did that before this lawsuit was
9   filed, before any of the work that has been done in this case
10  was done, before she was hired, and before you were here.
11  And so Dr. Kunst showed up having already made up her mind.
12  You can consider that as you weigh the options.
13          Mr. Ng says that BASF and Cargill know that we
14  infringe and we decided to go forward anyway, but I told you
15  in the beginning that timing matters.  How can that be
16  possible, when the patents that have been asserted in this
17  case didn't exist when BASF and Cargill made the decision to
18  go forward?  That's illogical, and it doesn't make any sense.
19          I'll just leave you with this:
20          What I just heard was an appeal to your heart
21  strings:  Please don't deprive Dr. Singh of his life's work.
22          No one is taking Dr. Singh's life's work from him at
23  all.  Dr. Singh's life's work exists in the product that
24  Nuseed presumably will commercialize and sell.  What we're
25  asking you to do is hold Dr. Singh and Dr. Petrie and CSIRO
```

1    and GRDC and Nuseed to the bargain that they struck with the

2    Patent Office, that you can't file a patent in 2004 and then

3    try to enforce it in 2019, when it expands your claims beyond

4    what you actually invented.

5            On the MTEA, if there are claims in other patents

6    that don't relate to what they got from BASF, Dr. Singh still

7    has his life's work.  But when you use someone else's stuff

8    and then you get patents on it, you're not taking his life's

9    work, you're taking back what he didn't deserve in the first

10   place.

11           Thank you for your time and for your consideration.

12   Be safe on Halloween.

13           THE COURT:  All right, ladies and gentlemen.  As I

14   said, we'll adjourn now that you've heard the closing

15   argument.

16           And you've heard me say this to the witnesses

17   repeatedly:  I'll ask you to return to the jury room tomorrow

18   morning at 10:00 with the same state of knowledge as you have

19   as you leave tonight.

20           You're adjourned.

21           (The jury exited the courtroom.)

22           THE COURT:  I'm going to put the instructions and

23   the verdict form on the podium -- I've got one, too -- and I

24   want counsel to review those and make sure they're in the

25   form that was decided at the charging conference as to the

```
 1    instructions and as to the verdict form.  I think there were
 2    a couple of typos we actually corrected this morning.  We
 3    e-mailed copies of the verdict forms to you last night, but I
 4    think there was a correction in one of them, so make sure
 5    they're in proper form to go in to the jury.
 6              And I don't know if you finished reviewing the
 7    exhibits with Lori, but if you haven't, this would be the
 8    time to finish doing so, so that when the jury comes in
 9    tomorrow morning we'll be able to send the instructions, the
10    verdict form, and the exhibits into the jury room promptly.
11    So there it is on the podium.  Look at it and make sure it's
12    correct.
13              And I don't know where you stand on the exhibits, as
14    I say, but if you're not already satisfied that the exhibits
15    are in proper form, this is the time to do it.
16              What are all those big books?
17              THE CLERK:  These are the exhibits.
18              THE COURT:  Really?  That many?  Good luck, guys.
19              The last instruction that I give the jury talks
20    about selecting a foreman and asking questions and so forth.
21    That I will give to the jury tomorrow morning.
22              How about the charts for the jury's --
23              COURT SECURITY OFFICER:  They're in there.
24              THE COURT:  They've already been delivered?
25              COURT SECURITY OFFICER:  Yes, Your Honor.
```

```
 1            THE COURT:  Okay.  Don't remove the jury
 2   instructions from the clip.
 3            (There was a pause in the proceedings.)
 4            THE COURT:  Have counsel found the instructions to
 5   be ready for the jury?
 6            MS. FLANAGAN:  Yes, Your Honor.
 7            MS. GONZALEZ:  Yes, Your Honor.
 8            MR. CONNALLY:  Yes, Your Honor.
 9            THE CLERK:  All right.  Two instructions, one
10   verdict form, one red folder, one cart of exhibits, one clip.
11            THE COURT:  All right.  And you've got your set of
12   the jury instructions?
13            THE CLERK:  I have two sets right here, Your Honor,
14   and Brandon and Josh have gone through them, as well.
15            THE COURT:  All right.  Well, Josh should have a
16   conformed copy, as well.
17            THE CLERK:  This is the correct verdict form.
18            THE COURT:  I've got that form, a copy of that.
19            THE CLERK:  Okay.
20            THE COURT:  But I don't have Josh's conformed copy.
21            THE CLERK:  So this will be ready to go tomorrow.
22            THE COURT:  Well, Josh has got to conform his copy
23   to those.
24            THE CLERK:  That's true; although, these are the
25   official ones now.
```

1          THE COURT:  Well, except we've got another
2   correction.
3          What happens is I make corrections, and then the
4   next draft puts the things I struck back in there.  That's
5   what happened.
6          (There was a pause in the proceedings.)
7          THE COURT:  Anything further to talk about before we
8   adjourn for tomorrow morning?
9          MR. ZAHEER:  Nothing, Your Honor.
10         MR. DAVIS:  Not for us, Your Honor.
11         THE COURT:  We're adjourned until 10:00 tomorrow
12  morning.
13         (Proceedings adjourned at 4:15 p.m.)
14
15                      CERTIFICATION
16
17     I certify that the foregoing is a correct transcript
18  from the record of proceedings in the above-entitled matter.
19
20
21         _____/s/_____
22                  Carol L. Naughton
23                  October 31, 2019
24
25

Carol L. Naughton, Official Court Reporter