```
1                IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
2                         Norfolk Division

3    - - - - - - - - - - - - - - - - - -
                                       )
4    BASF PLANT SCIENCE, LP,           )
                                       )
5            Plaintiff,                )
                                       )
6    v.                                )
                                       )
7    COMMONWEALTH SCIENTIFIC AND       )
     INDUSTRIAL RESEARCH               )
8    ORGANISATION,                     )
                                       )
9            Defendant.                )
     _____  )
10                                     )   CIVIL ACTION NO.
     COMMONWEALTH SCIENTIFIC AND       )      2:17cv503
11   INDUSTRIAL RESEARCH               )
     ORGANISATION, GRAINS RESEARCH     )
12   AND DEVELOPMENT CORP., AND        )
     NUSEED PTY LTD.,                  )
13                                     )
        Plaintiff-Counterclaimants,    )
14                                     )
     v.                                )
15                                     )
     BASF PLANT SCIENCE, LP, and       )
16   CARGILL, INC.,                    )
                                       )
17    Defendants-Counterdefendants.    )
                                       )
18   - - - - - - - - - - - - - - - - - -

19
                     TRANSCRIPT OF PROCEEDINGS
20                    (Jury Trial - Day 13)

21                      Norfolk, Virginia

22                      November 4, 2019

23
     BEFORE:   THE HONORABLE HENRY COKE MORGAN, JR.
24             United States District Judge, and a jury

25
```

Carol L. Naughton, Official Court Reporter

```
 1    APPEARANCES:

 2                    HOGAN LOVELLS US LLP
                      By:  Nitya Anand
 3                         Arlene L. Chow
                           N. Thomas Connally, III
 4                         Una Chiao-Yi Fan
                           Thomas B. Hunt
 5                         Takashi Okuda
                           Jared Schubert
 6                         Anna K. Shaw
                           Ernest Yakob
 7                    Counsel for BASF Plant Science, LP

 8                    VANDEVENTER BLACK LLP
                      By:  Richard H. Ottinger
 9                    Counsel for Defendants, Third-Party
                      Plaintiffs, and Counterclaimants
10
                      KOBRE & KIM LLP
11                    By:  Jonathan E. Barbee
                           Hugham Chan
12                         Matthew I. Menchel
                           Michael K. Ng
13                         Hartley M.K. West
                           Daniel A. Zaheer
14                    Counsel for Commonwealth Scientific and
                      Industrial Research Organisation
15
                      PORTER HEDGES LLP
16                    By:  Miranda Jones
                           Megan Mon-Ting Luh
17                         Erin C. Villasenor
                      Counsel for Grains Research and
18                    Development Corporation

19                    WILEY REIN LLP
                      By:  Alexander Owczarczak
20                         Teresa Summers
                           Lawrence M. Sung
21                    Counsel for Nuseed Pty Ltd

22                    FISH & RICHARDSON PC
                      By:  Ahmed J. Davis
23                         Christopher R. Dillon
                           Elizabeth Flanagan
24                         Daniel R. Gopenko
                      Counsel for Cargill, Inc.

25
```

```
 1                          I N D E X

 2
     WITNESSES                                          PAGE
 3
       BENITA BOETTNER
 4          Direct Examination By Mr. Sung              2181
            Cross-Examination By Mr. Connally           2202
 5          Redirect Examination By Mr. Sung            2224
       JOHN JAROSZ
 6          Direct Examination By Mr. Sung              2226
            Cross-Examination By Ms. Shaw               2288
 7          Redirect Examination By Mr. Sung            2344

 8

 9

10

11                      E X H I B I T S

12
     NO.                                                PAGE
13
       CX-0181                                          2220
14     CX-0483                                          2274
       CX-0681                                          2220
15     CX-0928                                          2259
       CX-0964                                          2276
16     CX-1723                                          2198

17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

1              (Proceedings commenced at 9:57 a.m.)

2              THE COURT:  All right.  Counsel, I went through your

3     briefs.  I don't see any way to avoid an issue that one of

4     you brought up, I'm not sure who, about avoiding having the

5     damage witnesses testify twice.  I think they're going to

6     have to do that.  And this phase of the case is going to deal

7     only with past damages.  You should caution your witnesses

8     not to mention anything about injunctions or any form of

9     future damages.

10             So that's all we're talking about in opening

11    statements.  That's all the evidence we'll deal with, is past

12    damages.  And then when the jury decides that issue, we'll --

13    well, actually, probably while they're deliberating, we'll

14    start talking about future damages, but we will not talk

15    about them in this phase of the case.

16             Somebody raised something about the '792 patent not

17    being used.  I don't think that's going to have any major

18    effect on this phase of the case.  We'll take it up prior to

19    the next phase, if you claim that that wasn't used.  If you

20    claim that wasn't used, so be it.

21             All right.  We're not going to keep the jury

22    waiting.

23             (The jury entered the courtroom.)

24             THE COURT:  Good morning, ladies and gentlemen.

25    This morning we're going to take up what is called past

2162

1    damages, that is, damages incurred by the plaintiff up until

2    this point.  That's the issue the jury has to decide.  That's

3    all we're going to be talking about at this point in the

4    case.

5            You will hear opening statements from counsel just

6    as we did in the previous phases of the case.  But, of

7    course, as I say, at this point we're limited to the issue of

8    what are the past damages suffered by the proponent of the

9    patent.

10           All right.  You may proceed.

11           MR. SUNG:  Thank you, Your Honor.

12           Good morning, everyone.  My name is Lawrence Sung,

13   and I'm counsel for Nuseed.  I met you on the first day.

14   Remember three weeks ago when you crammed into the front rows

15   right behind me here, you were probably looking around and

16   seeing all the lawyers and maybe even asking yourself, so

17   this is what it's like when the circus comes to town.  That's

18   okay.  We all get it.  We've journeyed quite a distance

19   together since then, and now we're asking you to come just a

20   bit farther.

21           For our part, we promise to take you through our

22   proofs as efficiently as we can.  You will hear from just two

23   witnesses for the proponents:  Ms. Benita Boettner, Nuseed's

24   new omega-3 global general manager, and our damages expert,

25   Mr. John Jarosz.

1          You might recall Ms. Boettner.  The opponents played

2     a video clip of her deposition earlier.  They all look like

3     moving mugshots.  Yes.  But you'll get to hear from her and

4     see her live today, and, hopefully, that will give you a

5     better sense of the person she is.

6          Like a stage play, a patent trial can have different

7     phases or acts.  We finished Act I, the liability phase, when

8     you found that BASF and Cargill infringed five of the

9     asserted patents.  We now start with Act II, the damages

10    phase, which asks what the appropriate remedy is for BASF and

11    Cargill's infringements.

12         We're separately going to be talking to Judge Morgan

13    about another aspect of remedies, but today, we're here just

14    to talk with you specifically about your starring role, which

15    is going to be assigning a royalty in the form of a

16    percentage.

17         And this rate is the centerpiece for two different

18    reasons:  First, from it, we can calculate the amount of past

19    damages, that is, the loss that the proponents have already

20    suffered due to BASF and Cargill's infringement; and, more

21    importantly, your rate can also serve as a guide for

22    conversations that we'll have with Judge Morgan, again about

23    other remedies that might be available to the proponents.

24         We'll continue to be straight with you.  Helpful or

25    hurtful to this case, you'll hear about the facts as we know

1    them.  So let's begin with a few points.

2          Patent damages are not about punishment.  It's not a

3    toll or a tax or a fee that a patent owner collects.

4    Remember, the patent video described a patent as an earned

5    right to temporary exclusivity, but if there is the presence

6    of various products on the market, then that exclusivity may

7    not be there, and so what we do with damages sometimes is to

8    assign fairly a compensation for any exclusivity that might

9    have been taken away.

10         The opponents have said repeatedly that no one has

11   sold a product yet.  We agree.  The opponents will keep

12   reminding you that the total amount of money they owe for

13   past damages is less than a couple thousand dollars.  We

14   agree with that, too, but that doesn't mean that's what

15   happened up till now is unimportant.

16         It's actually the opposite.  That's right.  The work

17   that BASF and Cargill have been doing to obtain regulatory

18   approval, and to get their product ready for market, is a

19   great harm to the proponents even if BASF and Cargill haven't

20   made a cent yet.

21         What they've done isn't research.  It's

22   commercialization; it's competition; and most of all, it's

23   infringement.  And what's plain as day, a company does not

24   take 20-plus years, employ hundreds of people, and spend

25   hundreds of millions of dollars on something that has zero

1    commercial value.

2          Now, in some cases, we can use the lost profits of a

3    patent owner, due to the infringer's sale, as a proxy for the

4    value of the economic injury.  But sometimes, it's harder to

5    quantify when products haven't been sold yet, such as in this

6    case, and that's why we'll be talking again with Judge Morgan

7    about another remedy.  But it's wrong to say that the value

8    on infringing conduct cannot be set alternatively.  Indeed,

9    the law addresses the circumstance by asking juries to

10   calculate something called a reasonable royalty.

11         Now, you might have wondered, and, yes, the patents

12   have -- the parties have, for years, on their own tried and

13   failed to work out a business settlement, mainly because of a

14   disagreement about the patents that you've heard about but

15   also because we've been unable to come up with a mutually

16   acceptable dollar amount.

17         So now we're asking you to sit in judgment to tell

18   us what royalty the parties should have agreed to if they're

19   all put together in a room and told to come up with a

20   percentage that would allow both sides to be on the market.

21         The patent law calls this a hypothetical

22   negotiation.  And like all good compromises, no one gets

23   their way entirely.  But this is one path to calculating a

24   fair compensation for the patent rights that were violated.

25   Again, the percentage you set now is important for those two

1    reasons that I mentioned earlier; to determine past damages

2    and for informing Judge Morgan on another matter.

3           Now, opponents' counsel may try to tell you in this

4    phase of the trial that Chilean's fish feed makers viewed the

5    two products, Nuseed's Aquaterra and Cargill's Latitude,

6    differently.  But Cargill's witnesses have already spoken of

7    Nuseed and Cargill as direct competitors; and Aquaterra and

8    Latitude as competing products.

9           And as you heard from both sides in Act I, the

10   aquaculture market alone for omega-3 oil is a billion-dollar

11   business.  Again, you'll hear Cargill say why are we even

12   talking about past damages when no one's sold anything yet?

13   But you heard Mr. Horton admit that Cargill has been growing

14   infringing crops since 2017, regardless of whether they call

15   it research or trials or testing.

16          You don't get a pass on paying for your infringement

17   just because you haven't made any money on it yet.  And

18   Cargill wouldn't be ready to sell Latitude but for that past

19   infringing conduct.  Cargill declared here that commercial

20   launch has begun, and that was years ago, long before

21   receiving USDA deregulation and before the so-called brand

22   launch of Latitude that Mr. Christiansen spoke of.  Don't be

23   fooled.  The absence of a commercial sale of Latitude is not

24   the same thing as the absence of commercial activity by

25   Cargill.  Cargill has been busy promoting Latitude to the

1     aquaculture market, and by this activity, Cargill has harmed

2     and continues to harm Nuseed.

3            Cargill was keeping a watchful eye on the

4     competition even in 2016.  Fast-forward to present day, and

5     pardon the pun, Nuseed is the only one left standing in the

6     field of crop-based omega-3 oils.  And Cargill was taking aim

7     when it noted that CSIRO and Nuseed need partners and money

8     to execute.

9            Cargill has always known it can leverage its

10    long-time supply chain partners and outspend Nuseed handily.

11    As we've said before, the patents in this case are what

12    protect us and what help level the playing field.

13           And what's been Cargill's master plan?  Global

14    commercial dominance into 2025.  You see here planting of a

15    half a million acres of Latitude-producing crops has been its

16    vision all along.

17           As for Nuseed, we haven't been sitting idly either.

18    The oil crushed from seeds harvested from 35,000 acres

19    planted this year will be sold as Aquaterra next year, 150

20    railcars full of that precious oil.

21           Nuseed has been giving Aquaterra away for free --

22    that's right; free -- to feed over a million salmon in Chile

23    to confirm product safety and to learn the benefits of a

24    DHA-rich fish-oil replacement.  If Cargill is allowed to sell

25    Latitude, it would reach the windfall of Nuseed's hard and

1    expensive work to educate and build omega-3 canola oil

2    interest with those same aquaculture customers.

3           Nuseed is also expected to obtain FDA regulatory

4    approval soon for the sale of Nutriterra to the human market.

5           These studies are reported every day making certain

6    health benefits with DHA-rich omega-3 oil for human

7    nutritional supplements and pharmaceuticals.

8           And with USDA regulation or deregulation now in

9    hand, nothing stops Cargill from writing sales contracts

10   today in Chile.  This would be for Latitude that Cargill will

11   plant crops for next spring in unrestricted acreage.  And the

12   folks in Chile have already heard their share of rumor and

13   innuendo about Aquaterra and Latitude, so it shouldn't

14   surprise you that the market is confused about a lot of

15   things.  And because Cargill keeps reminding the aquaculture

16   industry that Latitude is coming, Nuseed is harmed because

17   those Chilean fish feed makers may think twice about entering

18   into supply contracts with Nuseed.

19          Aquaterra and Latitude are the only two crop-based

20   omega-3 oils in the foreseeable future.  There aren't any

21   other scaleable, sustainable, and cost-efficient alternatives

22   to natural fish oil available.  This is effectively a

23   two-player market where every infringing sale of Latitude is

24   a lost sale of Aquaterra.  If Latitude is allowed to enter

25   the market, it will compete with Aquaterra even though it

1    infringes.

2         Now, you've heard earlier that Cargill bought into

3    the aquaculture market in 2015 by purchasing a company called

4    EWOS for $1.5 billion.  EWOS is now a division of Cargill

5    known as Cargill Aqua Nutrition.  And they control almost a

6    third of the global fish feed market.  So if Cargill is

7    allowed to sell Latitude, Nuseed will be shut out completely

8    of a third of the market, automatically, and limited to

9    competing for the only remaining two-thirds of the market.

10        So that's Cargill's edge.  So, you see, some may

11   call a patent a temporary monopoly granted by the government,

12   but if the asserted patents are not enforced here, Cargill's

13   market power will give it a monopoly on omega-3 canola oil.

14   And plus, as both buyer and seller of Latitude, Cargill can

15   engage in lower transfer pricing.  And what happens with

16   Aquaterra, as we mentioned, will have a direct impact on

17   Nuseed's financial ability to bring Nutriterra to the human

18   market for the health benefit of consumers, which brings us

19   all back to the critical question for you today.

20        What royalty should the parties have agreed to in

21   November 2018 to permit the infringers to sell Latitude?  And

22   two considerations go into this hypothetical negotiation, and

23   they're called comparability and apportionment.  So let's

24   talk about comparability first.  If you're selling your home,

25   you price it based on comparables.  This might include what

Carol L. Naughton, Official Court Reporter

1    you bought your home for, what similar homes have sold for,

2    but you wouldn't price that based on what somebody else paid

3    just for the bricks or the concrete that they used to build

4    their home.

5            So what's the right benchmark for valuing the

6    patents here?  After looking at many comparables, our expert,

7    Mr. Jarosz, selected the CSIRO, GRDC, and Nuseed agreement on

8    the one hand; and, secondly, the BASF and Cargill agreement,

9    and picked those as the two most reliable comparables.  These

10   agreements are by the parties to this case concerning the

11   omega-3 canola technology in the case.

12           What better benchmarks than the same who, what,

13   when, where, how and why?  Plus Mr. Jarosz didn't just lift

14   numbers straight out of these contracts.  He properly

15   adjusted for certain factors and calculated royalties.  So

16   the royalty percentages he arrived at was 12.4 percent and 13

17   percent, respectively.  But unlike rates from agreements

18   between friends, you'd expect the rate that would apply to a

19   competitor would be much higher.

20           On the other hand, the opponents' experts will point

21   to what BASF paid others for the right to use certain

22   enzymes, only some of which are used to produce Latitude, and

23   they'll say that that's the measure of what BASF and Cargill

24   owe for infringing the asserted patents, between .7 percent

25   and 2.3 percent, or expressed another way, 1.4 percent plus a

one-time payment of $1.235 million.  Mind you, this is almost
10 times less than what Cargill paid BASF in their own
agreement, and it's certainly nothing near the $200 million
they've spent developing Latitude.

So what about apportionment?  You've already heard
testimony from Dr. Kunst that each of the asserted patents
covers the entire blueprint or pathway of the invention.
Mr. Jarosz supplied apportionment correctly in his analysis.

The infringement of any one of those asserted
patents commands the full value of this technology.  It's not
just to a component or a minor feature of omega-3 canola.

Now, Cargill might tout other aspects of its
Latitude-producing seeds to try and diminish the patented
technology that is only a minor feature, but the bottom line
is, without the infringing LFK genes, Cargill's canola can't
make long-chain omega-3s, and if Latitude didn't contain
long-chain omega-3s, we wouldn't even be here.

So what's the final scorecard?  A reasonable royalty
of 12.4 percent is what BASF and Cargill would have paid if
they got the same deal as Nuseed under the CSIRO, GRDC, and
Nuseed agreements.

That's the very least that BASF and Cargill should
pay.  But, again, because competitors shouldn't expect to get

We ask that you accept Mr. Jarosz's comparables and
to reject those of the opponents' expert.

1    the same rate as true partners do, the rate we'd be asking

2    for would be higher.

3           Now, a royalty of 49.1 percent would be what the

4    proponents would be losing due to BASF and Cargill's

5    infringement.  And if Cargill were to come onto the market

6    with Latitude, this is the amount it would take to make the

7    proponents whole and keep Nuseed in business.

8           Now, would BASF and Cargill have done much better

9    had they struck a deal with us?  Perhaps.  But as opponents

10   noted in their closing, they, instead, chose to sue us twice,

11   bringing us here.  You've already sent a powerful message

12   that BASF and Cargill cannot ignore the proponents' patents.

13          We ask that you now hold them accountable for that

14   infringement.  Please reject the single-digit royalty number

15   suggested by BASF and Cargill.  To say that this fight has

16   been over 1.4 percent or just a few thousand bucks, well, you

17   know what rings hollow and what rings true.  Thank you for

18   your kind attention.

19          MS. SHAW:  Good morning, ladies and gentlemen.  My

20   name is Anna Shaw, and I represent BASF.  I want to first

21   thank all of you for your service over the past few weeks,

22   and also coming back today for another round.  You have

23   listened carefully and often patiently to our witnesses and

24   closely reviewed the evidence in this case.  There is no

25   doubt that both opponents and proponents of the patents, as

1    well as this Court, appreciate your service and have been

2    impressed with the rigor of your deliberations on what have

3    turned out to be very highly complex and scientific matters.

4            It has been a long road, and we are very close to

5    the end, but there remains one undecided and very important

6    decision, and that is what is the remedy appropriate here?

7            Now, just to be clear, the decision before you is

8    what is the total amount of passed damages in this case?  And

9    the amount that the proponents of the patent are requesting

10   is $356 to $1,456, and you heard that amount correctly.

11   About three weeks ago, proponents asked you, the jury, to

12   find five groups of patents, the Groups A, B, C, D, and E

13   patents valid, infringed, and co-owned by BASF and Cargill.

14           During the trial and before the verdict was entered,

15   this Court found that the Group C patent was not infringed.

16   Then, just last week, proponents dropped their infringement

17   claim for the Group D patent against Cargill's commercial

18   plant line, the 9093 line.  The reason why is because

19   proponents' attempt to target Cargill's commercial product

20   missed the mark.  Remember, that the Group D patent only

21   covers a specific oil profile.  It does not cover plants,

22   cells, or seeds.

23           It does not cover any genes, including the Acyl-CoA

24   genes or bifunctional genes, and it does not cover the

25   delta-6 pathway, and I hope that's the last time I refer to

1    the Acyl-CoA bifunctional enzymes or delta-6 pathway again,

2    as I'm sure all of you do as well.

3        When they filed that Group D patent in August of

4    2017, proponents targeted the very specific oil profile from

5    the LFK elite event in BASF's research canola line, which was

6    publicly disclosed in its petition for deregulation.

7        This was not oil from Cargill's commercial lines.

8    Remember, Cargill took the LFK elite event and transferred it

9    into their commercial hybrid lines.  Then they did further

10   cross-breeding to improve the profile of that oil.

11       As a result, the oil profile of Cargill's Latitude

12   product, which is what we are talking about here today in

13   this courtroom, does not infringe the Group D patent.

14       So on the Group D patent, proponents are left with a

15   finding of the infringement on oil that will never be offered

16   for sale and for which there will be no damages.

17       Then last Friday, you found that the Group B patent

18   was co-owned by BASF, and thus, unenforceable in this case.

19   And you also found that the Group E patent was invalid.  Of

20   the five groups of patents that were litigated in this case,

21   only one group, the Group A patents, which expire in April of

22   2025, has found to be infringed by Cargill's commercial

23   product Latitude.  It is only these patents in Group A that

24   should be the focus of your consideration as you assess

25   damages and royalties in this case.

1          Now, the other side has painted a very optimistic

2     picture of what the market for omega-3 oil is in the fish

3     feed market.  On the first day of trial, Mr. Zacharias

4     testified that this is a multibillion-dollar market and that

5     the sky is the limit.  The truth is that Nuseed and Cargill

6     have very different views of what this market looks like,

7     what it costs to make this product and deliver it to market,

8     and what the profit actually might be.  And these differences

9     significantly impact the royalty rate and the amount of

10    damages in this case.

11         You will hear more about that from my colleague,

12    Chris Dillon, and from Dmitri Gromov from Cargill who is in

13    charge of the Latitude product.  It will be up to you to

14    decide whose numbers are more credible.  The self-called

15    start up Nuseed, or a company like Cargill who has over 100

16    years of farming experience, including in aquaculture in the

17    United States.

18         Now, proponents want to recover past damages for

19    these small amounts of oil that have been produced for

20    testing purposes in experimental use.  But remember, to date,

21    neither party has sold any omega-3 oil.

22         In fact, as you can see from this chart, Cargill

23    does not even expect that it will have first sales until next

24    year.  So I told you that the top amount of damages that

25    they're seeking, past damages that they're seeking, is

1    $1,500, and you might ask yourself, why do proponents care so

2    much about a small number?  I'm going to tell you.  Because

3    there are no sales, no profits, no costs, the proponents want

4    you, the jury, to set a reasonable royalty rate based on

5    so-called comparable license agreements, comps that their

6    expert, Mr. John Jarosz, will testify about.  And because the

7    total amount they're asking for is so small, they're hoping

8    you will just go ahead, award them the whole thing, and in

9    the process, rubber-stamp the royalty rate they are

10   proposing.

11          But the truth is, they do not even care about this

12   small amount.  In fact, opponents offered to pay them that

13   amount to take it off the table, but they refused.

14          Why?  Because proponents hope if you agree with

15   their small number, they can persuade this Court to use that

16   number in future decisions that this Court might address.

17   Now, proponents are presenting a royalty rate based on

18   comparable agreements.  Just like Mr. Sung said, it's like

19   going on Redfin or Zillow and finding comps to determine the

20   value of your home.  But the comps that proponents rely on

21   cover way more than just the Group A patents, which are the

22   only patents relevant in assessing what damages are owed on

23   the Latitude product.

24          One of the comps proponents rely on is their own

25   agreement; the agreement between Nuseed, CSIRO, and GRDC.

1   But as you heard from Mr. Zacharias on the first day of
2   trial, one of the specific reasons Nuseed partnered with
3   CSIRO and GRDC was their patent estate.  Those are his words,
4   not mine.
5           That estate included way more than just the Group A
6   patents.  Further, and importantly, none of the comps
7   Mr. Jarosz relies on provide for any payments based on
8   production of oil without sales; and further, Mr. Jarosz
9   relies on a rate -- Mr. Jarosz came up with a rate in May
10  when all five groups of these patents were in play, but
11  today, have not revised that rate at all, even though only
12  one of those groups of patents remain.
13          Now, there are other comps in this case that BASF
14  and Cargill's expert, Mr. Brian Napper, relied on to come up
15  with a reasonable royalty.  And, in fact, you have already
16  heard about these agreements during the liability phase
17  during the testimony of Dr. Carl Andre when he talked to you
18  about how they came up with their proof of concept for their
19  elite event.
20          And you'll see that what BASF paid those partners
21  that they worked with while they were developing the elite
22  event was based on fair comps, and it is a lot less than what
23  proponents are asking for now.
24          Just this August, BASF and Cargill received
25  regulatory approval to plant their omega-3 canola oil.  This

1    means that this upcoming spring, Cargill will plant its first

2    commercial crop of omega-3 plants in Montana.  And after all

3    that time and money that they have invested, BASF and Cargill

4    will finally be able to offer Latitude oil to the aquaculture

5    market next year and slowly begin to see a return on their

6    investment.

7              But what proponents are asking you to do is to take

8    virtually all, or even more than all, of BASF and Cargill's

9    expected return on that investment and hand it to them.

10   Proponents are not interested in making money by competing

11   with BASF and Cargill in the market.  If they did, they could

12   be selling product already.  They received regulatory

13   approval a year before BASF did.

14             Proponents have chosen a different strategy, and

15   that is to compete in this courtroom.  Ladies and gentlemen,

16   you now have the responsibility to decide whose behavior and

17   whose work you will reward and protect.  Are you going to

18   reward proponents who have no sales, no business plan, no one

19   responsible for sales, and are seeking to make money off of

20   BASF and Cargill's hard work, unwilling to compete with them

21   in the market; or will you protect BASF and Cargill, two

22   companies that actually are committed to investing in and

23   bringing an entirely new product to market?

24             It is hard to do what BASF and Cargill are trying to

25   do, and many will start their journey on this path and give

1    up because it is hard, because it requires investment, and

2    success is not overnight, must less guaranteed.  BASF and

3    Cargill have stayed the course.  They filed this lawsuit to

4    stay the course.

5         As you consider the appropriate remedy, this is the

6    path that BASF and Cargill respectfully request that you

7    choose to protect today.  Thank you very much.

8         MR. DILLON:  How much time do I have?

9         THE LAW CLERK:  Three minutes, 56 seconds.

10        MR. DILLON:  That will be plenty.

11        Ladies and gentlemen, I haven't met you before.  My

12   name is Chris Dillon.  I work with Mr. Davis at Fish &

13   Richardson, and we represent Cargill.  And I have one

14   question for you today.  It's the same question the Judge is

15   going to ask you at the end:  What are the past damages?

16   This is not about the future.  That's for the Judge.  Your

17   sole question is what are the past damages in this case?

18   Those accrued to date.  This isn't going to be about

19   Cargill's plans for the future or Nuseed's plans for the

20   future.  This is about what is the amount owed today, and I

21   think you're going to base your decision on that, on the

22   evidence, the evidence that is accrued as to the damages to

23   date.

24        And there are a couple of factors you need to

25   consider:  One is have there been any sales of Nuseed's

1    product or of the Latitude product of my client Cargill?   The

2    answer is no.   Dr. Dmitri Gromov, the program manager for

3    Cargill's Latitude program will come and testify to you that

4    today there is no product that exists.   There are no sales,

5    no offers for sale.   The first time we're going to

6    manufacture that product is next year.   If a customer came

7    today, there is nothing to sell.   So there is no product

8    today.   All Cargill activities to date have been research and

9    development to create that product that will be launched next

10   year.

11          The second piece of evidence that you need to

12   consider are those very license agreements that Mr. Sung

13   mentioned in his opening.

14          He said his damages expert based it on the

15   Cargill/BASF agreement and also and, primarily, on the

16   Nuseed/GRDC agreement.   What do those agreements say about

17   this pre-sales activity?   With regards to BASF and Cargill,

18   Cargill has agreed to share the profit in the business with

19   BASF once the business is profitable.   Under -- and

20   Dr. Dmitri Gromov will tell you that the current projections

21   are that will occur in 2023.

22          So under the BASF/Cargill agreement, there are no

23   past damages because nothing is owed until their business

24   gets profitable, which necessarily occurs after there are

25   sales.   But I want you also to pay attention to the agreement

2181

1    between CSIRO and GRDC and Nuseed, because under that

2    agreement, which forms the basis for his 12.4 percent royalty

3    rate, there is no money owed by Nuseed to CSIRO until there

4    is a sale, which has not occurred.

5              So under both companies' sets of agreements, the

6    parties have agreed that the commercial arrangement is once

7    you have made a sale, then you owe a royalty; and before

8    that, there is no money owed.

9              THE COURT:  Your time is up.

10             MR. DILLON:  Thank you very much.

11             THE COURT:  All right.  We'll hear first from the

12   proponents.

13             MR. SUNG:  Your Honor, we'd like to call Ms. Benita

14   Boettner to the stand.

15             (Witness sworn.)

16             MR. SUNG:  May I proceed?

17             THE COURT:  You may.

18             BENITA BOETTNER, called by Nuseed, having been first

19   duly sworn, was examined and testified as follows:

20                       DIRECT EXAMINATION

21   BY MR. SUNG:

22   Q.  Hello, Ms. Boettner.  Please introduce yourself to the

23   jury.

24   A.  Yes.  My name is Benita Boettner.  I'm from Arvada,

25   Colorado.  That's a suburb of Denver.

Boettner, B. - Direct

1    Q.  You were introduced to the jury via a video of your
2    deposition last Monday.  Do you recall being deposed?
3    A.  I definitely do.  It's not something you quickly forget.
4    Q.  Do you have an understanding of why you were being
5    deposed at that time?
6    A.  It's my understanding that I was deposed because Andy
7    Thomas had left the company and might not be available for
8    trial.
9    Q.  And who is Andy Thomas?
10   A.  Andy Thomas was my boss at the time and head of
11   innovation and strategy at Nuseed.
12   Q.  And so at the time you were deposed, how long had you
13   been in this new role of yours?
14   A.  The job that I'm in now, I was two-and-a-half weeks into
15   that job.  It was brand new.
16   Q.  And was that your first time being deposed?
17   A.  It was.
18   Q.  But you answered the questioning attorneys' questions
19   truthfully and accurately, yes?
20   A.  Yes.  I tried to answer them as fully and accurately as I
21   could.
22   Q.  Before we get to your background, let's stick with a
23   couple of the deposition aspects.
24          Do you recall testifying that Nuseed has not yet
25   sold Aquaterra?

─────Boettner, B. - Direct─────

1   A.   Yes.   I remember that, and that's still the case.
2   Q.   So what is your understanding of when Nuseed will sell
3   Aquaterra?
4   A.   So there's no definite date.   There are a lot of things
5   that go into determining when a company might sell a product,
6   but we're working in that direction, and my personal goal is
7   within the next six months, we'll have sold some Aquaterra.
8   Q.   And so Nuseed doesn't have any contracts in place today
9   for the sale of Aquaterra; is that correct?
10  A.   That's correct.   That's what I mentioned at the
11  deposition, and that's still the case.
12  Q.   And in your deposition, were you asked about any harm or
13  injury to Nuseed from what Cargill was doing?
14  A.   I remember being asked a lot about that.   There were many
15  questions, probably more than a dozen, that I remember from
16  the deposition.
17  Q.   Do you recall that repeatedly in response to those
18  questions about harm or injury, you said you couldn't answer?
19  A.   I do.
20  Q.   And why is that?
21  A.   Yeah, so the terms "harm" and "injury," they're not words
22  I normally use, and for me, it seemed that the question
23  was -- had some sort of legal significance that had a special
24  legal meaning, and so I had tried to ask the attorney for a
25  definition so that I could answer the question, and I wasn't

—————Boettner, B. - Direct—————

1    given one.

2    Q.  So are you saying here today that Cargill's activities

3    have not affected Nuseed?

4    A.  No, I'm not saying that at all.

5    Q.  And what types of activities and what have their effects

6    been, then?

7    A.  Yes, so I guess one example I could give is that we're

8    looking now for growers in Montana.  Around this time of

9    year, you start to recruit farmers to work with, and so

10   Cargill is also looking for growers for their omega-3 canola

11   in Montana, and we're having to compete for farmers that will

12   grow our crop.

13   Q.  Any other examples than that?

14   A.  Yeah.  I would say, in my interactions with the

15   aquaculture industry, so we've been trying to move them

16   through kind of a collaborative approach into a commercial

17   discussion, and those discussions are being slowed down, in

18   my opinion, in part, because Cargill is very active in the

19   market.

20   Q.  And at your deposition, was it your testimony that Nuseed

21   had no plan for selling Aquaterra?

22   A.  I think I remember saying that I believe Nuseed would

23   absolutely intend to sell Aquaterra.  I think the discussion

24   around a plan was my comment was that we don't have a formal

25   or informal business plan.  It's just not how Nuseed

2185

─Boettner, B. - Direct─

```
 1   operates, and I think a lot of businesses are very successful
 2   without a formal business plan.
 3   Q.  And so there's just no document at Nuseed that you would
 4   call a formal or informal business plan --
 5           MR. CONNALLY:  Objection.  Leading.
 6           THE COURT:  Sustained.
 7   BY MR. SUNG:
 8   Q.  Is there a formal business plan?
 9   A.  No, that is what I was just trying to explain.  We don't
10   have a written business plan or strategic plan, but that
11   certainly doesn't mean that we don't have an intent to
12   commercialize or take this product to market.
13   Q.  You were also asked during deposition whether Nuseed has
14   a sales team.  Do you remember that?
15   A.  I do.
16   Q.  And do you recall what your answer to that was?
17   A.  Yes.  I said we didn't have a sales team, which we don't.
18   Q.  And how can you not have a sales team as a company that's
19   going to move forward with commercialization?
20   A.  Yeah.  So I think the most important thing to understand
21   is that this industry, especially the market that we're
22   focused on, which is salmon and trout feed, is made up of a
23   small number of companies.  There's probably four or five
24   that would be seed suppliers.  And on the farming side,
25   there's maybe 10 or 12 in Chile that we're focusing on.  And
```

──────Boettner, B. - Direct──────

1    so I've been working for the last three years to build strong

2    relationships in that market, and it's easily something that

3    I can handle.

4    Q.  And since your deposition, has Nuseed hired any

5    individuals that you would consider part of a sales team?

6    A.  Yes.  Last week, I extended an offer that was accepted to

7    someone in Chile that will be a business lead for aquaculture

8    in Chile, and so a part of his role will be to help sell

9    Aquaterra into the market.

10   Q.  And so let's come back to sort of step one.

11          What is your present job title at Nuseed?

12   A.  My job title today is global general manager, omega-3.

13   Q.  And in that role, what do you do?

14   A.  So in addition to the work I was doing to develop the

15   market, I now have taken on responsibility for supply chain

16   and regulatory work.  It, in essence, is full responsibility

17   for the business now.

18   Q.  And prior to assuming this role, what was your previous

19   job title?

20   A.  My title before was global lead for commercial strategy,

21   omega-3.

22   Q.  And were those the only two job titles you've held at

23   Nuseed?

24   A.  Yes.

25   Q.  And so what did you do prior to Nuseed?

Carol L. Naughton, Official Court Reporter

2187

Boettner, B. - Direct

1   A.   Just before joining Nuseed, I was with a consulting

2   company called Lismore Advisors.

3   Q.   And what did you do at Lismore?

4   A.   Well, we did a wide range of consulting work, mostly

5   focused on market assessments and helping companies think

6   about strategic planning.

7   Q.   Was Nuseed one of your clients while you were at Lismore?

8   A.   They were.

9   Q.   And do you recall when you joined Nuseed?

10  A.   I joined in 2016.  I think it was March.

11  Q.   And who do you report to directly today?

12  A.   I report to Brent Zacharias.

13  Q.   And you're aware that he testified as a witness at this

14  trial earlier; is that correct?

15  A.   That's my understanding.

16  Q.   Now, what is your -- well, let me ask you:

17          How many direct reports do you have right now in

18  your present job?

19  A.   In my new position, I now have three direct reports, and

20  they have people reporting to them, as well, so I think it's

21  a total of eight or nine with the new hire.

22  Q.   So what is your general understanding of the aquaculture

23  industry?  What is aquaculture?

24  A.   So aquaculture, I guess, in its simplest sense, is

25  farming of fish and a whole lot of different species and

2188

Boettner, B. - Direct

1    shrimp.  So fish, that's tilapia, carp, cod.  It's a whole

2    range of different species that are farmed.  The aquaculture

3    industry within the -- all of the companies that are needed

4    to support that industry.  So it would be the processing

5    plants, the equipment makers that provide nets, the aquafeed

6    companies.  So holistically, it's everything that goes into

7    farming fish and shrimp.

8    Q.  And is it part of your job responsibilities to maintain

9    an awareness of developments in this industry?

10   A.  Yes, it definitely is.

11   Q.  And how do you do that?

12   A.  I do that in a lot of different ways.  I get daily

13   newsletters, electronic newsletters.  I attend conferences.

14   I'm in discussions with the industry.  I also have some

15   consultants that are working in Chile.  So they're in regular

16   contact with me.  I have a weekly call.  So it's through a

17   whole range of different ways.

18   Q.  So have you been down to Chile to see these fish farms

19   and other components of the aquaculture industry?

20   A.  I have.  I've been to Chile many times.

21   Q.  Can you give us a sense about what these fish farms are

22   like from a size or scope?

23   A.  Yeah.  So they're much larger than you would expect.

24   They're huge.  I'm trying to picture in this room the size of

25   a net pen, but you would have -- usually, one site would have

—Boettner, B. - Direct—

1    two sites to it.  So it has nets, what they call pens, and

2    it's probably the size of the circumference here each, and

3    then it's divided in -- each cage or pen has 50,000 to

4    100,000 fish in it.  So the whole site might have 800,000 to

5    a million fish that are being farmed on just one site.

6    Q.  And so this is out in the saltwater part?

7    A.  Yeah, out in a bay typically where it's a little

8    protected from the ocean.

9    Q.  So let's shift a little bit to the Nuseed's product,

10   Aquaterra.

11          Can you describe what Aquaterra is?

12   A.  Yeah.  So, first of all, Aquaterra is the brand name for

13   the omega-3 canola oil that we plan to sell to aquaculture.

14   I'm guessing that there's been some discussion about that

15   product, but it has, in my opinion, unique fatty acid

16   profile, high DHA and high ALA, so high total omega-3, which

17   is very appealing to the industry.

18   Q.  And do you plan to sell Aquaterra to the fish feed

19   suppliers in Chile?

20   A.  Yes.

21   Q.  If I could refer you to a tab in your binder in front of

22   you.  It is CX-0928.  CX-0928.

23          MR. CONNALLY:  Objection, Your Honor.  May we

24   approach?

25          THE COURT:  All right.

Carol L. Naughton, Official Court Reporter

——————————Boettner, B. - Direct——————————

1           MR. CONNALLY:  Hearsay, foundation.

2           (The following was heard at sidebar:)

3           MR. CONNALLY:  Two issues, Your Honor.  First is an

4    evidentiary issue.  All the exhibits they've marked are all

5    hearsay documents, none of which -- I'm not sure if this

6    witness would have foundation for, and she testified at her

7    deposition she didn't know any of the background for any of

8    these things.  She didn't know what their sales or sales

9    plans were.  She didn't know any of the logistics around what

10   they were growing, how many acres they were growing, anything

11   like that.  She didn't know any of this, and now she is going

12   to offer a series of hearsay documents, none of which that

13   she's the author of, as far as I could see, to testify all

14   about future damages, as far as I can tell.

15           So evidentiarily, it's improper.  And then your

16   order was this proceeding is limited to past damages.  This

17   has nothing to do with past damages.

18           MR. SUNG:  Sorry.  I was just about to lay the

19   foundation, Your Honor, for how she has been involved with

20   certain portions of these documents, and we would limit our

21   questioning to those portions.  I think the answer she gave

22   at her deposition about not knowing certain aspects were not

23   about not knowing the document, they're not knowing certain

24   topics that might have been discussed in those documents.

25   What I can say is that we'll be brief in terms of going

———Boettner, B. - Direct———

1   through this particular document on very discrete points, but
2   I think you'll see our foundation.
3        THE COURT:  Well, it looks like the documents refer
4   to their plan for future sales as opposed to having anything
5   to do with damages that they've suffered up until now.
6        MR. SUNG:  Well, I think part of this is also
7   background information.  It's not a matter of simply whether
8   or not these relate to past damages or future damages.  All I
9   can say is if you offer a little latitude on this --
10       THE COURT:  Well, all these plans, I mean, how have
11  your plans for marketing your product been affected by all
12  these documents?
13       MR. SUNG:  Well, this particular document is going
14  to show the specific customers that we have been trying to
15  sell to at this point in time, Your Honor.
16       THE COURT:  All right.  But you don't have anything
17  to sell.
18       MR. SUNG:  Well, we are trying to sell.  I think
19  that's the relevant aspect about it.
20       THE COURT:  Well, the evidence was clear that they
21  did not have a product ready for market.
22       MR. SUNG:  Well, we have a product ready for market.
23  We haven't sold a product yet.
24       THE COURT:  That's not the way I understood her
25  testimony here in the trial.  They had not tried to sell the

———Boettner, B. - Direct———

1   product.  They didn't have any plans to sell.  So their plans
2   are not relevant to this portion of the damage hearing.  Did
3   I hear you say you were asking for $1.2 million?  Is that for
4   royalties?
5        MR. SUNG:  No.  That is what the opponents' expert
6   will be testifying is the appropriate royalty.
7        MR. DILLON:  For future royalties.
8        MS. SHAW:  Your Honor, yes, our expert will be
9   providing opinion that for future damages, the royalty rate
10  should be 1.4 percent plus an upfront payment of $1.235
11  million.  But they will be opining, for past damages, that
12  the payment should be zero.
13       THE COURT:  Where did the 1.235 million come from?
14       MS. SHAW:  Your Honor, I spoke in my opening --
15       THE COURT:  From your expert?
16       MS. SHAW:  Yes, Your Honor.
17       THE COURT:  And it has to do with future damages?
18       MS. SHAW:  Yes, Your Honor.
19       THE COURT:  All right.  We've got to focus on future
20  damages, and based on her testimony, I don't think she's in a
21  position to say that they've lost sales up until this point.
22       MR. SUNG:  That is correct, Your Honor.  It wouldn't
23  be a lost sale, but what she has said is that Nuseed does --
24  while it doesn't have a formal business plan, it intends to
25  sell this product, and we would just like an opportunity to

————Boettner, B. - Direct————

1    talk about who we are trying to sell this product to.

2              THE COURT:  Okay.  You can do that without these

3    documents.

4              MR. SUNG:  That's fine, Your Honor.

5              MR. CONNALLY:  Exactly, Your Honor.  My concern

6    would be that she can testify as to what she knows, but she

7    can't admit these documents that she doesn't --

8              THE COURT:  Well, I think the point is well taken.

9              MR. SUNG:  Thank you, Your Honor.

10             (The following was heard in open court:)

11   BY MR. SUNG:

12   Q.  Ms. Boettner, in your work in, as you've mentioned,

13   engaging the aquaculture industry, are there particular fish

14   feed suppliers you've engaged in Chile?

15   A.  Yes.  Several.

16   Q.  And can you describe who they are and what they do?

17   A.  Yeah, sure.  So aquafeed suppliers are companies that

18   produce feed for, as I mentioned before, salmon farms.  There

19   are, in Chile, four or five.  The two largest are Skretting

20   and Biomar, which are global feed markets.  They're

21   headquartered out of Norway, but they operate globally, and

22   they have production facilities in Chile.

23             And then AquaChile would probably be the next

24   largest.  So AquaChile is a company that produces feed for

25   itself.  So it's actually a salmon farmer, and they've

2194

—Boettner, B. - Direct—

1   decided that rather than buying all their feed externally,

2   they're manufacturing feed for themselves.  And what is

3   interesting about AquaChile is within the past year, they've

4   acquired a number of large salmon farms.  And so by next

5   year, they'll be producing as much feed as Skretting and

6   Biomar in Chile.  So they're going to become a very

7   significant player.

8          And then there is Salmofood which operates only in

9   Chile and sells feeds to the salmon farms locally.  And

10  another company called Salmones Antarctica, which is also

11  producing feed for itself, but they also produce some extra

12  feed that they either export or sell to other farms.

13  Q.  So have you personally engaged all of these companies

14  with respect to your discussions about Aquaterra?

15  A.  Yes, I have.  For the past three years, I've been

16  building relationships with each of these companies.  That's

17  my job, and so I've spent a lot of my time trying to develop

18  the right relationship at different levels within the

19  company.

20  Q.  And are you aware of a division of Cargill known as

21  Cargill Aqua Nutrition?

22  A.  Yes, I'm familiar with Cargill Aqua Nutrition.  I know it

23  a little bit better as EWOS.

24  Q.  And is EWOS a company that Cargill had purchased?

25  A.  Yes.  So EWOS would have been the third largest global or

Boettner, B. - Direct

1  was/is the third largest feed supplier in the world again.

2  They were, at the time that they were acquired, headquartered

3  in Norway.  They were required by Cargill.

4  Q.  And so when I asked you earlier about the different

5  companies that you had talked to and are aware of in the

6  Chilean aquaculture industry, how come you didn't mention

7  Cargill Aqua Nutrition?

8  A.  Because I don't see them as a potential customer since

9  they were acquired by Cargill.  They'll be buying Latitude.

10  They'll be buying ingredients from their raw materials

11  counterparts in the company.

12  Q.  Has Nuseed been engaged in working with Chilean fish

13  farmers with respect to its Aquaterra product already?

14  A.  Yes, we -- so from -- I'm not quite sure how you're

15  asking the question, but we've been working to educate the

16  farms.  So even though we won't be selling directly to farms,

17  we've been working very hard to educate them on Aquaterra and

18  how to use the product and what it is.  And we've been --

19  we've been engaged with a few of them on some trials of the

20  product, some trying out the product at their farms.

21  Q.  And can you describe what that -- those trials are like?

22  A.  Yes.  So we have -- we have three trials that we started

23  a year ago, so three different farms in three different feed

24  suppliers.  So it's a three-way collaboration between Nuseed,

25  a feed supplier, and a farm.

—————Boettner, B. - Direct—————

1           And what we agreed was that the farms were
2    interested, as I said, in trying or testing the product, so
3    we provided oil.  And feed was produced for a site that the
4    farm selected, and the fish were -- well, we were replacing a
5    portion of the fish oil in each of these trials, and so these
6    fish have been eating that feed for somewhere between 9 to 12
7    months.
8    Q.  And when you talk about the Aquaterra that was used for
9    these trials, how much are we talking about?
10   A.  So each of the trials was a little bit different, but I
11   would say somewhere between 50 to 100 tons for each trial.
12   So a total of maybe 300 tons was delivered to these trials.
13          You have to remember, this was on a commercial site.
14   So these are live production sites that are actually farming
15   the salmon with the intention of selling them into the
16   market, and we were replacing fish oil for half the fish on
17   each of these sites.  So somewhere in the order of maybe a
18   million, million and a half fish were receiving an Aquaterra
19   diet.
20   Q.  So to be clear, you didn't sell Aquaterra to these fish
21   feed manufacturers of fish farmers, did you?
22   A.  No.  That's right.  We contributed the oil free of
23   charge.  Again, I was trying to describe it was a three-way
24   partnership.  So we delivered oil free of charge.  Everybody
25   was contributing something to the task.  The feed suppliers

———Boettner, B. - Direct———

1   were producing a specialty feed in this case, because it's

2   not a commercial feed yet, and the farms were selecting a

3   site and doing all the operations of doing kind of a test on

4   a live production site, which had its own challenges.

5   Q.  Even though you're giving away Aquaterra for free,

6   doesn't it cost you something?

7   A.  It cost us a lot, yeah; I would say in the millions.

8   Between producing the oil -- growing the crop, producing the

9   oil, getting the oil down there, managing storage and

10  transport, it cost us a lot of money.

11  Q.  Is Nuseed marketing Aquaterra as an alternative to fish

12  oil?

13  A.  Yes.

14  Q.  And are you aware of what the current price is of fish

15  oil?

16  A.  I am.  I get a regular -- it's one of the regular news

17  feeds that I get, and over the weekend, the update came

18  across, and it's still at $1,900 a metric ton.

19  Q.  Now, you mentioned you're also responsible to Nuseed for

20  regulatory matters; is that correct?

21  A.  I am.  I'm generally aware, but I'm not specifically

22  close to some of the regulatory work.  I have someone now

23  reporting to me that is responsible for that work.

24  Q.  And are you aware of Nuseed's regulatory filings to the

25  FDA for approval for human food and animal feed use?

─────Boettner, B. - Direct─────

1   A.  Yes.  Yes.

2   Q.  And have you obtained FDA approval yet?

3   A.  Not yet.  We're still waiting.

4   Q.  And if we can turn to tab CX-1723 in your binder.

5           MR. CONNALLY:  Objection.  Foundation.  Hearsay.

6           THE COURT:  Do you recognize this document?

7           THE WITNESS:  I do.  I helped put it together.

8           THE COURT:  Overruled.

9   BY MR. SUNG:

10  Q.  What is this document, Ms. Boettner?

11  A.  So this document is in what we call an infographic.  We

12  put it together to help educate the market about omega-3 oil

13  since it's a very new space for our company.

14  Q.  And is this the type of document that would be created in

15  the ordinary course of business at Nuseed?

16  A.  It would be.

17  Q.  And is this the type of document that would be maintained

18  in the ordinary course of business at Nuseed?

19  A.  Yes.

20          MR. SUNG:  Your Honor, we move the admission of this

21  exhibit into evidence.

22          THE COURT:  That document will be admitted.

23          (Exhibit CX-1723 received in evidence.)

24  BY MR. SUNG:

25  Q.  Ms. Boettner, can you describe what we're seeing in this

—Boettner, B. - Direct—

1    infographic?

2    A.   Yes, I can.  So what it's showing is really the market

3    for omega-3 oil, how all the different ways that omega-3 oils

4    are used.  You can see that we have a value, estimate for the

5    market of $3.2 billion.

6           THE COURT:  Well, we're not interested in what

7    somebody estimates the future market to be.  What we're

8    interested in is what damage the proponents have suffered up

9    until today.  So if this is a document that you produced in

10   your efforts to create a market, that's fine, but we're not

11   interested in any projections for future sales.

12          THE WITNESS:  Okay.  Understood, Your Honor.  I

13   guess I can just then comment that it was showing, as well,

14   the consumption of omega-3 oil.  So about two-thirds of the

15   oil goes to aquaculture, and about one-third goes to human

16   consumption, like dietary supplements.  You're probably

17   familiar with fish oil pills.  Some foods are fortified with

18   omega-3, and then also some omega-3 oil goes into

19   pharmaceutical use.

20   BY MR. SUNG:

21   Q.   If I can refer you to the lower portion of that

22   particular infographic.  Are you familiar with a term "fish

23   oil deficit"?

24   A.   I am, yes.

25   Q.   And what does that term mean to you?

2200

———————Boettner, B. - Direct———————

1   A.   So to me a fish oil deficit is a situation at any point

2   in time where there's more -- there's not enough omega-3 oil

3   for what the market needs or wants.

4   Q.   And turning to this infographic, I think you can see on

5   the screen there a section that's labeled "deficit."  Can you

6   tell us what that means?

7   A.   Yeah.  So this chart is showing, on the bottom line,

8   supply, so how much of fish oil is available over a period of

9   time, or expected to be available, and then the top line,

10  which is what I was defining as market need, so at any point

11  in time, or over time, how much fish oil the market might

12  need, and then the yellow bars are representing the deficit.

13  Q.   So am I seeing here correctly that there are portions

14  that are narrower and portions that are larger?  What is that

15  all about?

16  A.   Yes.  So a deficit is not static.  It's something that

17  changes all the time for a lot of different reasons.  You can

18  see -- you can see a narrowing there around 2016.  That -- a

19  large contribution to that narrowing was that there was a

20  significant algae bloom in Chile that affected the farms, and

21  so the number of fish being farmed was quite a bit lower, and

22  so the feed they needed and the omega-3 oil that would be

23  needed for the feed was quite a bit lower that year.

24  Q.   And is it your understanding that Nuseed can meet the

25  demand for omega-3 fish oil that's reflected in these

———Boettner, B. - Direct———

1    deficits?

2              MR. CONNALLY:  Objection.  Leading.

3              THE COURT:  Sustained.

4    BY MR. SUNG:

5    Q.  What is your understanding of Nuseed's capabilities with

6    regard to supplying fish oil replacements?

7              MR. CONNALLY:  Objection.  Lack of foundation.

8              THE COURT:  Overruled.

9              THE WITNESS:  So my -- so -- can you repeat the

10   question?

11   BY MR. SUNG:

12   Q.  Yeah.  What is your -- let me ask it another way.

13             Do you have an understanding as to Nuseed's ability

14   to meet the supply of fish oil based on the demand that's

15   present?

16   A.  Yeah.  I guess I would say I think that Nuseed plans to

17   fill the deficits, that one of our goals is to meet the

18   market's needs.

19   Q.  And how can you be so confident that Nuseed can meet the

20   demand for omega-3 fish oil?

21   A.  Because we've already shown scaleability.  So we grew

22   3,000 acres of the crop in 2017, and then we tripled that in

23   2018.  This year we planted 35,000 acres of omega-3 canola,

24   and right now, we're in discussions internally where we're

25   planning for next year, and we're probably going to double it

2202

─────Boettner, B. - Cross─────

1    again to 65,000 acres or more maybe.

2         MR. SUNG:  Okay.  Thank you.  I pass the witness.

3         MR. CONNALLY:  Your Honor, may I proceed?

4         THE COURT:  You may.

5                    CROSS-EXAMINATION

6    BY MR. CONNALLY:

7    Q.  Good morning, Ms. Boettner.  I'm Tom Connally.  I work

8    for Hogan Lovells, and I represent BASF.  We've not met

9    before, so welcome to the courtroom.

10        So you joined Nuseed in 2016, right?

11   A.  That's right.

12   Q.  And before you joined as an employee, you were working as

13   a consultant for Nuseed, right?

14   A.  I was -- yes, I was working for Lismore Advisors, and

15   Nuseed was a client.

16   Q.  And you were -- when you were working at Lismore, you

17   were working on the omega-3 project, right?

18   A.  Yes, I was.

19   Q.  And then you joined Nuseed in 2016, and you were the

20   global lead for commercial strategy, correct?

21   A.  That's correct.

22   Q.  And then recently you were promoted to -- what is your

23   new title?

24   A.  Global general manager, omega-3.

25   Q.  And that was in late August?

Carol L. Naughton, Official Court Reporter

——————Boettner, B. - Cross——————

1   A.   Yeah.  It was end of August/beginning of September.

2   Q.   So you've been working on the omega-3 project for three

3   years?

4   A.   Three years while I was an employee of Nuseed, yes.

5   Q.   And then how long while you were at Lismore?

6   A.   Probably 12 to 18 months before that, year and a half, I

7   think, we were working on the project with Nuseed.

8   Q.   So you've been working on the omega-3 project for about

9   four-and-a-half years; is that right?

10  A.   Yes.  But not full time.

11  Q.   You've been working full time for about three years, and

12  you've been working on the project for about four-and-a-half;

13  is that correct?

14  A.   That's correct.

15  Q.   And right now, you report directly to Brent Zacharias; is

16  that right?

17  A.   I do.

18  Q.   Now, you don't have a technical background; is that

19  correct?

20  A.   I'm not sure what you mean by a technical background.

21  But I don't have a degree.  I don't have a science degree.

22  But I spent -- I started my career in pharmaceuticals and

23  spent quite a bit of time with healthcare technology

24  companies.  So I've been in a technical space for quite some

25  time in my career.

2204

─Boettner, B. - Cross─

1   Q.  But you testified at your deposition you didn't have a

2   technical background; is that correct?

3         Let me give you the specific cite.  You should have

4   your deposition in the back there.  It should be under the

5   deposition tab.  And if I could refer you to Page 74.

6         THE COURT:  Wait a minute.  74?

7         MR. CONNALLY:  Correct.  At the bottom.  Starting at

8   line 24, continuing on through line 4 on Page 75.

9         THE WITNESS:  I'm sorry.  I'm looking at the small

10  page numbers?

11  BY MR. CONNALLY:

12  Q.  Correct, yes.

13  A.  Okay.

14  Q.  And you see on lines 3 and 4 on 75, you say you don't

15  have a technical background?

16  A.  I'm sorry.  I just don't think I'm on the right page.

17  Page 74, line 3 is about --

18  Q.  No, 74, line 24, and then going down to immediately below

19  that, Page 75, lines 3 and 4.

20  A.  Okay.  Yes.  I see that.

21  Q.  And you testified you don't have a technical background,

22  correct?

23  A.  I did.

24  Q.  Okay.  It's been very clear that Nuseed is not currently

25  selling Aquaterra, correct?

2205

—Boettner, B. - Cross—

1   A.   That's correct.

2   Q.   And Nuseed is not selling any product derived from its

3   omega-3 canola crops, correct?

4   A.   Not that I'm aware of, not right now, no.

5   Q.   And you don't know if Nuseed is going to sell Aquaterra

6   in 2020, do you?

7   A.   It would be impossible to know if we will because that's

8   a future projection.  I can only repeat that I have every

9   plan to sell Aquaterra within the next six months.

10  Q.   You don't know if Nuseed is going to sell any product

11  derived from its omega-3 canola crops in 2020, correct?

12  A.   That's right.  As I just said, I think it's very hard to

13  predict what will happen in 2020.  I can only speak to our

14  intent to sell it.

15  Q.   And since it's made no sales, Nuseed hasn't paid CSIRO or

16  GRDC any royalties, correct?

17  A.   It's not an area I'm familiar with, if payments have been

18  made to our partners.

19  Q.   So you don't know?

20  A.   No, I wouldn't know that.  I'm not --

21  Q.   Okay.  You're the global head of the omega-3 program.

22  Who would know if you don't know?

23  A.   I would say that if there were payments that were made,

24  our CFO would know, our group executive, Brent Zacharias,

25  would know.  Again, I've been in this job for two months, and

—————Boettner, B. - Cross—————

1    the financial relationship that we have with our

2    collaborating partners is not something that I've been

3    involved with in the past.

4    Q.   Right.  But you've been working there for three years on

5    the project, right?

6    A.   That's correct; I have been.  As I said, but this is not

7    an area that I've been involved with.

8    Q.   And you are the global manager for the omega-3 project,

9    and you don't know if they've paid any royalties to CSIRO or

10   GRDC?  Is that your testimony?  Just want to make sure.

11   A.   That's what I said.  I'm not familiar with this area.  I

12   wouldn't be aware if a payment had been made because it would

13   now become part of my new responsibilities.  It wasn't

14   something that I was involved with in my prior

15   responsibilities.

16   Q.   But you've been on this job for a month and a half now,

17   right?

18   A.   That's right.

19   Q.   And you still don't know?

20   A.   I think I've said that I don't know.

21   Q.   Okay.  And you're not aware of any contracts that Nuseed

22   has to sell Aquaterra, correct?

23   A.   I'm not aware that Nuseed has any contracts, no.

24   Q.   And you're not aware of any contracts Nuseed has to sell

25   Nutriterra or any product for human consumption, correct?

Boettner, B. - Cross

1  A.  Correct.  I'm not aware that they have any contracts for
2  Nutriterra.
3  Q.  And there's no regulatory approval to sell products for
4  human consumption, correct?
5  A.  On the human consumption side in the United States, our
6  FDA application is pending, and we would need that to sell --
7  they regulate whether people can consume a new ingredient
8  like ours.  So we would need that before we could have sales
9  or contracts; that's correct.
10 Q.  So on September 9th, when Ms. Shaw took your deposition,
11 you weren't aware of anyone at Nuseed who was responsible for
12 negotiating contracts for the purchase of Aquaterra, correct?
13 A.  Yes.  I remember that part of the deposition, yes.
14 Q.  And that was true at the time?
15 A.  That was true at the time.
16 Q.  And you're suggesting that's changed now?
17 A.  Yeah.  So we're not yet in a negotiation phase for
18 contracts.  So what we have been doing, as I said, is working
19 very collaboratively with the industry so that we can
20 determine how they would want to use our product, and I'm
21 moving forward now with a commercial discussion where we're
22 trying to understand what volume they might want to take,
23 what price they might be willing to pay, and both of those
24 are related.  And once we have a better sense of that, then
25 my plan is to move into a negotiation with them.

Carol L. Naughton, Official Court Reporter

Boettner, B. - Cross

1    Q.   But there's no negotiations currently ongoing?

2    A.   No.  There's a commercial discussion, but no formal

3    negotiations, but there are commercial conversations.

4    Q.   And as of September, you didn't have anyone responsible

5    for negotiations, correct?

6    A.   I remember saying that in the deposition, yes.

7    Q.   And that was true, right?

8    A.   Of course, yes.

9    Q.   Nuseed doesn't have a formal strategic plan?  I think --

10   your direct testimony was a little strange.  So Nuseed

11   doesn't have a formal strategic plan for the Aquaterra

12   product, correct?

13   A.   What I was trying to explain is that we don't have a

14   formal or informal.  We don't have a written business plan or

15   strategic plan.  But that doesn't mean that we don't have a

16   plan for Aquaterra.  There are a lot of businesses that

17   operate without a business plan, quite successfully, and at

18   Nuseed, one of the things we want to do is stay very

19   flexible.  As we get feedback from our customers, we want to

20   be able to adjust to changes in the market, and so we don't

21   operate with a strict business plan, no.

22   Q.   So you don't have any plan written down?

23   A.   There are components of our plan, but there's no written

24   plan, no.

25   Q.   Okay.  So do you believe Nuseed's omega-3 project is a

Boettner, B. - Cross

1    bet-the-farm project?

2    A.   I'm sorry?

3    Q.   Is it a bet-the-farm project?

4    A.   It's a what farm?

5    Q.   Is it a bet-the-farm project?  Is it a very important --

6    A.   I'm sorry?

7    Q.   -- bet-the-company kind of project?

8    A.   Not at all.  I wouldn't describe it that way at all.  As

9    I said, I've been working three years to develop strong

10   relationships, deep relationships with the industry in Chile.

11   I've traveled there many times.  I have consultants that work

12   for me in Chile.  We've invested in clinical trials with

13   Nutriterra.

14          So we have patients today taking capsules to see

15   what the absorption is of Nutriterra to prepare our files for

16   additional filings for that side of the business.  So it's

17   hardly -- I'm not sure how you're using the term, but I

18   wouldn't say "bet the farm."  It's a very intentional

19   movement towards the market.

20   Q.   Okay.  Do you have a price for the Aquaterra product?

21   A.   We haven't set a price.  I was trying to describe just

22   now.  We're in a discussion with customers that is related to

23   how much volume of the oil they might take, and that relates

24   to the price because it's related to scale and a whole host

25   of other things.

2210

Boettner, B. - Cross

1   Q.   Okay.  You have no understanding of the logistics

2   associated with Nuseed's omega oil, right?

3   A.   I have some understanding.  I'm generally aware, but it's

4   not my primary responsibility.  In the last two months, when

5   I took on this job, I now have someone reporting to me on

6   supply chain.  So I've been coming up to speed on some of

7   those requirements.

8   Q.   Okay.  And, in fact, you'd just be speculating when you

9   talk about logistics for the project, correct?

10  A.   I wouldn't be just speculating.  As I said, I have

11  someone reporting to me that is responsible for planting the

12  crop, working with growers, harvesting the crop, delivering

13  that grain to storage, so -- and I've been in those

14  discussions for the last two months.  It's a new area for me,

15  but I wouldn't be speculating.  My view today would be on --

16  based on what I've learned over the last two months working

17  with him.

18  Q.   Mr. Sparks, can we play the clip from Page 106 of the

19  deposition.  Wait till the Court is there.

20            It's 106, line 3 through line 12, Your Honor.

21            (A video was played in open court.)

22            MR. CONNALLY:  Continue on, Mr. Sparks.

23            (A video was played in open court.)

24  BY MR. CONNALLY:

25  Q.   Ms. Boettner, you don't know what steps Nuseed has taken

————Boettner, B. - Cross————

1   to be prepared to plant crops, correct?

2   A.  At the time of my deposition, as I said, I didn't have a

3   lot of information, because it was not my area of

4   responsibility.  That was my colleague's, supply chain

5   colleague's.

6           In the last -- in the last two months in my new job,

7   I've spent a lot of time trying to understand better exactly

8   where we are and what is going to be required to get the oil

9   to the market.

10  Q.  And at your deposition, you also didn't know what steps

11  Nuseed had taken to prepare to harvest the crop, correct?

12  A.  At my deposition, I was not familiar with the work that

13  had been done, no.

14  Q.  Okay.  And you don't know how many acres of canola Nuseed

15  currently has planted in North America, do you?

16  A.  I don't know -- I don't know exactly how many acres were

17  planted.  I know that we went out to secure 35,000 acres.  I

18  think around 30,000 were actually planted.

19  Q.  So you don't know how many acres of crops Nuseed will

20  harvest in 2019; isn't that right?

21  A.  That's correct.  The harvest isn't complete yet.  The

22  harvest has been ongoing in Montana, but North Dakota had

23  some weather delays, so the harvest isn't complete.  So I

24  don't know how many acres will be harvested.

25  Q.  And you don't know who is going to be harvesting those

―――――Boettner, B. - Cross―――――

1   2019 crops, do you?

2   A.  Those crops -- yes, I do.  Those crops will be harvested

3   by our farmer partners, the growers that are growing the crop

4   for us.

5   Q.  Okay.

6        MR. CONNALLY:  Your Honor, I'd like to play a clip

7   from Page 114, lines 20 through 25.

8        THE COURT:  All right.

9        (A video was played in open court.)

10       MR. CONNALLY:  Go to lines 23 through 25, if you

11  have them.

12       All right, I'll move on.

13  BY MR. CONNALLY:

14  Q.  You don't know if Nuseed has any contracts in place with

15  farms to plant omega-3 canola crops in the future, correct?

16  A.  I do know that we don't have any contracts in place,

17  because, as I mentioned a little while ago, it's around

18  October, November that the companies go out to start planning

19  for contracting for the next year's crop.  So we're just now

20  starting those discussions with farmers.

21  Q.  Okay.  You haven't had any discussions with any aquafeed

22  suppliers regarding purchasing something from Nuseed, have

23  you?

24  A.  So I'm in active dialogue right now with aquafeed

25  companies, and we're starting to shift our conversations to

─────Boettner, B. - Cross─────

1    what I hope will become a sale and a contract for Aquaterra.

2           MR. CONNALLY:  Your Honor, I'd like to play a clip

3    from 90-91, starting on Page 90, line 25, through 91, line 3.

4           THE COURT:  90.

5           MR. CONNALLY:  Page 90, line 25.

6           THE COURT:  I think that we should note that the

7    deposition was taken on September 9th of this year.

8           MR. CONNALLY:  Thank you, Your Honor.

9           THE COURT:  Where are you on Page 90?

10          MR. CONNALLY:  Starting on line 25.

11          THE COURT:  All right.

12          (A video was played in open court.)

13   BY MR. CONNALLY:

14   Q.  And you also haven't had any conversations with aquafeed

15   suppliers about them entering into agreements to purchase

16   something from Nuseed, correct?

17   A.  No.  As I've been trying to describe, we haven't yet

18   reached the stage where we're negotiating a contract or where

19   a customer said, I'm ready to buy.

20          What we're doing is going through a conversation

21   where I'm trying to determine how much oil they might want

22   and when that might start, what kind of delivery schedule,

23   and all of that will determine a price.  And so, no.  Right

24   now, no.

25   Q.  Okay.  So Nuseed has used the omega-3 oil it has produced

—Boettner, B. - Cross—

1  so far for testing and customer trials, right?

2  A.  Most of the oil has gone -- a large volume of the oil has

3  gone to the trials in Chile that I was describing before.

4  Q.  And that was for free, I believe you testified, correct?

5  A.  Yes, I said that was delivered free of charge, as a

6  contribution to the trials.

7  Q.  Right.  But none of the aquafeed manufacturers who have

8  tried Aquaterra have told you they're interested in

9  purchasing Aquaterra, have they?

10 A.  The fact that -- we're moving forward with commercial

11 conversations, so they're very interested in having a

12 discussion about our pricing.  They've started to ask what

13 that might be.  They're very interested in sourcing Aquaterra

14 as an omega-3 oil option.

15 Q.  Have you talked to Skretting?

16 A.  Skretting, yes.

17 Q.  Sorry.

18 A.  Yes, I'm in a conversation with Skretting now.

19 Q.  Okay.  And Skretting hasn't told you that it wants to

20 purchase Aquaterra, has it?

21 A.  So what -- they haven't directly said, We're ready to

22 buy, but we continue to advance our conversations in that

23 direction.  I have another call with them tomorrow morning

24 where we start to narrow the conversation, as I've been

25 trying to describe, on how much volume.  They've had to --

Carol L. Naughton, Official Court Reporter

—Boettner, B. - Cross—

1    they've had to make some decisions about how they might use

2    the ingredients.

3            So when you're formulating feed, you have to decide

4    how much of it would you use, how much of the fish oil you're

5    replacing.  They're trying to decide do they want oil just in

6    Chile, or do they want oil also delivered to Canada.  So

7    we're not at the point where they're saying, Okay, we're

8    ready to move into a contract negotiation.

9    Q.  And, similarly, Los Fiordes has not told you that it

10   wants to purchase Aquaterra, either, has it?

11   A.  Again, they've not specifically said the words, "We want

12   to purchase Aquaterra."  That doesn't mean that they aren't

13   interested in buying the product.  They've been extremely

14   interested.  They would not have, in my opinion, conducted a

15   trial with our product.  They were one of our farm partners,

16   and if you think about 800,000 to a million fish on that

17   site, half of which are getting Aquaterra, that's valuable

18   inventory, and they're testing a new ingredient, and they're

19   doing that with the intention of using that ingredient.

20           MR. CONNALLY:  Your Honor, I'd like to play

21   Page 100, line 15 through 101, line 2.

22           THE COURT:  All right.

23           (A video was played in open court.)

24   BY MR. CONNALLY:

25   Q.  Now, you've never estimated how much Aquaterra oil Nuseed

—Boettner, B. - Cross—

1   could make, have you?

2   A.  No.  I have not done a calculation of how much Aquaterra

3   Nuseed could make, no.

4   Q.  And you don't know if anyone at Nuseed has made any

5   projections related to how much Aquaterra oil Nuseed could

6   make, right?

7   A.  No, I don't know.  Someone may have, but I don't know.

8   Q.  And you've never had discussions with anyone at Nuseed

9   about the maximum amount of Aquaterra oil Nuseed could

10  produce, correct?

11  A.  The only discussions that we've had are that we are --

12  it's an easily scaleable product, and we plan to fill as much

13  of the deficit as we possibly can.

14  Q.  And you've never made any projections on Nuseed's costs

15  related to Aquaterra, have you?

16  A.  I haven't.  It's now my new responsibility -- my supply

17  chain colleague is responsible for calculating our cost of

18  goods, and so I've been working much more closely with our

19  cost estimates.

20  Q.  You don't know if another company selling omega-3 oil

21  will affect Nuseed's plans to sell Aquaterra, correct?

22  A.  I -- I do know that another company selling omega-3 oil

23  would affect, but without knowing specifically what those

24  plans are...

25          I think you're probably referring back to my

Carol L. Naughton, Official Court Reporter

—————Boettner, B. - Cross—————

1   deposition, and without having plans described or knowing

2   what customers they're targeting, then you can't know the

3   exact effect.  But, of course, another company selling

4   omega-3 canola oil or omega-3 oils is something we're going

5   to compete with.

6   Q.  Okay.

7           MR. CONNALLY:  Your Honor, I'd like to play Page 204

8   to 205, lines 22 on 204 through lines 10 of 25.

9           THE COURT:  204, line what?

10          MR. CONNALLY:  22 -- sorry -- through 10 on 205.

11          THE COURT:  All right.

12          (A video was played in open court.)

13  BY MR. CONNALLY:

14  Q.  You don't know if deregulation of Cargill's Latitude has

15  had any impact on Nuseed's plans to commercialize Aquaterra,

16  correct?

17  A.  I don't know if their deregulation specifically has had

18  an impact.  I know that Cargill has become much more active

19  in the market, and that is absolutely having an effect.

20  Q.  Okay.  In fact, you don't know whether Cargill's

21  promotion of Latitude to the industry has had any impact on

22  Nuseed's plan to commercialize Aquaterra, correct?

23  A.  I believe what I was saying earlier is that I -- now that

24  we're going out for growers in Montana, we're competing for

25  growers in the same state.  It's not a big canola-growing

———Boettner, B. - Cross———

1   region, and so that competition is going to present some

2   challenges.  And I also believe that Cargill's presence in

3   the market, in the aquaculture market, is contributing to a

4   slower progress on our commercialization of the product.

5          MR. CONNALLY:  Your Honor, I'd like to play two

6   clips; 250, 15 through 22 --

7          THE COURT:  250?

8          MR. CONNALLY:  Let's start with 250, line 15 through

9   line 22, a question by Mr. Dillon.

10         (A video was played in open court.)

11         MR. CONNALLY:  And next I'd like to play, Your

12  Honor, Page 251, line 12 through 252, line 1, again,

13  questioning by Mr. Dillon.

14         THE COURT:  All right.

15         (A video was played in open court.)

16  BY MR. CONNALLY:

17  Q.  So, Ms. Boettner, you can't identify any impact to

18  Nuseed's plans to commercialize Aquaterra that would result

19  from Cargill's plans to promote or sell Latitude in the

20  aquafeed market, correct?

21  A.  I believe I just said that our ability to move forward

22  and progress our commercial discussions with aquafeed

23  suppliers has been delayed, it's been slow-going, and I

24  believe, at least in part, that's contributed to by the fact

25  that Cargill is on the market.

—————————Boettner, B. - Cross—————————

1          MR. CONNALLY:  Your Honor, I'd like to play 252 to

2     253, lines -- 252, line 22, to 253, line 11.

3          THE COURT:  All right.

4          (A video was played in open court.)

5          THE COURT:  How much longer are you going to be with

6     this witness, Mr. Connally?

7          MR. CONNALLY:  Your Honor, I've got a little bit

8     more.  I'm pausing right now to cross out some things, but I

9     do have another -- I do have some more time, so if this is a

10    good time for a break, let's do that.

11         THE COURT:  All right.  Let's go ahead and take our

12    morning break, ladies and gentlemen.

13         (The jury exited the courtroom.)

14         THE COURT:  We'll take a 20-minute recess.

15         (Recess from 11:35 a.m. to 11:55 a.m.)

16         (The jury entered the courtroom.)

17         THE COURT:  You may resume.

18         MR. CONNALLY:  Thank you, Your Honor.  In an effort

19    to speed things along, Mr. Sung and I have agreed to the

20    admission of two license agreements between GRDC, CSIRO, and

21    Nuseed.  They're in the cross binder, the larger binder.

22    CX-0181 --

23         THE COURT:  CX-0181.  Okay.

24         MR. CONNALLY:  -- and to the admission of CX-0681, a

25    companion license agreement.

2220

—————Boettner, B. - Cross—————

1          THE COURT:  CX-0681?

2          MR. CONNALLY:  Correct, sir.

3          THE COURT:  Those two exhibits will be admitted.

4          (Exhibits CX-0181 and CX-0681 received in evidence.)

5          MR. CONNALLY:  Thank you.

6    BY MR. CONNALLY:

7    Q.  Ms. Boettner, do you know Sue McIntosh?

8    A.  Yes, I do.

9    Q.  Okay.  And she worked on Nuseed's petition for

10   deregulation, correct?

11   A.  Yes, that's correct.

12   Q.  And you're aware that Ms. McIntosh obtained seeds from

13   BASF's LFK elite event from the American Type Culture

14   Collection for patented seeds; is that right?

15   A.  No, I don't -- I'm not aware of that.

16   Q.  Okay.  Are you aware that Ms. McIntosh had the oil

17   profile for the LFK event?

18   A.  No.

19   Q.  You can't point to any harm Nuseed has suffered based on

20   BASF's activities to date relating to omega-3 canola,

21   correct?

22   A.  Again, I'm not familiar with the term "harm" in a legal

23   sense.  I think I was trying to explain that I think

24   certainly Cargill's presence in the market is affecting us in

25   several ways.  One is what I've discussed, which is trying to

--------Boettner, B. - Cross--------

1    compete for growers, a limited number of growers in Montana,

2    and the second is that our discussions with

3    aquaculture/aquafeed companies is progressing much more

4    slowly.  And I wouldn't suggest that Cargill's presence is

5    the only reason, but I believe Cargill is a contributing

6    factor, because it's come up in conversations that they're

7    now in the market, and aquafeed companies are wanting to take

8    some time to get familiar with that product.

9             MR. CONNALLY:  Your Honor, may I impeach the

10   old-fashioned way by just reading the transcript?

11            I'm on Page 193, line 21, through line --

12            THE COURT:  193?

13            MR. CONNALLY:  Correct, Your Honor, through

14   line 21 -- actually, I'm going to start on line 19, Your

15   Honor, on Page 193.

16            THE COURT:  Line 19 on Page 193?

17            MR. CONNALLY:  Correct, Your Honor.

18   BY MR. CONNALLY:

19   Q.  Ms. Boettner, you can follow along in your transcript, if

20   you'd like.

21            THE COURT:  You can read the question and answer and

22   ask her if that was her testimony.

23            MR. CONNALLY:  Yes, sir.  Thank you.

24   BY MR. CONNALLY:

25   Q.  Are you there, Ms. Boettner?

─────Boettner, B. - Cross─────

1    A.  No, I'm sorry.  What was the page number?

2    Q.  Page 193, in the lower right-hand corner there, on

3    line 19.

4    A.  Okay.

5    Q.  Question, by Ms. Shaw:  "I'm not asking a legal -- just

6    to be clear, I'm not asking you a legal question.  I'm just

7    asking you can you point to any harm Nuseed has suffered

8    based on BASF's activities to date relating to omega-3

9    canola?

10          "Answer:  I don't believe I can answer that

11   question."

12   A.  Yes, I see that.

13   Q.  Okay.  And that was your testimony, correct?

14   A.  It was, but I have to clarify.  I'm not very familiar

15   with BASF's activities.  I'm much more familiar with

16   Cargill's activities.

17   Q.  Okay.  You can't tell us whether BASF --

18          THE COURT:  Where are you?

19          MR. CONNALLY:  I'm sorry, Your Honor.  I'm not

20   reading testimony, I'm asking her a question.  I apologize.

21          THE COURT:  All right.

22   BY MR. CONNALLY:

23   Q.  You can't tell us whether BASF and Cargill have harmed

24   Nuseed in any way, can you?

25   A.  Again, "harm" -- to me, there's a legal definition to it,

—Boettner, B. - Cross—

 1  considering that I was in a legal setting when I was in my

 2  deposition, I'm in a legal setting now, and so I --

 3          THE COURT:  I think you need to use the microphone.

 4          THE WITNESS:  I'm sorry, Your Honor.  I was saying

 5  that I don't know the legal definition of "harm," and so it's

 6  very hard for me to point to a specific harm, but I can say

 7  that Cargill's presence in the market is affecting our

 8  ability to move forward with Aquaterra.

 9          MR. CONNALLY:  Your Honor, I'd like to play

10  Page 261, lines 23 to 26.

11          The computer is frozen.  Again, I'll do it the

12  old-fashioned way.

13          THE COURT:  261?

14          MR. CONNALLY:  Yes, Your Honor, line 23.

15          (There was a pause in the proceedings.)

16          MR. CONNALLY:  I'm sorry, Your Honor.

17          THE COURT:  261?

18          MR. CONNALLY:  261, yes, line 23.

19          THE COURT:  All right.

20  BY MR. CONNALLY:

21  Q.  Are you there, Ms. Boettner?

22  A.  Which lines?

23  Q.  261, starting on line 23.

24  A.  Okay.  Yes.

25  Q.  Question by Mr. Dillon:  "Do you believe BASF and Cargill

──────────Boettner, B. - Redirect──────────

1    have harmed Nuseed in any way?

2              "Answer:  I can't answer your question."

3              That was your testimony, correct?

4    A.  That's correct.  As I explained, I don't know the legal

5    definition of "harm."

6              MR. CONNALLY:  Pass the witness, Your Honor.

7              MR. SUNG:  May I proceed?

8                        REDIRECT EXAMINATION

9    BY MR. SUNG:

10   Q.  Just one question as a follow-up, Ms. Boettner.  And,

11   sorry, I don't have a video with this one, but --

12   A.  Thank goodness.

13   Q.  -- with respect to your cross-examination testimony with

14   Mr. Connally just a moment ago, he had referred to the fish

15   feed trials that we talked about earlier.  Do you recall

16   that?

17   A.  Yes.

18   Q.  And with regard to those fish feed trials, do you have

19   any understanding as to what happened to all those fish?

20   A.  Yes.  So those trials have all completed now, and so the

21   fish were harvested.  They were taken out of the pens and

22   sent to a processing plant and sent into the market.  I'm

23   guessing that quite a few of them made their way to the U.S.

24   market, since Chile --

25              THE COURT:  You're guessing.  Don't tell us what

```
 1    you're guessing.

 2              THE WITNESS:  Okay, yes, Your Honor.

 3              So I'm -- the fish --

 4              MR. CONNALLY:  Your Honor, foundation.  I object for

 5    lack of foundation.  I don't think foundation has been laid

 6    here.

 7              THE COURT:  Maybe you better start over, Counsel.

 8    BY MR. SUNG:

 9    Q.  Well, again --

10              MR. SUNG:  No further questions for the witness,

11    Your Honor.

12              THE COURT:  All right.

13              MR. CONNALLY:  Nothing further, Your Honor.

14              THE COURT:  All right.  May this witness be excused?

15              MR. SUNG:  Yes, Your Honor.

16              MR. CONNALLY:  Yes, Your Honor.

17              THE COURT:  All right, Ms. Boettner.  You may be

18    excused as a witness, and since you're excused, you may

19    remain in the courtroom, but you may not discuss your

20    testimony with any other witness in the case until the case

21    is concluded.

22              THE WITNESS:  Okay.

23              (The witness was excused.)

24              THE COURT:  All right.

25              MR. SUNG:  Your Honor, the proponents would like to
```

──────────────Jarosz, J. - Direct──────────────

1    call Mr. John Jarosz to the stand.

2              (The clerk administered the oath.)

3              THE COURT:  All right.  You may proceed.

4              MR. SUNG:  Thank you, Your Honor.

5              JOHN JAROSZ, called by Nuseed, having been first

6    duly sworn, was examined and testified as follows:

7                        DIRECT EXAMINATION

8    BY MR. SUNG:

9    Q.  Mr. Jarosz, would you please state your name for the

10   record.

11   A.  My name is John C. Jarosz.

12   Q.  And what is your profession?

13   A.  I'm an economist.

14   Q.  Generally, what does an economist do?

15   A.  We do lots of things, but among the things that I do in

16   the work that I do in economics is value assets, evaluate

17   marketplaces, and study the behavior of producers and

18   consumers.

19   Q.  And do you specialize in any particular area of

20   economics?

21   A.  Most of my work is in the economics of intellectual

22   property protection, and most of my work in that area is

23   assessing damages in patent infringement cases.

24   Q.  And if we can bring up a slide here for you.

25              Can you tell us what's on this slide?

─────────Jarosz, J. - Direct─────────

1    A.  Yes.  This is a summary of my qualifications.  At the

2    very top, it shows my education.  I have a Bachelor's in

3    economics from Creighton University, which is in Omaha,

4    Nebraska.  I have a law degree from the University of

5    Wisconsin.  And I was a fellowship student in the Ph.D.

6    program in economics at Washington University in St. Louis.

7    There I completed most of the requirements for a Ph.D. but

8    not all of them and was ultimately awarded a Master's in

9    economics.

10        I have been in this profession for about 34 years,

11   and along the way, I've been actively involved in a number of

12   professional associations that are shown on the screen.  The

13   Sedona Conference is the one I've been most active in

14   recently, and that is a group of judges, economists, and

15   lawyers who get together to try to move the law forward in an

16   effective way.  And what I'm involved with is the group that

17   helps with the presentation of patent damages to juries in

18   infringement settings.

19        I also regularly research and publish articles in a

20   variety of professional and practitioner journals.  I

21   regularly give speeches and teach classes.  Among the places

22   I teach are the United States Patent and Trademark Office,

23   the Georgetown Law School, the George Washington Law School,

24   the University of Pennsylvania Economics Department and Law

25   School, and the Columbia Business School.

—————————Jarosz, J. - Direct—————————

1           And, finally, for a number of years, I was the

2    editor of a treatise, a book on licensing, and that's what is

3    shown on the bottom.

4           MR. SUNG:  If we can bring up the next slide,

5    please.

6    BY MR. SUNG:

7    Q.  Can you tell us what this slide represents?

8    A.  One of the things that I do is provide testimony in

9    trials like this, and I have provided arbitration or trial

10   testimony almost 100 times across the country in a variety of

11   different settings, and this is just a map of the places in

12   which I've provided trial or arbitration testimony.

13   Q.  Where do you work now?

14   A.  I work at Analysis Group, Incorporated.

15   Q.  Can you tell us what Analysis Group, Incorporated does?

16   A.  We're an economic, financial, healthcare, and strategy

17   consulting firm.  We have about 1,000 people.  Many of us are

18   in the United States.  We have offices throughout the

19   United States, but we also have offices overseas.  I think

20   today it's four or five different offices overseas.  I am the

21   founder of the firm's Washington, D.C. office, and I have

22   been director of that office ever since I founded it, though

23   I currently live in Virginia and have for the last 34 years.

24   Q.  And how long have you been employed by the Analysis

25   Group?

———Jarosz, J. - Direct———

1   A.   Since March of 1996.  So that's a little over 23 years at

2   Analysis Group.

3   Q.   And prior to that?

4   A.   I was at another economic consulting firm that did

5   similar kind of work, and I was at that firm for about ten

6   years.

7   Q.   And with respect to the testimony that you've provided in

8   the past on behalf of, let's say, plaintiffs and defendants,

9   about how much have you offered testimony for one versus the

10  other?

11  A.   In the patent infringement field, about half the time I'm

12  working and representing the owner of patent rights, and

13  about half the time I'm working with and representing the

14  parties that have been accused of infringement.  So my work

15  is about 50/50; sometimes for the owner of the patents,

16  sometimes for the infringer or alleged infringer of the

17  patents.

18         MR. SUNG:  Your Honor, we offer Mr. Jarosz as an

19  expert in the fields of intellectual property valuation and

20  the analysis of damages arising from the alleged infringement

21  of intellectual property.

22         MS. SHAW:  No objection, Your Honor.

23         THE COURT:  All right.  You may proceed.

24         MR. SUNG:  Thank you, Your Honor.

25  BY MR. SUNG:

---

Jarosz, J. - Direct

1    Q.  Mr. Jarosz, what have you been asked to do in this case?

2    A.  I was asked to do two things:  For current purposes, the

3    first thing, which is relevant today, is evaluate the damages

4    that should be paid since the jury has found that patent

5    rights have been infringed by BASF and Cargill's activities,

6    so how much money should be paid them.

7    Q.  And what is your understanding of the patented

8    technology?

9    A.  I generally understand that it allows for the

10   synthesization or the creation of omega-3 fatty acids in

11   canola seeds.  So it's generally -- I think I'll use the term

12   today -- a plant-based or canola-based omega-3.

13          I understand that the technology is used in two sets

14   of projects.  The first, on the left, is CSIRO, GRDC, and

15   Nuseed's project and ultimate product called Aquaterra.  On

16   the right, it's the BASF/Cargill project, which will

17   hopefully ultimately become a product, called Latitude.  Both

18   of those are oriented to aquaculture that is used in fish

19   feed.

20   Q.  And have you reviewed any materials with respect to what

21   has taken place here, either before or during trial?

22   A.  Yes, I reviewed quite a number of documents that were

23   produced by all the parties in this case; I read quite a bit

24   of deposition testimony; expert reports that have been filed

25   by a variety of individuals in this case; and I also read the

---

———Jarosz, J. - Direct———

1   trial testimony that has occurred so far.

2   Q.  And are you aware that Mr. Zacharias and Ms. Boettner

3   have testified that Nuseed has not yet sold Aquaterra?

4   A.  Yes, I'm aware of that.

5   Q.  So you're aware that Cargill's witnesses have also

6   testified that Cargill has not sold Latitude?

7   A.  Yes, I'm aware of that.

8   Q.  And do you have an understanding as to whether there have

9   been any pre-sales activity?

10  A.  Yes.  With this product line for both companies, as is

11  true with any product line for any company, there are a

12  substantial number of pre-sale activities, things like

13  research and development and testing.  Here, there's been

14  work having to do with research and sampling with potential

15  clients or customers and regulatory approval activities.

16          So there's been quite a bit that was done, as is

17  necessary in any setting of rolling out products before the

18  first product is sold in the marketplace.

19  Q.  So are activities undertaken before actual sales

20  important to the commercialization process?

21  A.  Yes, they're extremely important.  In fact, in some

22  regards, they're the most important activities, because the

23  companies are seeking to determine whether the product can

24  and will succeed, so they're undertaking research activities

25  and necessary regulatory approvals and product testing.

──────────Jarosz, J. - Direct──────────

1           So once those hurdles are passed, then the product

2    is ready for commercial roll-out or first sales.  So that

3    early activity is essential for later selling activities.

4    Q.  Okay.

5           THE COURT:  Mr. Sung, can you get the mic a little

6    closer?

7           MR. SUNG:  Will do, sir.

8           THE COURT:  Thank you.

9    BY MR. SUNG:

10   Q.  So if we can bring up the next slide, please.  Before

11   we --

12          MS. SHAW:  Objection.  Your Honor, could we have a

13   sidebar and take that slide down?

14          THE COURT:  All right.

15          (The following was heard at the sidebar:)

16          MS. SHAW:  Your Honor, this slide provides a royalty

17   rate that is based entirely on future projections.

18          THE COURT:  I'm sorry.  I can't hear you.

19          MS. SHAW:  I'm sorry.  This slide that he's putting

20   up, this royalty right here is based entirely on future

21   projections of sales, costs, and profits by Nuseed, as well

22   as BASF and Cargill, and also based on what their future lost

23   profits might be.  There is no basis for this reasonable

24   royalty outside of future projections.

25          Further, this reasonable royalty base is calculated

——Jarosz, J. - Direct——

1   using a future selling price for the Aquaterra oil, and that

2   is the only way they arrive at this past damages amount.  It

3   is based entirely on future projection, and, as I understand

4   from Your Honor, you did not want to allow evidence in that

5   was related to future sales and projections, and I object to

6   this on those grounds.

7           MR. SUNG:  And, Your Honor, the numbers that

8   Ms. Shaw is referring to are the product of the hypothetical

9   negotiation that our expert will describe.

10          MS. SHAW:  If you look at the size -- they're going

11  to put this revenue number up in front of the jury; this is

12  Cargill's future projections.  They're going to put this

13  number up before the jury; this is Nuseed's.  This is how

14  they're calculating their royalty rate, using future

15  projections, future costs, future expected royalties.  None

16  of this is based on past activity.

17          MR. SUNG:  Your Honor, it would be our position

18  that, as part of the hypothetical negotiation, the expert may

19  rely upon information about projected sales as a proxy for

20  what would have been agreed upon as a reasonable royalty rate

21  in the hypothetical negotiation.

22          MS. SHAW:  And that would only apply to sales, and

23  there have been no sales here.  Importantly, all the past

24  damages relates to is product that his not been sold.

25  They're trying to apply a number that they've calculated that

—Jarosz, J. - Direct—

1   has no relationship to the activity that has happened in the

2   past to set a rate.

3         THE COURT:  I don't believe that there has been any

4   foundation to base damages that they've incurred to date on

5   future projections.  There just isn't any evidence to support

6   that as a foundation.  I mean, when somebody comes up with a

7   50 percent royalty, I mean, that is just so far off the

8   charts, it's just absurd to think that the Court would use

9   that for any kind of guidance.  12 percent is bad enough, but

10  49 percent is laughable.

11        There's just no foundation for projecting sales when

12  the party doesn't even know when the sales will begin, and

13  we're talking about damages that have been incurred up until

14  today.

15        Now, it may be possible to tell the projected

16  damages when we're talking about future damages, but not when

17  we're talking about past damages.

18        MR. SUNG:  There's a valuation that does bear a

19  relationship to the activity that they've already undertaken.

20  Unless Your Honor is saying that there is a valueless

21  activity, I think that the jury should be able to hear, based

22  on the hypothetical negotiation, what the parties would have

23  agreed to on this issue.

24        THE COURT:  I don't think that there's any

25  foundation for the hypothetical negotiation that you project.

Jarosz, J. - Direct

1    There may be a hypothetical negotiation that would take place

2    now that the patents have been decided, but I don't think

3    that there's any hypothetical negotiations based on these

4    projections that would tell us what the past damages are.

5            And I'm not saying that you don't have any past

6    damages.  What I'm saying is I don't think that there's any

7    foundation to base past damages upon these projections in the

8    uncertain world that we are at this point, which is neither

9    side knows even when they're going to begin sales; mostly

10   your sales.  I mean, you know, your witness said one thing

11   two months ago and a different thing now.  And, granted, she

12   may have learned something between the deposition and today

13   in some areas, but, you know, she said two months ago she

14   didn't have any idea when they were going to start selling

15   the product, and now she says she hopes to start selling it

16   in six months.  That's the hope.  I haven't heard any

17   evidence that would support that hope.

18           So I don't think you can use this as the basis for

19   damages incurred up until now.  They've spent money on

20   research in the hopes that they will eventually commercialize

21   the product, but we haven't heard anything about that.  You

22   can't start out with those numbers.  You have to lay a

23   foundation for those numbers.  It's just like your first

24   witness said this is a billion-dollar business.  There was no

25   basis for that testimony.  He just pulled it out of the air.

—————————Jarosz, J. - Direct—————————

1   There's no foundation for this.

2         MR. SUNG:  Well, what I would say, Your Honor, is

3   that, unlike a completely untested new product, both products

4   are admittedly directed to replacing natural fish oil, and we

5   do have evidence of what the natural fish oil price is that

6   both companies are benchmarking to.  So there's a valuation

7   basis for all of this.  Whether it applies --

8         THE COURT:  Well, if there is, I haven't heard it.

9         MR. SUNG:  Well, Ms. Boettner did testify that the

10  current fish oil price is $1,900, and we will bring out,

11  through both Mr. Jarosz as well as our cross of Dr. --

12        THE COURT:  That number standing alone has no

13  meaning, absolutely none.  That's the only number she said.

14  They haven't costed out how much it's going to cost to

15  produce the product.  They haven't costed out what they're

16  going to sell it for.  So you can't start with those figures.

17  Whether you get to those figures -- I think it's going to be

18  difficult to get to them at this phase of the trial, but you

19  haven't gotten to them yet, and you can't start out with

20  those numbers and work backwards.

21        MR. SUNG:  Understood.

22        THE COURT:  You have to lay a foundation for them.

23        MR. SUNG:  We would do that with Mr. Jarosz, and so

24  we would agree to withdraw that slide --

25        THE COURT:  Well, you'll attempt to do that with

———Jarosz, J. - Direct———

1    him, and we'll see if you do.

2            MR. SUNG:  Understood.  Yes, sir.

3            THE COURT:  But you haven't done it yet.

4            MS. SHAW:  And I can make objections at the

5    appropriate time -- I plan on objecting at the appropriate

6    time because in Mr. Jarosz's report, he has not provided any

7    basis for valuing any oil unless it was sold, including the

8    fish oil price.

9            THE COURT:  Well, I'll have to deal with -- I can't

10   project what is going to happen in the future, but you can't

11   start out throwing those numbers at the jury.  There's no

12   foundation for it.

13           MR. SUNG:  Understood.

14           (The following was heard in open court:)

15           THE COURT:  Ladies and gentlemen, that chart flashed

16   momentarily on the screen.  You should pay no attention to

17   that.  Such a graph can't be put on the screen until first

18   it's admitted, which it hasn't been.  So whatever you saw on

19   the screen, you'll have to put out of your mind.  I don't

20   know if you saw it or not.  It was not up there very long,

21   but at this point, there's no basis for it being up there.

22           All right.  You may proceed.

23           MR. SUNG:  Thank you, Your Honor.

24   BY MR. SUNG:

25   Q.  Mr. Jarosz, can you tell us from your calculations, as a

—Jarosz, J. - Direct—

1    summary, of what you have found the reasonable royalty

2    damages to be in this case?

3         THE COURT:  That's what I just said he hadn't laid a

4    foundation for, Counsel.

5         MR. SUNG:  I understand, Your Honor.

6    BY MR. SUNG:

7    Q.  Mr. Jarosz, have you seen evidence that estimates

8    Cargill's anticipated production in the future?

9    A.  Yes, I have.

10        MS. SHAW:  Objection, Your Honor.  This is unrelated

11   to past damages.

12        THE COURT:  Let me see counsel again.

13        (The following was heard at the sidebar:)

14        THE COURT:  I don't know what you're thinking.  You

15   just started out by asking him what was on the chart after I

16   said that there was no foundation.

17        MR. SUNG:  I'm sorry, Your Honor.  I thought you

18   were referring to the percent royalties on that chart.

19        THE COURT:  We're talking about past damages.  The

20   only evidence he has that has any relevance to any kind of

21   damages is this witness's statement of how much fish oil

22   costs today.

23        MR. SUNG:  Yes, sir.

24        THE COURT:  Okay.  Well, that isn't really helping

25   us, because what we're talking about are past damages.

──────Jarosz, J. - Direct──────

1           MR. SUNG:  Yes, sir.

2           THE COURT:  We need to know some calculation of how

3    much it's going to cost to produce the product, how much the

4    product costs, whether it justifies the investment they've

5    made.  I mean, as I said before we even started this, I

6    didn't know how in the world you were going to prove any past

7    damages because if he established a reasonable royalty, which

8    is not going to be 50 percent, what would you apply it to?

9           MR. SUNG:  And so I'm not trying to be enigmatic

10   about this, Your Honor.

11          THE COURT:  Well, I don't think you're being

12   enigmatic.  You're facing a difficult task.  As I said, I

13   don't know how you prove past damages when neither side has

14   any sales.  We don't know how much to expect the sale price

15   to be.  How much are fish farmers going to pay extra so that

16   their fish would have more omega-3 fatty acid?

17          MS. SHAW:  Your Honor, I would just note that the

18   past production of oil, none of that was provided, as I

19   understand it, to fish farmers.  So to the extent fish

20   farmers are paying whatever Mr. Sung concedes that -- thinks

21   that they're paying, that number is not relevant to the

22   purposes of the oil that was made in the past if it was used

23   for an entirely different intended purpose.

24          MR. SUNG:  And our position has been, all along,

25   that the projections of both companies as to what the sales

—Jarosz, J. - Direct—

1    would be going forward can help inform, as a proxy, the
2    amount of oil that has already been produced by Cargill.  We
3    would apply that same metric.
4            MS. SHAW:  There's no basis for that in Mr. Jarosz's
5    report.  There's no basis for valuing the oil that is the --
6            THE COURT:  Well, I don't know how many plants it
7    takes to produce a given amount of oil, and so how can we
8    apply a royalty to a given amount of plants when we don't
9    know -- there's no history of price of the oil, and we don't
10   know how many plants it takes to produce the oil.
11           MR. SUNG:  There would be testimony on that, Your
12   Honor, in terms of how much.
13           THE COURT:  Well, there isn't yet.
14           MR. SUNG:  Correct.
15           THE COURT:  Well, you're going to the wrong starting
16   point.
17           MR. SUNG:  Okay.  I'm happy to start there.
18           MS. SHAW:  Your Honor, Benita Boettner was a fact
19   witness for the past damages case.  Mr. Jarosz has no basis
20   or foundation to provide testimony on these things.
21           MR. SUNG:  This would be from Cargill's own
22   documents.
23           MS. SHAW:  Mr. Jarosz is not in a position to lay
24   the foundation for Cargill's own documents which have not
25   been admitted and for which no testimony has been provided.

—————————————Jarosz, J. - Direct—————————————

1          THE COURT:  Well, I don't know -- I don't know how

2     much -- I mean, it seems to me the starting point is how much

3     does it cost to produce a given amount of canola oil, and how

4     can you estimate what the price is going to be without

5     knowing what it cost to produce it and what you're going to

6     sell it for?

7          MR. SUNG:  That's why both companies' projections

8     are the best metric of that, in our opinion.

9          MS. SHAW:  Your Honor, I would just note that the

10    past damages amount is not for oil that was made to sell into

11    the market, it was oil that was made for R&D purposes.  So to

12    use valuations of oil for commercial sales, it bears no

13    relationship to the value when used for R&D, and it is

14    clear --

15         THE COURT:  Well, I think it does bear some

16    relationship --

17         MS. SHAW:  Okay.  Well, there's no basis.  There's

18    no opinion laid in Mr. Jarosz's expert report for valuing the

19    oil for R&D purposes.  He relies solely on the future

20    commercial value --

21         THE COURT:  Well, I haven't heard what he relies on.

22    I don't know what he relies on, but you have to start with

23    how much it cost to produce the oil and how much went into

24    research.  Of course, they spent a lot more money than you

25    did.  How much did it cost you to research it, how many

2242

—Jarosz, J. - Direct—

1    plants does it take to produce a given amount of oil, how

2    much does it cost, how much do you have to pay the farmers to

3    do that.  I mean, you have to have a foundation.  You don't

4    have anything.

5            MR. SUNG:  Yes.  I was about to introduce an

6    exhibit, Your Honor, of Cargill's projections, but those

7    projections start from 2016, so they are historical.

8            THE COURT:  Projections for what?

9            MR. SUNG:  For the expected production, the expected

10   price of the oil.  And, again, all of the data --

11           MS. SHAW:  These numbers are for 2020.  I don't know

12   which document you're referring to, but these documents are

13   for the future.

14           MR. SUNG:  Sorry.  I don't have my glasses.  And

15   then with Nuseed as well --

16           THE COURT:  Do you have any --

17           MR. SUNG:  -- ones that are projections --

18           THE COURT:  Do you have any projections from your

19   client --

20           MR. SUNG:  We do.

21           THE COURT:  -- as to how much they spent?

22           MR. SUNG:  We do.

23           THE COURT:  Well, that's the starting point.

24           MS. SHAW:  Those are future projections, Your Honor.

25   They're projections for future costs that have not happened.

Jarosz, J. - Direct

1          THE COURT:  Well, they've spent money raising them.

2   That's what is -- that's what they've done in the past.

3   They've spent money raising them.  That's the number that we

4   ought to have, how much it cost them to raise the product,

5   how much oil was produced for what costs in the past.

6          MS. SHAW:  And, Your Honor, Mr. Jarosz does not rely

7   on that in calculating --

8          THE COURT:  Well, if he didn't rely on that, we'll

9   deal with that when we get to it.

10          MS. SHAW:  Yes, Your Honor.

11          MR. SUNG:  May we ask to possibly consider a lunch

12   break to allow us to really narrow this down?  I think it

13   will be a lot more effective.  Because we want to take and

14   heed what you just said in terms of making sure that we can

15   direct this to those foundational elements for you.

16          THE COURT:  All right.  We'll take a lunch break

17   now.

18          (The following was heard in open court:)

19          THE COURT:  Ladies and gentlemen, the parties --

20   well, I think we should ask the witness to step down and

21   remain outside the courtroom until he's recalled.

22          MS. SHAW:  Your Honor, would you please give the

23   witness the same instruction you've given other witnesses?

24          THE COURT:  You should not discuss your testimony

25   with anyone between now and the time that you return to the

──────────Jarosz, J. - Direct──────────

1   stand, or consult any documents.  You should return to the

2   stand exactly as you leave it now.

3           THE WITNESS:  Yes, sir.

4           (The witness exited the courtroom.)

5           THE COURT:  All right.

6           Ladies and gentlemen, it's going to take a little

7   while to straighten out the wrinkles that are caused when we

8   have a dual system of determining damages.  Part of them are

9   determined by you, and part of them are determined by me, and

10  it's difficult to draw the line exactly where one starts and

11  the other begins, and that's what we're trying to figure out

12  now.

13          So let's take a recess, and you can have a leisurely

14  lunch and return at 2:00.

15          (The jury exited the courtroom.)

16          THE COURT:  Counsel, the projections that you make

17  on what is a reasonable royalty are so astonishing that the

18  Court, even if it was inclined to let you start at the end

19  and work back to the beginning, can't do that in this case.

20  I mean, you've got the royalty going up to 49 percent, which

21  is unheard of.  I've never heard of such a royalty.

22          So you're going to have to have a foundation before

23  you put any numbers in front of the jury.  And, as I said,

24  what matters to past damages is what happened in the past,

25  not what is projected in the future, and before you can start

─────────Jarosz, J. - Direct─────────

1    projecting in the future, you have to know how much it cost

2    to produce the oil.  And you've produced it, and they've

3    produced it, and that's where you have to start; how much did

4    it cost to produce it?

5         The research money is what an economist, I guess,

6    would call a sunk cost.  That's been spent.  It can't be

7    recaptured.  I mean, you try to recapture it through sales

8    over time, but -- I guess your sunk costs are relevant to how

9    much you have invested in the project, but we have to know

10   what it cost to produce it and what damage has been caused to

11   you by their infringement to date, not what may be caused by

12   their infringement at some time in the future.

13        And, as I said earlier, I was really wondering how

14   you were going to prove any past damages, and it's proving

15   very difficult for you to do so, which I expected it would.

16   When you've got no sales of the product on either side, you

17   don't even have a projected cost of the product.  You don't

18   have a cost of producing the product.  How can you come to

19   any realistic estimate of past damages?

20        So if your expert is basing things entirely on

21   projections of future sales, I don't think that is going to

22   be an effective determinant of what you are entitled to in

23   past damages.  It may be relevant, if he can support it, to

24   potential future damages, but past damages -- what are they?

25   How much does their alleged infringement affect your research

—Jarosz, J. - Direct—

1    costs?

2            When did the infringement start?  Nobody said when

3    the infringement started.  Did it start when they first

4    planted the product which produced allegedly infringing oil?

5    I don't know.  Did it start when you first notified them that

6    you were claiming they were infringing?  I don't know.  But

7    you have to lay your foundation before you hit the jury with

8    any percentage royalty that you're requesting.

9            So I don't know how you do that.  I just named some

10   examples of what I think is missing, but I don't know if I've

11   thought of all the examples of what's missing or not.  It's

12   just that everything is missing at this point.

13           MR. SUNG:  And, Your Honor, we greatly appreciate

14   your guidance on that, and so based on --

15           THE COURT:  Well, I'm not supposed to be -- I'm not

16   supposed to be determining what evidence you should present.

17   You have to decide what evidence you want to present or

18   attempt to present, but I've told you that I don't see how

19   you can support these numbers without some foundation, and

20   I've given you some ideas of what I meant by foundation, but

21   you've got to put it together however you think it ought to

22   be put together.

23           MR. SUNG:  And, Your Honor, just a question about

24   order of presentation.  For purposes of the presentation,

25   would it be your decision to keep the jury here on an

—Jarosz, J. - Direct—

1    advisory basis on future damages, as well?

2          THE COURT:  Absolutely not.  They make a decision,

3    and I'm not going to have them give an advisory verdict on

4    future damages.

5          MR. SUNG:  Understood.

6          THE COURT:  They'll make their decision, and then

7    they'll be excused, and then we can start working on future

8    damages when they start deliberating.

9          MR. SUNG:  Thank you.

10          THE COURT:  All right.  We'll be in recess until

11    2:00.

12          (Recess from 12:44 p.m. to 2:02 p.m.)

13          MR. SUNG:  Your Honor, if we may, the proponents

14    would like to address the Court in the form of a proffer.

15          The proponents are not seeking to prove past damages

16    in this case based on the direct economic injury from the

17    infringing conduct.  Rather, what we would intend to prove is

18    that, based on a royalty base multiplied by a royalty rate,

19    that there could be indeed past damages.  The royalty base

20    would be based on evidence we would intend to introduce that

21    talks about the amount of infringing oil that Cargill has

22    produced to date.

23          In addition, the royalty rate would be based on

24    expert testimony with regard to the parties' individual

25    licenses but also based on projected information or data with

—Jarosz, J. - Direct—

1    regard to future projections by both parties.  If it's Your

2    Honor's determination that the reliance on these future

3    projections is unacceptable to present to the jury or that

4    any jury verdict that relied on that would otherwise not be

5    informative to the Court for future ongoing royalties, then

6    we would submit that we can dismiss the jury from further

7    proceedings and head directly to a discussion about

8    injunctive relief and any ongoing royalties.

9           Part of the proffer would include submitting to the

10   Court for evidence the expert report of John Jarosz from

11   June 21, 2019, as well as Mr. Jarosz's supplemental expert

12   opinion from August 28 of 2019, and then, lastly,

13   Exhibit CX-0364.

14          THE COURT:  Well, there are problems with attempting

15   to base a reasonable royalty rate based on projected future

16   sales, and at this point, as the evidence stands, I don't

17   believe the Court can do that.

18          One thing that happened is that the -- a couple of

19   the patents were found not to be infringed.  Mr. Jarosz's

20   report did not apportion the damages between the patents.  He

21   seemed to be trying to say that the damages from any one

22   patent would support the entire damages claim, which I don't

23   believe is in accordance with the law on determining damages.

24          Furthermore, there's no evidence before the Court as

25   to when the proponents will get their product to market.  As

2249

—Jarosz, J. - Direct—

1    I said, the only evidence is the testimony of Ms. Boettner,

2    if I'm saying their name correctly, that she hopes it will be

3    ready in six months, which is different than her testimony

4    was in her deposition, but time has passed since her

5    deposition, and I can't determine the difference, what

6    difference, if any, that that made.

7            So I don't believe that there's any way that

8    Dr. Jarosz can base his projection of past damages.  I

9    understand that what he's going to base it on is the value of

10   the seeds produced in the experimental basis, which that part

11   of it makes sense.  And even if you applied the maximum

12   range, he didn't pick any range.  He said between 12 and 49

13   percent, which is not helpful to the Court in the least.

14   I've never heard of a 49 percent range, nor can I imagine any

15   economic basis for same.  How can somebody manufacture a

16   product and give away 49 percent in a royalty?  I've never

17   seen it.  I've never seen anybody even argue that that's what

18   it should be.

19           So based on the testimony in the record thus far, I

20   would say that his range would not be helpful to the Court in

21   projecting what the future damages should be or whether an

22   injunction should hold.

23           I've got to know whether the patents which are found

24   to be invalid would be sufficient for, for example, for the

25   opponents to produce Latitude.  In other words, can they

—————Jarosz, J. - Direct—————

 1   produce it without infringing on any of the Group A patents?

 2   If they can, then it's questionable whether it would be

 3   possible to determine any royalty.

 4         But the patents that have been infringed seem, to

 5   the Court, at this stage of the proceeding -- and I haven't

 6   heard from the defendant yet -- but seem to be a proper basis

 7   for an injunction.  But I don't know how you would determine

 8   a royalty rate based on the evidence that's before me at this

 9   time.

10         MR. SUNG:  And the only thing I would add, Your

11   Honor, is that, of course, we respectfully disagree with

12   regard to the apportionment law application in this case.  It

13   is Dr. Kunst's testimony earlier that each of the Group A

14   patents, at the very least, would command the full value of

15   that technology based on infringement, and I believe

16   Mr. Jarosz --

17         THE COURT:  Well, all of the Group A patents, I

18   think, with maybe one exception -- were there four or five

19   Group A patents?

20         MR. SUNG:  Four, Your Honor.

21         THE COURT:  Well, all four of them were found to be

22   infringed.

23         MR. SUNG:  Yes.

24         THE COURT:  So that your position is that any one of

25   them would preclude the Latitude product, but I don't know

Carol L. Naughton, Official Court Reporter

---

Jarosz, J. - Direct

1    that yet.  And that's just speculation for the Court to try

2    to decide that issue.

3            MR. SUNG:  Well, we believed, again, that Dr. Kunst

4    did testify to that effect during the liability phase of

5    trial.

6            THE COURT:  Well, I don't know that her testimony

7    was accepted or not.  There was testimony to the contrary,

8    and if the Court has to decide that question, I would have to

9    compare her testimony and the other testimony in the case to

10   see if those four patents would bar Latitude entirely or not,

11   or how difficult would it be for Cargill and BASF to design

12   around those four patents?

13           MR. SUNG:  Understood, Your Honor.

14           THE COURT:  But it seems to the Court, based on the

15   evidence at this time, that you'd be entitled to an

16   injunction on those four patents.  But there are just too

17   many holes in the economist's testimony; the range, the fact

18   that he didn't apportion them.  Even in view of that

19   testimony, the fact that he's only applying the range to that

20   one group of products that was worth, what, around $3,000?

21           But, of course, that -- I mean, you want that big

22   number so you can apply it to the ongoing royalty.  It

23   doesn't help you -- it's worth a few hundred dollars on past

24   damages.  But I can tell you that as far as an ongoing

25   royalty is concerned, the Court would not accept that range

---

―――Jarosz, J. - Direct―――

 1  as advisory.

 2        MR. SUNG:  Understood, Your Honor.  I think that

 3  you've seized upon the various factors relating to the

 4  uncertainties in this case in advance of the commercial sales

 5  that you've talked about, and we would agree with you from

 6  the proponents' standpoint that injunctive relief would be

 7  warranted on those bases, and so I think based on what you've

 8  articulated just now, again, we would submit that the jury

 9  could be dismissed at this point in time.

10        THE COURT:  Do the opponents have anything to say

11  about that?

12        MS. SHAW:  Your Honor, we have no objection to

13  dismissing the jury.  As I understand it, proponents of the

14  patents are now withdrawing their past damages claim, if I

15  heard it correctly.

16        I did want to comment on the point about the

17  injunction.  We do believe that there is evidence to be put

18  on and expert testimony to be put on on the appropriateness

19  of both, any future royalty and an injunction, which as I'm

20  sure this Court knows, post *eBay*, there's a number of factors

21  and considerations to take into account for that.

22        THE COURT:  I know that there are a number of

23  factors to take into consideration.  That's why I said that

24  it appeared to the Court that at this point, that it was the

25  most probable, but I'm not -- I don't want to guarantee to

---Jarosz, J. - Direct---

1  the proponents that I'm going to grant them an injunction.  I

2  don't want that to be the basis for your dismissing the jury.

3          But I think you have a -- what can I say?  I mean, I

4  think you certainly have a prima facie case to get an

5  injunction, and it's up to the opponents to persuade the

6  Court that that would not be an appropriate remedy.  I think

7  prima facie it would be, but I don't want that to be the

8  reason for you to dismiss the jury.

9          MR. SUNG:  Thank you, Your Honor.  We understand.

10         THE COURT:  All right.  Well, do you want to dismiss

11 the jury?

12         MR. SUNG:  Yes.  That would be our proffer.

13         THE COURT:  All right.  Bring the jury in.

14         (The jury entered the courtroom.)

15         THE COURT:  Well, ladies and gentlemen, as I

16 mentioned to you before the break, it appears that all

17 aspects of this case are very complex, including the damages,

18 and it's very difficult to draw a line between the damages

19 that occurred in the past and those which may occur in the

20 future.

21         The part of the case that applies to you is only the

22 past damages, and using the evidence that the plaintiff is

23 prepared to present, it does not appear that the past damages

24 would be of any great significance.  So the parties have

25 agreed that they are going to focus on the future damages and

—Jarosz, J. - Direct—

1    not the past damages, which means that you don't have a

2    decision to make, and you're going to be excused as jurors.

3           Again, if you would wait just a minute in the jury

4    room, I'll come in there and thank you again for your

5    service.

6           (The jury was excused from the proceedings.)

7           THE COURT:  Give me just a minute or two.

8           (There was a pause in the proceedings.)

9           THE COURT:  Well, the jury wanted me to say that

10   they thought the attorneys on both sides did an excellent

11   job, and they thought they were very professional in the way

12   they presented their case, and very well prepared and

13   knowledgeable about your respective presentations.  They

14   wanted to be sure that I said that to you, and I will say I

15   agree with them.  So they have been excused now, and we can

16   proceed with the other aspect of damages.

17          MR. SUNG:  Thank you, Your Honor.  I think just as a

18   housekeeping issue, we wanted to make sure it was clear on

19   the record that Your Honor did accept the proffer of

20   proponents?

21          THE COURT:  Did accept what?

22          MR. SUNG:  The proffer of proponents that,

23   essentially, the basis for our dismissal or request to

24   dismiss the jury was the insufficiency of the evidence from

25   Your Honor's perspective of the evidence that we would

Carol L. Naughton, Official Court Reporter

---Jarosz, J. - Direct---

1   otherwise have submitted with respect to the royalty rate.

2          THE COURT:  Yeah.  Well, basically, the Court felt

3   that no foundation had been established for the royalty rates

4   set forth in the doctor's report, and I felt that the range

5   was too wide to be of any help, and the application of that

6   range of rates to past damages would not be persuasive to the

7   Court in setting royalties.

8          I've just never heard of a license agreement that

9   had royalties in that range, particularly the upper end of

10  the range, and I can't imagine the results of a hypothetical

11  negotiation being a royalty range of 49 percent.

12         All right.

13         MR. SUNG:  So, Your Honor, we'll go ahead and bring

14  Mr. Jarosz back to the stand to continue his testimony, now

15  focusing on the injunctive relief aspects.

16         THE COURT:  All right.

17         (The witness resumed the witness stand.)

18         THE COURT:  All right.  You may proceed.

19         MR. SUNG:  Thank you, Your Honor.

20  BY MR. SUNG:

21  Q.  Mr. Jarosz, you'll notice that we're a little fewer in

22  number this afternoon.

23  A.  Yes.

24  Q.  But what I'd like to do is to take you through your

25  analysis and your expert opinion with regard to the

———Jarosz, J. - Direct———

1    injunctive relief aspect, and so let me ask:

2            In coming to your opinion on whether injunctive

3    relief is appropriate in this case, what factors did you

4    consider?

5    A.  I considered three factors; irreparable harm, balance of

6    hardships, and public interest.

7    Q.  And can you explain what irreparable harm means in this

8    context?

9    A.  As I understand it, it means harm for which there will

10   not be full compensation due to the facts and circumstances

11   of the situation at hand, in other words, harm that is

12   extremely difficult to measure completely.

13   Q.  And what types of harm did you consider that Nuseed may

14   suffer here?

15   A.  I think there are three forms of harm if BASF and Cargill

16   remain in the marketplace:  Number one is profit erosion;

17   number two is impact on research and development activities;

18   and number three is the impact on customer relationships.

19   Q.  And in your opinion, would these harms be irreparable?

20   A.  Based on the facts and circumstances of this case, it

21   appears that it would be exceedingly difficult to measure all

22   of the harms that are likely to occur in those three

23   categories.

24   Q.  So if we can take each of these --

25           THE COURT:  Could you give me those three again.

—————Jarosz, J. - Direct—————

1          THE WITNESS:  The three categories of irreparable

2     harm are, number one, profit erosion; number 2, impact on

3     research and development activities; and, number 3, impact on

4     customer relationships.

5          THE COURT:  Okay.

6     BY MR. SUNG:

7     Q.  And so let's take each of these harms in turn.  What is

8     profit erosion?

9     A.  Profit is the difference between price and cost.  In this

10    case, if infringement were allowed to continue, there would

11    be a negative impact on the price trajectory and a positive

12    impact on the cost trajectory.  In other words, the profits

13    would be squeezed because of the competition.

14    Q.  And would Cargill's entry into the market put any

15    downward pressure on Nuseed's prices for Aquaterra?

16    A.  Yes.  It's one of the basic precepts of economics, and

17    that is, competition often leads to price reduction.

18    Companies often compete directly with one another by offering

19    lower prices, and that is likely to occur in this business

20    place.

21    Q.  Now, are you suggesting that Nuseed should be able to

22    charge monopoly prices?

23    A.  Absolutely not.  Both companies are competing to be

24    alternatives to and supplements to fish oil.  So fish oil is

25    still out there and dominates the marketplace.  So the

—Jarosz, J. - Direct—

1   existence of fish oil will constrain the pricing that both

2   companies can engage in.  If they attempted the price too

3   high, fish oil would take all of that business.

4   Q.  And would Cargill's entry into the marketplace increase

5   Nuseed's costs?

6   A.  Yes.  In at least two dimensions -- and Ms. Boettner

7   talked about some of those earlier today -- it would result

8   in Nuseed engaging -- having to incur more marketing costs

9   than it otherwise would have in order to both keep and

10  attract a customer base, so increase in marketing costs.  And

11  there's also an increase in production costs, that is,

12  economies of scale or learning curve effects would not be

13  realized.

14  Q.  And have you seen any evidence that Nuseed expects its

15  cost to production to decrease with volume and experience?

16  A.  Yes.  I've seen documents from the company that are

17  consistent with normal economic principles, and that is, over

18  time companies learn, both because of volume and simply time

19  in the business, and by learning more about the business,

20  they reduce their costs.  That's called economies of scale or

21  sometimes learning curve effects.  The cost can occur both

22  straight production costs and of developing relationships

23  with growers.

24          By not being far enough down the experience or time

25  curve, the company will not be able to realize the gains that

─────────Jarosz, J. - Direct─────────

1    it otherwise be able to realize, and I've seen that in some

2    of the Nuseed documents.

3    Q.  Okay.  Can you turn in your binder, please, to CX-0928.

4    A.  I'm there.

5    Q.  And do you recognize this document?

6    A.  I recognize this general document.  Are you wanting me to

7    look at a particular page?

8    Q.  Well, if you flip through it, my question is going to be:

9    Is this the type of document that you would normally rely

10   upon as an expert in rendering your opinion?

11   A.  Absolutely.  This is investor day slides in which -- as I

12   recall, in which the company that is Nuseed talked about the

13   business that it's in and hoping to continue to be in.

14        MR. SUNG:  Your Honor, we'd like to move the

15   admission of CX-0928 into evidence.

16        THE COURT:  That document will be admitted.

17        (Exhibit CX-0928 received in evidence.)

18   BY MR. SUNG:

19   Q.  Mr. Jarosz, can I refer you to particularly Bates number

20   ending 789 within this set.

21   A.  Yes, I'm there.

22   Q.  And once you're there, if you could tell us, what does

23   this slide describe to you?

24   A.  This shows precisely the concept that in economics we

25   know as scales of economies or learning curve effects.  One

—————Jarosz, J. - Direct—————

1   sees that early on, on the left-hand side toward the

2   beginning of the project, or what's called launch, the costs

3   are fairly high.

4          But over time, as the company learns about the

5   business and learns how to succeed in the business, the costs

6   go over time -- reduce over time.  So you'll see what is

7   fairly high on the left-hand side because quite a bit lower

8   on the right-hand side because the company has learned more

9   and have a larger scale within which to work on reducing its

10  costs.

11  Q.  So what effect does Cargill's entry into the marketplace

12  have on Nuseed's ability to realize these cost reductions?

13  A.  It slows the ability of Nuseed to be able to move down

14  that learning curve.  In other words, it will be stuck more

15  toward the left-hand side than the right-hand side because

16  the volumes will be substantially lower.  The ability to

17  learn will be much lower because the company will be

18  defending its position in the market rather than working on

19  economies of scale.

20  Q.  In your opinion is the harm that Nuseed is likely to

21  suffer due to profit erosion quantifiable in this case?

22  A.  It's extremely difficult to adequately quantify here, for

23  a couple of reasons.  The first is, we don't know exactly

24  what the price trajectory is going to be.  We all know the

25  products have not been for sale yet.  So we don't know for

—Jarosz, J. - Direct—

1   sure what the selling price will be.  As a result, we don't
2   know what the trajectory of selling prices will be, and as a
3   result of that, we don't know what the impact of competition
4   will be.
5          Will it reduce prices 10 percent, 50 percent, or not
6   at all?  We don't know that because the business is just now
7   beginning on the commercial scale.
8          Secondly, we don't know what the cost structure will
9   look like for the same reasons the newer company has been in
10  full commercialization yet, there have not been sales.  So we
11  don't know what the cost curve will look like for Nuseed as a
12  result.  We don't know what the trajectory will look like,
13  and as a result of that, we don't know precisely what the
14  impact of the competition will be, how it might change that
15  line.
16  Q.  And why is price erosion irreparable here?
17  A.  For the reasons that I just explained, that is, we don't
18  know what the prices will be, we don't know what the
19  trajectory will be, and we don't know what the impact of the
20  competition will be on that trajectory.
21  Q.  So let's move on to the second type of harm you've
22  identified.  Can you explain what sort of harm Nuseed may
23  suffer with respect to product development?
24  A.  Nuseed will have less resources to be able to invest in
25  its own business.  That means it won't be able to extend upon

─────Jarosz, J. - Direct─────

1    and improve Nutriterra.  Moreover, it will be less able to

2    develop new applications than it's hoping to develop.  In

3    this case we know that applications for the human market is

4    quite important to both companies.  Things like food and

5    beverage or supplements or nutraceuticals is the next wave

6    beyond aquaculture.

7            But if the company is forced to defend its position

8    in the aquaculture business and generates less money from

9    that business, it will not be in a position to develop the

10   human, direct human applications at the rate it was hoping it

11   would.

12   Q.  And why is the impact of Cargill's presence in the

13   marketplace on Nuseed's product development likely to be

14   irreparable harm?

15   A.  We don't know precisely what new projects Nuseed will

16   invest in.  We don't know what the success rate of those

17   extensions will be.  As a result, we don't know what the

18   impact of the competition will be.  Will it halt all

19   development?  Will it slow development or will it have no

20   impact?  We just don't know.

21   Q.  So let's discuss the last item that you had mentioned,

22   customer relationships.

23           How does Cargill's entry into the marketplace affect

24   Nuseed's customer relationships?

25   A.  As we heard Ms. Boettner talk about, the company is

————Jarosz, J. - Direct————

1    attempting to develop customer relationships.  It's been

2    working on that for many months.  But there are not yet

3    customers who have signed contract for the purchase of

4    Nutriterra.

5            We don't know what customers will be developed over

6    what time frame.  The impact of the competition will,

7    undoubtedly, have some impact on the development and

8    retention of new customers.

9    Q.  And why is that impact, the impact of Cargill's entry

10   into the marketplace on Nuseed's customer relationships

11   likely to be irreparable here?

12   A.  We don't know what customers will ultimately choose

13   Nutriterra.  We don't know at what scale they will be sending

14   their business to Nuseed.  And as a result, we don't know

15   what the competitive impacts will be since we don't know what

16   the trajectory would be without the competition.

17   Q.  You've just mentioned Nutriterra a moment ago.  Is that

18   the product you're talking about with respect to --

19   A.  I meant Aquaterra.  I misspoke.  I'm sorry.

20   Q.  Would you be able to reliably quantify unobserved

21   customer relationships that may have formed in the absence of

22   Cargill's entry into the marketplace?

23   A.  No.

24   Q.  What are the particular circumstances that play in this

25   case that would make quantifying the damage done to Nuseed

—Jarosz, J. - Direct—

1    due to Cargill's entry particularly difficult?

2    A.   There are four characteristics of this business that bear

3    on the irreparable issue quite importantly:   Number one, this

4    is a new to market, a first-time product.   There's not been a

5    canola-based source of omega-3 until now, and the market has

6    not known how it will accept that new product.   So it's a

7    brand-new business that's being developed.

8          Secondly, you have the issue of a first mover.

9    Nuseed was planning to be the first mover in this business,

10   and first movers typically have advantages over later movers.

11   Because of the competition from Cargill, that first mover

12   advantage is likely to be impacted, but we don't know how

13   much.   It's difficult enough to measure first mover, and then

14   to figure out what the impact of an altered first mover is

15   exceptionally difficult.

16         The third characteristic of this business is that

17   it's a worldwide business, so the patents here or U.S.

18   patents, but the business is run throughout the world, in

19   Chile, for example.   And so things that happen in the

20   United States reverberate, but unclear exactly how in other

21   geographic markets.   So that's the third characteristic.

22         And the fourth characteristic is that this

23   technology is what we economists call a platform technology.

24   Mr. Zacharias, Ms. Boettner talked about that.   I talked

25   about it a few minutes ago.   Both companies are hoping to use

—Jarosz, J. - Direct—

1    the aquaculture product and move more directly into the human

2    markets with food and beverages, food supplements,

3    nutraceuticals.

4            The company's had hopes that this technology will

5    become ubiquitous.  Those are the characteristics of this

6    business that make it particularly difficult to quantify what

7    the harm could be in the future to a dollar amount and

8    express that today.

9    Q.  Now, would a reasonable royalty apply to future sales

10   fully compensate Nuseed for the damage here?

11   A.  No, not if the reasonable royalty is dependent only on

12   past licenses.  But we have so many other things going on,

13   the profit erosion, the impact on customer relationships, the

14   impact on research and development that aren't reflected in

15   the preexisting licenses in this business.

16           So if a royalty were reliant on those preexisting

17   licenses, we would be losing large measures of potential

18   harm.

19   Q.  So in addition to irreparable harm, are there other

20   factors you considered in your analysis of whether injunctive

21   relief is appropriate here?

22   A.  Yes.  The balance of the hardships and public interest.

23   Q.  What does the balance of the hardships mean as it relates

24   to injunctive relief?

25   A.  We're asked to weigh, as I understand it -- and this is

———Jarosz, J. - Direct———

1    one of the factors that comes from a famous Supreme Court

2    case -- to weigh the harm to Nuseed if there's not an

3    injunction versus the harm to Cargill if there is an

4    injunction.  So we're trying to weigh the hardships to both

5    parties.

6    Q.  And did your analysis consider the relative importance of

7    long-chain omega-3 canola oil to each of the parties here?

8    A.  Yes.  And I had quite a bit of evidence on the

9    significance of this project to Nuseed.  In fact, I

10   understand it was really one of the primary reasons for the

11   development of the company, that is, to further develop this

12   product line and bring it to the marketplace.  One sees

13   throughout the documents the significance of the canola-based

14   omega-3 technology to Nuseed.

15   Q.  And is the prior Exhibit CX-0928 one of those documents

16   you referred to reach that determination?

17   A.  Yes, it is.  One sees throughout this presentation

18   mention of the significance of this program.

19   Q.  And in your review of similar documents from BASF and

20   Cargill, did you see an equal emphasis on the importance of

21   long-chain omega-3 canola oil to those parties?

22   A.  I did not see the same kind of emphasis.  Both those

23   parties are involved in lots of other projects, and I didn't

24   see the significance of this project in the same way that I

25   saw the significance of this project to Nuseed.

─────Jarosz, J. - Direct─────

1   Q.  So over all what did you conclude about the balance of

2   hardships in this case?

3   A.  They seemed to favor Nuseed, that is, in position of an

4   injunction would protect the position that's extremely

5   important to Nuseed, and it's a position that appears to have

6   somewhat less significance to BASF and Cargill.

7   Q.  And how did your analysis of whether injunctive relief is

8   appropriate here, taking into consideration the public

9   interest?

10  A.  I realize that they're somewhat competing interests here.

11  The patent system wants to protect innovation and wants to

12  encourage further innovation.  On the other hand, competition

13  can result in reduced prices.  So I needed to examine which

14  factor predominated here.

15  Q.  And why is it important from an economic perspective to

16  protect patented inventions?

17  A.  It's the whole reason why the patent system exists, that

18  is, it wants to give inventors and innovators protection for

19  the substantial investments that they made, so it grants a

20  limited monopoly for those companies and individuals to

21  recoup the investment.

22          The patent system encourages innovation and it

23  encourages innovation not only by big companies but small

24  companies, and not having that protection here would send a

25  signal to potential innovators that their innovations may not

Carol L. Naughton, Official Court Reporter

2268

—Jarosz, J. - Direct—

1    be as protected as they had hoped.

2    Q.  And how would public interest be impacted should Cargill

3    be allowed to remain in the marketplace?

4    A.  The impact is that there would be less confidence in the

5    patent system.  Nuseed has already prevailed on liability.

6    Nuseed has prevailed in showing that its patents are valid,

7    enforceable, and infringed.  If a permanent injunction is not

8    granted, there will be less certainty among innovators that

9    their positions will be protected in the future.

10   Q.  And, alternatively, how is the public interest impacted

11   should an injunction issue here?

12   A.  The supply of canola-based omega-3 is likely to be quite

13   substantial.  You heard from Ms. Boettner and, I think,

14   Mr. Zacharias, as well, that this is a very scaleable

15   business.  In other words, it can be expanded.  One needs to

16   grow more crops.

17          So there certainly is a fish oil gap.  Nuseed

18   believes it can meet much of that gap, and depending on the

19   year, perhaps all of it, because the scaleability is quite

20   agreeable to the company.  This is a technology that can fill

21   much of that fish oil gap.

22   Q.  Would an injunction preventing Cargill from entering the

23   long-chain omega-3 canola marketplace prevent Cargill, under

24   any circumstances, from entering the market?

25   A.  No.  It has at least two options open to it.  One, is to

—Jarosz, J. - Direct—

1    design around the patents, in other words, attempt to remain

2    in the business but not use the CSIRO and GRDC and Nuseed

3    intellectual property.

4            But, secondly, they have the ability to come and

5    negotiate a license with the proponents.  That is, an

6    injunction often leads to further negotiation, one in which

7    the parties figure out what terms are fair going forward.

8    Q.  And so overall what is your opinion as to whether

9    injunctive relief is appropriate here?

10   A.  Based on the facts and circumstances of this case, it

11   appears that injunctive relief is the most appropriate form

12   of relief.

13   Q.  So I'd like to turn back and address with you the aspect

14   of future ongoing royalties.  Alternatively, to your

15   injunctive analysis, what other form of damages did you deem

16   appropriate in the absence of injunctive relief?

17   A.  A reasonable royalty.

18   Q.  And would lost profits not be appropriate here?

19   A.  Not for anything in the past because as has been

20   established, there have not been commercial sales.  So there

21   are no losses in that dimension that Nuseed has incurred.

22   That's not to say it hasn't been harmed, but there are no

23   sales that have been lost by the company to date.  The

24   future, however, may be a very different story.

25   Q.  Can you tell us about the methodology you used to

—————Jarosz, J. - Direct—————

1    determine the amount that a reasonable royalty should be for

2    ongoing royalties?

3    A.   I used a hypothetical negotiation construct.

4    Q.   And can you describe what that is?

5    A.   It can be thought of as a license fee that should have

6    been paid by the infringer to the owner of certain patent

7    rights, and it's established based on setting up a bargaining

8    negotiation that we know never really existed but should have

9    existed.  That is, what should have happened if the parties

10   sat down at a negotiating table and instead of infringement,

11   there was a license that was entered into?

12   Q.   So here in this case, how is it possible to calculate

13   what royalty the parties should have agreed to for the

14   patents had they conducted this negotiation before first

15   infringement?

16   A.   We have three sets of facts that are quite useful in

17   determining the outcome of a hypothetical negotiation.  One

18   is licenses and agreements covering the patent rights at

19   issue here or something very close to those patent rights.

20   Number two, we have information on BASF and Cargill's

21   projected gains from infringing as of the point of this

22   negotiation.  And third, we have information on CSIRO, GRDC,

23   and Nuseed's projected losses out into the future if

24   competition were to continue from Cargill.

25   Q.   And in this case is such evidence to support those

——————Jarosz, J. - Direct——————

1  available?

2  A.   Yes.  I have evidence on all three of these dimensions.

3  Q.   And is that evidence quantitative or qualitative?

4  A.   We economists view it as quantitative.  It's data, but I

5  also consider it a set of qualitative factors that impacts

6  any negotiation, including a hypothetical negotiation.

7  Q.   And when did you -- or what date did you apply to the

8  hypothetical negotiation in this case?

9  A.   November of 2018.

10 Q.   And are you aware whether both sides agree to that date?

11 A.   Yes, I think there's agreement on that.

12 Q.   And so you mentioned you had looked at a number of

13 different comparables but you had focused on two in

14 particular.  Can you describe what those were?

15 A.   Yes.  I'm not sure if I fully mentioned that.  I looked

16 at a number of licenses, a couple dozen licenses, but I found

17 two in particular that were extremely useful, and I

18 summarized those in a slide.

19 Q.   And can you walk us through what is on this slide?

20 A.   The first is the set of agreements between CSIRO and GRDC

21 on one hand and Nuseed on the other hand.  Those agreements

22 were entered into in 2010, and those covered the very patents

23 that we're talking about here.

24      They provided -- those agreements provided that

25 Nuseed would pay 25 percent of what it calls net sales, but

———Jarosz, J. - Direct———

1    it's something less than that sales.  It's some measure of
2    profits that we'll get into in a few moments.
3            The second agreement is between BASF on one hand and
4    Cargill on the other hand, which was entered in 2011.  This
5    covered the BASF inventions that presumably allowed for
6    canola-based omega-3 oils, and the patented inventions were
7    licensed or shared with Cargill such that Cargill agreed to
8    pay 40 percent of all positive product EBITs.  So, in other
9    words, years in which there were positive profits, Cargill
10   agreed to pay 40 percent as a license fee to BASF for access
11   to that technology.
12   Q.  Now, you had mentioned that you had other type of
13   evidence used in applying this hypothetical negotiation,
14   particularly what the infringer stood to gain from the
15   infringement.  What kind of evidence did you use for this?
16   A.  I had profit -- revenue and profit projections made at
17   about November of 2018 by Cargill in profit-and-loss
18   statements.
19   Q.  If you can turn to your binder to CX-0483.
20   A.  I've done that.
21   Q.  And, Mr. Jarosz, is this the type of document that you
22   would normally rely upon to render your expert opinion?
23   A.  Yes, it is.
24           THE COURT:  0483.  Okay.
25           MR. SUNG:  Your Honor, we would move the admission

Carol L. Naughton, Official Court Reporter

——Jarosz, J. - Direct——

1    of CX-0483 into evidence.

2            MS. SHAW:  Your Honor, we'd object to the extent

3    this is not the most recent --

4            THE COURT:  I'm sorry.  I can't hear you.

5            MS. SHAW:  We object.  This is not the most recent

6    Cargill projection that's available.

7            THE COURT:  It's not the most recent one available?

8            MS. SHAW:  Yes, Your Honor.  It's an outdated

9    projection.

10           MR. SUNG:  And, Your Honor, we would just say that

11   this is what was available at the time of Mr. Jarosz's

12   opinion.

13           MS. SHAW:  I don't believe that's true.  And also

14   updated -- and also Mr. Jarosz has provided supplemental

15   reports, and he has elected not to submit a supplemental

16   report with updated Cargill information that was available.

17           THE COURT:  Well, I'm going to overrule the

18   objection.  I think that goes to the weight rather than the

19   admissibility of the evidence.

20   BY MR. SUNG:

21   Q.  Mr. Jarosz, if we move to the next slide with you, can

22   you tell us, is this information that is summarized from

23   CX-0483?

24   A.  Yes, it is.  And that projection, by the way, was done

25   just at about the same time as the hypothetical negotiation,

—————Jarosz, J. - Direct—————

1   so that's what's at most relevance to me.

2          THE COURT:  Well, it says fiscal year ending May

3   31st.  Do we know what year?

4          THE WITNESS:  The year is below in the next row,

5   Your Honor.  So it's fiscal year ending May 31 in the first

6   column 2020, and then 2021, and then 2022.  They meant fiscal

7   year ending May 31 to be appropriate for each column heading.

8          THE COURT:  All right.  So this was the one starting

9   in 2020, which -- but what I was trying to find out was the

10  date the projection was made.

11         THE WITNESS:  Your Honor, it was in late 2018.  My

12  memory is that it was October of 2018, but I could

13  double-check that, but it's roughly in that time frame.

14         THE COURT:  Okay.

15         MR. SUNG:  And, Your Honor, just for housekeeping,

16  we just wanted to confirm that CX-0483 is in evidence?

17         THE COURT:  Yes.

18         (Exhibit CX-0483 received in evidence.)

19         MR. SUNG:  Thank you, Your Honor.

20  BY MR. SUNG:

21  Q.  What profits did Cargill project from selling its

22  long-chain omega-3 canola oil?

23  A.  You can see at the middle column under the dollar sign

24  the profits that it was projecting were $264.7 million.  The

25  MM stands for millions, and EBIT is the measure of profits on

Carol L. Naughton, Official Court Reporter

———Jarosz, J. - Direct———

1   the left.  That is earnings before interest and taxes that
2   equates to a profit rate, which is what is relevant for the
3   hypothetical negotiation of 28.2 percent.
4            So for every $1.00 of revenues associated with this
5   product line, the company was expecting $0.28 in profits
6   after accounting for all expenses.
7   Q.  And could Cargill earn its projected operating profit
8   without a license to the infringed patents?
9   A.  I understand it could not.  Dr. Kunst testified about
10  this, that each one of the infringed patents is a blueprint
11  to get to DHA, and then without having legal access to the
12  blueprint, Cargill could not commercialize and sell the
13  product.
14  Q.  Now, you mentioned another type of evidence used in
15  applying the hypothetical negotiation evidence about what the
16  patent owner stood to lose from the infringement.  What kind
17  of evidence did you rely upon for this?
18  A.  I, as well, had projections on expected performance in
19  the business for Nuseed.  I had a profit and loss projection
20  upon which I relied.
21  Q.  And if you can turn in your binder to CX-0964.  Do you
22  recognize this document?
23  A.  Yes.  This is a document upon which I relied to
24  understand what Nuseed was expecting or hoping its
25  performance would be in this business going forward from a

———Jarosz, J. - Direct———

1  revenue and profit standpoint.

2  Q.  And is this the type of document that you would normally

3  rely upon in rendering your expert opinion?

4  A.  Yes.

5          MR. SUNG:  Your Honor, we'd like to move the

6  admission of CX-0964 into evidence.

7          MS. SHAW:  No objection.

8          THE COURT:  That will be admitted.

9          (Exhibit CX-0964 received in evidence.)

10  BY MR. SUNG:

11  Q.  Mr. Jarosz, is the slide being shown now taken from

12  CX-0964 for summary purposes?

13  A.  For the most part, yes.

14  Q.  And can you describe for us what this slide shows?

15  A.  It shows that over the forecast period Nuseed was

16  projecting about $8.6 billion in revenues and about $4.2

17  billion in profits.  You'll see the 4.2 at the bottom.  That

18  equates to a profit margin accounting for all expenses of

19  49.1 percent.

20          So over the life of this projection, the company was

21  expecting for every dollar in revenues for Aquaterra, it

22  would realize $0.49 in fully loaded profits.

23  Q.  And this slide is labeled "conservative pricing

24  scenario."  Can you explain why that is?

25  A.  Yes.  When I looked at the estimate that was made by

———Jarosz, J. - Direct———

1   Nuseed, I felt that the projections of price were, perhaps, a

2   bit aggressive, based on my understanding of fish oil prices.

3   So I adjusted downward the prices embedded in these

4   projections to account for what I think are, perhaps,

5   somewhat more reasonable and more recent expectations of what

6   the prices for Aquaterra will be.

7   Q.   Okay.  Now I'd like to discuss the result of your

8   reasonable royalty analysis.  Earlier you talked about

9   royalties ranging from 12.4 percent upwards.  Can you explain

10  where the 12.4 percent number comes from?

11  A.   If I take the agreements that were entered into between

12  CSIRO and GRDC on one hand and Nuseed on the other hand, so

13  that 2010 set of agreements, and then I asked myself, what

14  would BASF and Cargill pay under those agreements, so I put

15  in numbers that were specific to the company from its

16  projections, and that arrived at a number of 12.4 percent.

17  Q.   Okay.  If we can move to the next slide.  Does this slide

18  show how you reach that calculation?

19  A.   It does.

20  Q.   And can you describe that for us?

21  A.   Sure.  The way the calculation is done is one starts with

22  long-chain omega-3 canola revenues in that purple chart and

23  subtracts from that the value of commodity canola, so the

24  non-improved canola.  Then subtracted from that were some

25  certain specified costs in the contract.  The result is

—Jarosz, J. - Direct—

1   something called value added under the contract.

2           The royalty payment to the owner of the patented

3   technology was 25 percent of that value added.  So 25 percent

4   of the value added is $117.4 million in the small green bar

5   at the right.

6   Q.  And if we can move to the next slide.  Does this show

7   your math?

8   A.  It does.  I then converted that royalty payment to a

9   payment on a revenue basis.  So I took the 117.4 million

10  divided by 939.7 million in revenues to arrive at a royalty

11  rate per dollar of 12.4 percent.

12  Q.  Now I'd like to ask you briefly about the other side of

13  the range.  Can you explain where that number came from?

14          THE COURT:  All right.  So you applied that to

15  revenues?

16          THE WITNESS:  Yes.

17          THE COURT:  Not the profits, but the revenues?

18          THE WITNESS:  Correct.  The contract took a portion

19  of profits, and so I just asked myself, what would that be as

20  a portion of revenues?  And that's what the 12.4 percent

21  represents.

22          THE COURT:  Go ahead.

23  BY MR. SUNG:

24  Q.  So I'd like to ask you about the other end of the range,

25  the 49.1 percent.  Can you explain how you arrived at that

─────Jarosz, J. - Direct─────

1   number?

2   A.  That's the number that we saw earlier.  That is Nuseed's

3   projections for its performance out into the future.  It was

4   the calculation that I did associated with every additional

5   dollar of revenues resulting in $0.49 in profits.  That's

6   where the 49.1 percent comes from.

7   Q.  With that type of wide range that you've laid out here

8   for us, Mr. Jarosz, does that, in your mind, speak to

9   anything with respect to injunctive relief appropriateness?

10  A.  It says there's lots of uncertainty in this business, and

11  this is just based on the evidence we've talked about for the

12  last few moments, that is, what the prices will be, what the

13  volumes will be, what the costs will be, what the acceptance

14  of the product will be.  We just don't know.  So that's, in

15  large part, why I have such a wide range of outcomes because

16  no one knows for sure and opinions have changed over time

17  quite a bit.

18  Q.  Now, you had mentioned earlier that you looked at both

19  quantitative factors as well as qualitative aspects.  Can you

20  explain the qualitative approach you undertook?

21  A.  Those come from the patent opinion in *Georgia-Pacific*.

22  That is the case that laid out 15 factors that can be

23  considered in determining what the outcomes of a hypothetical

24  negotiation would be.  Those factors I've summarized on the

25  slide that's on the screen.

————Jarosz, J. - Direct————

1  Q.  And how did you use the factors in conjunction with the
2  quantitative analysis you performed?
3  A.  Well, I started knowing that a quantitative range,
4  according to my analysis, is 12.4 to 49.1 percent.  And I
5  asked myself, based on the *Georgia-Pacific* factors, should
6  the outcome be toward the low end of that range, or should it
7  be toward the high end?  So I used the factors to tell me
8  where an ultimate number may best lie.
9  Q.  Okay.  And if we turn to the next slide, can you tell us
10  what this slide shows based on your analysis?
11  A.  It shows the *Georgia-Pacific* factors.  Some provided very
12  little additional guidance, so I didn't have much
13  information.  Those are grayed out.  Some of them suggested
14  that the rate should be toward the high end under
15  consideration, and some of them suggested the rate should be
16  the low end, toward the low end under consideration.
17          So the green arrows for factors 1, 2, 4, 5, 6, 9,
18  and 10 suggest a number toward the high end might be most
19  appropriate here.  The red downward pointing arrows for 3, 8,
20  and 11 suggest that the royalty rate might best be put toward
21  the low end of the consideration range.
22  Q.  So if we can walk through these.  For factor 1 there look
23  likes an upward pointing arrow.  Why is that?
24  A.  I left a quite a number of licenses.  The one that I
25  found most useful was the one that covered these patented

—Jarosz, J. - Direct—

1    inventions, the 2010 agreement between CSIRO and GRDC on one

2    hand and Nuseed on the other hand.

3         When those agreements were entered, there was

4    uncertainty about the strength of the patent rights.  There

5    was a cloud of uncertainty.  Whenever there's uncertainty,

6    rates tend to be moderated.  When that uncertainty is

7    removed, as is the case here, because the jury found five of

8    the patents, in fact, to be valid, enforceable and infringed,

9    then the rates should go up, in other words, the patent

10   owner's power is stronger at a negotiation than in a

11   situation where there is still uncertainties about the

12   patents.

13   Q.  Let's turn to factor 2.  Why is that associated with an

14   upward pointing arrow?

15   A.  It's a similar kind of analysis here.  That is, the

16   license that I found most useful in this category was the

17   2011 agreement between BASF and Cargill.  Just like the 2010

18   agreement, there were uncertainties about the strength of the

19   patent portfolio.  Uncertainties tend to depress royalty

20   rates.

21        With those uncertainties removed, because of the

22   jury's verdict here, the rate should go up from what it

23   otherwise would have been.

24   Q.  Okay.  Turning to factor 3, that looks like a downward

25   pointing arrow.  Why is that?

—————————Jarosz, J. - Direct—————————

1    A.  A number of the licenses, including the ones that I

2    looked closely at here, were exclusive licenses, meaning

3    there's only one authorized user of the patent rights.

4    Exclusive licenses are quite valuable and command high rates.

5            In a hypothetical negotiation, we're assuming a

6    nonexclusive license from the patent owner to the infringer,

7    so that says that the rate should be brought down versus a

8    situation in which there's an exclusive license.

9    Q.  So is a nonexclusive license generally less valuable than

10   an exclusive one?

11   A.  Yes.  And people pay less money for nonexclusive licenses

12   than they do for exclusive licenses.

13   Q.  Turning back to four.  It looks like it's an upward

14   pointing arrow there.  Why is that?

15   A.  This asks us to evaluate what the licensing program has

16   been, and in the case of Nuseed and CSIRO and GRDC, they've

17   been interested in having a business relationship, a

18   collaborative relationship with a partner, but they've not

19   been interested in simply licensing out their rights.  They

20   wanted to co-develop.  In situations where they've licensed,

21   it was in co-development settings.

22           So, as a result, this hypothetical license is not

23   that.  This is a straight one-way license.  So the rate

24   should be higher than it would be between companies that are

25   partnering with one another in business.

Jarosz, J. - Direct

1    Q.  And why does this exclusivity put upward pressure on the

2    royalty?

3    A.  Because in this particular case Nuseed is interested in

4    continuing its collaborative relationship with CSIRO and

5    GRDC.  They're not interested in allowing other participants

6    in this business.  Moreover, the license between CSIRO and

7    GRDC on one hand and Nuseed on the other hand is an exclusive

8    license.  CSIRO doesn't really even have the ability to grant

9    other licenses.

10   Q.  And how about factor five, the commercial relationship

11   between the parties?  Can you explain that factor?

12   A.  In situations where companies are vigorous competitors in

13   the marketplace, they tend to license one another at high

14   rates because they are threats to one another.  These two

15   companies have been, and will continue to be, direct

16   competitors in this space.  They have been competitors for a

17   long time and will continue to be competitors if Cargill

18   remains in the business.

19        These are the only two companies that have received

20   regulatory approval for a canola-based or even a plant-based

21   source of omega-3 fatty acids.  So they compete directly with

22   one another.  Situations in which parties are competing with

23   one another are situations in which royalty rates tend to be

24   higher than where the companies are cooperators.

25   Q.  All right.  How about factor six?

--------Jarosz, J. - Direct--------

1    A.  This goes to what we were talking about before, the

2    platform technology.  That is, are we just talking about one

3    particular product line or a product line that will foster

4    other developments in the business?  Ms. Boettner and

5    Mr. Zacharias talked about using this technology to make

6    further entries into the human business, and even as late as

7    2018 Cargill has talked about entering the human business;

8    food and beverages, nutraceuticals, food supplements.  So

9    both parties want to use this technology to extend more

10   broadly.  That's a situation in which a royalty rate should

11   be toward the high end.

12   Q.  Factor eight.

13   A.  Factor eight talks about -- and I look at that and 11

14   together.  That is, to what extent has the set of products at

15   issue met with success in the marketplace?  We all know that

16   there have not yet been commercial sales of the product.  As

17   a result, there have not been commercial products.  So

18   there's no historical basis upon which to say the rate should

19   be higher than otherwise.  So this says the rate should be

20   low because we don't know precisely how successful these

21   products will be from a revenue standpoint or from a profit

22   standpoint.

23   Q.  And let's look at 9 and 10 together.

24   A.  These factors ask us to determine how important are these

25   patented inventions, and the jury has already provided an

─────Jarosz, J. - Direct─────

1   opinion that there's been infringement of valid, enforceable

2   patents.

3           We know the patents are breakthrough, according to

4   Dr. Kunst.  They're blueprints for getting to DHA.  I also

5   understand that these inventions are scaleable.  They can be

6   extended quite broadly, and they are very attractive,

7   sustainable alternative to fish oil.

8   Q.  Now, before we leave this slide, I'd like to ask you

9   about one of the factors that doesn't have an arrow next to

10  it, factor 13.  Did you take this into account?

11  A.  Yes, I did.

12  Q.  And how so?

13  A.  This asks us to determine a portion of whether there

14  needs to be further apportionment in the estimation of

15  damages, and here we actually have two forms of apportionment

16  that are addressed, and I have a slide that shows those.

17  Q.  And could you walk us through this analysis.

18  A.  Sure.  The first form of apportionment is between

19  intellectual property rights and other rights.  So Cargill's

20  project Latitude can be thought of as having those two

21  bundles of rights.

22          I examined roughly two dozen industry agreements,

23  including the 2010 and 2011 agreements that we've been

24  talking about, and those already give us a breakdown of IP,

25  or intellectual property rights versus other rights.  In

——————Jarosz, J. - Direct——————

1   other words, they're payments associated with some of the

2   profits but not all of the profits.  Many of the profits go

3   to provide compensation for the other assets.  So that

4   apportionment is already accounted for.  But then there's a

5   second form of apportionment.

6   Q.  And can you describe what that is?

7   A.  That is, we're asked to determine within the bundle of

8   patent rights how much should be apportioned or attributable

9   to these individual patents.  Two things are extremely

10  important in this investigation.  That is, the agreements

11  that we talked about so far, which is the first oval, and

12  Dr. Kunst's opinion, which is in the second oval.

13        Dr. Kunst said that each patent covers the

14  blueprint, each one of the patents in the Group A covers the

15  entire blueprint, and, moreover, she told me there weren't

16  ways to develop non-infringing alternatives.

17        Moreover, if you look at the agreements, the ones

18  that are in the left oval or the one in the middle of the

19  page, those agreements provide that full payment is made even

20  if only one of the patents covered is enforced.  In other

21  words, the patent, the last two expire patents commands the

22  same rate as the entire bundle or portfolio of patents.  So

23  those facts together sets the apportionment, is accounted for

24  such that each one of the patents can command the full rate.

25        THE COURT:  How much longer are you going to be with

─Jarosz, J. - Direct─

1    this witness, counsel?

2              MR. SUNG:  Actually, less than five, Your Honor.

3              THE COURT:  What?

4              MR. SUNG:  Less than five minutes, sir.

5              THE COURT:  All right.

6    BY MR. SUNG:

7    Q.  So taken together, what was your *Georgia-Pacific* analysis

8    indicating about the outcome of the hypothetical negotiation?

9    A.  Considering the *Georgia-Pacific* factors, the outcome

10   should be toward the high end of the range under

11   consideration.  Remember, I had the range of 12.4 to 49.1

12   percent.  The factors suggest something towards the high end,

13   but there's tremendous uncertainty.  That's why I've

14   presented this fairly broad range.

15   Q.  Turning back to just one last point, you're aware that

16   Cargill has obtained USDA deregulation within the past couple

17   of months?

18   A.  Yes, I'm aware of that.

19   Q.  And how does that impact your injunction analysis, if at

20   all?

21   A.  The threat from Cargill is more tangible than it was at

22   the time that I wrote my report.  At the time that I wrote my

23   report, it was unclear when or even if deregulation would

24   occur.  It has occurred.  Cargill is poised to enter the

25   market and has sent notification to the market of its

---Jarosz, J. - Cross---

1    intentions.

2    Q.  And very last point:  With respect to the stipulation by

3    BASF and Cargill that their products infringe the Group A

4    patents, you are aware of that, are you not?

5    A.  Yes, I am.

6            MR. SUNG:  Pass the witness, Your Honor.

7            THE COURT:  All right.  When we interrupt a

8    witness's testimony in the middle of it, so to speak, the

9    requirement is that you not discuss your testimony with

10   anyone during the interruption or consult any documents or

11   other information so that you will return to the stand

12   exactly as you leave it now.

13           With that, we'll take a 20-minute recess.

14           (Recess from 3:33 p.m. to 3:56 p.m.)

15           THE COURT:  Are you ready to cross-examine?

16           MS. SHAW:  May I proceed, Your Honor?

17           THE COURT:  You may.

18                      CROSS-EXAMINATION

19   BY MS. SHAW:

20   Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  I wanted to ask you first off about a couple of things

23   that you testified to in your direct examination.  If you

24   could take a look at CX-928.  I think that's actually in your

25   direct examination binder.  So we'll try to get through that

———Jarosz, J. - Cross———

1   binder, these questions first, so I don't have you going back

2   and forth.

3            THE COURT:  What was that number?

4            MS. SHAW:  CX-0928, Your Honor.

5   BY MS. SHAW:

6   Q.  And if you could turn to the page ending in 16789.

7   A.  All right.  I'm there.

8   Q.  And I believe in your direct examination you testified

9   that the ability for Nuseed to reduce its costs was one of

10  the harms that it would suffer if Cargill was allowed to go

11  into the market; is that right?

12  A.  Yes.

13  Q.  Okay.  I'd like to look at this chart here with you.  Do

14  you have an understanding of what value is represented by any

15  of the bars in this chart?

16  A.  No.  That's not listed in the chart.

17  Q.  And do you have an understanding outside of this document

18  as to what value is associated with those bars?

19  A.  Not outside this document.  I see the document says "cost

20  and scale."

21  Q.  Okay.  So all you have relied on is the series of bars

22  that decrease in height through 2028 without having an

23  understanding of what value or numbers are behind each of

24  those bars; is that correct?

25  A.  That's correct, yes.

––––––––––––Jarosz, J. - Cross––––––––––––

1    Q.  And each of these bars are divided into three different

2    colors; green, yellow, and orange.  Do you see that?

3    A.  I do, yes.

4    Q.  And each of those colors represent a different type of

5    cost associated with this particular product, right?

6    A.  Yes.

7    Q.  And those three different things are supply chain scale

8    in orange, right?

9    A.  Yes.

10   Q.  Yellow for on-farm growing costs, right?

11   A.  Yes.  That's correct.  Yes.

12   Q.  And green for stewardship and IP, right?

13   A.  Yes.

14   Q.  Do you have an understanding of what costs are associated

15   with supply chain scale?

16   A.  Not generally.  I would have an estimate or a guess, but

17   I don't know for sure.

18   Q.  Do you have any understanding of what costs are

19   associated with on-farm growing?

20   A.  I have some general sense as with the previous term what

21   that means, but I don't know for sure if I'm right.

22   Q.  Do you have any understanding of what costs are

23   associated with stewardship and IP?

24   A.  Not all the costs, no.

25   Q.  Do you have an understanding of any of the costs with

—Jarosz, J. - Cross—

1    stewardship and IP?

2    A.  I think they're generally having to do with stewardship,

3    which is a program that growers need to or do follow in

4    making sure that their activities are consistent with

5    community needs, as I understand it.

6    Q.  That's your understanding of stewardship?

7    A.  That's my understanding, yes.

8    Q.  And did you look at any additional documents that provide

9    any back-up for the information appearing in this chart?

10   A.  I do not recall specifically looking for back-up numbers

11   for those.

12   Q.  Did you discuss this chart with anyone from Nuseed?

13   A.  I think perhaps at one time I spoke about this chart with

14   Mr. Zacharias.

15   Q.  And do you recall what Mr. Zacharias told you about this

16   chart?

17   A.  I think we generally talked about the learning curve and

18   scale economies concept as reflected here, but I don't recall

19   that we talked about specific numbers.

20   Q.  Thank you.

21        I believe you also testified on direct examination

22   that both Nuseed and Cargill would be going to the human food

23   market.  I might be mischaracterizing your words so please

24   let me know if I'm incorrect about that.

25   A.  I meant to say the human market or direct human market,

———Jarosz, J. - Cross———

1    which includes food and beverages, food supplements and

2    nutraceuticals, as I understand it.

3    Q.  As part of your opinion, you did review deposition

4    testimony from Cargill's witnesses; isn't that right?

5    A.  Yes.

6    Q.  And you understand that Cargill currently has no plans to

7    go into that market; isn't that right?

8    A.  I saw the deposition testimony, I think it was Mr. Gromov

9    on that topic.  I also did see a late 2018 document that

10   talked about the human market.

11   Q.  And you understand that today, as we sit here in this

12   courtroom, Cargill has no plans to go into the human markets;

13   isn't that right?

14   A.  I think he said they didn't have specific plans for that,

15   if I remember correctly.

16   Q.  I believe you also testified that Nuseed has not been

17   interested in licensing its IP, that they were only looking

18   for a deeper collaborative agreement; is that a correct

19   reflection of your testimony?

20   A.  I think they're interested in licensing to a

21   collaborator.  They wanted to have a business partnership,

22   and in that context, they were willing to license, but not

23   outside that context, to the best of my knowledge.

24   Q.  Are you aware that Nuseed and BASF had straight licensing

25   discussions in 2016 and 2017?

Jarosz, J. - Cross

1   A.   Yes.

2   Q.   And are you aware that those discussions did not include

3   any collaborative relationship between the parties?

4   A.   I believe they had a discussion about the fact that

5   Nuseed would get access to BASF's Australian patent portfolio

6   or some of the patents, and vice versa.  So in that regard it

7   was a business relationship.  It wasn't a collaboration to

8   jointly develop a product, but it was a situation where they

9   would be assisting one another in the business.

10  Q.   They would be providing cross-licenses to each other,

11  that was the licensing discussion around, right?

12  A.   That's right.

13  Q.   Okay.  Could you take a look at CX-181.

14  A.   Which binder is that in?

15  Q.   It might be in that direct binder.  If it's not there, it

16  will definitely be in your cross binder.

17  A.   It's not in the direct binder.  I'll look at the cross

18  binder.  I'm there.

19  Q.   And CX-181 --

20           MS. SHAW:  Your Honor, are you there?

21           THE COURT:  Yes.

22  BY MS. SHAW:

23  Q.   This is the license agreement between CSIRO, GRDC, and

24  Nuseed?

25  A.   Yes.  CSIRO and GRDC on one side and Nuseed on the other.

—————Jarosz, J. - Cross—————

1    Yes.

2    Q.  And I believe this exhibit has been admitted into

3    evidence.  Okay.

4          Now, let's just hold on to our space here or mark

5    here on the license agreement.  I wanted to ask you a

6    question about something you testified on your direct

7    examination, and if you could look at -- I don't know if we

8    can pull up your slide 19.

9    A.  I'm looking at that.

10   Q.  Okay.  And this is your slide where you talk about how

11   the agreements essentially provide apportionment for you;

12   isn't that right?

13   A.  Within the patent portfolio, yes.

14   Q.  Okay.  And you had testified that essentially because the

15   full rate applies until the last patent expires, that

16   demonstrates that the royalty is tied to even one single

17   patent within the portfolio; isn't that right?

18   A.  In this agreement, in 181, yes.

19   Q.  Okay.  If you take a look on Page CSI -- the page ending

20   in 90893 of CX-181.  Could you take a look at that.

21          THE COURT:  What were those numbers again?

22          MS. SHAW:  The exhibit is CX-0181, and it is the

23   page ending in 98093, and I'm going to direct your attention

24   to Section 2.1 of the agreement.

25          THE WITNESS:  I'm sorry to say it looks like this

Carol L. Naughton, Official Court Reporter

─────────Jarosz, J. - Cross─────────

1    copy only has Bates numbers on the first two pages, and it

2    doesn't have it after.

3           THE COURT:  Well, that's the way mine is, too.

4    BY MS. SHAW:

5    Q.  Do you see the page number 9 in the document itself?

6    A.  Yes, I do.

7    Q.  Okay.  If you could turn to Page 9.  And do you see

8    Section 2.1?

9    A.  Yes, I do.

10   Q.  The royalties under this agreement are actually tied to

11   the 20 years from the launch of the product, right?

12   A.  It says, "Ends on the later of the expiry of the date

13   that the last to expire patent or any relevant patent or 20

14   years from the first launch."  So it's the last date which

15   could be the expiry of the last to expire patents.

16   Q.  But it could also expire 20 years from the launch of the

17   product, right?

18   A.  If there's no patent that extends beyond that, yes.  But

19   this provides protection beyond that 20 years if the patent

20   runs past that period.

21   Q.  And you're aware that Nuseed has not yet launched its

22   product, correct?

23   A.  Not from a sale perspective, that's right.

24   Q.  Okay.  And you are aware that there are -- that if Nuseed

25   launches its product, for example, next year in 2020, you

—————Jarosz, J. - Cross—————

1    would agree that Nuseed would have to pay royalties under

2    this agreement until 2040, right?

3    A.   I'm not an expert in interpreting this contract, but I

4    believe it should go through the last to expire patent, which

5    possibly is beyond 2040.  I don't --

6    Q.   Go ahead.

7    A.   I don't know all the patents that will be issued during

8    the life of this agreement.

9    Q.   So you don't know if there are any patents that expire

10   before 2040?

11   A.   I would imagine that there are some, yes.

12   Q.   I'm sorry.  You don't know if there are any patents that

13   expire after 2040?

14   A.   Not today, I don't know that, that's correct.

15   Q.   So if there -- if all the patents expire before 2040, you

16   would agree that the term of the agreement continues after

17   the expiration of the patents?

18   A.   Yes, I would agree with that, as I understand this

19   provision.

20   Q.   And royalties would also be paid after the expiration of

21   the patents, correct?

22   A.   As I understand this agreement, yes.

23   Q.   So royalty payments are not necessarily tied to the life

24   of the patents in this agreement, correct?

25   A.   Well, they are tied.  They said past the expiry of the

—Jarosz, J. - Cross—

1   last to expire patent, which could be after 2040.

2   Q.  So -- but you would have to pay patents, you would have

3   to pay royalties even after a patent expires?

4   A.  A patent could expire after 2040, and you would still

5   make payment.

6   Q.  And I'm asking you in the situation where the patents

7   expire before 2040, you would be required to pay -- to pay

8   royalties even after the patents expire under this agreement?

9   A.  In that situation, yes, but that's not the only state of

10  the world.

11  Q.  In that particular situation, then the payment of

12  royalties would not be limited to just for the life of the

13  patent, correct?

14  A.  Correct.  But the provision says if a patent goes beyond

15  2040, the rate is still in effect.

16  Q.  Okay.  So, Mr. Jarosz, your reasonable royalty range is

17  the same today as it was when you wrote your report on May

18  2019, isn't it?

19  A.  Yes, I think that's right.

20  Q.  And since that time a verdict has been entered that has

21  determined that BASF is a co-owner of the Group B patents.

22  Do you understand that?

23  A.  Yes, I believe that to be the case.

24  Q.  And you also understand that the proponents have dropped

25  the Group C patent?

2298

---

Jarosz, J. - Cross

1    A.  I have heard that representation, yes.

2    Q.  And you are also aware that proponents have dropped the

3    Group D patent against Cargill's commercial lines?

4    A.  I think that's right, although I'm a little bit confused

5    what is happening with regards to the '541 patent.

6    Q.  And you're also aware that the Group E patent has found

7    to be invalid?

8    A.  Yes, that's my understanding.

9    Q.  Okay.  And your royalty projections are based on sales of

10   Cargill's commercial products, correct?

11   A.  Yes.

12   Q.  Okay.  So although --

13   A.  Sorry.  You said my royalty sales.  I guess I should --

14   Q.  Your royalty calculations are based on projections of

15   Cargill's commercial sales?

16   A.  I don't have royalty damages into the future.  I have a

17   royalty rate into the future, if that's what you're getting

18   at, yes.

19   Q.  So your royalty rate into the future is based on

20   Cargill's commercial products, correct?

21   A.  Yes, that's one building block.

22   Q.  So although only one of the five groups of patents

23   asserted in this trial remain, with respect to Cargill's

24   commercial products, your royalty remains unchanged; is that

25   right?

---

─────────Jarosz, J. - Cross─────────

1   A.   Yes.  And I talked about that in my report, and you and I

2   talked about that at my deposition.

3   Q.   Okay.  Now, your testimony has been excluded by a court

4   on at least four separate occasions; isn't that right?

5   A.   It's been limited on four or five or six, yes.

6   Q.   Okay.  And on one occasion your testimony was excluded

7   because you failed to apportion out the value contributed by

8   the patents at issue when calculating a royalty; isn't that

9   right?

10  A.   Yes, in a multicomponent electronics or software setting,

11  yes.

12  Q.   And in that case the judge was not convinced you had done

13  sufficient allocation; is that right?

14  A.   That's correct.

15  Q.   Now, you understand that Cargill commercial lines have

16  only been found to infringe the Group A patents, right?

17  A.   That's my understanding.  Well, and some part of the

18  '541.  I'm a little bit confused about that.

19  Q.   So is it your understanding that Cargill's commercial

20  lines have been found to infringe the '541 patent?

21  A.   That's a good point.  No, I think just the Group A

22  patents.

23  Q.   Thank you.  And all your projections on Cargill's

24  earnings in your expert report, those are based on sales of

25  oil from Cargill's commercial lines, right?

────Jarosz, J. - Cross────

1   A.   They're based on profits that are projected out into the
2   future, yes.
3   Q.   Okay.  And all of the projected profits, if we could take
4   a look at your slide 11, all of these projected profits that
5   we see here, those are based on projected revenue from the
6   Cargill commercial lines, right?
7   A.   Yes.  In this slide.
8   Q.   They are not based on projected revenue from sales of the
9   LFK elite event in BASF's research canola lines, right?
10  A.   That's right.
11  Q.   And the Group A patents expire in 2025, right?
12  A.   Yep, as I understand it.
13  Q.   So any royalties that BASF and Cargill would pay based on
14  the rate in your report, those would end in 2025, right?
15  A.   Yes.  I'm not suggesting what the royalty base should be
16  into the future, I use these numbers to calculate a royalty
17  rate, the 28.2 percent.
18  Q.   I understand.  I just want to be clear.  You would agree
19  that proponents would not be entitled to any royalty based on
20  sales of oil from Cargill's commercial lines after 2025,
21  right?
22  A.   I don't know for sure.  Certainly, with regard to the
23  Group A, I think the obligation would end, as I understand
24  it, in 2025.
25  Q.   Okay.  Could you take a look at Jarosz slide 14.  I think

—————Jarosz, J. - Cross—————

1   this is a slide you used in your direct testimony, and it

2   describes how you calculated the Cargill royalty to be paid

3   applying the formula in the proponents' agreement, which is

4   what we looked at, CX-181, right?

5   A.  Yes, I think that's a fair statement.

6   Q.  And all of these numbers in these boxes, they contain

7   values for different things, right?

8   A.  Yes.

9   Q.  And the number, for example, the values that you've

10  pulled here, all these numbers, they cover the value of

11  things over a particular date range, right?

12  A.  That's right.

13  Q.  And that range, that date range takes us through 2028,

14  right?

15  A.  Yes.  Again, I used those for a royalty rate.  I didn't

16  say what the base should be in the future.

17  Q.  Right.  And you use a range through 2028 even though

18  royalties in this case against Cargill's commercial lines

19  would end in 2025?

20  A.  Yes.  That's my understanding.  Because I'm trying to

21  arrive at a royalty rate that relies in part on projections

22  of profitability.  That is a profit margin.

23  Q.  And you have not -- but you could calculate the rate,

24  correct, using numbers just through 2025, right?

25  A.  You could.  But that wouldn't be correct.

Jarosz, J. - Cross

1   Q.  Why wouldn't that be correct?

2   A.  Because a company is in the business over an extended

3   period, or potentially in the business, and we're trying to

4   figure out what the returns are in that period.  You don't

5   just cut off at some arbitrary point to determine what the

6   economics of that business is.  If you did, then you would

7   have to restart what Cargill's performance would be, for

8   instance, or what Nuseed's performance would be in light of

9   the fact that the new Cargill entry would start brand new in

10  your hypothetical in 2026.  You can't just cut off

11  consideration.

12  Q.  2025 is not an arbitrary date, is it?  That's the date

13  when royalty payments would end from Cargill and BASF under

14  the Group A patent?

15  A.  Correct.  I didn't call it an arbitrary date, I don't

16  think.

17  Q.  I believe you used the word "arbitrary" in responding to

18  my question.

19  A.  Okay.

20  Q.  And you did not recalculate this royalty to just show

21  what these numbers would look like if you just looked through

22  2025, right?

23  A.  No, because that wouldn't be appropriate.

24  Q.  And you don't know whether your royalty rate would be the

25  same if these numbers only included values through 2025,

———Jarosz, J. - Cross———

1   right?

2   A.  I do know that they would change slightly, but it

3   wouldn't be the correct way to do it.

4   Q.  Okay.  And in the purple box you see the $940 million of

5   revenues, that's what's in the purple box, right?

6   A.  Yes.

7   Q.  Okay.  And that is revenue projected by Cargill for sales

8   through 2028, right?

9   A.  That's correct.

10  Q.  And that's based on a 2018 projection by Cargill,

11  correct?

12  A.  Yes.

13  Q.  Okay.  And in the blue box, this is the value of

14  commodity canola, right?

15  A.  Yes.

16  Q.  And commodity canola is different than omega-3 canola,

17  right?

18  A.  Yes.

19  Q.  It does not have omega-3 in it?

20  A.  Yes.

21  Q.  Okay.  And so this is -- this value is how much it can be

22  sold for; is that right?

23  A.  Yes, I think that's right.

24  Q.  Okay.  And in the orange box, that's the incremental cost

25  to grow omega-3 canola over commodity canola; is that right?

Jarosz, J. - Cross

1    A.  I don't think that's right.  It's a term that I use that
2    covers three particular cost components that are in the
3    contract.  I shorthanded it to be incremental costs.
4    Q.  Okay.  It includes the incremental costs which are the
5    costs of growing omega-3 canola over commodity canola, right?
6    A.  I don't think so.  There are three precise components
7    that are laid out in the contract.  If that's one of them, I
8    agree with you, but I don't remember that to be the case.
9    Q.  Okay.  What are the three components?
10   A.  They're in the contract.  I have not memorized them.
11   Q.  If you could take a look at CX-181.  Can you point us to
12   what those three components are?
13   A.  Sure.  You'll have to give me a few moments.  I'm not
14   seeing them right this moment, but they may be in the license
15   summary that I did in my report.
16   Q.  Could you take a look at CX-1148 in your
17   cross-examination binder.
18              THE COURT:  Has this been admitted?
19              MS. SHAW:  These are the schedules, Your Honor, from
20   his expert report.  I didn't plan on admitting them.  I was
21   just going to ask him some questions about it.
22              THE COURT:  All right.
23   BY MS. SHAW:
24   Q.  If you could turn to Page 19.  I believe we've tried to
25   number these pages so it's a little easier to manage in the

─────Jarosz, J. - Cross─────

1   left-hand corner.

2   A.  I don't see any page numbers on this.  I'm sorry.

3   Q.  If we could pull up Page 19 of CX- --

4           THE COURT:  Where are the page numbers?

5           MS. SHAW:  CX-1140.  Unfortunately, it appears that

6   the paginated page did not make it to your exhibit binder,

7   but it is tab 5 of your report.

8   BY MS. SHAW:

9   Q.  And this tab 5, this is the back-up document for your

10  calculations on the Cargill royalty, right?

11  A.  Yes, it is.

12  Q.  Okay.  And if you look at line 4, that says "incremental

13  costs," right?

14  A.  Yes.  That's the footnote for incremental costs.  We use

15  that terminology, but I think there are three specific

16  components that are in the contract.

17  Q.  Okay.  And you also see line 5, it says, "Post-Launch

18  costs"?

19  A.  Yes, I see that.

20  Q.  And if you add those lines 4 and 5 together, the 83,596

21  and the 12,735, you arrive at the number in the orange box in

22  your slide 14, right?

23  A.  If you could put 14 back on the screen, I would confirm

24  that.  And you said 83 ,000.  I think that's 83 million.

25  Q.  I'm sorry.  83 million.

Carol L. Naughton, Official Court Reporter

2306

---Jarosz, J. - Cross---

1    A.   Yes.  The sum of those two is what I've called

2    incremental costs.

3    Q.   And if we go back to your tab 5.

4    A.   I'm looking at that.

5    Q.   If you look at footnote 4, it describes the incremental

6    cost number as the incremental cost of producing omega-3

7    canola over commodity canola, right?

8    A.   Yes, that's the terminology I have used.

9    Q.   So you would agree that the 83 million number there is

10   the incremental cost of growing omega-3 commodity canola --

11   omega-3 canola over commodity canola?

12   A.   That's the terminology that I use, but I believe it

13   covers three specific components in the contract.

14   Q.   And you're not able to identify what those are?

15   A.   Not right now.  If you want me to spend ten minutes

16   looking through the contract, I'm happy to.

17   Q.   Okay.  And in arriving at the information in the dark

18   green box, you're basically -- of Jarosz slide 14, you're

19   basically taking the total revenue, right?

20   A.   Well, the dark green is the value added times 25 percent.

21   Q.   Right.  I just want to go through this process to make

22   sure I'm understanding this.  So you're taking that total

23   revenue through 2028?

24   A.   Yes.

25   Q.   You're taking what the sales price for commodity canola,

Carol L. Naughton, Official Court Reporter

—————————Jarosz, J. - Cross—————————

1   the value would be through 2028?

2   A.   Yes.

3   Q.   You're taking what the incremental costs of growing

4   omega-3 canola would be through 2028, plus the post-launch

5   costs?  That's what we see in the orange box, right?

6   A.   It's the sum of the three components in the contract,

7   which I've called incremental costs, yes.

8   Q.   And then you have this -- the green box, the dark and

9   light green box together, that's how you calculate the value

10  added by the omega-3 technology, correct, the traits?

11  A.   Yes.  The sum of the light green and the dark green is

12  about $470 million.

13  Q.   And then 25 percent of that is what you calculate as the

14  royalty rate, right?

15  A.   Under that contract, yes.

16  Q.   And then you divide that 25 percent by the total revenue

17  through 2028 to arrive at your 12.4 percent; is that correct?

18  A.   Yes.

19  Q.   Okay.  And you would agree that if the commodity canola

20  value is higher than what is in the blue box, the royalty

21  amount in the dark green box would decrease, right?

22  A.   Yes.  Mathematically.

23  Q.   And you would agree that if the incremental cost is

24  higher than what the orange box shows, the royalty amount

25  would also decrease, right?

―Jarosz, J. - Cross―

1   A.   Yes.   Mathematically, that's how it would work.

2   Q.   And then if that 117.4 number decreases, then your

3   royalty rate would decrease as well, right?

4   A.   Mathematically, that's correct.

5   Q.   Okay.   So I want to talk to you a little bit about your

6   incremental cost calculation, the number in the orange box.

7   This is the 96.3 million that we've been talking about.   It's

8   your understanding that this 96.3 million, that is 15 percent

9   of the total cost of goods plus certain post-launch costs?

10   A.   That's right.

11   Q.   Right?

12   A.   These three components comprise 15 percent of the cost of

13   goods sold, and then I added on, to be conservative, the

14   post-launch cost.

15   Q.   Okay.   And you got this information -- so if you take the

16   total cost of goods sold, 15 percent of it plus post-launch

17   costs is -- that's the kind of additional costs associated

18   with this product, right?

19   A.   As specified in the contract, yes.

20   Q.   Okay.   But you got that 15 percent number that -- that's

21   the incremental costs for selling omega-3 canola.   You got

22   that 15 percent number from a conversation with Brent

23   Zacharias and Andy Thomas, right?

24   A.   Yes, I did.   I talked to them about the three components

25   and what a percent of cost of goods sold they would

---
Jarosz, J. - Cross
---

 1  represent.

 2  Q.  Okay.  And Mr. Thomas is no longer with the company,

 3  right?

 4  A.  Correct.

 5  Q.  And he did not provide any testimony regarding that

 6  incremental cost amount during trial, did he?

 7  A.  No, not to my knowledge.

 8  Q.  And Mr. Zacharias has not testified to the incremental

 9  cost number in court, has he?

10  A.  No.  I don't think he was asked questions at trial about

11  that.

12  Q.  And Ms. Boettner, who testified this morning, she has not

13  provided any incremental cost testimony; is that right?

14  A.  Correct.  I did not talk to her about that topic.

15  Q.  And you did not review any Cargill documents to determine

16  what Cargill's incremental costs would be, right?

17  A.  I don't think we know what they would be; they haven't

18  begun selling product.

19  Q.  Okay.  And you did not review any Nuseed documents to

20  determine what Nuseed's incremental costs would be, right?

21  A.  I think that's right, because, again, they haven't

22  started selling product, either.

23  Q.  Okay.  And you did not ask for documents from Nuseed

24  reflecting their projections about incremental costs, right?

25  A.  I think I asked, but I don't think they had documents for

2310

—Jarosz, J. - Cross—

1  those three categories that are laid out in the contract.

2  Q.  And you did not review any documents from Cargill

3  regarding their projections about incremental costs, right?

4  A.  Correct.  I don't think I saw projections on those three

5  categories of costs.

6  Q.  So if the incremental costs of growing omega-3 canola are

7  15 percent of the total costs for making this product, would

8  you agree that the remaining 85 percent of the costs are

9  costs associated with selling normal commodity canola?

10  A.  I think that's right.

11  Q.  Okay.

12  A.  But I'd have to look at the contract again.  I think

13  that's correct, though.

14  Q.  So could you take a look at CX-1148, which is tab 4.

15  CX-1148, which is your expert report.

16          And my apologies.  We tried to get a numbered page

17  of this in your binders, and it didn't make it in there, but

18  it is tab 4 of your expert report.  It's Page 16 in my

19  version, if we could put that up.

20          THE COURT:  That's not in my book?

21          MS. SHAW:  CX-1148, Your Honor.

22          THE COURT:  I've got 1148, yeah.

23          MS. SHAW:  You don't have tab 4 in there?

24          THE COURT:  I don't have any tabs in here.

25          MS. SHAW:  It just says "tab 4."  There's no actual

─────Jarosz, J. - Cross─────

1    tabs on the top of the page.  It will say "tab 4."

2          THE COURT:  Well, I don't know.  How would I find

3    tab 4?

4          MS. SHAW:  That's why I asked them to put page

5    numbers on here, to make it a little easier for you, but it

6    doesn't look like they made it.  We're going to try to pull

7    that up on the screen.

8          THE COURT:  All right.  I can see it on the screen.

9          MS. SHAW:  Could we go to Page 17?

10   BY MS. SHAW:

11   Q.  You see the line that says, "Oil revenue estimate,"

12   Line 3?

13   A.  Yes, I do.

14   Q.  And do you see underneath that, that says, "Gross

15   margin," right?

16   A.  Yes, it does.

17   Q.  And if you subtract the gross margin from the oil revenue

18   estimate, that's the total cost of goods, right?

19   A.  Correct.

20   Q.  And if you subtract 382 from 939, you get about 557

21   million as the total cost of goods, right?

22   A.  Yes.  You're talking about in the 2019 to 2028 column?

23   Q.  Yes, I'm sorry.  For the period from 2019 to '28 you get

24   557 million for the total cost of goods sold, right?

25   A.  Yes.

Jarosz, J. - Cross

1   Q.  And you would agree that 85 percent of that is the cost
2   associated with growing commodity canola, right?
3   A.  I'm not sure, now that you ask that.  I don't know.
4   Q.  You just testified that 85 percent of this cost was the
5   cost associated with commodity canola.  Are you changing your
6   testimony?
7   A.  I'm saying I'm not sure.
8   Q.  Okay.  So for the period of time -- so for the period of
9   time between 2019 and '28, you're not sure whether the cost
10  of selling commodity canola was $473 million or not.
11  A.  Which number?  I'm sorry.
12  Q.  The 557 million is the total cost of goods sold, right?
13  A.  Correct.
14  Q.  85 percent of that, you thought, was the cost of growing
15  commodity canola, right?
16  A.  That's correct.  I think that's right, but I'd want to
17  look again.  I think that's right.
18  Q.  Okay.  So that number, 557 million, by 85 percent, that
19  would be $473 million, right?
20  A.  I don't have a calculator here, but that sounds about
21  right.
22  Q.  Okay.  Now, we just talked about the value of commodity
23  canola, right?  That's on your Jarosz slide 14.
24  A.  Yes.
25  Q.  And this is what you testified would be the sales value

—————Jarosz, J. - Cross—————

1   of commodity canola over that period of time, right?

2   A.   I'm sorry.   Which number are you focusing my attention

3   on, again?

4   Q.   In the blue box, the 373 million.

5   A.   Yes.

6   Q.   Okay.   So based on your understanding of the cost of

7   commodity canola, under your calculations, someone selling

8   commodity canola during this time period, they would be

9   taking roughly $100 million loss on sales of commodity

10  canola; is that right?

11  A.   Yes, by that calculation.

12  Q.   Isn't it possible that Mr. Zacharias and Mr. Thomas were

13  wrong about the incremental cost of selling omega-3 canola?

14  A.   It's possible, but I asked them about the three

15  particular categories that are in the contract.   They gave me

16  their best estimate, because we're projecting the future.

17  Q.   And isn't it possible they underestimated how much it

18  will cost?

19  A.   Yes, that's possible.   It's one of the reasons why I said

20  projecting the future here is very difficult here and a

21  permanent injunction might be appropriate.

22  Q.   Isn't it possible that it actually costs a lot more to

23  make omega-3 canola than commodity canola?

24  A.   It could be more or less, yes.

25  Q.   And if the incremental costs for omega-3 canola in your

─────Jarosz, J. - Cross─────

1   orange box there go up, right, then the royalty number --
2   that amount would go down.
3   A.  Yes.  I think you asked me that before.  Mathematically,
4   that's how it would work, yes.
5   Q.  And if your royalty amount goes down, then your rate
6   would go down as well, right?
7   A.  Mathematically, yes.
8   Q.  Now, you would agree, Mr. Jarosz, that Cargill and Nuseed
9   have differing views of the value of the potential omega-3
10  aquaculture market; is that right?
11  A.  I'm not exactly sure what you're asking.  I think they
12  both view it as a very attractive business.  I think they
13  have different assessments as to what their success will be
14  in the business.
15  Q.  Okay.  If you look at your Jarosz slide 11, in this slide
16  you note that Cargill's projected revenue from 2019 to 2028
17  for omega-3 oil is $940 million; isn't that right?
18  A.  Yes, according to this projection.
19  Q.  And all these numbers on your slide 11, they slide to
20  CX-4084-83, right?  If you look down there, you can see
21  that's the document it's citing to.
22  A.  I think that's right.
23  Q.  Now, I believe Mr. Sung showed you a copy of CX-483 on
24  your direct examination, but that did not have the metadata
25  associated with the document; isn't that right?

—Jarosz, J. - Cross—

1   A.   What do you mean by "metadata"?

2   Q.   Are you not familiar --

3   A.   I'm not sure how you're using that term.

4   Q.   The metadata is kind of hidden information about the

5   document, about who worked on the document, the date of the

6   document, those kinds of things.

7   A.   Okay.  I'm not sure I would have used that definition to

8   say what "metadata" is, but thank you for that.

9   Q.   Okay.  I'd like you to take a look at CX-483.  And I

10   believe you had said you thought this document was from late

11   2018; is that right?

12   A.   That's to the best of my memory, yes.

13   Q.   So, if you could, take a look at CX-483 in your

14   cross-examination binder.

15   A.   I'm there.

16   Q.   If you could, turn to the last page.  This is the

17   metadata.  Do you see that?

18   A.   I see Mozambique metical, Myanmar, Burma, and NAFTA on

19   the last page.

20   Q.   Are you looking at CX-0483?

21   A.   Yes, I believe I am.

22   Q.   Okay.  It's on the screen, Mr. Jarosz.  Do you see that?

23   A.   Yes.  That doesn't appear to be part of what's in my

24   binder.

25           MS. SHAW:  Your Honor, do you have that page in your

——Jarosz, J. - Cross——

1    binder?

2              THE COURT:  What?

3              MS. SHAW:  The very last page of CX-483.

4              THE COURT:  CX -- is that in the cross or direct?

5              MS. SHAW:  In the cross binder, Your Honor.

6              THE COURT:  CX-483?  0483?

7              MS. SHAW:  Yes, Your Honor.

8              THE COURT:  No, that's not the last page of mine.  I

9    don't have the metadata, it appears.

10             MS. SHAW:  You don't have the metadata.  Well, we're

11   going to have to fix your exhibits.  But the last page of the

12   document does appear on the screen, and this is the metadata

13   from CX-0483.

14   BY MS. SHAW:

15   Q.  Could you take a look at that, Mr. Jarosz.

16   A.  Just so that we're clear, it's not the last page of what

17   I have in my binder.

18   Q.  I understand that.

19   A.  Yes, I'm looking at it.

20   Q.  And that's a metadata page, right?

21   A.  I don't know.

22   Q.  And do you see the date on which this document was last

23   modified?

24   A.  Yes.

25   Q.  And that was in January of 2018, right?

─────Jarosz, J. - Cross─────

1    A.   Yes.

2    Q.   Okay.

3    A.   So it's early 2018.

4    Q.   Okay.

5    A.   I should correct my testimony to say it was early 2018.

6    Q.   So the projections that you relied on are about 21 months

7    old now; is that right?

8    A.   They're about 21 months old now, but they were the last

9    projections immediately before the hypothetical negotiation

10   in November of 2018.

11   Q.   And it is not unusual for a company approaching the

12   launch of a new product to be revising projections and

13   estimates the closer they come to launch; isn't that right?

14   A.   I missed one word in what you said.  It's not unusual for

15   what?

16   Q.   It's not unusual for companies approaching the launch of

17   a new product to revise projections and estimates as they

18   come closer to the launch, right?

19   A.   It's quite common.  The future is unknown, especially in

20   a new-to-this-world product.

21   Q.   And, in fact, you're aware that Cargill has more updated

22   financials; isn't that right?

23   A.   Yes, I'm aware of that.

24   Q.   You're aware that there were more recent 2019 Cargill

25   projections, right?

─────Jarosz, J. - Cross─────

1   A.   Yes.   Those were after the hypothetical negotiation, but

2   I am aware of those.

3   Q.   And as late as February 2019 Cargill had updated

4   projections, right?

5   A.   Yes.

6   Q.   And you did not consider those when you issued your

7   report in May of this year, did you?

8   A.   I did not quantify them.   I was aware of them, but they

9   did not pre-date the hypothetical negotiation.

10  Q.   And you are aware that BASF and Cargill have an expert

11  named Mr. Napper, right?

12  A.   Yes.

13  Q.   And you are aware that Mr. Napper calculated some of the

14  projections based on the 2019 projections; is that --

15  A.   Yes -- I'm sorry.   I thought you were done.

16         Yes, I'm aware of that.

17  Q.   Okay.   So if you look at your slide 12, now, Nuseed's

18  projected revenue is $8.5 billion, right?

19  A.   About 8.6 billion, but, yes, I see that number.

20  Q.   Okay.   And that number is from CX-964, right?

21  A.   Yes, I believe that's correct.

22  Q.   And that document is Nuseed's omega-3 budget, right?

23  A.   I forget the title of the document.

24  Q.   Okay.   And you did not talk to anyone at Nuseed about

25  CX-0964, did you?

————Jarosz, J. - Cross————

1    A.   I don't recall having done that, no.

2    Q.   Okay.  And no one from Nuseed has come to testify about

3    CX-0964; is that right?

4    A.   I don't believe so, no.

5    Q.   Okay.  And if you could -- if we could take a look at

6    CX-964.

7    A.   I'm sorry.  Is it in one of the binders?

8    Q.   It should be in your cross binder.

9    A.   I'm sorry.  I don't think it is.  I may be missing

10   something, but it doesn't appear to be.

11   Q.   It should be in your direct binder, then.

12   A.   Oh, the direct binder.  Okay.  Yes, I see it there.

13   Q.   Okay.  Do you see on the first page in column F it says,

14   "Date last revised"?

15   A.   Yes, I do.

16   Q.   And the date this was last revised, it says here, is

17   August 15, 2017?

18   A.   Yes, that's what it says.

19   Q.   And you were not provided a more recent update, were you?

20   A.   I don't recall one way or the other.

21   Q.   And, instead, you base the Nuseed projections in your

22   report on a budget last revised over two years ago; is that

23   right?

24   A.   I'm looking at this document.  You've used the term

25   "budget," and maybe you could remind me why you're using that

2320

Jarosz, J. - Cross

1   term.

2   Q.  I believe I'm using that term because that's the file

3   name for the document.

4   A.  Okay.  I don't see it saying "budget" anywhere, but I did

5   examine this document.

6   Q.  Okay.  If you look at the last page of this document, it

7   has the metadata for the document.  I hope it's there.

8   A.  No, it's not.

9   Q.  Okay.  Well, it's on the screen here.  Do you see that

10  there is a file name?

11  A.  Yes.

12  Q.  And the file name is "Omega-3 Budget, Version 2"?

13  A.  Yes.

14  Q.  And so this number, the 8.5 billion that covers the

15  period from 2019 to 2035, that's the -- sorry, it's the

16  8.6 billion, right?  I'm sorry.  We should go back to

17  Jarosz -- that's my fault -- we should go back to Jarosz

18  slide 12.

19          This 8.6 billion, that covers the period from 2019

20  to 2035, right?

21  A.  Yes, I believe that's correct.

22  Q.  So it's not really an apples-to-apples comparison between

23  the projections you have for Cargill's revenue, which appears

24  on Jarosz slide 11 and is about $940 million, right?

25  A.  That's correct.

———Jarosz, J. - Cross———

1    Q.   Okay.

2    A.   But what I used these for was the rate.

3    Q.   I understand.  But you can actually look at your report

4    and figure out what Nuseed's projections of revenue are from

5    2019 to 2028, right?

6    A.   Yes, you probably could.

7    Q.   Okay.  And we can look at your report to figure that out,

8    right?

9    A.   Yes, I would imagine one could.

10   Q.   Okay.  So if we go to CX-1148, which is your report

11   again --

12   A.   Which binder?

13   Q.   The cross binder.

14   A.   All right, I'm there.

15   Q.   And if we go to -- it's going to be hard for you to find,

16   so we'll put it up on the screen.  It's Page 25 -- actually,

17   if we can go to Page 26.

18          You can add up the projected revenue to figure out

19   what that revenue is through 2028, right?

20   A.   Yes.  You're talking about looking at row 3?  Yes, one

21   could do that.

22   Q.   Right.  And I'll represent to you I've gone through this

23   process of adding, and that number is about 2.5 billion.  Do

24   you dispute that number?

25   A.   If you give me a minute, I'll eyeball it to make sure.

Jarosz, J. - Cross

1  Q.  I have a calculator here, if that would be helpful to

2  you.

3  A.  No, I can just eyeball it.

4         What number did you say for revenues?

5  Q.  Through 2028, 2.489.

6  A.  Yes, that looks about right.

7  Q.  Okay.  And so -- and if you look at that -- the first

8  page of tab 7, which is Page 25, for Aquaterra there's

9  actually revenue that was projected and expected in 2019 of

10 $1.484 million, right?

11 A.  There was a projection for that year for Aquaterra, yes.

12 Q.  Okay.  But no such revenue has been realized by Nuseed

13 for Aquaterra so far this year, right?

14 A.  That's correct, yes.

15 Q.  Okay.  And if you compare the -- just going back, if you

16 compare the revenue between 2019 and 2028 for both Aquaterra

17 and for Cargill's Latitude, Cargill estimates about $940

18 million, and you would agree that Nuseed estimates $2.5

19 billion?

20 A.  That sounds right, based on what you said a few moments

21 ago.

22 Q.  So you would agree that Nuseed has a much more optimistic

23 view of the total revenue from this market than Cargill,

24 right?

25 A.  No, I would agree that it has a more optimistic view as

---- Jarosz, J. - Cross ----

1   to its performance in the business than Cargill has an

2   expectation as to its performance in the building.

3   Q.   So you would agree that Nuseed thinks it can make a lot

4   more money in this market than Cargill thinks it can make.

5   A.   On a revenue basis, yes.  At least as of the point of

6   these estimates, yes.

7   Q.   Okay.  You do not have a technical background, do you,

8   Mr. Jarosz?

9   A.   Correct, unless you call economics a technical

10  discipline, which I don't.

11  Q.   I might call it a technical discipline.

12  A.   I do not have a background in physical sciences.

13  Q.   Okay.  So you have to rely on someone else in order to

14  obtain an understanding of the scope of the patents or the

15  technology in any license, right?

16  A.   I often rely on other technical experts, but I often look

17  at licenses themselves.  You saw that I was author of a

18  treatise on license for many years, so I've looked at many

19  licenses over the years.

20  Q.   But you would agree that you need to rely on someone else

21  in order to understand the scope of specific patents or

22  technology that's referenced in a license, right?

23  A.   The precise patented scope, yes.  To have an

24  understanding of the coverage over the inventions, not

25  necessarily.

Jarosz, J. - Cross

1  Q.  Okay.  And you would agree that the proponents'

2  agreement, the agreement between Nuseed and -- CSIRO and GRDC

3  on the one side and Nuseed on the other, that includes rights

4  to patents that have not even been asserted in this case; is

5  that right?

6  A.  Yes, that's right.

7  Q.  Okay.  And you did not attempt to segregate out any value

8  under that agreement for those unasserted patents, did you?

9  A.  I didn't separately value patents other than the ones

10 that have been asserted here, if that's what you're asking.

11 Q.  Right.  And you didn't do that because you spoke to a

12 Mr. de Feyter, from CSIRO, who gave you comfort that it was

13 not necessary to segregate out the value of unasserted

14 patents; isn't that right?

15 A.  I don't recall our precise conversation, but he told me

16 generally about the coverage of the 2010 license versus the

17 asserted patents here.

18 Q.  And you relied on that in forming your understanding of

19 that agreement between CSIRO and GRDC and Nuseed, correct?

20 A.  In part, yes.

21 Q.  Okay.  And Mr. de Feyter is the IP manager for CSIRO;

22 isn't that right?

23 A.  I think he was at one time.  I don't know if he currently

24 is, but at the time that I talked to him I believe he was.

25 Q.  And he has not testified at trial here, has he?

Carol L. Naughton, Official Court Reporter

———Jarosz, J. - Cross———

1    A.   Not to my knowledge, no.

2    Q.   So he has not been subject to cross-examination for the

3    topics you discussed with him; isn't that right?

4    A.   Again, I don't believe he's testified here.

5    Q.   Okay.  And you did not rely on Dr. Kunst for your

6    understanding of the technology licensed under the

7    proponents' agreements, right?

8    A.   You mean their intra-party agreements or the ones between

9    CSIRO and GRDC on the one hand and Nuseed on the other?  No,

10   I did not talk to her about that license --

11   Q.   So she --

12   A.   -- or set of licenses.

13   Q.   Okay.  So she would not have an opinion on the relative

14   value of the asserted patents within the license for you to

15   rely on, correct?

16   A.   I don't know.  I don't think she generally has an opinion

17   on economic value.  I think she's a technical person.

18   Q.   But I'm just asking you if -- she does not have an

19   opinion on the relative value of technology under the

20   licenses that you could rely on.

21   A.   I don't know, but I don't recall asking her about that

22   topic.

23   Q.   Okay.  And you would agree that the proponents' agreement

24   now includes licenses to a patent that is now co-owned by

25   BASF, right?

—Jarosz, J. - Cross—

1    A.   Yes.  You mean following the jury verdict on one

2    particular patent?  Yes.

3    Q.   Yes.  And it also includes licenses to a patent that is

4    now invalid, right?

5    A.   Yes, as I understand it.

6    Q.   And you would also agree that at the time the agreement

7    was entered into by the parties, there are only patent

8    applications that were identified in the agreement; isn't

9    that right?

10   A.   In 2010?  Yes, I believe that's correct.

11   Q.   And there are no issued patents identified in either the

12   license agreement between CSIRO, GRDC, and Nuseed, on the one

13   hand, or the collaboration agreement between CSIRO, Nuseed,

14   and GRDC, correct?

15   A.   Could you ask that again?  I want to make sure that I'm

16   following it.

17   Q.   There are no -- let me break up the question to make it

18   easier.

19          There are no issued patents identified in the

20   license agreement between CSIRO, Nuseed, and GRDC, correct?

21   A.   That's correct.

22   Q.   And there is another agreement between CSIRO, GRDC, and

23   Nuseed.  Isn't that right, Mr. Jarosz?

24   A.   There's a collaborative agreement, if that's what you're

25   referring to, yes.

Jarosz, J. - Cross

1   Q.   Yes.  And that collaboration agreement also does not
2   include any issued patents, right?
3   A.   That's right.  So even though patents have issued, the
4   rate hasn't gone up.
5   Q.   Okay.  And if you -- if you could, take a look at CX-181
6   in your binder.
7   A.   Which binder?
8   Q.   The cross binder.
9   A.   Okay.  I'm there.
10  Q.   Could you turn to the page ending in 90893?
11  A.   Again, these don't have Bates numbers, besides the first
12  two pages, at least the version that's in my binder.
13  Q.   Do you see a Page 9?
14  A.   Yes.
15  Q.   Okay.  And Page 9, at Section 3.1, this is the grant of
16  license in the agreement; is that right?
17  A.   Yes.
18  Q.   Okay.  And if you turn the page, this lists all the
19  things that Nuseed received a license to under this
20  agreement, correct?
21  A.   Yes.  Are you referring to A through D?
22  Q.   Yes.
23  A.   Yes.
24  Q.   So it received an exclusive license to core technology,
25  right?

Carol L. Naughton, Official Court Reporter

———Jarosz, J. - Cross———

1    A.   That's right.

2    Q.   And an exclusive license to the project technology,

3    right?

4    A.   Yes.

5    Q.   It also received a nonexclusive license to existing

6    nonexclusive technology, right?

7    A.   Yes.

8    Q.   And it received a nonexclusive license to additional

9    patents, right?

10   A.   There's more to it in D, but, yes, I agree that D is as

11   it's stated here.

12   Q.   Okay.  It's a lot of stuff.  I just want to look at one

13   of these things, and that is the core technology.

14           That is defined, at the page ending 90888, which I

15   know you don't have in the version in your binder, but that

16   is Page 4 of the agreement.

17   A.   Okay, I'm there.

18   Q.   Okay.  And there is a definition for "core technology"

19   towards the bottom of Page 4.  Do you see that?

20   A.   Yes, I do.

21   Q.   Okay.  And it defines it as, "Genetic-based technologies

22   for the production of long-chain omega-3 oils and oilseeds of

23   transgenic plants comprising inventions, information,

24   techniques, materials, data, knowledge, know-how, scientific,

25   technical, and other information developed prior to and

Jarosz, J. - Cross

1   independently of the collaborative research agreement, which

2   is not in the public domain and made available by CSIRO and

3   GRDC for the project, all of which are described in substance

4   in parts A and B of Schedule 1 of the collaborative research

5   agreement."  Do you see that?

6   A.  There's more to that sentence, but, yes, I see that

7   provision.

8   Q.  "As may be updated by agreement of the parties from time

9   to time during the term."  That's what it says, right?

10  A.  Yes.

11  Q.  Now, could you take a look at CX-0681 in your binder.

12  A.  I'm there.

13  Q.  This is the -- and I believe this document has been

14  admitted.  This is the collaboration -- the collaborative

15  research agreement between CSIRO, Nuseed, and GRDC, right?

16  A.  Yes.

17  Q.  And this is -- the definition of "core technology" in the

18  license agreement makes reference to Schedule 1 of this

19  agreement, correct?

20  A.  Yes, I believe so.

21  Q.  Okay.  And if you turn to Page 27 of the agreement, which

22  ends in 90957, which is not on your document...

23         Are you there?

24  A.  Yes, I am.

25         MS. SHAW:  Your Honor, are you there?

—Jarosz, J. - Cross—

1          THE COURT:  Yes.  I'm looking at the screen.
2          MS. SHAW:  That's a good choice.
3   BY MS. SHAW:
4   Q.  This identifies all of the things that are included in
5   core technology, right?
6   A.  I'm not disputing that, but I don't see that on this
7   page.  Does it say "core technology" somewhere, and I'm just
8   not seeing it?
9   Q.  Do you want to go back and look at CX-0181 that we were
10  just looking at for the definition of "core technology" on
11  Page 4?
12  A.  Yes.  This is the Schedule 1 and part A and B that appear
13  to be referred to in CX-0181.
14  Q.  Okay.  And so parts A and B, these were exclusively
15  licensed to Nuseed under the license agreement, right?
16  A.  Yes, I believe so.
17  Q.  And so they received exclusive licenses to the three
18  patent applications you see listed here, right?
19  A.  Yes.
20  Q.  And they received exclusive licenses to the specific
21  genes identified in section B, right?
22  A.  Yes, that appears to be the case.
23  Q.  Okay.  And do you see at the top it also -- at the top of
24  this agreement, it says, "Part C, D, and E of Schedule 1 list
25  IP that is not exclusively licensed to Nuseed in the field"?

———Jarosz, J. - Cross———

 1   A.  I see that; although, 181 only refers to Parts A and B,
 2   Schedule 1.
 3   Q.  But you see that this was also -- is not exclusively
 4   licensed to Nuseed, right, parts C, D, and E?
 5   A.  I assume that's the case.  It wasn't a provision we were
 6   just reading, but I believe that's correct.
 7   Q.  Okay.  And if you turn to Page 29 of this agreement,
 8   that's where part C is identified.  And part C identifies
 9   various genes and gene sequences from CSIRO, right?
10   A.  Yes.
11   Q.  Okay.  And then part D on Page 30, this was also licensed
12   to Nuseed, right?
13   A.  Nonexclusively, as I understand it, yes.
14   Q.  And they got constructs from CSIRO and GRDC, right?
15   A.  Yes.
16   Q.  Okay.  And then in section E there was additional
17   confidential CSIRO information that Nuseed received, right?
18   A.  Yes.
19   Q.  And under the license agreement, Nuseed also obtained
20   ownership of the elite event, right?
21   A.  Yes, I believe so.
22   Q.  Okay.
23   A.  Or co-ownership, but some ownership rights.
24   Q.  And they also received ownership rights with respect to
25   future patents, right?

─────────Jarosz, J. - Cross─────────

1   A.  I think that's right.  I don't have a perfect memory on

2   that.

3   Q.  Nuseed, in fact, is the -- one of the owners of some of

4   the patents that have been asserted in this lawsuit, right?

5   A.  That's my understanding, yes.

6   Q.  Okay.  And you made no attempt to segregate out the value

7   under the agreement associated with any of these things, did

8   you?

9   A.  That's correct, because, remember, the license provides

10   the same rate, even if there's only one patent still

11   remaining at the end of the license.

12   Q.  And under the hypothetical negotiation, BASF and Cargill

13   would not receive any rights to any of these things we've

14   gone over, have we?

15   A.  Correct, it would just receive rights to the patents that

16   have been found infringed by the jury.

17   Q.  And with respect to Cargill's commercial lines, the only

18   thing that BASF and Cargill need a license for are the Group

19   A patents, right?

20   A.  Certainly, they need the rights under the Group A

21   patents.

22   Q.  And the '541 patent has not been asserted against

23   Cargill's commercial lines, has it?

24   A.  Not against the current commercial line.  I don't know

25   what the future will hold.

Jarosz, J. - Cross

1  Q.  And you made no effort to apportion any value under this

2  agreement attributable to just the Group A patents, did you?

3  A.  I did in the way that I described on my direct testimony.

4  Q.  And that is based on your understanding that all the

5  patents carry the same value of the whole agreement.  Each

6  patent carries the value of the whole agreement; that's your

7  understanding?

8  A.  That's part of the understanding from the 2010 and 2011

9  agreements, and it's also based on the testimony of Dr. Kunst

10  and my conversations with her.

11  Q.  And is it your understand that Dr. Kunst reviewed any of

12  these license agreements?

13  A.  I don't think she reviewed these two license agreements,

14  but she's familiar with the patents.

15  Q.  And that's also based on your understanding based on your

16  discussion with Mr. de Feyter at CSIRO, right?

17  A.  That what is based on that?

18  Q.  That each patent under the agreement equals the value of

19  the whole agreement.

20  A.  I don't know that he told me that.  I don't remember that

21  we had that conversation.

22  Q.  And you made no effort to apportion out the value

23  associated with the nonpatent rights license under the

24  agreement, did you?

25  A.  I apportioned value associated with these patents in the

Carol L. Naughton, Official Court Reporter

—————————————Jarosz, J. - Cross—————————————

1    way that we've talked about.  I didn't separately value

2    things other than the patents-in-suit here.

3    Q.  Now, you have based your royalty rate on sales of omega-3

4    oil by Cargill.  That's the royalty base that you think it

5    should be applied to, right?

6    A.  For -- would you mind asking that again?  I want to make

7    sure I'm following it.

8    Q.  So the royalty base for future damages is Cargill's

9    Latitude product, sales from Cargill's Latitude product?

10   A.  I don't recall providing an opinion on what the base is,

11   but that makes sense to me.  I did provide an opinion as to

12   the base for past damages.

13   Q.  Okay.  And you do not have an opinion on whether the

14   asserted patents disclosed all the technology necessary to

15   achieve a viable commercial product, right?

16   A.  I would be surprised if that's the case.  I think there

17   are more things that contribute to value.  That's why the

18   licenses that you see don't have 100 percent of the value of

19   the product payment going to an IP owner.

20   Q.  Could you just answer the question I asked, which is:

21          Do you have an opinion on whether the asserted

22   patents disclose all the technology necessary to achieve a

23   viable commercial product?

24   A.  Not from a technical standpoint, but I'd be surprised if

25   the patents alone give one everything needed to commercialize

Carol L. Naughton, Official Court Reporter

—Jarosz, J. - Cross—

1  a product.

2  Q.  And you did not have any discussions with Dr. Kunst

3  regarding whether the asserted patents are essential to the

4  production of a commercially viable omega-3 canola oil; isn't

5  that right?

6  A.  I recall her saying that these patents are the blueprint.

7  I don't recall if we used the term "essential" in our

8  conversation.

9  Q.  Could we play Kunst 290, Your Honor, from 20 -- 290-20,

10  to 291-2?

11         THE COURT:  Now, where is his deposition?

12         MR. SUNG:  Your Honor, we would object to playing

13  Dr. Kunst's video deposition to seek to impeach Mr. Jarosz.

14         THE COURT:  Who was talking?

15         MR. SUNG:  I was, Your Honor.  I think what counsel

16  was referring to is that they would like to play Dr. Kunst's

17  video deposition as a basis for impeaching Mr. Jarosz.

18         THE COURT:  Well, I missed that.  I assumed they

19  were looking for the witness's deposition.

20         MR. SUNG:  No, Your Honor.

21         MS. SHAW:  Your Honor, I had asked a question as to

22  whether he had discussions with Dr. Kunst regarding whether

23  the asserted patents are essential to the production of a

24  commercially viable omega-3 canola oil, and I believe he said

25  that he relied on Dr. Kunst's opinion about the value of the

─────────Jarosz, J. - Cross─────────

1    asserted patents, but he wasn't sure about the essentiality.

2          THE COURT:  I think that's a matter for argument,

3    not a matter for a question.

4          MS. SHAW:  Okay.  I'll move on, Your Honor.

5          THE COURT:  How much longer are you going to be?

6          MS. SHAW:  I have a little bit longer, probably

7    about 20 minutes -- 20, 30 minutes.  I'm happy to go through

8    it now or I can pick it up tomorrow.  I'm conscientious of

9    the Court and Mr. Jarosz.

10          THE COURT:  I expect there's going to be some

11   redirect examination?

12          MR. SUNG:  I expect so, Your Honor, but not very

13   long.

14          THE COURT:  Well, let's keep going.

15   BY MS. SHAW:

16   Q.  Mr. Jarosz, you're not aware of any sales Nuseed has lost

17   to Cargill, right?

18   A.  That's correct.

19   Q.  But it is your opinion that there has been price erosion;

20   isn't that right?

21   A.  There has been some evidence of price erosion so far.

22   There's likely to be more evidence in the future.

23   Q.  And your basis for saying that there is price erosion is

24   because customers have been hesitant in signing multiyear

25   agreements; isn't that right?

—Jarosz, J. - Cross—

1    A.   Yes.

2    Q.   And that may impact Nuseed's pricing going forward,

3    right?

4    A.   Yes.

5    Q.   But you don't know why customers will not enter into

6    multiyear contracts with Nuseed, do you?

7    A.   Not for sure, I do not, no.

8    Q.   And you don't think Nuseed really knows why customers

9    won't enter into long-term contracts, do you?

10   A.   I don't think they know for sure.  Ms. Boettner talked

11   about that topic earlier today.

12   Q.   And you did not speak to any potential customers of --

13   potential customers for Nuseed's omega-3 oil product, did

14   you?

15   A.   No, I did not.

16   Q.   You did not speak to anyone in the aquaculture market,

17   did you?

18   A.   I spoke to people at Nuseed.

19   Q.   Other than Nuseed?

20   A.   I don't recall having a discussion with others in the

21   business.

22   Q.   Okay.  And you did not perform any --

23            THE COURT:  You don't recall discussions --

24            THE WITNESS:  -- with people at Nuseed.

25            THE COURT:  -- with people at Nuseed?

Carol L. Naughton, Official Court Reporter

─────────Jarosz, J. - Cross─────────

1          THE WITNESS:  Yes.

2          THE COURT:  Go ahead.

3    BY MS. SHAW:

4    Q.  I think I had a slightly different question.  My question

5    was, you did not have any discussions with anyone in the

6    aquaculture market other than Nuseed, correct?

7    A.  Correct.  I agree with that, to the best of my memory.

8    Q.  And you did not perform any analysis on the demand in the

9    aquaculture market for omega-3 canola, did you?

10   A.  Not a formal analysis, but I looked at the documents that

11   had been produced, and they reflect Cargill and Nuseed's

12   views as to how the marketplace might develop.

13   Q.  And you do not have any understanding of what the current

14   customer acceptance for omega-3 canola oil is, do you?

15   A.  I'm sorry.  You said "customer expectance"?

16   Q.  Acceptance.

17   A.  Correct, I do not know, because no one has signed a sales

18   contract to date.

19   Q.  Okay.  And you did not talk to any farmers in preparing

20   your opinion?

21   A.  No.

22   Q.  You did not talk to any fish feed farmers?

23   A.  Correct.

24   Q.  You did not talk to any fish feed manufacturers?

25   A.  Correct.

Carol L. Naughton, Official Court Reporter

1   Q.   And you did not talk to any potential Aquaterra

2   customers, correct?

3   A.   I believe that's correct, yes.

4   Q.   Okay.  I want to focus a little bit more on the price

5   erosion issue.  You would agree that Nuseed has not finalized

6   a price for their omega-3 canola products yet, right?

7   A.   Correct.

8   Q.   And you would agree that both parties here, Cargill and

9   Nuseed, their pricing strategies will be setting the price of

10  their omega-3 canola oil relative to the price of fish oil?

11  A.   I think both intend to peg the price of their plant-based

12  omega-3 oil to the fish oil price.

13  Q.   And you would agree that both parties here -- their

14  pricing strategies will be setting that price as a function

15  of the price of fish oil, right?

16  A.   Yes, I think so.  In other words, fish oil will be a

17  consideration in determining what the canola oil price should

18  be.

19  Q.   In fact, both Nuseed and Cargill's products will have to

20  compete with fish oil in the aquaculture market.

21  A.   Yes, I believe that's correct.

22  Q.   And you do not have an opinion on what Nuseed's maximum

23  production capacity would be for the next ten years, do you?

24  A.   I don't think I know what it is.  I think I -- I know

25  that it's scaleable, but I don't know precisely what it's

——Jarosz, J. - Cross——

1   scaleable up to.

2   Q.  And your understanding that it is scaleable is based

3   solely on your discussions with Andy Thomas and Brent

4   Zacharias, right?

5   A.  No, I don't think that's right.  I think we talked about

6   this at my deposition.  I've seen produced documents that had

7   stars associated with certain characteristics of Nuseed's

8   program, and there were four or five stars associated with

9   scaleability, so I have seen produced documents on that

10  topic.

11  Q.  Okay.  But your understanding regarding Nuseed's

12  capacity, that's based on your discussions with Mr. Zacharias

13  and Mr. Thomas, right?

14  A.  I don't recall if I discussed capacity with them.  I

15  recall discussing scaleability.

16  Q.  Okay.  So you don't know what Nuseed's capacity is,

17  right?

18  A.  I don't know what its maximum capacity is for this new

19  product in any particular year.  Yes, I agree with that.

20  Q.  And you have not spoken to anyone at Nuseed regarding

21  what their maximum capacity is?

22  A.  Not that I recall.  I'm not sure if there is someone who

23  knows the answer to that.

24  Q.  And no one from Nuseed has testified at this trial

25  regarding their capacity for production; is that right?

—————————Jarosz, J. - Cross—————————

1   A.  I don't recall reading or hearing testimony on maximum

2   capacity.  I recall testimony on scaleability.

3   Q.  Okay.  Could you take a look at PX-55 in your binder?

4   A.  Which binder?

5   Q.  The cross binder.

6          THE COURT:  This is already admitted, isn't it?

7          MS. SHAW:  So, Your Honor, the document itself is

8   admitted, but because it is an Excel file, it's a little

9   difficult to review, so we've created PX-55, which is a

10  portion of the document, just so you can see the numbers with

11  your eyes.

12  BY MS. SHAW:

13  Q.  So this is the omega-3 budget document that we looked at,

14  right?  Are you there?

15  A.  I'm looking at PX-55.  It appears to be a two-page

16  document.

17  Q.  So this is the -- the first page of it, you see that

18  green chart that we saw in the other document.  I'd like to

19  take you to the second page.  Do you see that?

20  A.  Yes, I do.

21  Q.  Okay.  And this is a tab from that CX-964, that larger

22  document, that's titled "fish oil price and scarcity."  Do

23  you see that?  You might not see that here, but that's what

24  it is, okay?

25  A.  Scarcity?

─────Jarosz, J. - Cross─────

1    Q.  "Fish Oil Price and Scarcity."  That's the name of this

2    tab.

3    A.  I want to make sure that I'm following.

4    Q.  Yes, please orient yourself to the document.

5    A.  Where should I find price and scarcity on this?  I'm

6    sorry.

7    Q.  Do you see the aqua pricing strategy highlighted in

8    yellow under "Aqua Pricing Strategy"?

9    A.  Yes.

10   Q.  So that is the pricing, and then if you go to line 35.

11   A.  Yes, I'm there.

12   Q.  Do you see that's the "surplus/deficit" line there?  Do

13   you see that?

14   A.  Excluding Nuseed, yes, I see that.

15   Q.  Okay.  So I just want to focus your attention.  Let's

16   first talk about this line 35, the "surplus deficit excluding

17   Nuseed."  This is the kind of deficit of fish oil in the

18   market as calculated by Nuseed, correct, over time?

19   A.  Yes, it's the relationship or difference between demand

20   and supply, it appears.

21          THE COURT:  The deficit between demand and supply of

22   fish oil?

23          MS. SHAW:  Yes.  So --

24          THE COURT:  This only applies to fish oil?  It

25   doesn't apply to any capacity of either Cargill or Nuseed?

```
                        ┌Jarosz, J. - Cross┐
```

1           MS. SHAW:  I'm going to get to that in just a

2     minute, Your Honor.  It's right below here.

3     BY MS. SHAW:

4     Q.  And if you look at line 37, that line says, "Nuseed

5     volume," right?

6     A.  Yes, that's right.

7     Q.  And that is the -- in this projection, that is the volume

8     of oils Nuseed would make, right?

9     A.  That appears to be the case, yes, or equivalent fish oil.

10    Q.  Okay.  That's right.  And if you see line 39, that's the

11    percent of total fish oil demand that number could supply.

12    Do you see that?

13    A.  Yes, I do.

14    Q.  Okay.  And if you look at line 40, that is the percent of

15    the deficit, the shortage of fish oil that Nuseed could

16    supply, right?

17    A.  Yes.  Based on this calculation, yes.

18    Q.  Okay.  And if you look in column O, that's the

19    information for 2028, right -- 2025?

20    A.  I believe it's 2025, yes.

21    Q.  So the percent of the deficit that Nuseed projected that

22    they could supply in 2025 was 33.7 percent, correct?

23    A.  This calculation shows 33.7 percent, and I think they

24    were figuring the economics of providing that amount.

25    Q.  Okay.  So, for example, if Cargill was only able to

————Jarosz, J. - Redirect————

1   supply, say, 30 percent of the deficit in 2025, then both

2   Nuseed and Cargill could both sell to this market without

3   Cargill taking a single sale from Nuseed; isn't that right?

4   A.   I don't know that that's true.

5   Q.   If Cargill provided 30 percent of the deficit in 2025 and

6   Nuseed provided 33.7 percent of the deficit in 2025, you

7   would agree that Cargill and Nuseed would be providing 63.7

8   percent of the deficit?

9   A.   Using that calculation, that's correct.

10   Q.   Okay.

11   A.   That doesn't mean Cargill's sales don't come at the

12   expense of Nuseed.

13          MS. SHAW:  I have no further questions.  Pass the

14   witness.

15          THE COURT:  All right.

16                    REDIRECT EXAMINATION

17   BY MR. SUNG:

18   Q.   Mr. Jarosz, opponents' counsel had questioned you about

19   one of the cases in which you testified previously in which

20   you had not apportioned with respect to a multicomponent

21   device or case; is that correct?

22   A.   Yes.

23   Q.   In your expert opinion, is this a multi-device or

24   component case?

25   A.   No.  These patents appear to cover the whole blueprint or

2345

——Jarosz, J. - Redirect——

1   the whole product.  This is not an electronics multicomponent

2   case, for instance.

3   Q.  You were also questioned on cross-examination with

4   respect to CX-0181, the agreement, license agreement, and do

5   you recall testifying with respect to this?

6   A.  Yes.

7   Q.  Do you recall how many amendments there are to this

8   particular contract?

9   A.  Sitting here right now, I don't.

10   Q.  And if I can refer you to your expert report at tab 3 to

11   see if that would refresh your recollection.

12   A.  I see tab 3, and you'll have to give me a moment, please.

13   Maybe you have a particular page I should turn to.

14   Q.  Line 18 on that document, if you will.

15   A.  I'm sorry.  This entry is collaborative research

16   agreement and variations 1 through 5 agreements, so that

17   suggests that there were at least five.

18   Q.  So counsel didn't question you about the patent listing

19   in any of those other amendments, did she?

20   A.  No.

21   Q.  If we could pull up Exhibit CX-0483, the last page, the

22   metadata that counsel referred to.

23          Mr. Jarosz, can you look at the last date modified,

24   I think, and tell me what date that reflects?

25   A.  January 26, 2018.

2346

Jarosz, J. - Redirect

1   Q.   And can we look at the line right below that, the date

2   created?

3   A.   That's February 28, 2018.

4   Q.   Do those two dates suggest to you anything with regard to

5   this particular metadata?

6   A.   I find that very curious that the last modification was

7   before the date created.

8   Q.   You usually don't modify something before you create it;

9   is that your understanding?

10  A.   That's correct.  That's why I find this curious.

11  Q.   Let's turn to the questioning that opponents' counsel

12  ended with with respect to the 30 percent of the fish oil

13  deficit that Nuseed had projected.

14         That was a projection in 2025 based on data back in

15  2016, 2017; is that your understanding?

16  A.   It was a projection for 2025 done in something like 2016

17  or 2017.

18  Q.   And what is your understanding with regard to projections

19  that are that far in the future?

20  A.   It is difficult to estimate the future.  It's certainly

21  difficult to estimate ten years out into the future.

22  Q.   And does a projection like that support your discussion

23  earlier with respect to injunctive relief?

24  A.   Yes.  The future is unknown.  It's unknown as to prices,

25  it's unknown as to quantities, it's unknown as to revenues

1   and costs, and I've seen a variation in projections in just a

2   short amount of time because neither party really knows how

3   this product line will develop.

4   Q.  And each of these projections that they're based upon,

5   they're based on single snapshots in time; would you agree?

6   A.  That's correct.

7           MR. SUNG:  No further questions, Your Honor.  I

8   think we'd ask that the witness not be excused, however; that

9   we reserve the ability to recall him, if necessary, for

10  rebuttal.

11          THE COURT:  All right.  If you may be recalled as a

12  witness, you shouldn't discuss your testimony with anyone or

13  consult any other documents without the prior authorization

14  of the Court.

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  You can step down at this time.

17          (The witness stepped down.)

18          THE COURT:  Does that complete the case in chief for

19  the proponents?

20          MR. SUNG:  Yes, Your Honor.  Subject to any

21  rebuttal, we would close now.

22          THE COURT:  All right.  Well, I think we'll resume

23  again at 10:00 tomorrow morning with the opponents' evidence

24  on damages.

25          MS. SHAW:  Your Honor, I do have one question.  Just

2348

1   for clarification, I just wanted to understand if the Court

2   has any preference on how they want to handle closings and

3   also proposed findings of fact and conclusions of law.

4           THE COURT:  Well, I think your proposed findings of

5   fact and conclusions of law should be ready tomorrow morning

6   in the hopes that we'll finish the evidence tomorrow and be

7   able to hear closing arguments.

8           Obviously, you could amend them based on the

9   evidence that's actually produced either in your case in

10  chief or rebuttal evidence, but I think both sides should

11  have that ready tomorrow morning so that it can expedite the

12  process tomorrow.

13          MS. SHAW:  And did I understand correctly that you

14  did want to do closings, as well, for this phase of the case?

15          THE COURT:  Yes.  And I don't know how long you

16  think you need for closing argument.

17          MS. SHAW:  I don't have a good estimate right now.

18  Maybe 15, 20 minutes.

19          MR. SUNG:  That would be acceptable.

20          MS. SHAW:  Actually, my counsel is telling me a half

21  an hour.

22          THE COURT:  Well, I think I can live with half an

23  hour each side, and, of course, the proponents would have the

24  right to open and close on this issue so they could reserve

25  time for rebuttal.

1          MS. SHAW:  Certainly.  And just the last

2    housekeeping issue:

3          As I mentioned on Friday, Dr. Murphy, his testimony,

4    he was deposed on Saturday, his testimony will be presented

5    by deposition, and we just wanted to understand from the

6    Court if they had a preference as to how they receive and

7    review that evidence; whether you would like us to play the

8    testimony in court, if you would like to receive a video

9    clip, if you would like to review the transcript.

10         THE COURT:  You mean you have your expert plus

11   Dr. Murphy?  Who else do you have?

12         MS. SHAW:  So tomorrow we plan on putting on Dmitry

13   Gromov from Cargill, as well as Carl Andre and Brian Napper

14   live, and then we would also have the deposition testimony of

15   Dr. Murphy, which I understand is around 40 minutes.

16         THE COURT:  I don't think this case is ever going to

17   end.

18         MS. SHAW:  I do think we'll be able to get all the

19   live witnesses done tomorrow and, hopefully, the deposition

20   testimony of Dr. Murphy, as well.  But, again, we just wanted

21   to see how you would like to receive that evidence.

22         THE COURT:  Well, I think that you should present --

23   you can present it however you want it, but it seems to me it

24   should be just like the live witnesses.

25         MS. SHAW:  Okay, Your Honor.

```
1              THE COURT:  Play his deposition.  I don't like to
2    hear all the evidence in the case and then go back in
3    chambers and look at a movie.  I like to be prepared to rule
4    when the evidence is concluded, because I believe that I have
5    a better grasp of the case then than I will months later or a
6    month later or a week later, going back and looking at the
7    record.
8              MS. SHAW:  We're happy to do that, Your Honor.
9              THE COURT:  You lose so much ability to weigh the
10   evidence when you go back and look at a cold record, so I
11   like -- that's why I like to have closing arguments as soon
12   as possible after the conclusion of the evidence, as well as
13   proposed findings of fact and conclusions of law.
14             MS. SHAW:  We're happy to do that, Your Honor.
15             THE COURT:  All right.  Any further questions?
16             MR. SUNG:  No, Your Honor.
17             MS. SHAW:  Nothing from us.
18             THE COURT:  If you have a rebuttal witness, who
19   would your rebuttal witness be?
20             MR. SUNG:  I think only to the extent that there is
21   testimony elicited from Mr. Napper would we recall Mr. Jarosz
22   for that purpose.
23             THE COURT:  Okay.  We'll be adjourned until 10:00
24   tomorrow morning.
25             (Proceedings adjourned at 5:28 p.m.)
```

Carol L. Naughton, Official Court Reporter

```
 1
 2                          CERTIFICATION
 3
 4        I certify that the foregoing is a correct transcript
 5   from the record of proceedings in the above-entitled matter.
 6
 7
 8        _____/s/_____
 9                     Carol L. Naughton
10                     November 4, 2019
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Carol L. Naughton, Official Court Reporter