```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                        )
 4   BASF PLANT SCIENCE, LP,            )
                                        )
 5          Plaintiff,                  )
                                        )
 6   v.                                 )
                                        )
 7   COMMONWEALTH SCIENTIFIC AND        )
     INDUSTRIAL RESEARCH               )
 8   ORGANISATION,                      )
                                        )
 9          Defendant.                  )
     _____    )        CIVIL ACTION NO.
10                                      )            2:17cv503
     COMMONWEALTH SCIENTIFIC AND        )
11   INDUSTRIAL RESEARCH               )
     ORGANISATION, GRAINS RESEARCH      )
12   AND DEVELOPMENT CORP., AND         )
     NUSEED PTY LTD.,                   )
13                                      )
        Plaintiff-Counterclaimants,    )
14                                      )
     v.                                 )
15                                      )
     BASF PLANT SCIENCE, LP, and        )
16   CARGILL, INC.,                     )
                                        )
17     Defendants-Counterdefendants.   )
                                        )
18   - - - - - - - - - - - - - - - - - -

19
                    TRANSCRIPT OF PROCEEDINGS
20                  (Jury Trial - Day 15)

21                     Norfolk, Virginia

22                    November 6, 2019

23
     BEFORE:  THE HONORABLE HENRY COKE MORGAN, JR.
24              United States District Judge

25
```

Carol L. Naughton, Official Court Reporter

```
 1   APPEARANCES:

 2              HOGAN LOVELLS US LLP
                By:  Nitya Anand
 3                   Arlene L. Chow
                     N. Thomas Connally, III
 4                   Una Chiao-Yi Fan
                     Thomas B. Hunt
 5                   Takashi Okuda
                     Jared Schubert
 6                   Anna K. Shaw
                     Ernest Yakob
 7              Counsel for BASF Plant Science, LP

 8              VANDEVENTER BLACK LLP
                By:  Richard H. Ottinger
 9              Counsel for Defendants, Third-Party
                Plaintiffs, and Counterclaimants
10
                KOBRE & KIM LLP
11              By:  Jonathan E. Barbee
                     Hugham Chan
12                   Matthew I. Menchel
                     Michael K. Ng
13                   Hartley M.K. West
                     Daniel A. Zaheer
14              Counsel for Commonwealth Scientific and
                Industrial Research Organisation
15
                PORTER HEDGES LLP
16              By:  Miranda Jones
                     Megan Mon-Ting Luh
17                   Erin C. Villasenor
                Counsel for Grains Research and
18              Development Corporation

19              WILEY REIN LLP
                By:  Alexander Owczarczak
20                   Teresa Summers
                     Lawrence M. Sung
21              Counsel for Nuseed Pty Ltd

22              FISH & RICHARDSON PC
                By:  Ahmed J. Davis
23                   Christopher R. Dillon
                     Elizabeth Flanagan
24                   Daniel R. Gopenko
                Counsel for Cargill, Inc.
25
```

1                         I N D E X

2

3   WITNESSES                                        PAGE

4     BRIAN NAPPER
            Cross-Examination By Mr. Sung             2557
5           Redirect Examination By Ms. Shaw          2581

6

7                       E X H I B I T S

8   NO.                                              PAGE

9     CX-1148                                         2556
10    CX-1149                                         2556
      CX-0364                                         2556
11    CX-0996                                         2561
      PX-55                                           2585
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commenced at 10:00 a.m.)
 2              THE COURT:  Good morning.
 3              MR. SUNG:  Good morning, Your Honor.
 4              THE COURT:  Are you ready to begin your
 5    cross-examination?
 6              MR. SUNG:  Yes, sir.  Before we get started, there
 7    were just a couple of housekeeping matters we'd like to
 8    address with the Court, if possible.  The parties have agreed
 9    to the admission of certain tabs from each of the experts --
10    the damages experts' reports, and if I could read those out
11    to you.  It would be --
12              THE COURT:  Certain tabs?
13              MR. SUNG:  Yes.  They are, essentially, the
14    financial data references that the experts have relied upon.
15              THE COURT:  Well, are the experts' reports already
16    in this?
17              MR. SUNG:  Those would be the tabs.  We've not
18    sought the admission of the expert reports themselves.
19              THE COURT:  All right.  Are they both contained for
20    both experts in this exhibit?
21              MR. SUNG:  I think the opponents' set is coming up
22    to you momentarily.  And so if I could just read into the
23    record the particular tabs that we're talking about, Your
24    Honor.
25              THE COURT:  CX-1148?
```

 1           THE WITNESS:  Correct.  That would be the tabs for

 2  Mr. Jarosz's expert report.

 3           THE COURT:  Okay.

 4           MR. SUNG:  And the second for the opponents would be

 5  CX-1149.

 6           THE COURT:  All right.  I will admit Exhibits

 7  CX-1149 and CX-1148.

 8           (Exhibits CX-1148 and CX-1149 received in evidence.)

 9           MR. SUNG:  And apologies, Your Honor, one last one.

10  During Dr. Gromov's testimony yesterday, there was one

11  exhibit that we had discussed and questioned him on.  It is

12  CX-0364.

13           THE COURT:  That's in the book?

14           MR. SUNG:  It was in the book, and we'd like to move

15  the admission of that.  I understand that Mr. Dillon has no

16  objections to that.

17           THE COURT:  CX-0364 will be admitted.

18           (Exhibit CX-0364 received in evidence.)

19           MR. SUNG:  Thank you, Your Honor.  I think we're

20  ready to proceed with cross whenever you are.

21           THE COURT:  All right.  You're still under oath,

22  Mr. Napper.

23           THE WITNESS:  Yes, Your Honor, good morning.

24           THE COURT:  Good morning.  You may proceed.

25           BRIAN NAPPER, called by Nuseed, having been

────Napper, B. - Cross────

1   previously duly sworn, was examined and testified further as

2   follows:

3                          CROSS-EXAMINATION

4   BY MR. SUNG:

5   Q.  Good morning, Mr. Napper.

6   A.  Good morning, Mr. Sung.

7   Q.  You testified yesterday that you reviewed all of

8   Cargill's witness deposition transcripts; is that correct?

9   A.  I did, yes.

10  Q.  And you reviewed Dr. Gromov's deposition transcript in

11  particular?

12  A.  I reviewed his as well, yes.

13  Q.  And do you agree with his testimony regarding financial

14  projections about Latitude and Project Boost?

15  A.  I think you have to be more specific, Mr. Sung.

16  Q.  He testified during his deposition that over the course

17  of project development, we've run several multiple timelines,

18  and so it's always trying to predict the future, and it's

19  also giving a snapshot in time, so we're always wrong but

20  this is the best guess.  Would you agree with that?

21  A.  I have to see context, but certainly I've reviewed many

22  of the Cargill financial projections over time.  And, as I

23  noted, I think, in my direct testimony, it does change, but

24  the changes become less significant.

25          So, for example, from 2018 to 2019 prepared

—Napper, B. - Cross—

1  projections, the projections of revenue go from 939 million

2  down to about 905 million, so not too much variance in that

3  regard.

4  Q.  But you would agree that any one of those financial

5  projections is a snapshot in time of what their projections

6  are at that moment; is that fair?

7  A.  I would say that's fair, yes.  It's the best estimate at

8  that point in time, sure, based on the information that they

9  continue to bring into their business, yes.

10 Q.  And so, in your opinion, the most recent information with

11 regard to a future financial projection, does that tend to be

12 the best?

13 A.  I think, generally, it tends to be -- include more

14 information.  Obviously, the parties -- both parties gather

15 more information when they do their forecasts.  So, yes, I

16 would agree with that, generally.

17 Q.  So you would, generally, in rendering your expert

18 opinion, take in the best information possible, and that

19 would include this most current information?

20 A.  Yes.  As I indicated previously, I'm crosschecking with

21 previous information and forecasts, in this situation the

22 2019 Cargill -- or the 2018 Cargill prepared projections, and

23 I found those to be, you know, relatively in line, but there

24 were changes based upon new information, as I understand it.

25 Q.  Okay.  Would you apply that same standard to information

Napper, B. - Cross

1   of Nuseed that you've reviewed?

2   A.  Generally, I would apply that, sure.  They gather more

3   information.  I don't believe I had any new Nuseed

4   projections or forecasts since, I think, dated in 2017, with

5   some additions to pricing, I believe, in early 2018, the best

6   I could tell.

7   Q.  You testified yesterday that, based on your

8   understanding, the Group D patent has been found to be

9   infringed by BASF's elite event; is that correct?

10  A.  That's my understanding of the jury's verdict.

11  Q.  And it was also your understanding that the hybrid canola

12  lines being used and continued to be used by Cargill are not

13  using this elite event; is that correct?

14  A.  Well, it's my understanding a little bit different.  It's

15  my understanding that those hybrid canola lines were not

16  accused of infringing the Group D patents, as I understand

17  the claims between the parties.

18  Q.  Are you aware that that patent expires in 2033?

19  A.  Yes, I'm aware of that.

20  Q.  And so would you agree with me that for at least your

21  balance of the hardships consideration for injunctive relief,

22  that if an injunction were to issue with respect to the Group

23  D patents, that it would not be a hardship on Cargill?

24  A.  I would have to kind of revisit that a little more

25  formally, because I didn't study that as earnestly as I did

‒Napper, B. - Cross‒

1    the Group A patents because of their reach-through to the
2    hybrid canola lines of Cargill.  So I'd have to think about
3    that, but my inclination would be to agree with that.
4    Q.  So if I could refer you in your cross binder to the tab
5    CX-0996.  Despite the size of the binder, there should only
6    be one exhibit today.
7    A.  That's good news, Mr. Sung.  CX-0996?
8    Q.  Correct.
9         THE COURT:  That's already in evidence, isn't it?
10        MR. SUNG:  It was not admitted by the opponents
11   yesterday.  This is a different numbered version of it, so I
12   will be seeking the admission of this.
13   BY MR. SUNG:
14   Q.  So, Mr. Napper, do you recall this document?
15   A.  I do.
16   Q.  And I believe that opponents' counsel questioned you
17   about this document, or at least a different version of this
18   document, but it's the same dated Credit Suisse letter.
19   Would you agree to that?
20   A.  I would agree that this appears to be the Credit Suisse
21   investment analyst report of Nufarm in late 2018.
22        MR. SUNG:  Your Honor, we'd like to move into
23   evidence CX-0996, and there are excerpted pages that are
24   attached in that exhibit.
25        THE COURT:  All right.  That will be admitted.

--------Napper, B. - Cross--------

1              (Exhibit CX-0996 received in evidence.)

2     BY MR. SUNG:

3     Q.  So if I can refer you to internal Page 23, which is Bates

4     number 320.

5     A.  Okay.  Thank you.

6     Q.  And so yesterday I believe your testimony was that you

7     referred to this Credit Suisse analyst report for the section

8     labeled next to Figure 37, which appears to state that

9     Nufarm, or Nuseed, could capture 35 percent of the fish oil

10    supply gap; is that correct?

11    A.  Yes.  This, I understand, is Credit Suisse's estimate of

12    what Nufarm could capture of the fish oil supply gap.

13    Q.  And if we can refer you up to the prior paragraph above

14    that figure 37, which appears to state that this was their

15    base case and was conservatively framed.  "We assume that

16    Nufarm/Nuseed captures a 50 percent of the omega-3 crop

17    opportunity."

18              Did you take that into consideration?

19    A.  Yes.  That was a reference to excluding China, so that 50

20    percent indication was suggesting that if you take China out

21    of the equation, that Nuseed could potentially -- based upon

22    Credit Suisse's analysis, could capture 50 percent of

23    everything but China fish oil supply gap.

24    Q.  Do you recall Dr. Gromov's testimony yesterday in

25    response to the Judge's question, "Do you know how much fish

———Napper, B. - Cross———

1    oil these fish farming companies purchased each year?"

2         Dr. Gromov responded, "My estimates put the use in

3    the salmon industry at about 400,000 metric tons a year of

4    fish oil, and then if you added to it perhaps another 250,000

5    metric tons of fish oil used to feed other fish and shrimp,

6    for a total of 650,000 metric tons of fish oil in the

7    aquafeed industry."

8         Is that your recollection as well?

9    A.  I think so.  I think so.  I've seen other estimates as

10   high as 850,000 metric tons in documents, but I think his

11   testimony -- I'm not sure if it was limited to salmon and

12   other fish.  I can't explain the gap in other documents I've

13   seen of 850,000 tons of metric -- I'm sorry -- 850,000 metric

14   tons versus the 650,000 metric tons he testified to

15   yesterday.

16   Q.  But going back to my earlier question, you would take

17   Dr. Gromov's testimony yesterday to be more accurate or the

18   best information compared to what you've reviewed previously?

19   A.  Again, that one is harder to reconcile, because I've

20   seen -- I'd have to refresh my memory as to what the 850,000

21   metric tons estimate of the fish oil supply market would be;

22   whether that's from an independent analysis, for example,

23   like Credit Suisse, whether it's internal documents from

24   Cargill or Nuseed.

25        So I don't -- I'm not saying I don't believe

——Napper, B. - Cross——

```
 1    Dr. Gromov's testimony, I'd just like to understand the gap
 2    between those two estimates, and I don't know the timing of
 3    them.  But fair enough.
 4    Q.  And if we go down below Figure 37 to Figure 38 there, it
 5    appears that the Credit Suisse report in Figure 38 found the
 6    addressable market for Nuseed to be within the range of
 7    128,000 and 341,000 metric tons.  Do you see that?
 8    A.  I do see that.  I'm assuming that's through 2027.
 9    Q.  And do you have any reason to dispute those numbers?
10    A.  Not on the fly.  I would have to look at it, but I don't
11    have any reason to dispute those.
12    Q.  So if the Credit Suisse report that you've relied on
13    previously shows about half of the estimated demand from what
14    Nuseed had testified would be the total amount of fish oil
15    that customers are looking for, then wouldn't that mean that
16    the supply gap that the 35 percent that you had relied upon
17    was based on may not be as large as you had calculated?
18    A.  Just so I'm clear, Mr. Sung, in that question are you
19    asking about the total fish oil supply gap and what that
20    amount is?
21    Q.  Yeah.  Let me try to be a little clearer.
22         Dr. Gromov testified that there would be a potential
23    need for as much as 65,000 tons.
24    A.  I think it's 650,000.
25         THE COURT:  650,000.  Does this article project the
```

2564

———Napper, B. - Cross———

```
 1    size of the market?

 2              MR. SUNG:  That's what we believe, Your Honor.

 3              THE COURT:  I said does this article project the

 4    size of the market?

 5              MR. SUNG:  That's what the highlighted section on

 6    the screen does, Your Honor.

 7              THE COURT:  It gives Nuseed's share of the market.

 8    Does it project the entire market?

 9              MR. SUNG:  Well, Your Honor, what we're saying is

10    that because Nuseed has not been on the market, when they

11    talk about the addressable market that's the demand for what

12    they believe the -- well, that's what they believe the demand

13    would be for the product.

14              THE COURT:  That's not my question.  Do you

15    understand my question?

16              MR. SUNG:  I do.  So --

17              THE COURT:  Does the article address the total

18    market or projected the total market?  This article, does it?

19              MR. SUNG:  We believe that it does, because --

20              THE COURT:  Where?

21              MR. SUNG:  Well, that line, we believe, is what the

22    analyst is saying the total market for this product would be.

23              THE COURT:  "This product" being Nuseed's product?

24              MR. SUNG:  Correct, sir.

25              THE COURT:  That's not the total market, is it?
```

—Napper, B. - Cross—

1              MR. SUNG:  No.  The total market is not --

2              THE COURT:  Well, that's my question.

3              MR. SUNG:  Well, Dr. Gromov did testify yesterday

4     that it would be 650 --

5              THE COURT:  Well, I heard him testify.

6              MR. SUNG:  Yes, sir.

7              THE COURT:  Can you just answer my question?

8              Does this article project the total market for the

9     product?  Whether it's Nuseed's or BASF's or fish oil or

10    what, does this article address that?

11             MR. SUNG:  So, Your Honor, I'm just trying to be

12    accurate.

13             It does not address the total fish oil market;

14    however, it addresses the total market for the omega-3 canola

15    oil.

16             THE COURT:  For the omega-3 -- what is their

17    projection?

18             MR. SUNG:  As it states there, their addressable

19    market is between 128,000 and 341,000.

20             THE COURT:  Well, that's not what it says.  It says

21    Nuseed's addressable market could range between that.  It

22    doesn't say the total addressable market for the omega-3.

23             MR. SUNG:  Yes, sir, but there's no other product

24    that they're talking about.

25             THE COURT:  Do you understand my question?

─────────────Napper, B. - Cross─────────────

1           THE WITNESS:  I absolutely do, Your Honor.

2           THE COURT:  Does this article address that?

3           THE WITNESS:  The total fish oil supply gap

4    potentially available for omega-3 from canola is estimated in

5    Figure 37.  So it's the one I talked about yesterday, and

6    it's 545,000 tons.  That's the number -- that's pretty close

7    to what Dr. Gromov testified to of 650,000.  So it's the one

8    above.  It's not Nufarm's addressable market, you're exactly

9    right.

10          THE COURT:  Why couldn't you answer that?

11          MR. SUNG:  Again, sir, I was just trying to be

12   accurate with the numbers.

13          THE COURT:  All right.  Well, move on.

14   BY MR. SUNG:

15   Q.  In terms of Ms. Boettner's testimony, you were here for

16   her testimony, correct?

17   A.  Yes.

18   Q.  And do you recall her testifying that Nuseed can meet the

19   market demand now and into the near future due to proven

20   scaleability?

21   A.  I heard that testimony, yes.

22   Q.  And you disagree with that?

23   A.  Well, I don't know if I disagree, per se.  What I

24   testified to is Ms. Boettner said that Nuseed can scale to

25   anything they think they could supply, so that struck me as

—Napper, B. - Cross—

1    inconsistent -- or consistent, then, with the projections

2    that Nuseed puts together as to what it thinks it could

3    supply in the marketplace.

4            Since Nuseed hasn't produced their capacity

5    information beyond verbal representations, I just went with

6    the best available Nuseed projection, applying that now with

7    Ms. Boettner's testimony that Nuseed could scale up as fast

8    as it possibly could.  If that were the case, why not fill

9    the whole gap.

10   Q.  So the only data that you have seen on Nuseed's financial

11   projections, you testified, was from 2017, correct?

12   A.  Yeah, there's some adjustments made.  I believe certain

13   tabs, Excel tabs, of price adjustments made in early 2018,

14   but the rest of the projections do not seem to be touched.

15   Q.  So the only data with respect to supply that you have

16   reviewed from Nuseed is from 2017, correct?

17   A.  I would phrase it slightly differently.  The only

18   projection I have seen that Nuseed has put together, detailed

19   projection, is dated 2017 and changed in 2018.  That document

20   was produced fairly close to my report date, actually.

21   Q.  So the only other data point that you have from your

22   review of documents and your listening to the testimony is

23   Ms. Boettner's testimony that Nuseed would be able to meet

24   that demand today; is that correct?

25   A.  Again, phrased a little differently, my recollection of

Napper, B. - Cross

1    her testimony is Nuseed would scale up as fast as they could
2    to meet the demand.  So I just combine that with the
3    information I have from Nuseed's detailed financial
4    projections to say that must meet that 35 percent market
5    aspiration, and market share of Nuseed must meet their
6    capacity.
7    Q.  If we can stay within that exhibit and turn to Bates
8    number 300, 3-0-0, and if we can head down to the portion
9    that refers to a game-changer development.
10           Do you see that?
11   A.  I see that section.
12   Q.  Do you recall testifying yesterday that you did not
13   consider Nuseed to have a first-mover advantage?
14   A.  I didn't see indication that, one, this market
15   necessarily has a first-mover advantage, and I didn't see --
16   recognize that Nuseed is going to be the first to market, it
17   appears; that there was some significance associated with
18   that.
19   Q.  So do you disagree with the Credit Suisse report here
20   referring to a first-mover advantage as ascribed to
21   Nufarm/Nuseed?
22   A.  I don't see any quantification of the first-mover
23   advantage.  I just know -- and I would agree with that --
24   that Nuseed will be the first to market.
25   Q.  And, similarly, if I can refer you to Bates number ending

—Napper, B. - Cross—

1    in 331.

2    A.   331, Mr. Sung?

3    Q.   Yes, correct.

4    A.   I don't think that's in my binder.

5            MS. SHAW:  I was going to say the same thing.

6            THE WITNESS:  Is it 321?

7            THE COURT:  That's 321.

8            MR. SUNG:  It's 321.  Sorry, sir.

9            Okay.  That's not it, either.  I think we'll just

10   move on from there.  Thank you.

11   BY MR. SUNG:

12   Q.   If we can pull up the demonstrative you referred to

13   yesterday, PDX-618.  It will just appear on your screen.

14   A.   I see that.

15           MR. SUNG:  I'm sorry, Mr. Boles.  Can we pull up the

16   fish oil pricing?  I might have the numbers mixed.

17   BY MR. SUNG:

18   Q.   While we're trying to pull that up, I'll just ask you

19   through the questions.

20           You do agree that there is a volatility in fish oil

21   prices, correct?

22   A.   In traditional fish oil prices, that's correct.

23   Q.   And Dr. Gromov testified yesterday -- and here we have it

24   up on the screen, as well -- that fish oil prices are

25   extremely unpredictable and volatile.  Did you hear him

--------Napper, B. - Cross--------

1   testify to that?

2   A.  Yes, for traditional fish oil, I would agree with that.

3   Q.  And he said in a span of a few months the price can go

4   between $1300 to $2700 and back?

5   A.  Depending on seasonality and the weather and other

6   impacts, that's what I heard, yes.

7   Q.  And, in your expert opinion, can a sharp change in price

8   affect the change in supply or demand for fish oil?

9   A.  For this marketplace, it could have an impact on demand,

10  sure.

11  Q.  And so if there's a big spike or dip in, let's say,

12  according to this chart, 2016 or 2017, can that equate to a

13  change in the supply or demand?

14  A.  Potentially; although, again, I think that there's a --

15  the traditional fish oil suppliers are flattening out in

16  terms of their ability to supply, and the fish feed

17  manufacturers need the fish oil, which is why this

18  opportunity exists.

19  Q.  Right.  But if we take a look at this that appears to be

20  a chart driven by data, if we look around the 2017 time

21  frame, you'd degree with me that there appears to be a sharp

22  dip and a sharp spike within that time frame?

23  A.  I agree.

24           MR. SUNG:  If you could pull up CX-1723 -- this was

25  previously moved into evidence -- and if we can focus on the

—Napper, B. - Cross—

1    deficit portion of this.

2    BY MR. SUNG:

3    Q.  Do you recall seeing this during Ms. Boettner's

4    testimony?

5    A.  I do recall seeing this, yes.

6    Q.  And so would you agree with me that as this fish oil

7    deficit is projected between demand and supply there that

8    there are some times that it is smaller or narrower, and some

9    times it's a little bit larger but generally trending upward?

10   A.  I agree.

11   Q.  If we can turn to another demonstrative you had

12   yesterday, PDX-637.

13          Are you with me, Mr. Napper?

14   A.  Yes.  Sorry, yes.

15   Q.  Did you draw this demonstrative?

16   A.  I didn't draw it, but I supplied the detail into it, yes.

17   Q.  Is it your testimony that the line that is represented by

18   total projected fish oil deficit, was that generated based on

19   data, or does it appear to just be a line somebody drew?

20   A.  No, it's based upon data.  I'd have to look at my report

21   to see the underlying source document.  It might be Credit

22   Suisse; it might be something else.

23   Q.  So it appears to be just a smooth curve upwards, with no

24   change from year to year, season to season?

25   A.  Yes, based upon their particular source, which could

─────Napper, B. - Cross─────

1   differ from the document you showed me before.

2   Q.  If we could move to another demonstrative you talked

3   about yesterday, PDX-640.

4          THE COURT:  The other chart was a graph of prices,

5   not demand, wasn't it?

6          MR. SUNG:  We can return to it, Your Honor.  I

7   believe it does address supply and demand.

8          THE COURT:  Well, the one we looked at before just

9   addressed the cost, didn't it?

10         MR. SUNG:  The one after that was the one that was

11  not cost but supply and demand.

12         Can we bring that one up, CX-1723, and if we can

13  focus on that portion of it.

14         So, Your Honor, over the period of time that's down

15  at the bottom, and then you see the two different lines, one

16  says "demand" and one says "supply."

17         THE COURT:  That's not the one I'm talking.

18         MR. SUNG:  Oh, the previous one.  Okay, the previous

19  one --

20         THE COURT:  The previous one just dealt with price.

21         MR. SUNG:  Correct.

22         THE COURT:  Okay.

23  BY MR. SUNG:

24  Q.  So if we can go back to PDX-640, do you remember

25  testifying about this chart yesterday?

─────Napper, B. - Cross─────

1   A.   I do.

2   Q.   So you employed, generally, the same methodology as

3   Mr. Jarosz but using different numbers as inputs for that.

4   Would you agree to that?

5   A.   Slightly different.  I don't agree with the approach that

6   Mr. Jarosz took to calculate or determine a royalty rate from

7   the CSIRO/GRDC/Nuseed agreement.  So I don't agree that

8   that's the way to try to calculate a rate, but accepting his

9   approach, I made certain adjustments that I think are

10  appropriate to that approach.

11  Q.   So other than the conclusion, you don't dispute that the

12  methodology that he implied, in terms of calculating this,

13  are different than an economist would normally do?

14  A.   Well, I don't know about what an economist would normally

15  do.  In this case I do not believe that taking a projection

16  of Cargill and taking and superimposing the CSIRO/GRDC/Nuseed

17  financial metrics onto Cargill's projections, to then try to

18  calculate a 25 percent of net sales and convert that into a

19  royalty rate on end product sales, I just don't think is

20  appropriate, for the reasons I've already stated, including

21  the CSIRO/GRDC/Nuseed does not drill down to the specific

22  infringed patents in this case.

23  Q.   So when you performed this calculation -- if we can pull

24  up PDX-641 -- to ultimately come up with a 3.8 percent

25  number, that's not something that you're advocating as a

Napper, B. - Cross

1    royalty for this case, are you?

2    A.   I'm not advocating for this royalty rate in this matter.

3    If the Court were to determine that Mr. Jarosz's approach is

4    appropriate, I thought I would offer up a more reliable way

5    to use that approach, to reflect the current -- for the

6    reasons that I went through yesterday.

7    Q.   You've taken the position that the hypothetical

8    negotiation date in this case is no earlier than between

9    March and November 2018; is that correct?

10   A.   That was my assumption.

11   Q.   So you don't take issue with Mr. Jarosz's assignment of

12   November 2018 as a proper date for the hypothetical

13   negotiation?

14   A.   We both agree on that.

15   Q.   And you would agree that the set of the Cargill financial

16   projections that Mr. Jarosz relied upon while they were in

17   2017 were before the agreed date of the hypothetical

18   negotiation?

19   A.   The Cargill projections?

20   Q.   Correct.

21   A.   I think they were early 2018, to be fair, and they were

22   prior to the November 1, 2018 projection.  The 2019

23   projections were dated January, February of 2019, so they

24   were much closer in time to the hypothetical negotiation

25   date.

—————Napper, B. - Cross—————

1   Q.  Turning to the licenses that you had relied upon in your

2   own analysis, if I can refer you to the Hamburg agreement

3   that you had described.

4           So the Hamburg agreement, I think I heard you

5   testify yesterday, was signed in 1998; is that correct?

6   A.  Correct.

7   Q.  So the 20 years of time that's passed between this

8   license and the date of the hypothetical negotiation, that

9   didn't bother you?

10  A.  Not at all, not for this industry.  As Dr. Andre

11  testified to, and as observed even by these various

12  companies, starting in 2003, 2004 -- for example, CSIRO not

13  having a patent until 2017 -- there's just a long -- I think

14  there's been a lot of testimony that there's a long, slow,

15  diligent process to come to fruition to a commercialized

16  product, and we're still not there.

17  Q.  So the fact that 16 years have passed between the

18  Bioriginal agreement and the hypothetical negotiation rate,

19  that didn't bother you, either?

20  A.  Not for the facts and circumstances in this matter, in

21  context, not at all.

22  Q.  And so, also, the 13-year difference between the Amaethon

23  agreement and the hypothetical negotiation date, that didn't

24  both you?

25  A.  Not for the facts and circumstances here.  In some cases,

─────Napper, B. - Cross─────

1   like smartphone technology, that might have an impact,

2   because there's a new generation of product every single

3   year, but not for my experience in pharmaceutical and

4   biotech.  It's not surprising that there's a long lead time.

5   Q.  So this concept of a long lead time and long development,

6   did you ever discuss that in your expert opinion?

7   A.  I thought I did.  In my report I thought I commented upon

8   that, but if I didn't, I certainly had discussed it with

9   Dr. Andre before my report.

10  Q.  But you would agree that, other than the discussions, you

11  don't recall it being in your report?

12  A.  I'd have to look at my report to see if I commented upon

13  that.  If I did not have it in my report, I apologize.  It's

14  certainly my experience, doing a lot of work in this

15  industry.

16  Q.  And Dr. Andre, he's not qualified as an expert in this

17  case, is he?

18  A.  Actually, he's a fact witness in this case.  I would say

19  he's an expert in a lot of fields, but he's not an expert

20  witness, I guess.

21  Q.  Now, you relied upon Dr. Murphy for technological

22  comparability; is that correct?

23  A.  That's correct.

24  Q.  And if Dr. Murphy was incorrect about his conclusion on

25  technological comparability, you don't have an independent

———Napper, B. - Cross———

1    basis for technological comparability, do you?

2    A.  Well, I don't have a difference source.  Dr. Murphy would

3    be the source.  It would go to what did he mean by "wrong" in

4    his technological comparability.  I haven't seen any rebuttal

5    to that, let's put it that way.

6    Q.  And do you recall testifying during your deposition that

7    Cargill was not even doing projections or forecasts for human

8    consumption?  Is that your understanding still?

9            THE COURT:  Again, I overlooked this a couple of

10   times yesterday during the proponents' questioning, but you

11   came out with some long interpretation of what the deposition

12   said.  If you're going to ask him what he said in his

13   deposition, you'll have to ask him *in haec verba* the

14   questions and answers in the deposition, not paraphrase it.

15           MR. SUNG:  I understand, Your Honor.  I'll ask him a

16   more direct question.  Thank you.

17   BY MR. SUNG:

18   Q.  So, Mr. Napper, is it your understanding that Cargill has

19   no intention of targeting its Latitude product towards the

20   human nutrition market?

21   A.  As I understand it from Dr. Gromov, is that there are

22   currently no plans by Cargill to go into the human market.

23   Q.  You criticized Mr. Jarosz's valuation for not taking into

24   account Cargill's research use.  Do you remember that?

25   A.  I do.

─────Napper, B. - Cross─────

1    Q.  Is it your position that Cargill's infringing activity is

2    exempt because it's a research use?

3    A.  No.  I think, if I recall correctly, the issue of

4    research use is one that -- because all of the agreements

5    I've reviewed in this matter, the BASF agreements I discussed

6    yesterday, as well as the CSIRO/GRDC/Nuseed agreement and the

7    BASF/Cargill agreement, all call for a royalty rate to be

8    paid once a product is sold in the marketplace.  So that

9    is -- that's what I mean by that statement.

10   Q.  Yesterday you testified that you had examined the amount

11   of money that BASF and Cargill have invested in their omega-3

12   canola technology and compared that to the amount of money

13   that CSIRO, GRDC, and Nuseed have spent on their omega-3

14   canola technology.  Do you recall that?

15   A.  I do.  I think that was in the balance of hardships

16   section.

17   Q.  And have you ever evaluated the proportional spend by

18   each one of those sides in this technology?

19            THE COURT:  Relative to the size of what?

20            MR. SUNG:  Relative to the size of the parties, Your

21   Honor.

22            THE COURT:  Do you mean the size of the Australian

23   government as opposed to the size of BASF?

24            MR. SUNG:  Yes, sir.

25            THE COURT:  Do we have any evidence of the size of

-------Napper, B. - Cross-------

 1    the Australian government as opposed to the size of BASF?

 2            MR. SUNG:  I don't believe anything is in evidence

 3    now.

 4            THE COURT:  Okay.  Then move on.

 5    BY MR. SUNG:

 6    Q.  And so in your evaluation of the various licenses and

 7    arriving at the royalty figure based on those license

 8    amounts, do you recall the --

 9            MR. SUNG:  Mr. Boles, if we can bring up the vector

10    chart.

11    BY MR. SUNG:

12    Q.  Do you recall seeing this in prior testimony?

13    A.  Yes, I do.

14    Q.  And so for all of the different portions of this overall

15    construct, would you agree with me that, separate from the

16    Bioriginal, Hamburg, and Amaethon agreements, there remain

17    other portions of this vector that are not included in your

18    calculations of those licenses?

19    A.  Yes, I would agree with that.  It's my understanding

20    those are not as contributory towards the BASF elite event as

21    explained to me by Dr. Andre and even Dr. Murphy.  But, yes,

22    I would agree that there are other aspects that BASF used in

23    their elite event.

24    Q.  So your testimony is that with respect to portions of the

25    genetic construct of BASF's elite event, only the ones that

Carol L. Naughton, Official Court Reporter

—Napper, B. - Cross—

1    are contributed from those three entities have value.

2    A.  I'd phrase that a little differently, Mr. Sung.  I would

3    say that the ones that are in color on this elite event

4    circle are the ones that then Dr. Murphy did his analysis of

5    those particular intellectual property rights, and he tracked

6    it to every single enzyme, desaturase, and elongase in BASF's

7    elite event.

8            So that's what he testified to yesterday through his

9    video.  So he tracked it to every single one.  There wasn't

10   anything else.  Since I'm not a scientist, I can't reconcile

11   between that analysis and these other shaded parts of the

12   elite event.

13   Q.  Okay.  I'm just trying to understand what you just said.

14           Your testimony is that Dr. Murphy believes that

15   between Bioriginal, Amaethon, and University of Hamburg, they

16   address all of the other unassigned portions of this

17   construct?

18   A.  Said a little bit differently, I only can go with the

19   four corners of what Dr. Murphy did, and he tracked each of

20   these intellectual property and patents to the enzymes in the

21   elite event, as well as Acyl-CoA and the bifunctional

22   enzymes, which we've -- I've heard a lot about in this trial,

23   and so -- but I'm not able to reconcile what else was in the

24   elite event from his analysis, which struck me as there

25   wasn't much to this particular circle chart.

2581

———Napper, B. - Redirect———

1    Q.  Okay.  Thank you, Mr. Napper.

2            MR. SUNG:  No questions.

3                     REDIRECT EXAMINATION

4    BY MS. SHAW:

5    Q.  I just have a few questions for you, Mr. Napper.

6            Could you take a look at CX-928 in your direct

7    examination binder, if it's still up there.

8    A.  I have that.

9    Q.  Do you recognize this document, Mr. Napper?

10   A.  Yes.  This is a Nuseed investor presentation, I think in

11   2018.

12   Q.  Do you have an understanding for what purpose this

13   document was used?

14   A.  Yes.  It's my understanding that this is a slide

15   presentation that Nuseed put together for its investors.

16   Q.  And do you have an understanding of when this information

17   was provided to investors?

18   A.  As I indicated, the best I recall is 2018, although it

19   doesn't have a date on it.

20   Q.  Could you take a look at the very last page of the

21   document.

22   A.  Okay.  The metadata, yes.

23   Q.  And what date does the metadata identify this document as

24   being from?

25   A.  May 2018.

Carol L. Naughton, Official Court Reporter

Napper, B. - Redirect

1    Q.  Could you please turn to the page labeled -- ending in

2    16790.

3              MS. SHAW:  790, Your Honor.

4              THE WITNESS:  I have that.

5    BY MS. SHAW:

6    Q.  Can you tell me what we see here?

7    A.  This is Nuseed's presentation to investors identifying

8    the total fish oil demand, which is the yellow curve upward,

9    and the total current, I call it traditional fish oil supply,

10   which is quite flat, from the periods of 2015 through 2035.

11             And then what Nuseed is doing with this information

12   is presenting that for each 1 percent share of the deficit,

13   meaning if Nuseed is able to capture a 1 percent share of the

14   deficit, in its estimation, Nuseed would earn for each of

15   those percentage shares 8.5 million EBITA, which is profit

16   after depreciation and amortization.

17   Q.  What size does Nuseed tell investors is the size of the

18   fish oil deficit?

19   A.  Well, by 2028, it's 850,000 metric tons.  That's the

20   number I remember as well.

21   Q.  Okay.  Could we take a look at PDX-623.  I believe this

22   is your proposed ongoing reasonable royalty rate.  Do you see

23   that there?

24   A.  Yes, I see that.

25   Q.  Could you please explain to the Court how you would apply

Napper, B. - Redirect

1    your ongoing reasonable royalty rate as a remedy?

2    A.   Yes.  I believe that the -- there would be an initial

3    payment by BASF/Cargill of $1.235 million, and then once

4    Cargill starts selling omega-3 fish oil product in the

5    marketplace, they would pay a 1.4 percent rate on the price

6    that Cargill charges for that fish oil.

7    Q.   Could we take a look at PDX-402.  I believe Mr. Sung

8    asked you about this during your cross-examination.  Do you

9    see the gray arrows that appear in this diagram here?

10   A.   Yes.

11   Q.   Do you know whether the gray portions have been accused

12   of infringement in this case?

13   A.   It's my understanding, which was -- I was trying to

14   explain before, vis-a-vis Dr. Murphy's comparison and

15   analysis, as well, that they are not accused.

16          MS. SHAW:  Nothing further, Your Honor.

17          THE COURT:  May this witness be excused?

18          MS. SHAW:  Yes, Your Honor.

19          MR. SUNG:  Yes, Your Honor.

20          THE COURT:  All right.  Mr. Napper, you're excused

21   as a witness, which means that you cannot discuss your

22   testimony with any other witness in the case until the case

23   is concluded.  Having been excused as a witness, you may

24   remain in the courtroom or you may depart and carry on your

25   usual business.

2584

1          THE WITNESS:  Thank you, Your Honor.  I understand.

2          THE COURT:  You may step down at this time.

3          MR. SUNG:  Thank you.

4          (The witness was excused.)

5          MR. SUNG:  Your Honor, we had previously reserved

6    Mr. Jarosz for a possible rebuttal.  We are not going to

7    proceed with that rebuttal at this point in time, so we ask

8    the Court to excuse Mr. Jarosz as well.

9          THE COURT:  All right.  Mr. Jarosz, if you wish to

10   be excused, you may be excused.  You don't have to leave if

11   you don't want to, but if you do want to, you may do so.

12         MR. JAROSZ:  Thank you.

13         MR. SUNG:  And, Your Honor, the proponents would

14   otherwise be ready to proceed directly to closing.

15         THE COURT:  All right.

16         MS. SHAW:  And opponents, likewise, are ready, Your

17   Honor.

18         THE COURT:  All right.  Well, why don't we go ahead

19   and take a recess before we start the closing.

20         MR. SUNG:  Thank you, Your Honor.

21         (Recess from 10:46 a.m. to 11:11 a.m.)

22         MS. SHAW:  Your Honor, during the break the parties

23   stipulated to entry of an exhibit that is an exhibit that I

24   used during the cross-examination of John Jarosz.  It is an

25   excerpt of a document that's already been admitted, CX-0964.

2585

```
 1    CX-0964 is a spreadsheet that is very, very difficult to
 2    read, and so I had blown up and excerpted portions of it, and
 3    I would like to move those into evidence.
 4              THE COURT:  All right.
 5              MS. SHAW:  Thank you, Your Honor.  This is PX-55,
 6    for the record.
 7              THE COURT:  It's part of PX-55, you mean?
 8              MS. SHAW:  PX-55 is a portion of CX-964.  It may
 9    still be difficult to read.  This is the Nuseed omega-3
10    budget.  And I've just blown up a portion of it so that
11    there's a legible document in the record.
12              THE COURT:  All right.
13              (Exhibit PX-55 received in evidence.)
14              THE COURT:  All right.  Proponent looks ready.
15              MR. SUNG:  Yes, sir, Your Honor.
16              May it please the Court.  While words of
17    appreciation at closing are more customarily reserved for the
18    jury, the proponents would like to ask Your Honor's
19    indulgence to address you and the Court's staff with a
20    sincere heartfelt thank you for its professionalism and
21    hospitality throughout the trial.
22              This case has been an education and a memorable
23    experience for us all.  The proponents had an ambitious goal
24    to find a way to make a true difference in the world by
25    harnessing the power of agriculture to address the human need
```

2586

1    for an essential nutrient in an anxious time of declining

2    natural resources.

3         Long-chain omega-3 fatty acids teaching canola to

4    make fish oil.  We are witness to the introduction of a

5    groundbreaking technology on a commercial scale, but just as

6    science needed time to catch up, so does the market, and this

7    is the hallmark of invention, and the reason the patent

8    system was established.

9         The infringed patents -- the '880, '579, '357, and

10   '033 of Group A and the '541 of Group D -- stand before you

11   seeking relief.  There is precious little time left, a little

12   over five years really, for the Group A patents, and this is

13   particularly why the proponents believe the grant of a

14   permanent injunction would best serve the interest of justice

15   in this case.

16        The primary objective of the CSIRO, GRDC, and Nuseed

17   patent estate has been to protect the significant financial

18   investment in the development of our omega-3 canola oil and

19   to facilitate a reasonable commercial return on this

20   investment in what time is left in order to help launch other

21   new technology products.

22        This has never been about leveraging the patent

23   system to exact a toll on the unsuspecting.  Indeed, the

24   metaphor of a race that we have offered has been quite apt.

25   The evidence is clear that the proponents and the opponents

```
 1   have eyed one another for years anticipating the respective
 2   commercial launches of their competing products.
 3          When Aquaterra sells next year as the first omega-3
 4   canola seed to market, Nuseed hopes its inaugural product
 5   will light a wildfire of interest in the aquaculture space.
 6   But if Cargill is allowed to launch Latitude, the commercial
 7   reality is that Nuseed's first mover status will likely not
 8   withstand the competitor pressure of Cargill's market
 9   dominance.
10          The enforcement of our patents is Nuseed's best
11   chance for its brief head start to get a solid enough
12   foothold in the market to realize a reasonable commercial
13   return.  Only if this head start is not protected by
14   injunction does the notion of some monetary compensation
15   become relevant.
16          As Your Honor has recognized from the very beginning
17   of this case, it is plain to see what we don't know; the full
18   measure of the market outcomes for untested competing
19   products before market entry can barely be accounted for
20   qualitatively, much less quantitatively.  Within the mandate
21   of the four-factor rubric for injunctive relief post-*eBay*,
22   this case warrants the grant of a permanent injunction to the
23   proponents.  The evidence has provided sufficient proof of
24   the likelihood of irreparable harm by Cargill's Latitude.
25          The evidence points to the conclusion that money
```

1    damages alone would be inadequate to compensate the

2    proponents.  In this case, the balance of the hardships

3    favors Nuseed over Cargill.  And the public interest does not

4    outweigh the need for an injunction.  Perhaps

5    counter-intuitively, the damages experts' wide-ranging and

6    polarized royalty rates are the best indicators that the

7    potential harms to Nuseed are irreparable and that money

8    damages would be inadequate to compensate for the host of

9    possible harms.

10           Whether profit or margin erosion due to infringing

11   competition, the jeopardy to future product development from

12   hampered success in the initial market due to an infringing

13   competitor, or interference with customer relationships from

14   competitive pressure by an adjudicated infringer, each raises

15   distinct risks that they may or may not manifest

16   substantially, but that doesn't make a known unknown

17   speculative.

18           So what do we know from the evidence?  There has

19   been much more party agreement in this phase of the trial

20   than one might credit.  Neither side has made a sale.

21   Neither side has entered into a contract for sale.  Neither

22   the proponents nor the opponents have set a price for their

23   respective products, and neither side can tell you definitely

24   when they'll make their first sales or how much they'll sell

25   when they do.

1          You've seen documents and heard testimony from both

2     sides showing that the price of fish oil is anything but

3     stable or predictable.  Literally, it changes with the

4     weather.  But for the market of fish oil alternatives in

5     which both Aquaterra and Latitude will compete, the benchmark

6     is the price of fish oil.  You heard both Ms. Boettner and

7     Dr. Gromov state that clearly.  These are the facts, and they

8     are undisputed.

9          Just because the full scope of a potential harm may

10    not be definite today does not make such a harm speculative.

11    The degree of the harm, not its existence, is the only thing

12    unclear due to the unpredictability of the underlying

13    quantitative metrics.

14          What do we also know from the evidence?  Both Nuseed

15    and Cargill engage in regular financial projections about the

16    potential market value for their products.  It's good

17    business to know exactly what or how much revenue you think

18    you might make and how much it might cost to make your

19    product, but every financial projection is a single snapshot

20    in time, and it's based on assumptions.  There's nothing

21    wrong with that, but the reliance on any one data point to

22    generate a royalty rate is.  That's a problem.

23          And we see that borne out here by the experts.  And

24    at least Mr. Jarosz tried to offer a range of royalties

25    knowing that the underlying projections themselves were given

1   to wide swings.  And recognizing that reliance on future

2   projections ten years out with no relevant historical data is

3   an inherent question.

4          Now, Ms. Boettner testified that Nuseed has already

5   felt the effects of Cargill's presence in the pre-sales

6   marketplace with competition for canola growers in Montana as

7   well as the delay in obtaining sales contracts with

8   aquaculture customers in Chile.

9          Both Ms. Boettner and Dr. Gromov acknowledge that

10  the aquaculture industry is composed of three major fish feed

11  manufacturers:  Cargill Aqua Nutrition, formerly EWOS;

12  Biomar; and Skretting.  They also testified that Nuseed and

13  Cargill will be competing for these same three customers only

14  if Cargill is unable to sell Latitude.  If no injunction

15  issues, as Dr. Gromov testified, Cargill will be selling

16  Latitude to CQN; actually itself.

17         And then in that case, as Ms. Boettner testified,

18  Nuseed would only have two-thirds of the remaining market to

19  compete against an infringing product.

20         Dr. Gromov also acknowledged that contracts for the

21  sale of Latitude will be signed 12 to 18 months before

22  Cargill delivers its product in 2021.  Cargill is present in

23  the market already, and its impacts are being felt today.

24  Dr. Gromov also testified that Cargill's benefitting from the

25  current consumer product testing of Nuseed's Aquaterra,

2591

```
 1    further diminishing our first mover advantage.
 2          The opponents have argued that the willingness of
 3    the proponents to consider a business resolution of this
 4    dispute with the opponents shows that money damages would be
 5    adequate to compensate for the harm under the second *eBay*
 6    factor.  I think Your Honor would agree that the polar
 7    opposite views of the parties throughout this case on the
 8    value of the patented technology alone dismisses that notion.
 9          On the balance of hardships, a key factor in favor
10    of granting the injunction, particularly with respect to the
11    Group A patents, is Cargill's own admission that it will not
12    enter the market until 2021 and not be profitable until 2023,
13    at the earliest.  If so, any hardship to Cargill from an
14    injunction seems to be minimized.
15          As Mr. Zacharias testified, the commercial success
16    of Aquaterra is a huge consequence to Nuseed.  The company's
17    life may depend on it.  The balance of hardships weighs
18    greatly in favor of the proponents.  Moreover, the public
19    interest does not outweigh the grant of an injunction here.
20    The evidence and testimony from both sides has been
21    consistent that there is a growing need for omega-3 oils
22    indirectly and directly for human nutrition.
23          THE COURT:  Wait a minute.  You're saying the public
24    interest is outweighed by the need for an injunction.  Don't
25    you have to prove each of the four elements by a
```

2592

1   preponderance of the evidence to get an injunction?

2          MR. SUNG:  Yes, Your Honor.  I'm not suggesting that

3   there is a difference in burden of proof.  I'm just

4   suggesting that on balance, the public interest factors, as

5   looked at in the whole, among all of the *eBay* factors alone,

6   doesn't outweigh it.

7          THE COURT:  All right.

8          MR. SUNG:  The evidence and testimony of both sides

9   has been consistent.  There is a growing need for omega-3

10  oils for the human nutrition market, and Cargill has admitted

11  that it has no plans to pursue the human market.  In sharp

12  contrast, Nuseed's DHA-rich omega-3 oil is destined for human

13  consumption as Nutriterra.

14         As you heard from Mr. Zacharias and Ms. Boettner,

15  Nuseed has filed for FDA approval and Nutriterra's in

16  clinical trial.  These are concrete steps, not merely

17  reaching for the stars.  But the need to protect Nuseed's

18  business with Aquaterra comes to the floor when you think of

19  the potential for human health benefits.

20         Shifting to the future ongoing royalty.  I do feel

21  compelled to say again that the proponents believe that any

22  attempt to fashion a monetary compensation is unworkable for

23  the reasons I've already mentioned in favor of the permanent

24  injunction.

25         It is a half measure, at best, here.  But let's

Carol L. Naughton, Official Court Reporter

1    start by taking a look at the opponents' final offer, if you

2    will.  A proposed 1.4 percent plus a one-time payment of

3    1.235 million with a royalty stream until 2025, where Cargill

4    has told us it doesn't plan to be profitable until '23, this

5    proposal, at bottom, is trivial.

6              THE COURT:  Well, now, wait a minute.  The 1.4

7    doesn't apply to profits; it applies to gross sales?

8              MR. SUNG:  Correct, Your Honor.  What we're

9    basically saying is even at that particular rate, given the

10   projections of Cargill, the return over the next six years

11   will be minimal in comparison to the investment.

12             THE COURT:  Minimal compared to what?

13             MR. SUNG:  Compared to the investment in this

14   technology that's already been made.

15             THE COURT:  How much are their sales projected to be

16   over these --

17             MR. SUNG:  Just in terms of rough numbers, Your

18   Honor, we're thinking that over the lifetime, if there were a

19   royalty at 1.4 percent plus the 1.235 million, it still would

20   only be several million.

21             THE COURT:  All right.

22             MR. SUNG:  And this prospect of being paid just the

23   several million over six years, again, after investing over

24   200 million to bring this game-changing technology to the

25   public, and still being driven out of the market by an

```
 1    infringing competitor, that is a bitter pill to swallow.
 2           You have expert testimony from Mr. Jarosz that the
 3    agreements between the respective party partners in this
 4    case, concerning the entire technological blueprint in this
 5    case, serve as the best guide for a royalty rate if an
 6    injunction is denied.
 7           And Mr. Jarosz properly based his understanding
 8    about the technological coverage of the infringed patents by
 9    Dr. Kunst's own testimony.  Now, Mr. Napper criticizes Mr.
10    Jarosz' analysis based on the lack of adjustments from an
11    economist's perspective.
12           And to the contrary, Mr. Jarosz doesn't just lift 25
13    percent or 40 percent figures that were included in these
14    agreements relating to the split among those partners.
15    Indeed, he did adjust downward significantly to account and
16    to apportion and to yield a royalty that would approximate
17    the value of the patented technology in his expert opinion;
18    12.4 percent and 13 percent.  Even the relative
19    correspondence of these numbers gives some confidence.
20           But instead of standing behind a recalculated
21    adjustment of the two best comparables available, Mr. Napper
22    takes a wild turn and abandons these metrics to focus on
23    unrelated contracts that BASF had with third parties decades
24    ago to buy the components BASF needed to build its pathway to
25    produce its own EPA canola.
```

1                Not only does Mr. Napper rely upon the conclusory

2      and sometimes incomprehensible technological comparability

3      statement of Dr. Murphy, as well as Dr. Andre, who is not

4      qualified as an expert in this case, Mr. Napper never

5      explains how the sum payments to the BASF gene construct

6      account for the full value of that technology given the

7      missing valuation that we see in the gene construct.

8                I won't belabor this issue, Your Honor.  The future

9      ongoing royalty really is a secondary issue for us.  We seek

10     a permanent injunction as the most appropriate remedy and ask

11     that Your Honor grant that request and moot the issue of

12     fashioning a royalty from questionable valuation sources.

13               I'd like to reserve the remainder of my time for a

14     possible rebuttal.  Thank you, Your Honor.

15               THE COURT:  All right.

16               MR. DILLON:  Thank you, Your Honor.  I want to move

17     to the very end and talk about the fourth factor.  The public

18     interest is disserved by a permanent injunction, and the

19     reason for that is that these products are different.  They

20     have a DHA product; we have an EPA product.  And one of the

21     things that was consistent throughout all of their witnesses

22     was that their unique health benefits associated with an EPA

23     products that are different from the unique health benefits

24     associated with the DHA product.

25               And if an injunction is issued, Your Honor, there

1    will be no alternative source in the market for EPA.  Right

2    now it's supplied by fish oil, but as both sides agree, there

3    is an unmet demand today for omega-3, and that is going to

4    continue to grow.

5            And although there is alga oil as an alternative

6    source for DHA, although there is the proponents' product

7    that can support DHA, the only alternative source of EPA that

8    is ready to go to the market is the product from Cargill and

9    BASF.  And Dr. Singh and Dr. Petrie and Mr. Zacharias each

10   told you of the unique health benefits of EPA, and those

11   would not exist in the market if you enjoin the sale of our

12   products.

13           There is no doubt the source of the natural fish in

14   the ocean for EPA is diminishing.  That testimony is

15   undisputed in this courtroom.  It is also undisputed that the

16   only additional source, what Mr. Zacharias called the holy

17   grail, for providing these additional sources of omega-3s are

18   crop-based, whether it's providing the DHA from the

19   proponents' product, or the EPA from the opponents' product.

20           And as the *Amgen* case says, "This public interest

21   factor is critical and needs to be taken into consideration,

22   and a Court may not issue an injunction if, in fact, there is

23   a public harm that will occur from this injunction," and the

24   public harm here would be there would be no alternative

25   source for EPA in the market.

 1          I want to back up briefly and talk about the other

 2     three factors, but I wanted to start there because this is

 3     how the public is harmed if this product is not brought to

 4     market.

 5          We start with *eBay*.  The four factors are known.

 6     The four factors are their burden to prove.  If it is unknown

 7     whether one of these factors is met, then that is a failure

 8     of them to meet their burden and an injunction should not

 9     issue.

10          There is no doubt that there is no irreparable

11     injury today.  The question is can they show you that there

12     will be an irreparable injury between now and 2025?  That is

13     their burden, and they have not met it with evidence.

14     Instead, what they have met it with is by pointing to the

15     fact that the future is uncertain.  But uncertainty is not

16     likelihood of showing irreparable harm in the future.  The

17     burden shifted with the *eBay* case.  It's no longer sufficient

18     that we're competitors.

19          They have to show that there will be irreparable

20     harm in the future, not just harm, irreparable harm, and they

21     have not done that.  We're not in the market today so,

22     clearly, there's no injury today.  The question is what does

23     the future look like?  And they have suggested to you some

24     theoretical harms that could occur to them in the future.

25          On the supply side, they have suggested that it may

```
 1   be difficult for them to obtain farmers or their crops might
 2   go up, but they didn't support that with evidence.  They
 3   didn't come before you and show a spreadsheet showing this
 4   was our cost structure before Cargill proposed to come into
 5   the market, and this is what it is after.
 6           Instead what they suggested is they might lose
 7   farmers in the future.  But whether they might lose is not
 8   meeting the burden to establish that there will be
 9   irreparable harm in the market between now and 2025.
10           Similarly, they had suggested that they might lose
11   customers in the aquafeed market, but they have not shown you
12   any of that evidence.  There is no evidence from the
13   aquaculture market.  No farmers came in.  No aquaculture
14   farmers came in.  There were no depositions.  There were no
15   documents from those industries.
16           Yes, theoretically, they could lose a sale, but we
17   have not shown that that loss of any theoretical sale is an
18   irreparable harm.  We came in to try to disprove a negative.
19   We taught you through Dr. Gromov's testimony that this is a
20   market where people buy in-the-spot contract or short-term
21   contracts.  They're not looking for long-term sales.  They're
22   not looking to lock into three-year contracts.
23           Dr. Gromov said he wanted to have a three-year
24   contract with the supplier, but his supplier said no.  They
25   buy on short-term contracts.  So Cargill might make the sale
```

1   this week, and next month it might be a sale that's made by

2   the proponents.  But what we do know is that the market for

3   both of us is untapped and it is large.  These, Your Honor,

4   are their numbers.

5         This is their projected unmet demand.  And the light

6   blue line there is, I think, the most realistic assessment of

7   what Cargill, with all its resources, thinks it can do to

8   supply this unmet demand.

9         Whether we lose a sale to them or they lose a sale

10  to us, the fact of the matter is the market is large enough

11  for both of us to co-exist in this market, especially through

12  2025.

13        And if there is a loss of sales, or if there is an

14  additional cost because a particular farmer decides to sign

15  with them, that is compensable with a royalty or monetary

16  damages.

17        I think we can all assess the credibility of

18  Dr. Gromov's testimony, that he's probably the most

19  knowledgeable person about what the cost of bringing this

20  product to market are who testified before this Court.

21        Cargill has 20 years of experience doing closed-loop

22  production.  He brought that experience to us to show us what

23  the costs are and presented to you our expectation regarding

24  how much it will cost to bring this product to market, and he

25  told you what our projections are.

1              There is uncertainty in the market going forward,

2    Your Honor.  No doubt.  But a royalty can capture that

3    uncertainty.  If we sell more of the infringing product, they

4    would receive more of a royalty because the royalty rate is

5    attached to the sales.

6              If the price of fish oil goes up or goes down, they

7    would still capture based on a tax on the sale of the

8    gross -- the gross sales of our product.

9              And that's why this is a compensable injury, because

10   they will benefit if we do better, and if our expectations

11   are not what Dr. Gromov said, they will be harmed less

12   because there will be less infringement.  A royalty rate

13   attached to sales is the best way of dealing with the

14   unpredictability of the future.

15             The balance of harms.  Dr. Andre was quite clear,

16   Your Honor, these patents issued in 2018 after we had already

17   undergone the regulatory process.  There is no way that we

18   can go back to the start today and design around these

19   patents before 2025.  This is not a situation where the

20   patent issued in 2005, and we came into the market knowing

21   it, and we ran the risk.  This is a product, the elite event

22   was in 2015.  They began the process of doing the

23   deregulation, and now all of a sudden if we are forced to, if

24   there is an injunction, there is no way to design around this

25   in the time period.  This isn't a feature we can take out of

2601

1    a product and retool it and be back in the market.

2            We're out of the market with an injunction, period,

3    because we do not have the time to go back to the beginning,

4    redesign the elite event, and go through the entire process

5    of a deregulation.  So the choice of an injunction is one

6    where, effectively, it puts us out of this market.

7            Cargill made an investment.  You've heard about our

8    investment.  But I want to go back to the instruction.

9    Corporations work through the people.  The people of Cargill

10   involved in this project have a personal stake in this.

11   Whether it's Dr. Loh, who's been doing this for ten years;

12   Dr. Gromov for six years; the research scientists in Fort

13   Collins; the agronomists in Montana like Keith Horton, this

14   is very personal to them.  This isn't just a big company

15   losing money.  This is the livelihood and the life work of a

16   lot of important people who want to bring this product to

17   market.

18           And we talked about the public interest, Your Honor.

19   The right remedy here is a royalty.  The parties have been

20   talking about a royalty since 2016.  You've heard lots of

21   discussion of that.  They haven't been able to figure out

22   what the number is.  But that doesn't mean that there isn't a

23   number that quantifies the harm that would likely occur in

24   the future between now and 2025.

25           That's what this case is about.  There is a number

1    that is appropriate to put as a tax on the sales of Cargill's

2    products going forward that will compensate them for the harm

3    they face, that will adequately balance the respective

4    interests, and it will allow us to get this product to

5    market.

6            I don't know whether they're going to be able to get

7    to the market and solve the need for omega-3.  I think both

8    companies have room in this market to get there.  But the one

9    thing I know is that there's no one else bringing EPA to this

10   market, and that's why, Your Honor, we'd ask that,

11   respectfully, you not grant the injunction but, instead,

12   allow a royalty on this product.  Thank you.

13           MS. SHAW:  May it please the Court.

14           I'd like to first thank this Court for everyone's

15   patience, courtesy, and professionalism over the past three

16   weeks.  It has been a long and tiring three weeks, and on

17   behalf of BASF and Cargill, we greatly appreciate the Court's

18   consideration of these matters, as well as the consideration

19   of the lawyers, the paralegals, the witnesses, the client

20   representatives, and the others that have invaded your

21   courtroom over the past three weeks.  Thank you very much.

22           Your Honor, there are two groups of patents at issue

23   here for which you are determining the appropriate remedy.

24   The first is the Group A patents, and the second is the Group

25   D patent.  Both groups only issued in 2018 and were filed

1    specifically to target BASF and Cargill's products.  They do

2    not cover proponents' products.  These are patents which, by

3    design, were intended to go after BASF and Cargill.

4            I will start with the Group D patent.  As I stated

5    in opening, the '541 patent is an oil profile patent that

6    proponents filed to specifically target BASF's LFK elite

7    event in their regulatory petition.  Cargill's Latitude

8    product does not infringe this patent, and proponents have

9    dropped their claims against Cargill's commercial product.

10   Dr. Gromov, from Cargill, testified that the oil from the LFK

11   elite event will never be sold.  As such, there will be no

12   future infringement of the Group D patent and no resulting

13   harm to proponents as a result.

14           While the Group A patents are based on what

15   proponents call their blueprint, their original claim that in

16   2004 they invented the way to get omega-3 acids from a

17   laundry list of plants, those patents were also filed much

18   more recently.  In October of 2016, Nuseed sent a letter to

19   Cargill to open a broad discussion on licensing of those

20   patents.

21           Not a single one of the patents identified in that

22   October 2016 letter have found to be infringed.  And, indeed,

23   based on Your Honor's Markman rulings, many of these earlier

24   patents would have been deemed invalid for lack of

25   enablement, which is why proponents dropped them from the

2604

1    case and ultimately had to provide us a covenant not to sue.

2            In September of 2016, one month prior to sending

3    that letter, proponents began filing new applications

4    claiming priority to its 2004 application but including new

5    claims with the specific combination of genes that BASF uses.

6    These claims do not cover Nuseed's products.  They continued

7    filing applications through July 2017, while the parties were

8    engaged in licensing discussions, and the resulting Group A

9    patents issued between March and June of 2018.  And even

10   though they issued in 2018, they will expire in 2025, as they

11   claim priority back to that 2004 filing.  That is because the

12   patent laws give patent owners limited monopolies.  That is

13   the bargain a patent owner makes.

14           But you should not feel bad for proponents.  They

15   have had the benefit of numerous other patents under the 2004

16   filing, and they have enjoyed the exclusivity provided by

17   those patents.  However, those earlier patents are not being

18   asserted against BASF and Cargill.  Only the ones boxed in

19   red are the ones that remain, the Group A patents.

20           Proponents should not be allowed to use these 2018

21   Group A patents to recover for harm based on BASF's and

22   Cargill's activities prior to the issuance of those 2018

23   patents, and the harm that proponents might face in the

24   future must be considered in the future and not as

25   compensation for what damage may have been incurred in the

1    past, prior to the issuance of the Group A patents, even if

2    those activities in the past have provided advantages for

3    BASF and Cargill in the future.

4           And, to be sure, BASF and Cargill have spent years

5    working towards the point they are at now, and even up to

6    March 26, 2018, the day before the first Group A patent

7    issued, BASF and Cargill were working hard on bringing

8    Latitude to market.  But these activities happened before the

9    patents issued, and there can be no harm and, thus, no remedy

10   for proponents from these activities.

11          So what is the future harm, and what is the future

12   remedy?  I appreciate that this is a difficult question that

13   Your Honor is grappling with.  There are two choices before

14   Your Honor:  The first, an injunction; and the second, an

15   ongoing reasonable royalty.

16          Now, proponents have told this Court that an

17   injunction is the only thing that can address their unknown

18   and unquantifiable harm, but the simple truth is that the

19   only value of the injunction to proponents is to extract a

20   higher royalty rate from BASF and Cargill.  That has been

21   their strategy all along.

22          Remember that this case was not filed by proponents

23   because they needed an injunction to prevent irreparable

24   harm.  It was brought by BASF and Cargill after licensing

25   negotiations between the parties in late 2016 and 2017 broke

1    down over monetary terms.  BASF was not willing then, and

2    they are not willing now, to agree to terms being proposed by

3    proponents that are inflated, unrealistic, and which bear no

4    relationship to marketplace reality, including the value of

5    the patents which BASF then believed to be valid and

6    unenforceable.  That is why BASF, not CSIRO, not GRDC, and

7    not Nuseed, brought this lawsuit.

8            Proponents didn't want an injunction then, and they

9    don't want one today.  The only value of an injunction to

10   proponents is that it would provide them with leverage to

11   extract a higher royalty rate.  That is what they really

12   want, and, in fact, that is what their expert told you BASF

13   and Cargill could do if an injunction was entered.

14           It is ironic and telling that proponents would stand

15   before the Court today and tell you that an injunction is the

16   only remedy to their unquantifiable harm, while their expert

17   testified just two days ago that if an injunction issued,

18   BASF and Cargill could negotiate a license with proponents.

19   That alone should be sufficient evidence for this Court that

20   an ongoing royalty is sufficient to remedy any harm, but

21   proponents do not want you to set an ongoing royalty because

22   they fear you will set one that is fair and reasonable.

23           Proponents want an injunction so that they have

24   leverage in negotiating a more favorable royalty rate,

25   because granting an injunction would push BASF and Cargill

2607

1    back more than half a decade.  Proponents know this, and they

2    want an injunction that would give them leverage to negotiate

3    a rate that reflects the value of far more than the

4    technology in the Group A patents.  Instead, it reflects the

5    value of the time that would otherwise be lost if BASF and

6    Cargill had to go back to the drawing board.  But that is not

7    the purpose of an injunction.

8           An injunction is a drastic and extraordinary remedy

9    which should not be granted as a matter of course, and if a

10   less dramatic remedy is available, the Court does not have to

11   turn to this extraordinary relief.  And here, where there is

12   no evidence of possible future irreparable harm, an

13   extraordinary injunctive remedy is simply unwarranted.  At

14   best, proponents have only adduced evidence of speculative

15   harm that may or may not occur in the future.  This does not

16   meet the clear showing of harm that a party seeking such a

17   remedy must meet.

18          Let's look at the evidence.  This is the same slide

19   Mr. Sung showed you in his opening, but look at what the

20   witness is actually saying on direct examination as an

21   identification of the harm they suffer:  "We're going to have

22   to compete with farmers to grow our crop."

23          Your Honor, there are 5 million acres of farmland in

24   Montana, more than plenty for both Cargill and Nuseed, and

25   there is zero evidence that Nuseed has not been able to find

1   farmers to grow their crop.  Ms. Boettner was not able to say

2   that, and there were no farmers that testified at trial.

3   Talking about discussions with those in the aquaculture

4   market, all she could say is those discussions were being

5   slowed down.

6          But their own expert, Mr. Jarosz, testified that he

7   did not think Nuseed knew why customers were unwilling to

8   engage with Nuseed.  And, just like the farmers in Montana,

9   there were no fish feed manufacturers or fish farmers who

10  showed up and testified at trial.

11         And it should not be surprising to this Court that

12  there is no harm because Nuseed's and Cargill's own documents

13  show that for the life of the Group A patents, the parties'

14  own projections indicate that neither can meet the existing

15  demand on the market, even together.

16         The reality is that this is not a market that is

17  easy to get ramped up into.  Dr. Gromov talked about this,

18  about the challenges to getting started, the up-front

19  investment required, including taking a loss in the early

20  years, finding the farmers to work with, running closed-loop

21  production.  This is not the easiest way to make money.  And

22  while the parties in this case have differing views on a lot

23  of things, one thing that is clear from the parties' own

24  projections is that neither party can meet the entire market

25  demand.

1           Now, even though proponents have argued that an

2    injunction is an appropriate remedy, both parties have had

3    their experts calculate what they believe to be an

4    appropriate ongoing royalty for the value of the Group A

5    patents, and both experts, in principle at least, sought to

6    determine those rates in the same way; by looking at

7    comparable agreements in the rates used in those agreements.

8           Proponents' expert, Mr. Jarosz, has proposed a

9    royalty rate of 12.4 percent and 13 percent, based on his

10   review of what he deems to be comparable agreements, the

11   agreement between CSIRO, GRDC, and Nuseed, and the

12   commercialization agreement between BASF and Cargill.  He

13   also proposes a range all the way up to nearly 50 percent of

14   Cargill's revenue, but I think we can all agree that is most

15   likely pie in the sky.

16          As you heard at trial, these agreements are not

17   comparable, for a number of reasons, including the fact that

18   they are fundamentally very different from a discrete,

19   nonexclusive license to the Group A patents, which is the

20   value of the license that BASF and Cargill would get under

21   the ongoing reasonable royalty.  They include numerous rights

22   to patents that have not been found to infringe, and they

23   include rights and obligations with respect to many other

24   things.  Mr. Napper testified about this and Mr. Jarosz

25   admitted to this.

1              And even if you were to rely on these agreements,

2        Mr. Jarosz's calculations under these agreements are based on

3        future projections of sales and costs that are unsupportable,

4        and, in the case of the BASF and Cargill agreement, fail to

5        account for BASF's nearly $100 million regulatory

6        contributions to the Latitude product.

7              But, interestingly, when both these agreements are

8        adjusted to account for these errors, the royalty rates under

9        both agreements are remarkably similar; 3.8 percent and 3.2

10       percent are Cargill's forecasted omega-3 revenues.  Now,

11       remember, though, these are rates under two agreements that

12       cover a whole lot more than just the Group A patents, and so

13       they have not yet been apportioned to address the value of

14       the Group A patents.

15             Now, Mr. Napper has also calculated an ongoing

16       royalty rate, and this is his rate:  His rate is 1.4 percent

17       on all of the Latitude oil revenue, plus an up-front payment

18       of $1.235 million.  Now, the other side will say that this is

19       a low rate, but when you compare it to the correctly adjusted

20       rates under the CSIRO/GRDC/Nuseed agreement and the

21       BASF/Cargill agreement, the 3.8 percent and 3.2 percent

22       numbers, and you remember that those agreements cover a whole

23       lot more than the Group A patents, the 1.4 percent royalty on

24       all Latitude oil revenue makes sense, given how much less is

25       conveyed under the hypothetical negotiation than under the

2611

1    commercialization agreements relied upon by Mr. Jarosz.

2         Mr. Napper's rate is based on looking at agreements

3    that were technologically and economically comparable, and he

4    turned to the very agreements and collaborations BASF entered

5    into when creating its proof of concept for omega-3 in a crop

6    plant and creation of its elite event.

7         And what do I mean by that?  Dr. Andre identified

8    the key agreements for development of the delta-6 pathway and

9    the genes used in BASF's elite event.  Dr. Murphy reviewed

10   those patents from those agreements and determined that they

11   were technologically comparable to the Group A patents.  This

12   should come as no surprise, as BASF's elite event, which

13   comes out of these agreements, has been found to infringe

14   those very patents.

15        And then Mr. Napper reviewed the economic terms of

16   those agreements and came up with a reasonable royalty that

17   combined the compensation provided under all three of those

18   agreements.  That became Mr. Napper's proxy for what a

19   reasonable royalty should be, and it is from these agreements

20   that Mr. Napper calculated his reasonable royalty rate.

21   Mr. Napper added up all the various rates and payments under

22   this agreement to come up with the royalty rate you see here,

23   and this is what he is proposing be applied against Latitude

24   omega-3 revenue as a royalty.

25        Your Honor, I believe you have characterized this

1    case as a dispute between two parties who were working
2    together and then could no longer work together.  The truth
3    is CSIRO and GRDC wanted a commercial partner in BASF, but
4    BASF needed a different partner.  They needed one that had
5    the cross-breeding, agricultural, and aquaculture experience
6    to bring this product to market.  That is why BASF chose
7    Cargill.  So, instead, CSIRO and GRDC had to select a
8    different partner, and that partner was Nuseed.

9         And, as Ms. Boettner testified, Nuseed is a company
10   with no business plan, no sales team, and, when pressed about
11   business plans and the status of their business, can only
12   make reference to building relationships and starting
13   commercial discussions.  The concrete steps identified
14   towards commercialization were feeding trials involving 300
15   metric tons of oil, which is, frankly, a drop in the bucket
16   of the fish oil deficit we keep hearing about and the
17   clinical study for human use, a market in which Cargill will
18   not compete.

19        Throughout this trial you have been hearing about
20   this race to bring this technology to market.  Mr. Sung made
21   reference to it again in his closing.  The truth is the only
22   race proponents have been in was to get patents.  That was
23   when the race ended for them.  Nuseed certainly isn't trying
24   to win any race.  They had a one-year regulatory lead on
25   Cargill, but they chose to sit on that.  That was a business

```
 1    choice, and it is not one for which BASF and Cargill should

 2    be penalized.

 3           BASF and Cargill are respectfully requesting that

 4    you enter a remedy in the form of an ongoing reasonable

 5    royalty on future Latitude revenue for the duration of the

 6    Group A patents.  We also respectfully request that you

 7    decline to enter an injunction, as it is a drastic remedy,

 8    and there has been a failure of proof by a preponderance with

 9    respect to irreparable harm.  It cannot be the case, Your

10    Honor, that proponents' failure to adduce evidence of harm

11    can be sufficient to meet their burden for demonstrating it.

12           Thank you very much.

13           MR. SUNG:  Mr. Lang, can I ask how much time we

14    have?

15           THE LAW CLERK:  15 minutes, 55 seconds.

16           MR. SUNG:  Okay.  I assure you we won't be using

17    that time.  Just a few points, Your Honor.

18           About the somewhat 11th hour argument about how an

19    EPA property and a DHA product are different, Dr. Gromov

20    testified just yesterday that with regard to a fish feed

21    maker in Chile that he spoke with, they've essentially said

22    it doesn't matter in the aquaculture market.  I think the

23    exact words were, "We don't care about the difference between

24    EPA and DHA content.  It's the total omega-3 content that

25    matters."  And, in addition, since Cargill has stated that it
```

1    will not be entering the human market, all of those health

2    benefits that were discussed really won't be directed at the

3    human market the way that has been addressed.  And so this is

4    not about the science of whether EPA and DHA can provide

5    different health benefits.  They ultimately aren't going to

6    reach the exact members of the public that they have

7    otherwise discussed.

8            I think under the standards, if I hear them

9    correctly, that opponents' counsel have laid out for

10   injunctive relief, it's almost as if a new product can never

11   actually make it onto the market successfully, because market

12   demand is unknown at this point in time.  And if there's a

13   focus on whether both parties can be in the market or not,

14   again, as I hear it, new product entry is rather untested

15   about this, and whether or not two companies or three

16   companies can ultimately enter the market and co-exist is not

17   really the focus.

18           Moreover, with respect to the evidence,

19   quantification is not -- does not make something unknown, the

20   inability to quantify what is there.  Clearly, we have a

21   number of different factors because of this early stage prior

22   to sales where there is not direct evidence of what will

23   actually occur.  None of us have a time machine, and we can't

24   make those predictions with any degree of certainty, but that

25   doesn't make any of those factors themselves unknown.

1          In terms of the return to a consideration of the

2     patents, all I can say is that it is clear from the

3     expiration of the Group A patents in 2025, this is not about

4     evergreening.  This is not about extending patent exclusivity

5     by using the patent system.  This is very much just honoring

6     the temporary exclusivity that the patent system is designed

7     to award the patentholder for, and that's what we're asking

8     for purposes of the enforcement.

9          The other discussions generally about the ongoing

10    conversations between the parties with respect to a potential

11    business resolution of this, rather than coming to court,

12    it's as if we're being punished for being reasonable and to

13    being open to having those discussions at this point in time.

14    It is simply untrue that that is an automatic reference or

15    proxy for saying that money damages are somehow going to be

16    compensable to us under these circumstances.

17         At its heart, injunctive relief is about maintaining

18    the status quo, and the status quo right now is that Nuseed

19    will, indeed, get to market first, and what we're asking the

20    Court for is the injunction relief to give us the

21    opportunity, as I mentioned earlier, in order to maintain

22    that head start that we have for that purpose.

23         What I'd also like to conclude with, Your Honor,

24    that with respect to the Group D patent, the '541 for which

25    counsel has articulated that there will be know further

```
 1    future infringement, while we can accept that today in terms
 2    of their articulation, I don't hear a reason why injunctive
 3    relief, at the very least, would not be appropriate for that
 4    particular patent throughout its term.  Simply because they
 5    are making a representation in court that there will be no
 6    future infringement doesn't necessarily make that so.
 7            And, Your Honor, if there are no further
 8    questions...
 9            THE COURT:  All right.  Well, I think at this time
10    the Court will take its luncheon recess, during which it will
11    deliberate on the issues before it.
12            I certainly don't think the Court can decide all of
13    the findings of fact and conclusions of law necessary to
14    resolve the case; however, I do think there's some issues the
15    Court can resolve fairly expeditiously.
16            So we'll be in recess until 1:15.
17            (Recess from 12:00 p.m. to 1:13 p.m.)
18            THE COURT:  All right, counsel.  There are several
19    remedies that are available to the Court:  Obviously, an
20    injunction, or a running royalty, which the Court would fix;
21    or to compel the parties to engage in negotiation; or to do
22    nothing.
23            As to the Group A patents, the evidence is clear
24    that the public interest would not be served by granting an
25    injunction.  Both parties' evidence point strongly in that
```

1    direction.  We've heard, as I say, evidence all through the
2    case about the value of the inventions to the public.  The
3    only thing that would be in the public interest, from the
4    standpoint of the proponents, would be the public's interest
5    in seeing that their patent rights are protected, and they
6    can be protected in a number of ways, including a running
7    royalty or a lump sum royalty, for that matter.  But the one
8    thing that's abundantly clear from the evidence is that the
9    public interest would not be served by granting an injunction
10   as to the Group A patents.
11          There are some other findings of fact that the Court
12   is going to make, because the Court is going to require the
13   parties to engage in a negotiation to arrive at a reasonable
14   royalty.  The Fourth Circuit -- Federal Circuit -- I keep
15   saying "Fourth."  The Federal Circuit has said, on more than
16   one occasion, that the parties are better equipped than the
17   District Judge to determine what would be a reasonable
18   royalty, so I'm going to give the parties the opportunity to
19   arrive at a reasonable royalty.  If they fail to do so, then
20   the Court will fix the reasonable royalty, but not until the
21   parties have the opportunity to first do so themselves.
22          And there are some findings of fact that the Court
23   is making that would affect the conduct of the negotiations.
24   The Court, of course, cannot participate in negotiations, but
25   the Court can set some guidelines pursuant to which the

1    negotiations will take place.

2            The first is that to the extent that the

3    *Georgia-Pacific* factors talk about the uncertainty of the

4    result, well, the products have been found to be infringing,

5    so there's no uncertainty left, and in conducting the

6    negotiations, it will be a fact that the products are found

7    to be infringing.

8            Now, I said as to the Group A patents, the '541

9    patent does not have the strong evidence of the public

10   interest being a factor to prevent an injunction from being

11   granted, so some sort of relief must be attached to the

12   infringement of the '541 patent.

13           Now, the fact that Cargill is currently not

14   infringing the '541 patent with its commercial product is not

15   a reason not to grant relief to the proponents with respect

16   to the '541 patent.  Some sort of relief -- and the Court has

17   not determined as to that patent what that relief should

18   be -- must be afforded to that patent as well.

19           Also, the opponents have said that they're not

20   currently pursuing the use of their canola oil product for

21   human consumption.  Now, of course, what the salmon and other

22   fish consume is ultimately going to be consumed by the people

23   that eat the salmon, but it may well be -- I can't read

24   people's minds completely, and it may be that the only reason

25   that they're not making a product for human consumption is it

2619

```
 1    doesn't have DHA, which is of benefit to humans.

 2           So for purposes of the negotiations, the parties

 3    will not accept the proposition that the opponents will not

 4    at some point make a product for human consumption.  All you

 5    need is a change in management, and they might go in that

 6    direction.  So you can't assume that they're not going to do

 7    it just based on the fact that they're saying they have no,

 8    quote-unquote, present plans to do so.

 9           Another finding of fact is that the Court finds that

10    the comparables used by Dr. -- how do you say it?  Jarosz?

11    The comparables used by Dr. Jarosz were not comparables.

12    When they were first put before the Court as comparables, the

13    Court had serious concerns about that because I don't think

14    the type of hypothetical negotiation envisioned in the court

15    decisions was between people going into partnership, such as

16    BASF and Cargill, nor do I think they contemplated a person

17    who is being financially supported by one party, that their

18    royalty rate would in any way reflect the type of

19    negotiations contemplated, so those two comparables are

20    simply not comparable.

21           So any percentages derived from those comparables

22    has no weight in the negotiations.  Those include the

23    comparables -- well, they include the computations, I should

24    say, of both Dr. Jarosz and Dr. -- well, I don't know if he's

25    a doctor or not, but Mr. Jarosz and Mr. -- what was his name?
```

```
 1              MS. SHAW:  Mr. Napper, Your Honor.
 2              THE COURT:  -- Napper.  So no numbers based on those
 3    comparables are entitled to any weight.
 4              It was also interesting to observe that -- I think
 5    one of the parties ordered it -- the fact that the
 6    proponents' product has EPA and DHA in it; whereas, the
 7    opponents' product focuses on EPA.  That raises an issue as
 8    to whether the products should be used together in the final
 9    composition of fish feed.
10              As I say, it's not going directly to the humans, but
11    it's going to the humans through the fish, and since there
12    are different health benefits to be derived from the two
13    different forms of fatty acid, it will probably be a tough
14    sell to the fishermen to buy into that concept.  But I would
15    think that perhaps down the road somewhere it might make it
16    attractive to someone, who thinks it through, to have both
17    types of oils combined.  And I base that on the fact that
18    Mr. Gromov testified that they're using less omega-3 oil in
19    fish food now than they used to, considerably less, because
20    of perhaps its cost or perhaps its availability.
21              But it seems to me that it would make sense,
22    certainly in the product that's going directly to the humans,
23    to have both -- to try to get the maximum health benefits
24    from both types of fatty acid.  I don't know what other fatty
25    acids are currently common in fish feed, but Mr. Gromov said,
```

2621

1    clearly, that the percentage of omega-3s had gone down, which

2    means that there must be other types of fatty acids in there.

3            So where does that put us?  Where that puts us is

4    that the Court is going to instruct the parties to negotiate

5    a royalty, which can include a cash payment, as proposed by

6    the opponents' expert, or not.  I'm not saying that I'm fully

7    endorsing the opponents' calculations, but I do think that

8    his comparables would qualify as comparables.  Not ideal

9    comparables.  An ideal comparable would be negotiations for a

10   license between people operating in the same market.  And

11   these are schools, they're not commercial companies with a

12   product.  So they're not ideal comparables, but they are --

13   they do at least qualify, basically, as comparables, where

14   the comparables used by Dr. J don't so qualify.

15           Now, in conducting the negotiations, you may

16   consider the facts that the Court is going to find.  You

17   don't have to.  You must consider the fact that infringement

18   has been found, which causes you to have to modify the

19   *Georgia-Pacific* factors.  You may otherwise use the

20   *Georgia-Pacific* factors or not.  That's up to the people who

21   are negotiating.

22           I don't know what's most convenient to you as a

23   place to negotiate.  We have a room here adjacent to the jury

24   room that's been set aside for our use, if you want to use

25   that room, or you may want to use local counsel's office.  I

Carol L. Naughton, Official Court Reporter

1    don't know which would be most convenient.

2           But the Court is going to direct that you begin your

3    negotiations promptly and report to me at 5:00.  If you're

4    using -- if you go to your office, Vandeventer, you can

5    report to me just by telephone.  If you're in the courthouse,

6    we'll convene at 5:00, and you can tell me where you stand.

7    If you feel -- the same as a jury; if you feel you're close

8    to reaching a conclusion, you can continue to negotiate, and

9    I'll continue to be available until at least 6:00.

10          You can negotiate as long as you want today, but if

11   you don't negotiate today, you're going to have tomorrow,

12   too.  If you haven't reached a decision by, I'm going to say,

13   3:30 tomorrow, then it will be in my hands, and I will be

14   prepared to fix what the Court deems is an appropriate

15   royalty.

16          Now, I think that the Fourth Circuit is entirely

17   right when they say you guys are better equipped than I am to

18   make that decision; and, obviously, such a decision would, by

19   definition, be unsatisfactory to both parties.  And if you're

20   unable to do that, I'll try to make a decision that will be

21   unsatisfactory to both parties.

22          What do you want to do?  Do you want to use that

23   room, or we can find you another room in the courthouse, or

24   do you want to go to --

25          MR. CONNALLY:  Your Honor, I think we need to all

```
 1    talk -- certainly, on our side we're going to need to talk to
 2    people who are outside the courthouse, so we'll need access
 3    to a telephone.  So Mr. Ottinger's firm would be preferable.
 4            MR. OTTINGER:  I'm happy to host, and we can start
 5    as soon as people can get over there.
 6            THE COURT:  All right.  I think that would probably
 7    be more convenient.  I mean, I can find a phone for you, but,
 8    you know, you have to worry about being able to talk
 9    privately, and so forth.  So it would probably be better to
10    go to counsel's office than try to do it here at the
11    courthouse.
12            So you can just report to me where you stand, by
13    conference call, at 5:00.  Does anybody have any questions
14    about --
15            MS. SHAW:  No, Your Honor.
16            MR. CONNALLY:  Who shall we contact, Your Honor?
17            THE COURT:  Me.  Just call my office.
18            MR. CONNALLY:  Yes, sir.
19            THE COURT:  I'll be there.
20            Any questions on your side?
21            MR. ZAHEER:  No, Your Honor.
22            THE COURT:  Okay.  The Court will be in recess
23    pending your negotiations.
24            (Proceedings adjourned at 1:35 p.m.)
25
```

1                        <u>CERTIFICATION</u>

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6

7        _____/s/_____

8                     Carol L. Naughton

9                     November 6, 2019

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carol L. Naughton, Official Court Reporter