```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                        )
 4     BASF PLANT SCIENCE, LP,          )
                                        )
 5             Plaintiff,               )
                                        )
 6     v.                               )
                                        )
 7     COMMONWEALTH SCIENTIFIC AND      )
       INDUSTRIAL RESEARCH              )
 8     ORGANISATION,                    )
                                        )
 9             Defendant.               )
     _____  )
10                                      )   CIVIL ACTION NO.
       COMMONWEALTH SCIENTIFIC AND      )       2:17cv503
11     INDUSTRIAL RESEARCH              )
       ORGANISATION, GRAINS RESEARCH    )
12     AND DEVELOPMENT CORP., AND       )
       NUSEED PTY LTD.,                 )
13                                      )
          Plaintiff-Counterclaimants,   )
14                                      )
       v.                               )
15                                      )
       BASF PLANT SCIENCE, LP, and      )
16     CARGILL, INC.,                   )
                                        )
17      Defendants-Counterdefendants.   )
                                        )
18   - - - - - - - - - - - - - - - - - -

19
                       TRANSCRIPT OF PROCEEDINGS
20                       (Jury Trial - Day 16)

21                        Norfolk, Virginia

22                        November 7, 2019

23
     BEFORE:   THE HONORABLE HENRY COKE MORGAN, JR.
24             United States District Judge

25
```

Carol L. Naughton, Official Court Reporter

```
 1   APPEARANCES:

 2                   HOGAN LOVELLS US LLP
                     By:  Nitya Anand
 3                        Arlene L. Chow
                          N. Thomas Connally, III
 4                        Una Chiao-Yi Fan
                          Thomas B. Hunt
 5                        Takashi Okuda
                          Jared Schubert
 6                        Anna K. Shaw
                          Ernest Yakob
 7                   Counsel for BASF Plant Science, LP

 8                   VANDEVENTER BLACK LLP
                     By:  Richard H. Ottinger
 9                   Counsel for Defendants, Third-Party
                     Plaintiffs, and Counterclaimants
10
                     KOBRE & KIM LLP
11                   By:  Jonathan E. Barbee
                          Hugham Chan
12                        Matthew I. Menchel
                          Michael K. Ng
13                        Hartley M.K. West
                          Daniel A. Zaheer
14                   Counsel for Commonwealth Scientific and
                     Industrial Research Organisation
15
                     PORTER HEDGES LLP
16                   By:  Miranda Jones
                          Megan Mon-Ting Luh
17                        Erin C. Villasenor
                     Counsel for Grains Research and
18                   Development Corporation

19                   WILEY REIN LLP
                     By:  Alexander Owczarczak
20                        Teresa Summers
                          Lawrence M. Sung
21                   Counsel for Nuseed Pty Ltd

22                   FISH & RICHARDSON PC
                     By:  Ahmed J. Davis
23                        Christopher R. Dillon
                          Elizabeth Flanagan
24                        Daniel R. Gopenko
                     Counsel for Cargill, Inc.
25
```

```
1              (Proceedings commenced at 3:30 p.m.)
2              THE CLERK:  Civil Action No. 2:17cv503, BASF Plant
3    Science, LP, BASF Plant Science GmbH, and Cargill, Inc. v.
4    Commonwealth Scientific and Industrial Research Organisation,
5    Grains Research and Development Corporation, and Nuseed, PTY
6    LTD.
7              For BASF and Cargill, Ms. Shaw, Mr. Connally, are
8    you ready to proceed?
9              MR. CONNALLY:  We are.
10             THE CLERK:  For CSIRO, GRDC, and Nuseed, Mr. Zaheer,
11   Ms. Jones, and Mr. Sung, are you ready to proceed?
12             MR. ZAHEER:  We are, Your Honor.  Thank you.
13             THE COURT:  Well, the Court, of necessity, had to
14   pick a time when negotiations had to cease, if they were not
15   going to make any progress.  It appears to the Court, from
16   the proponents' filing, that they, at least, weren't
17   interested in making any progress, so I assume that none has
18   been made.
19             MR. ZAHEER:  Your Honor, the parties met yesterday
20   and this morning, and we were unable to reach --
21             THE COURT:  What?
22             MR. ZAHEER:  The parties met yesterday and this
23   morning, and we were unable to reach common ground with
24   respect to a royalty rate.
25             THE COURT:  Well, the document you filed this
```

```
 1   morning said you didn't want any relief, you wanted the Court
 2   to decide to award no relief.  That doesn't sound like there
 3   was much negotiating going on.
 4           MR. ZAHEER:  We were able to negotiate.  Again, we
 5   tried to -- tried our best to reach a resolution, but we were
 6   unable to do so.
 7           THE COURT:  Do the parties think any additional time
 8   would be fruitful?
 9           MR. CONNALLY:  I do not, Your Honor.
10           MR. ZAHEER:  No, Your Honor.
11           THE COURT:  All right.  Well, I must say it was
12   unusual to get the request we got from the proponents this
13   morning.  It sounds like you just want to have another trial
14   in another court.
15           MR. ZAHEER:  I'm happy to address that, Your Honor,
16   if you'd like me to.
17           THE COURT:  I don't think it would be fruitful.
18           Well, as I said, the Fourth Circuit has strongly
19   suggested that before the Court attempts to reach a royalty
20   decision, that it give the parties an opportunity to
21   negotiate, which we've done.  And both parties have now told
22   the Court that they didn't think any further negotiations
23   would be helpful, so the Court will proceed with what it
24   previously indicated its ruling was, which is to determine an
25   ongoing royalty.
```

1     I can only say it never occurred to me that I'd be
2  getting a brief asking for the Court to make a finding of no
3  action.  But I don't think that's appropriate, and, in fact,
4  I think that just runs exactly contrary to what the Court
5  requested that the parties do.  I suppose it would have been
6  reasonable to make that request before the Court made its
7  findings on which way we would proceed, but to make that
8  request in the middle of what is supposed to be negotiations
9  is not at all persuasive to the Court.
10    The Court has to look at all of the factors that
11 should go into determining what a reasonable royalty should
12 be and whether that reasonable royalty should be made up of
13 ongoing royalty or a lump sum or both.  I think the most
14 efficient way to review the factors is to go through the
15 *Georgia-Pacific* factors.  A number of the factors the Court
16 has considered follow the *Georgia-Pacific* factors, but there
17 are other factors the Court has considered, as well.
18    As the Court indicated, it did not find the
19 comparables cited by the plaintiffs' expert to be appropriate
20 comparables, nor did the Court believe that the mathematical
21 and economic assumptions from those two negotiations -- that
22 is, the contract between Nuseed and GRDC and CSIRO or the
23 consultations between BASF and Cargill -- were comparables,
24 and so the Court ruled out the 12 to 49 percent running
25 royalty put forth by the plaintiffs' expert, as well as

1    the -- by "the plaintiffs'," I should say "proponents'" -- as
2    well as the revised mathematical economic viewpoint based on
3    those comparables by the opponents' expert.
4             The comparables used by the opponents' expert are
5    reasonable, but, as the Court said, they're not ideal,
6    because they don't deal with negotiations between
7    competitors, which would be the best guide for the Court to
8    look to.  But they do have some value; although the Court is
9    not adopting the numbers put forth by the opponents' expert,
10   either.
11            So applying that reasoning to factors 1 and 2 of the
12   *Georgia-Pacific* factors, they simply are not sufficiently
13   comparable to base a ruling entirely on them, and, therefore,
14   factors 1 and 2 are not considered by the Court as highly
15   favorable or unfavorable to either party.
16            *Georgia-Pacific* factor number 2 weighs in favor of
17   reducing the royalty because the royalty would be
18   nonexclusive and, therefore, would encourage a reduction in
19   the royalty.  However, it appeared to the Court that, given
20   the evidence in the case, which indicates the extensive
21   research and development necessary, together with the
22   regulatory approvals necessary in the food product, make the
23   probability of another licensing agreement being available to
24   the proponents of little value.
25            *Georgia-Pacific* number 4 also would argue in favor

1  of a lesser royalty, as it indicates that recently there were
2  still negotiations going on.  And when I say "recently," I'm
3  talking about in 2016 there were negotiations going on
4  between the parties to obtain a license, and when those
5  negotiations broke down, the suit was filed.  But that
6  indicates that the proponents were willing to license their
7  property interest in the patents, but it does not appear from
8  the evidence that that was their preference.  They wanted
9  somebody who would be more of a partner with them in
10 marketing the product than just granting a license.  So that
11 factor does not carry much weight.
12         *Georgia-Pacific* factor number 5 calls for an upward
13 influence because the proposed licensee has been found to be
14 an infringer, and, arguably -- although the evidence is not
15 clear on this -- they would be competitors in the market,
16 along with all the sales of the fish oil.  The market, as
17 portrayed in the exhibits of the parties, includes not only
18 the parties to this action but also all the competing parties
19 in selling fish oil.  So it's not a two-party market, it's a
20 multiparty market.
21         Nonetheless, the fact that the opponents have been
22 found to be an infringer and, indeed, admitted infringement
23 on most of the patents asserted is a significant upward
24 factor for the Court to consider in determining the proper
25 number.

1             Factor number 6 is would the sale of the product
2    enhance the sale of other products?  I don't see that it
3    would, except it could enhance the sale of the product
4    intended for human consumption.  But neither party has
5    obtained permission to sell that product at this point, so
6    that's not a significant factor.
7             Factor number 7 -- and we talked about that
8    before -- is the duration of the patent, which is short.  So,
9    again, the downward influence of this is negated by the time
10   factor involved in producing a patentable food product,
11   whether it's for human or fish consumption.
12            Factor 8 comes into play because the opponents -- or
13   "something closely related to factor 8" may be more accurate
14   to say -- comes into play because the opponents' expert
15   referred to the additional technology obtained by the
16   opponent in its negotiation with the three schools.  However,
17   it does not appear that whatever extra technology that they
18   obtain -- there's no evidence to indicate that it has any
19   significant value, so what would otherwise be a downward
20   variance would be minimized by that factor.
21            And the potential profitability of the property is,
22   again, difficult to determine based on the projections of
23   both parties, as well as their testimony about how difficult
24   it is to make such a projection.
25            Another upward factor is that the product is unique;

1   although the opponents have been working for many years on
2   developing their own product and, in fact, were awarded a
3   patent.  That goes toward one of the factors in the liability
4   phase directly; it shows that there was competition for
5   developing the product.
6              Opponents' patent doesn't really have any import in
7   the consideration of the *Georgia-Pacific* factors on damages,
8   however.  Probably, over time, the products which are the
9   subject of the infringement will continue to improve.  It
10  will probably cost less to create them, and as they improve,
11  they will be more competitive with the fish-based products,
12  so that is a factor in favor of increasing the royalties.
13             Factor 11 is also in favor of a slightly upward
14  influence, because Cargill has -- although they've not sold
15  any product, they're close to it.  It does not appear that
16  the plaintiff, however, is close to it.  The deposition
17  testimony of Ms. Boettner, which was read into the case,
18  indicates remarkably little progress in bringing the
19  proponents' product to market.  And the only thing that's
20  happened between her testimony from September 9th and her
21  testimony at trial is that she's gotten a new title and hired
22  one employee, so that does not have much influence.
23             Factor 12 is the customary profit in similar
24  products.  We don't know what the customary profit is in
25  similar products since the similar products are the fish oil.

1   We have had testimony about the cost of fish oil, but we have
2   had absolutely no testimony of what profit you make from
3   selling the fish oil.
4           The risk as compared with the profit, under item 13,
5   also remains undetermined.  Both parties have made
6   projections, and both parties have invested considerable
7   funds in developing their respective products, but, again,
8   there's been little evidence of -- there's been some evidence
9   of the cost of the infringing products but no evidence of the
10  cost of the proponents' products which has been represented
11  as being in competition with the defendant, so that factor is
12  not significant.
13          Factor 14 is opinion testimony.  The Court found the
14  testimony of the opponents' expert far more objective and
15  credible than that of the proponents' expert on all of the --
16  not only the royalty, but the other factors affecting the
17  granting of an injunction, so that factor would favor a
18  downward adjustment.
19          However, the problem is that two of the downward
20  adjustments were not explained by the opponents' expert.  I
21  did examine him myself on one of the elements, which is the
22  short time remaining on the patent, and he conceded that that
23  was not an important element.  But although the opponents'
24  expert said that he considered the upward adjusting elements
25  and the downward adjusting elements, he didn't explain

```
 1   exactly how he considered them.  He ended up with a number
 2   which was based solely on the adjusted cost of what I believe
 3   they paid the University of Hamburg, adjusted for inflation.
 4   So the Court cannot make any determination whether he just
 5   offset the upward and downward adjustments and came out even,
 6   or exactly how he treated these upward and downward
 7   adjustments.  He didn't explain it.
 8           The Court finds that examining all the factors,
 9   including the Georgia-Pacific factors, there's more
10   persuasive evidence to support the upward factors than the
11   downward factors.  The question is how do you monetize that?
12   That's the difficult part, which I had hoped the parties
13   would resolve through negotiations, but since they were
14   unable to do so, the Court will do it.
15           One of the factors that's very important to the
16   negotiations is that the Court found that the evidence did
17   not justify the granting of an injunction, for a variety of
18   reasons; principal among which was the failure of the
19   proponents to establish any degree of public interest in
20   favor of the granting of injunction, but there were others as
21   well.
22           I think that there should be an upward adjustment of
23   the lump sum payment.  I think it should be tripled.  I think
24   there should also be an upward adjustment of the 1.4 percent
25   royalty, which the Court has increased by a factor of 2.5,
```

1  which would make the adjusted running figure 3.5 percent.
2          I haven't done the math on that, but I think we're
3  talking -- I think tripling the -- I think it was like
4  1.2-something million.  So the Court feels that that number,
5  whatever it was suggested by Mr. Napper, should be tripled.
6  I think it should be doubled because the Court doesn't know
7  to what extent he considered the upward factors, and I think
8  it should be increased by another factor because he spoke of
9  downward factors, which the Court feels were not -- may have
10 been considered by him, but the Court doesn't consider them
11 of any particular value -- or of minimal value, I would say.
12         So they're the numbers that the court will
13 incorporate into its finding.
14         The Court has already advised counsel of some of the
15 findings of fact it's going to make; however, I haven't
16 completed the findings of fact or conclusions of law beyond
17 which I stated before the negotiations and have restated, in
18 part, here today, so the Court is in the process of preparing
19 a written opinion on all the issues that have come before it
20 in the course of the trial, and we'll try to have that out as
21 soon as possible.
22         However, the Court's finding of the form of the
23 damages awarded and the Court's determination of the amount
24 of the running royalty and the lump sum payment are findings
25 that will be effective immediately.

2636

```
1           Does counsel have any matter it would like to bring
2   to the attention of the Court at this time?
3           MR. ZAHEER:  Yes, Your Honor.  I don't think the
4   Court addressed the '541 patent.
5           THE COURT:  What?
6           MR. ZAHEER:  I don't think Your Honor addressed the
7   '541 patent.
8           THE COURT:  I intentionally didn't address the '541
9   patent.  There doesn't seem to be any infringing activity
10  with respect to the '541 patent at this time, according to
11  the evidence, but nonetheless, that patent was found to be
12  infringed, and the proponent is entitled to some form of
13  damages or protection of that patent.  But I've been focusing
14  my attention on trying to come up with what I thought would
15  be an appropriate royalty, as opposed to dealing with other
16  issues, and that's what all of us have been focused on.  So
17  we just haven't figured out what the proper form of damages
18  would be for the '541 patent, but the proponent is definitely
19  entitled to some sort of protection of that patent.
20          Anything else from the proponents?
21          MR. ZAHEER:  Nothing further, Your Honor.  Thank
22  you.
23          THE COURT:  Anything from the opponents?
24          MR. CONNALLY:  No, Your Honor.
25          THE COURT:  All right.  As I say, the Court's
```

```
 1   findings of the form of the damages and the amount of damages
 2   are effective immediately, but I will prepare a written
 3   opinion explaining the number of issues that have arisen
 4   during the trial.  All I can say is we'll get it done as soon
 5   as we can.  I'm not sure exactly how long it's going to take.
 6   There are a lot of rulings, a lot of issues.
 7            If there's nothing further, then we'll be adjourned.
 8            (Proceedings adjourned at 4:05 p.m.)
 9
10                           CERTIFICATION
11
12      I certify that the foregoing is a correct transcript
13   from the record of proceedings in the above-entitled matter.
14
15
16            _____/s/_____
17                      Carol L. Naughton
18                      November 7, 2019
```

Carol L. Naughton, Official Court Reporter