## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Norfolk Division

| | | |
|---|---|---|
| BASF PLANT SCIENCE, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMONWEALTH SCIENTIFIC AND | ) | |
| INDUSTRIAL RESEARCH | ) | |
| ORGANISATION, | ) | |
| | ) | |
| Defendant. | ) | C.A. No. 2:17-CV-503-HCM |
| | ) | |
| COMMONWEALTH SCIENTIFIC AND | ) | JURY TRIAL DEMANDED |
| INDUSTRIAL RESEARCH | ) | |
| ORGANISATION, GRAINS RESEARCH | ) | |
| AND DEVELOPMENT CORP., AND | ) | |
| NUSEED PTY LTD., | ) | |
| | ) | |
| Plaintiffs-Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BASF PLANT SCIENCE, LP, AND | ) | |
| CARGILL, INCORPORATED, | ) | |
| | ) | |
| Defendants- | ) | |
| Counterdefendants, | ) | |
| | ) | |
| BASF PLANT SCIENCE GMBH, | ) | |
| | ) | |
| Counter-Counterclaimant. | ) | |

## PROPONENTS' MEMORANDUM IN SUPPORT OF MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL UNDER FED. R. CIV. P. 50(B) AND 59

Commonwealth Scientific and Industrial Research Organisation ("CSIRO"), Grains Research and Development Corporation ("GRDC"), and Nuseed Pty. Ltd. ("Nuseed") (collectively, "Proponents") respectfully request that the Court: (1) enter judgment as a matter of law or grant a new trial in favor of Proponents on BASF Plant Science LP's ("BASF") and Cargill, Incorporated's ("Cargill") (collectively, "Opponents") claim of ownership of U.S. Patent No. 9,994,792 ("'792 Patent" or "Group B patent") under the Materials Transfer and Evaluation Agreement ("MTEA" or "Agreement"), and (2) enter judgment as a matter of law or grant a new trial on the issue of whether claim 1 of U.S. Patent No. 10,125,084 ("'084 Patent" or "Group E patent") is invalid for lack of written description.

First, BASF cannot co-own the '792 Patent under the ownership clause of the MTEA. That clause only permits BASF and CSIRO to co-own work product, i.e., "Joint New Materials," "Joint Transformed Lines," and "Joint Results," or intellectual property that was jointly developed under the MTEA and not previously or subsequently placed in the public domain by the owner. But nothing claimed in the '792 Patent can be considered "new materials," "transformed lines," or "results" as those terms are defined in the Agreement. Further, CSIRO used neither any new and jointly developed work product nor BASF's confidential information under the MTEA to prosecute and obtain the '792 Patent. There is no dispute that the '792 Patent covers enzymes that were either previously disclosed in CSIRO's earlier patents or were voluntarily placed into the public domain by BASF. Thus, the patent is not the result of any work derived from the MTEA, not the result of anything "joint," and not the result of anything "new." Because CSIRO did not breach the MTEA, BASF cannot be a co-owner of the patent as a matter of law.

Second, claim 1 of the '084 Patent is not invalid for lack of written description. There was no sufficient evidence presented at trial from which a jury could conclude that claim 1 of the '084

1

Patent is invalid for inadequate written description. The specification discloses a broad range of oil compositions, experiments with seed oil from transgenic plants containing 1% to 16% DPA and less than 2% DHA, and a detailed description of how the results were obtained. These disclosures are plain on the face of the patent, and therefore, there was no triable factual dispute concerning the inventors' possession of *Brassica* seeds within those ranges, and certainly there was no clear and convincing evidence that could support a judgment or verdict of invalidity. Accordingly, the Court should grant judgment as a matter of law or a new trial as set out herein.

## I.   BACKGROUND[1]

Proponents filed a Rule 50(a) motion as to Opponents' MTEA claim, seeking judgment as a matter of law ("JMOL") that CSIRO did not breach the MTEA, and thus BASF could not be the co-owner of any of the patents-in-suit. *See* Proponents' Brief in Support of Motion Under Fed. R. Civ. P. 50(a) (Dkt. No. 778) at 4–5; Proponents' Supplemental Memorandum in Support of its Motion for Judgment as a Matter of Law to Address Additional Bases for Relief Under Fed. R. Civ. Proc. 50 (Dkt. No. 783) at 1–3. Additionally, Proponents also asserted in the Rule 50 briefing that Opponents had waived their theory of ownership at trial as it was never included in the parties' final pretrial order. *See* Proponents' Supplemental Memorandum in Support of its Motion for Judgment as a Matter of Law to Address Additional Bases for Relief Under Fed. R. Civ. Proc. 50 (Dkt. No. 783) at 2–3. The Court did not rule on the motion, and the jury returned a verdict in favor of Opponents on the MTEA claim, finding that BASF co-owned the '792 Patent. *See* Jury

---

[1]  For purposes of brevity, Proponents incorporate by reference the background previously set out in their earlier post-trial briefing and only recite additional facts necessary for the Court to resolve the post-trial motions herein. *See* Proponents' Memorandum in Support of Motions for Judgment as a Matter of Law and a New Trial as to Jury Issues Not Decided by Verdict Under Fed. R. Civ. P. 50(b) and 59 (Dkt. No. 818) at 2–5.

Verdict Form (Dkt. No. 788) at 5.  The jury also found that the patent was not invalid.  *See id.* at 3–4.

Similarly, Proponents sought JMOL that claim 1 of the '084 Patent had adequate written description in light of the absence of clear and convincing evidence otherwise at trial.  *See* Proponents' Brief in Support of Motion Under Fed. R. Civ. P. 50(a) (Dkt. No. 778) at 4.  The Court also did not rule on this motion, and the jury returned a verdict, finding that claim 1 of the '084 Patent lacked written description.  *See* Jury Verdict Form (Dkt. No. 788) at 4.  The jury found that BASF was not a co-owner of the patent.  *See id.* at 5.

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 50(b) allows a party to renew a motion for JMOL made under Federal Rule of Civil Procedure 50(a) following a jury verdict and judgment.  Fed. R. Civ. P. 50(b).  JMOL is proper "when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment."  *Singer v. Dungan*, 45 F.3d 823, 826 (4th Cir. 1995) (quoting 5A James W. Moore, *Moore's Federal Practice* ¶ 50.07[2], at 50–76 (2d ed. 1994)).  It must be granted "[i]f a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture."  *Myrick v. Prime Ins. Syndicate, Inc.,* 395 F.3d 485, 489 (4th Cir. 2005) (citing *Crinkley v. Holiday Inns, Inc.,* 844 F.2d 156, 160 (4th Cir. 1988)).  JMOL is proper where the non-moving party fails to meet its burden of proof on an essential element of an issue with respect to which it bears the burden of proof.  *Singer,* 45 F.3d at 827.  "While [this Court is] compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, [it is] not a rubber stamp convened merely to endorse the conclusions of the jury, but rather [has] a duty to reverse the jury verdicts if the evidence cannot support [them]."  *Price v. City of Charlotte*

*N.C.*, 93 F.3d 1241, 1250 (4th Cir. 1996) (first citing *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 99 (4th Cir. 1991); and then citing *Singer*, 45 F.3d at 829).  This Court must "review the record as a whole" and "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, at 297–301 (2d ed. 1995)).

Rule 50(b) also allows a party to move for a new trial in the alternative.  Fed. R. Civ. P. 50(b).  A new trial may be granted "for any reason" for which a new trial had been granted in a federal trial.  Fed. R. Civ. P. 59(a)(1)(A).  In deciding whether to grant a new trial, this Court may "weigh the evidence and consider the credibility of witnesses."  *Cline v. Wal-Mart Stores*, *Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (citing *Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989)).  "A new trial will be granted if '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'"  *Id.* (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)); *see also Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940) ("The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence . . . or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.").

## III.    ARGUMENT

### A. BASF Cannot Co-Own the '792 Patent Because CSIRO Did Not Breach the MTEA.

JMOL should be entered in favor of Proponents on the MTEA claim with respect to the '792 Patent or this claim should be retried because CSIRO did not use any new joint work product developed under the Agreement or any BASF confidential information to procure the '792 Patent. To demonstrate a breach of the MTEA, Opponents had to show by a preponderance of the evidence that there was a legally enforceable obligation between CSIRO and BASF; that CSIRO breached that obligation; and that the appropriate remedy for that breach was co-ownership of the '792 Patent.  *See, e.g.*, *Cent. Tel. Co. of Va. v. Sprint Commc'n Co. of Va.*, 715 F.3d 501, 517 (4th Cir. 2013).[2]

Here, BASF's MTEA claim fails as a matter of law because the '792 Patent is not and does not claim "Joint New Materials," "Joint Transformed Lines," or "Joint Results"—the three categories over which the Agreement creates joint ownership rights.  Chan Decl., Ex. 1 (JX-52 (MTEA)) at CSI00106415–16.  "Joint New Materials" is defined as "constructs [that] contain both CSIRO and BPS genes."  *Id*. at CSI00106412.  But the '792 Patent is not a construct (i.e., the physical string of DNA that was created for the experiments performed under the agreement), and the enzymes that are claimed in the patent undeniably do not contain a combination of "CSIRO and BPS genes."  *Id.*  Thus, the patent cannot be "Joint New Materials" or "Intellectual Property subsisting in them."  *Id.* at CSI00106415.  The '792 Patent is also not a "Joint Transformed Line" for similar reasons—it neither comprises a transformed line (i.e., the plants resulting from the

---

[2]  The Court has not resolved which law applies to the MTEA claims—Virginia state law, the law of the Australian Capital Territory ("ACT"), or some other law.  However, there is no conflict of law with regard to the elements for proof of breach and remedy under a contract theory.

insertion of the foreign DNA) nor does the patent claim any combination that incorporates both CSIRO and BASF genes and was incorporated into a plant during the work performed under the Agreement.[3]  And the '792 Patent is not "Joint Results" because it does not claim or even describe any of the results of the MTEA (*see* Chan Decl., Ex. 2 (PX-222 (Joint program on PUFA)) at CSI00106532) and particularly does not claim or describe any results pertaining to transformed lines or materials that contained a combination of CSIRO and BASF genes.  As such, the '792 Patent is not "Joint New Materials," "Joint Transformed Lines," or "Joint Results," and it is not "Intellectual Property subsisting in them."

The MTEA claim also fails as a matter of law because nothing jointly developed or confidentially obtained from BASF pursuant to the MTEA is claimed in the '792 Patent.  Again, under section 6.2 of the Agreement, BASF can only co-own "New Materials, Transformed Lines and Results and any Intellectual Property subsisting in them" that were jointly created by CSIRO and BASF under certain circumstances.  *Id.* at CSI00106415–16 ("Joint Results will be owned jointly by CSIRO and BPS.").  "Results" and "Intellectual Property" could only be results and intellectual property that did not exist before the MTEA's March 1, 2008 effective date and that were jointly developed under the Agreement.  *See* Chan Decl., Ex. 1 (JX-52 (MTEA)) at CSI00106411 (defining "Commencement Date"); *id.* at CSI00106412 (defining "Joint Results" as only those involving "New Materials" that were "developed under" the MTEA); *id.* at

---

[3]  An additional reason that BASF's MTEA claim fails is that BASF never asserted in its pretrial statement that it was alleging that it was a co-owner of any patent due to the combination of enzymes claimed in the patent.  *See* Proposed Final Pretrial Order (Dkt. No. 682) at 41–48.  Instead, the only theory of co-ownership described in the statement is that BASF purportedly taught CSIRO how to produce LC-PUFAs in *Brassica napus* through the MTEA collaboration.  But whatever was purportedly taught to CSIRO (something that BASF was never able to articulate at trial because plainly BASF taught CSIRO nothing) is not covered by the claims of the '792 Patent.  For this reason too, JMOL or a new trial should be granted on BASF's co-ownership claim with regard to the '792 Patent.

CSI00106415–16 ("Joint Results will be owned jointly by CSIRO and BPS."); *see also* Chan Decl., Ex. 3 (Expert Report of Susan Crennan ¶¶ 50, 54–59) (explaining that "each of 'New Materials'; 'Results' and 'Transformed Lines' refers to new items or information that are developed during the evaluation"; that "no intellectual property subsists in information in the public domain"; and that "the Intellectual Property [under the MTEA's ownership provision] must be the product of the evaluation"). The Agreement further makes clear that information *and materials* (such as genes and enzymes) that were not confidential, such as information in the public domain, could be freely used by either party for any purpose. *See* Chan Decl., Ex. 1 (JX-52 (MTEA)) at CSI00106411–12 (excluding from the definition of "Confidential Information" any "information or materials that . . . is in the public domain"); *id.* at CSI00106417; *see also* Trial Tr. at 1235:25–1238:20, 1239:18–1240:1.

Applying the plain text of the MTEA, nothing recited in the '792 Patent was new and jointly developed under the Agreement, and therefore, the patent cannot be jointly owned by BASF. The '792 Patent recites a transgenic *Brassica* seed comprising the following exogenous enzymes: Δ6 elongase, *Ostreococcus tauri* Δ6 desaturase, *Thraustochytrium sp.* Δ5 desaturase, *Ostreococcus tauri* Δ5 elongase, and *Pavlova lutheri* Δ4 desaturase. Chan Decl., Ex. 4 (JX-12 ('792 Patent, asserted claim 4)). But CSIRO publicly disclosed all but two of the enzymes claimed in the '792 Patent to produce DPA and DHA in transgenic plants in its 2004 and 2005 patent applications—several years before the MTEA. *See, e.g.*, Chan Decl., Ex. 5 (CX-0166 (September 2004 U.S. Provisional Patent Application No. 60/613861)) at CSI00015778 ("Preferably, the seed is from an oilseed plant. More preferably, the oilseed plant is oilseed rape, maize . . . ."); *id.* at CSI00015812 ("The plants of the invention may be: . . . canola (*Brassica napus*, *Brassica rapa* ssp.) . . . ."); *id.* at CSI00015788–91 (listing Δ6 elongases, *Thraustochytrium sp.* Δ5 desaturase,

7

*Pavlova lutheri* Δ4 desaturase); *id.* at CSI00015783–86 (same); *id.* at CSI0015852–54 (detailing exemplar transgenic experiment to obtain DHA); *see also* Trial Tr. at 1620:3–1625:25.  It is also undisputed that the genes encoding these particular enzymes described in the 2004 and 2005 CSIRO patent applications—the *Thraustochytrium sp.* Δ5 desaturase, and *Pavlova lutheri* Δ4 desaturase—were in the public domain.  *See* Chan Decl., Ex. 6 (Tonon 2003 ("Identification of a very long chain polyunsaturated fatty acid Δ 4-desaturase from the microalga Pavlova lutheri")); Chan Decl., Ex. 7 (Qiu 2001 ("Identification of a Δ4 Fatty Acid Desaturase from Thraustochytrium")).  And likewise, the genes encoding a Δ6 desaturase and Δ5 elongase from *Ostreococcus tauri* were disclosed in the public domain many years before the MTEA.  *See, e.g.*, Chan Decl., Ex. 8 (JX-48 (2004 publication describing *Ostreococcus tauri* Δ5 elongase)); Chan Decl., Ex. 9 (JX-36 (2005 publication describing *Ostreococcus tauri* Δ6 desaturase)); *see also* Trial Tr. at 1165:6–1168:16, 1249:23–1251:24.  This point was underscored by BASF's assertion of each of the publications disclosing these enzymes as prior art to the '792 Patent—a binding admission that they were in the public domain.  *See, e.g.*, Proposed Final Pretrial Order (Dkt. No. 682) at 6–10; *see also* Trial Tr. at 1165:6–1168:16, 1249:23–1251:24.

Nor was the combination of claimed enzymes information that was jointly developed under the MTEA or information that was confidential.  BASF disclosed several of the enzymes together in a patent application filed prior to the MTEA, *see* Chan Decl., Ex. 10 (PX-415 (U.S. Patent No. 9,433,228)) at cols. 10–13, and the particular combination of enzymes in a 2010 presentation given at roughly the same time frame as the evaluation under the Agreement, *see* Chan Decl., Ex. 11 (CX-0699 (BASF Canola oil)) at CSI00106571.[4]  Both of those disclosures predated the filing of

---

[4]  Opponents' insistence that the Δ6 desaturase and Δ5 elongase *Ostreococcus tauri* enzymes were "proprietary" to BASF is irrelevant.  *See, e.g.*, Trial Tr. at 1250:17–1251:4, 1257:21–1258:1.  As explained, these enzymes were in the public domain before the MTEA and were not discovered

the '792 Patent in 2017, as did BASF's public disclosure of the combination of enzymes through its 2015 international patent application and its deregulation petition to the USDA. *See* Chan Decl., Ex. 12 (JX-46 (WO 2016/076327)) at 96–122, 625–634, figs. 92–94; Chan Decl., Ex. 13 (JX-61 (BASF Plant Science, L.P.'s Petition for the Determination of Nonregulated Status for EPA+DHA Canola Event LBFLFK)) at BASF 00009273–74.[5]  CSIRO was free to use all of this information from the public domain to obtain the '792 Patent—both information concerning the individual enzymes and the combination thereof.  Trial Tr. at 1235:25–1238:20, 1239:18–1240:1; *see also Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) (patentees are entitled to use information in the public domain to draft patent claims covering a competitor's known product).  Thus, what is claimed in the '792 Patent was not jointly developed under the MTEA (i.e., "Joint Results") and cannot be jointly owned by BASF.[6]

Indeed, *all* of the witnesses with personal knowledge of the work developed under the

---

because of joint efforts pursuant to the Agreement.  Additionally, their allegedly proprietary nature does not prevent CSIRO from obtaining a patent on an invention that involves the use of those genes and enzymes as they were already known in the art.  *See, e.g.*, *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1445 (Fed. Cir. 2000) (holding that patents may and often do claim combinations of prior art).  Dr. Bauer recognized as much.  Trial Tr. at 1259:10–1260:3; *see also id.* at 1075:13–24 (Dr. Andre agreeing that "it was okay to apply for [a] patent, even though the pieces inside of it had already been patented by somebody else").

[5]  As Proponents asserted at trial, the basis for novelty of these claims was not grounded in the individual enzymes identified or the combination of those specific enzymes; instead, the claimed invention is the particular and novel use of a Δ6 pathway using a Δ6 desaturase with a preference for acyl-CoA substrates in transgenic *Brassica* seeds to efficiently produce LC-PUFAs.  *See generally* Trial Tr. at 1764:24–1782:16 (Dr. Kunst testimony); *see also* Chan Decl., Ex. 4 (JX-12 ('792 Patent)) at col. 34 ll. 47–64, col. 36 ll. 7–34.  The jury agreed and found that the asserted claim of the '792 Patent was not obvious in light of the asserted prior art, and also not invalid for lack of written description.  *See* Jury Verdict Form (Dkt. No. 788) at 3–4.

[6]  Proponents also move for a new trial because the jury was not properly instructed on the MTEA issues, for the reasons set forth herein and for the reasons Proponents set forth in their objections to the jury instructions.  *See, e.g.*, Trial Tr. at 1921:10–1925:12, 1930:18–1933:16, 1985:23–1986:17, 2006:2–15; Dkt. Nos. 708, 765, 772, 782 (proposed jury instructions).

MTEA or the information exchanged during the MTEA testified that CSIRO never used any "Joint

Results" (let alone "Joint Transformed Lines" or "Joint New Materials") or BASF's confidential

information in the '792 Patent.  Chan Decl., Ex. 1 (JX-52 (MTEA)) at CSI00106414 (§ 3.3).  For

example, Dr. Singh testified that CSIRO never used any "Joint Results" from the MTEA:

> Q. Did CSIRO keep any of the materials provided by BASF [under the MTEA]?
> A. No, ma'am.  We -- the materials that BASF provided were destroyed.
> Q. Did CSIRO ever use any BASF materials in its inventions?
> A. Absolutely not.
> Q. Did CSIRO ever use any of the joint results in its inventions?
> A. No, ma'am. . . .
> Q. Dr. Singh, you mentioned on cross that you cannot put into a commercial
> product, without a license, something that is owned by BASF; is that right?
> A. Yes, ma'am.
> Q. Did you?
> A. Never, no.
> Q. Did CSIRO?
> A. No.
> Q. Did CSIRO ever use any BASF material in a product?
> A. Absolutely not.

Trial Tr. at 697:11–18, 783:11–20 (Dr. Singh).  Mr. Adler testified similarly:

> Q. Mr. Adler, were you asked yesterday about 6.2(c)(iii) [of the MTEA], do you
> see that, about joint results will be owned jointly?
> A. I do.
> Q. Has CSIRO ever used any joint results?
> A. We had no rights to use it, and we would not have used it.
> Q. As far as you know, has CSIRO ever used it?
> A. As far as I'm aware, CSIRO has not ever used it.
> Q. Let's look, please, at the confidentiality section, which is paragraph 8.  Mr.
> Connally pointed you to Section 8.1(b).  Regarding obligation of confidentiality
> and each side -- each party must not use the other party's confidential
> information.  Do you see that?
> A. I do. . . .
> Q. Let's look at the next page, please, at the top, under section (b).  Do you see it
> says, "Confidential Information"?
> A. I do.
> Q. And under there it provides information on construct design?
> A. Yes.
> Q. And information on combinations of genes and configurations?
> A. I do.
> Q. Did CSIRO ever use any of this information?

      A. I'm not aware that CSIRO ever used it. . . .
      Q. Did CSIRO ever use in any of its patents any materials or results from the
      evaluation agreement?
      A. As far as I'm aware, no.

*Id.* at 855:3–857:10 (Mr. Adler).  BASF's witnesses did not provide any testimony to dispute this.

Dr. Bauer and Mr. Beadle had no recollection or knowledge of any information derived from or

exchanged pursuant to the MTEA being used by CSIRO:

      Q. The truth is, Doctor, that the most that you actually can say in this case is that
      you think that -- well, that CSIRO might have used information from the MTEA
      in its patents; isn't that true?
      A. Yes.
      Q. You don't really know for sure?
      A. No, I don't know for sure.  I know that we shared the information, but I don't
      know what -- what extent was used of it.

*Id.* at 1251:16–24 (Dr. Bauer); and

      Q.  Okay.  So you don't know the extent of any information that was exchanged
      between CSIRO and BASF pursuant to [the MTEA]?
      A.  Correct.  I have no recollection.
      *Q.  And you have no knowledge about the extent of any information that was*
      *exchanged between CSIRO and BASF pursuant to this agreement?*
      *THE WITNESS:  I have no recollection.*
      *Q.  Mr. Beadle, does having no recollection equate to having no knowledge?*
      *THE WITNESS:  Sure.  To me it does.* . . .
      Q.  Okay.  Have you ever been told by anybody at BASF that there was a breach
      of the agreement that we're looking at right now?
      THE WITNESS:  I have no recollection.

Beadle Dep. Tr. at 60:2–61:3, 137:18–138:5 (emphasis added); Trial Tr. at 1483:10–11.  And

BASF witnesses even testified that although it was monitoring CSIRO's patent filings and

commercial activity at least as early as 2010, BASF never raised any concerns to CSIRO relating

to the alleged co-ownership of the '792 Patent or use of BASF's confidential information in the

patent.[7]   Trial  Tr.  at  1033:1–1037:10;  1072:6–1073:23,  1215:1–1216:22,  1218:8–1220:14,

---

[7]  Tellingly, Opponents' expert, Dr. Denis Murphy, was not asked to provide any opinions on
whether the '792 Patent "included information from the MTEA joint results," even though he could

1226:2–12, 1230:4–1231:16, 1239:18–1241:11, 1262:10–1265:10.  For this reason too, there was no evidentiary basis from which the jury could conclude that CSIRO used joint new materials, lines, or results in the '792 Patent such as to make BASF eligible to be deemed a co-owner of that patent.

In sum, the evidence at trial unequivocally confirmed that CSIRO never breached the MTEA such that BASF is a co-owner of the '792 Patent under the ownership clause of the Agreement.  JMOL should be entered in favor of Proponents on the MTEA claim with respect to the '792 Patent, or alternatively, a new trial on this claim is necessary as the jury's verdict was against the great weight of evidence demonstrating that BASF is not a co-owner of the patent.

### B.   Claim 1 of the '084 Patent is Not Invalid for Lack of Written Description Because the Specification Adequately Demonstrates Possession of the Claimed Subject Matter.

The Court should enter JMOL that claim 1 (asserted claim) of the '084 Patent is not invalid for lack of written description or preside over a new trial on written description for this claim because the specification more than adequately informs a person of ordinary skill in the art ("skilled artisan") that the inventors were in possession of the claimed subject matter.  Based on the evidence Opponents presented at trial, no reasonable jury could have found claim 1 of the '084 Patent invalid by clear and convincing evidence under 35 U.S.C. § 112 for failure to meet the written description requirement.   "To satisfy the written description requirement the patent disclosure must 'reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1136 (Fed. Cir. 2018) (alteration omitted) (quoting *Ariad Pharm., Inc. v. Eli Lilly*

---

have.  Trial Tr. at 1424:12–1425:20.  But Proponents' expert, Dr. Ljerka Kunst, did review the evidence in the case and found no indication that CSIRO used any work developed under the MTEA or BASF's confidential information in the patent.  *See id.* at 1788:12–17.

& Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)). "It is not necessary that the exact terms of a claim be used *in haec verba* in the specification, and equivalent language may be sufficient." *Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1350 (Fed. Cir. 2019). An issued patent can be held to be invalid for failure to provide adequate written description only if the absence of disclosure is shown by clear and convincing evidence. *E.g.*, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1338 (Fed. Cir. 2016).

Opponents only contested the adequacy of the written description with respect to the limitations requiring a range of 1–16% DPA and less than 2% DHA in the asserted claim of the '084 Patent. *See, e.g.*, Trial Tr. at 1337:6–9. Opponents attempted to establish invalidity of the '084 Patent by relying on the trial testimony of their expert, Dr. Denis Murphy. However, Dr. Murphy's general and conclusory statements about the absence of a specific range in the specification failed to meet Opponents' burden of proof because that testimony was in conflict with the plain text of the specification, which more than adequately informs a skilled artisan that the inventors were in possession of the claimed subject matter. At trial, Dr. Murphy repeatedly testified that the specification disclosed a different range for DPA (7–35% DPA) than the range recited in the claims (1-16% DPA). Trial Tr. at 1332:3–1338:12.

But the specification describes transgenic *Brassica* plants comprising seed oil having, among other traits, 1%–16% DPA and less than 2% DHA.[8] Dr. Murphy's unsupported testimony

---

[8] At trial, BASF agreed that it was not pursuing a lack of enablement defense. *See, e.g.*, Trial Tr. at 1386:25–12, 1388:23–1389:4 (Opponents' counsel stating that Dr. Murphy "didn't offer an opinion about enablement"). As such, the question is not whether the patent teaches the skilled artisan *how* to achieve the claimed ranges; it is only whether the specification describes the ranges sufficiently to demonstrate that the inventors had conceived of producing them in *Brassica*. *See, e.g.*, *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014) ("[W]ritten description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described; it is not about whether the patentee has proven to the

failed to provide substantial evidence to support the jury verdict because the specification, itself, provides sufficient support for the DPA limitation.  Chan Decl., Ex. 14 (JX-17 ('084 Patent)) at col. 37 ll. 49–53 ("[T]he invention which produces high levels of DPA, such as 5% to 35% of the total extractable fatty acid content is DPA."); *id.* at col. 102 ll. 40–43 ("Surprisingly and unexpectedly, some of the T1 seeds contained DPA at levels of 10% to about 18% of the total fatty acid content and no detectable DHA (<0.1%)"); *id.* at col. 104 ll. 21–22 ("Progeny seed with *up to* 35% DPA in the total fatty acid content of the seed lipid are produced." (emphasis added)).  The specification also expressly recites the range of DHA claimed: "the level of DHA in the total fatty acid content of the extracted plant lipid is less than 2%, preferably less than 1%, or between 0.1% and 2%."  *Id.* at col. 9 ll. 27–29.

These express statements, taken together with the experimental results in the specification, show that the inventors possessed the claimed range.  The results of these experiments showing 1%–16% DPA and less than 2% DHA can be found in tables 17 through 20:

| TABLE 17 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fatty acid composition of seedoil from T1 seeds of *B. juncea* transformed with the T-DNA from GA7. | | | | | | | |
| T1 seed No. | C18:4ω3 | 20:1Δ11 | C20:2ω6 | C20:3ω3 | C20:4ω3 | C20:5ω3 | C22:5ω3 | C22:6ω3 |
| JT1-4-A-1 | 2.0 | 1.1 | 0.2 | 0.8 | 4.0 | 0.6 | 2.4 | 9.9 |
| JT1-4-A-2 | 0.9 | 1.3 | 0.2 | 1.4 | 3.2 | 0.3 | 9.4 | 0.0 |
| JT1-4-A-3 | 2.0 | 0.9 | 0.2 | 1.1 | 4.5 | 0.7 | 3.1 | 11.4 |
| JT1-4-A-4 | 9.9 | 1.7 | 0.2 | 0.3 | 0.5 | 0.0 | 2.5 | 0.0 |
| JT1-4-A-5 | 2.0 | 0.9 | 0.2 | 1.3 | 4.4 | 1.5 | 1.6 | 13.5 |
| JT1-4-A-6 | 1.4 | 1.4 | 0.1 | 0.8 | 1.9 | 0.4 | 13.9 | 0.0 |
| JT1-4-A-7 | 1.8 | 1.0 | 0.1 | 1.8 | 3.7 | 1.3 | 2.2 | 11.3 |
| JT1-4-A-8 | 1.4 | 1.3 | 0.1 | 0.8 | 2.4 | 0.4 | 9.6 | 0.0 |
| JT1-4-A-9 | 2.1 | 0.8 | 0.2 | 1.5 | 3.6 | 0.8 | 2.0 | 11.9 |
| JT1-4-A-10 | 1.5 | 0.9 | 0.2 | 1.7 | 7.8 | 0.9 | 1.0 | 6.5 |
| JT1-4-A-11 | 1.9 | 1.4 | 0.2 | 0.5 | 1.6 | 0.3 | 15.5 | 0.0 |
| JT1-4-A-12 | 1.9 | 0.9 | 0.1 | 1.5 | 3.2 | 1.1 | 1.8 | 10.2 |
| JT1-4-A-13 | 2.2 | 1.0 | 0.2 | 1.7 | 2.0 | 1.1 | 2.0 | 17.9 |

skilled reader that the invention works, or how to make it work, which is an enablement issue." (citing *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc))).

### TABLE 17-continued

Fatty acid composition of seedoil from T1 seeds of *B. juncea* transformed with the T-DNA from GA7.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| JT1-4-A-14 | 2.2 | 1.0 | 0.1 | 0.6 | 2.4 | 0.8 | 1.3 | 7.8 |
| JT1-4-A-15 | 1.6 | 1.1 | 0.2 | 0.6 | 4.7 | 0.9 | 15.2 | 0.0 |
| JT1-4-B-1 | 2.2 | 1.0 | 0.2 | 1.2 | 4.6 | 0.9 | 2.2 | 11.5 |
| JT1-4-B-2 | 1.7 | 0.9 | 0.2 | 1.6 | 8.7 | 1.3 | 2.2 | 8.5 |
| JT1-4-B-3 | 0.2 | 1.4 | 0.4 | 0.6 | 0.9 | 0.1 | 0.3 | 2.1 |
| JT1-4-B-4 | 1.9 | 1.0 | 0.2 | 0.8 | 4.3 | 0.5 | 2.3 | 7.8 |
| JT1-4-B-5 | 1.4 | 1.1 | 0.2 | 0.9 | 2.4 | 0.5 | 16.1 | 0.0 |
| JT1-4-B-8 | 0.3 | 1.3 | 0.4 | 1.4 | 0.9 | 0.1 | 4.4 | 0.0 |
| JT1-4-B-13 | 2.0 | 1.0 | 0.2 | 1.7 | 2.3 | 0.7 | 4.1 | 13.5 |

The seedoil samples also contained 0.1% C14:0; 0.1-0.2% C16:3; 0.0-0.1% of each of C20:1Δ13, C20:3ω6 and C20:4ω6; 0.3-0.4% C22:0; no C22:1 and C22:2ω6; 0.2% C24:0 and 0.2-0.4% C24:1.

### TABLE 18

Fatty acid composition of lipid from T1 seeds (pooled) of *B. juncea* transformed with the T-DNA from GA7-modB. The lipids also contained about 0.1% of each of 14:0, 16:3, 20:1d13, and 16:2, 22:1 were not detected.

| Seed | C16:0 | C16:1 | C18:0 | C18:1 | C18:1Δ11 | C18:2 | C18:3ω6 | C18:3ω3 | C20:0 | C18:4ω3 | C20:1Δ11 | C20:2ω6 | C20:3ω6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JT1-2 | 4.2 | 0.3 | 2.5 | 42.4 | 3.2 | 27.7 | 0.1 | 16.4 | 0.6 | 0.0 | 1.2 | 0.1 | 0.0 |
| JT1-3 | 4.5 | 0.3 | 2.7 | 44.6 | 3.1 | 26.8 | 0.1 | 14.8 | 0.7 | 0.0 | 1.2 | 0.1 | 0.0 |
| JT1-4 | 5.1 | 0.3 | 3.2 | 26.8 | 3.5 | 17.4 | 0.5 | 22.8 | 0.7 | 2.5 | 1.1 | 0.2 | 0.0 |
| JT1-5 | 4.7 | 0.4 | 2.4 | 41.6 | 3.4 | 28.4 | 0.1 | 15.8 | 0.7 | 0.0 | 1.2 | 0.1 | 0.0 |
| JT1-6 | 4.8 | 0.4 | 2.3 | 37.3 | 3.3 | 30.2 | 0.4 | 13.2 | 0.7 | 0.2 | 1.4 | 0.3 | 0.0 |

| | Seed | C20:4ω6 | C20:3ω3 | C22:0 | C20:4ω3 | C20:5ω3 | C22:2ω6 | C22:3ω3 | C24:0 | C24:1 | C22:5ω3 | C22:6ω3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | JT1-2 | 0.0 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 0.4 | 0.0 | 0.0 |
| | JT1-3 | 0.0 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 0.4 | 0.0 | 0.0 |
| | JT1-4 | 0.0 | 1.2 | 0.3 | 2.9 | 0.7 | 0.0 | 0.1 | 0.2 | 0.3 | 2.8 | 7.2 |
| | JT1-5 | 0.0 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 0.4 | 0.0 | 0.0 |
| | JT1-6 | 0.0 | 0.7 | 0.3 | 0.6 | 0.1 | 0.0 | 0.3 | 0.2 | 0.5 | 2.8 | 0.0 |

### TABLE 19

Fatty acid composition of seed oil from T1 (single) seeds of *B. juncea* transformed with the T-DNA from GA7-modB.

| T1 seed No. | C18:4ω3 | 20:1Δ11 | C20:2ω6 | C20:3ω3 | C20:4ω3 | C20:5ω3 | C22:5ω3 | C22:6ω3 |
|---|---|---|---|---|---|---|---|---|
| JT1-4-A-1 | 2.0 | 1.1 | 0.2 | 0.8 | 4.0 | 0.6 | 2.4 | 9.9 |
| JT1-4-A-2 | 0.9 | 1.3 | 0.2 | 1.4 | 3.2 | 0.3 | 9.4 | 0.0 |
| JT1-4-A-3 | 2.0 | 0.9 | 0.2 | 1.1 | 4.5 | 0.7 | 3.1 | 11.4 |
| JT1-4-A-4 | 9.9 | 1.7 | 0.2 | 0.3 | 0.5 | 0.0 | 2.5 | 0.0 |
| JT1-4-A-5 | 2.0 | 0.9 | 0.2 | 1.3 | 4.4 | 1.5 | 1.6 | 13.5 |
| JT1-4-A-6 | 1.4 | 1.4 | 0.1 | 0.8 | 1.9 | 0.4 | 13.9 | 0.0 |
| JT1-4-A-7 | 1.8 | 1.0 | 0.1 | 1.8 | 3.7 | 1.3 | 2.2 | 11.3 |
| JT1-4-A-8 | 1.4 | 1.3 | 0.1 | 0.8 | 2.4 | 0.4 | 9.6 | 0.0 |
| JT1-4-A-9 | 2.1 | 0.8 | 0.2 | 1.5 | 3.6 | 0.8 | 2.0 | 11.9 |
| JT1-4-A-10 | 1.5 | 0.9 | 0.2 | 1.7 | 7.8 | 0.9 | 1.0 | 6.5 |
| JT1-4-A-11 | 1.9 | 1.4 | 0.2 | 0.5 | 1.6 | 0.3 | 15.5 | 0.0 |
| JT1-4-A-12 | 1.9 | 0.9 | 0.1 | 1.5 | 3.2 | 1.1 | 1.8 | 10.2 |
| JT1-4-A-13 | 2.2 | 1.0 | 0.2 | 1.7 | 2.0 | 1.1 | 2.0 | 17.9 |
| JT1-4-A-14 | 2.2 | 1.0 | 0.1 | 0.6 | 2.4 | 0.8 | 1.3 | 7.8 |
| JT1-4-A-15 | 1.6 | 1.1 | 0.2 | 0.6 | 4.7 | 0.9 | 15.2 | 0.0 |
| JT1-4-B-1 | 2.2 | 1.0 | 0.2 | 1.2 | 4.6 | 0.9 | 2.2 | 11.5 |
| JT1-4-B-2 | 1.7 | 0.9 | 0.2 | 1.6 | 8.7 | 1.3 | 2.2 | 8.5 |
| JT1-4-B-3 | 0.2 | 1.4 | 0.4 | 0.6 | 0.9 | 0.1 | 0.3 | 2.1 |
| JT1-4-B-4 | 1.9 | 1.0 | 0.2 | 0.8 | 4.3 | 0.5 | 2.3 | 7.8 |
| JT1-4-B-5 | 1.4 | 1.1 | 0.2 | 0.9 | 2.4 | 0.5 | 16.1 | 0.0 |
| JT1-4-B-6 | 2.1 | 0.9 | 0.2 | 1.1 | 3.7 | 0.6 | 3.3 | 11.1 |
| JT1-4-B-7 | 11.5 | 1.4 | 0.2 | 0.3 | 0.4 | 0.0 | 4.1 | 0.1 |
| JT1-4-B-8 | 0.3 | 1.3 | 0.4 | 1.4 | 0.9 | 0.1 | 4.4 | 0.0 |
| JT1-4-B-9 | 1.3 | 1.1 | 0.2 | 2.0 | 5.5 | 0.6 | 0.8 | 5.2 |
| JT1-4-B-10 | 1.6 | 1.0 | 0.2 | 1.7 | 4.9 | 1.1 | 3.0 | 10.2 |
| JT1-4-B-11 | 1.6 | 1.2 | 0.2 | 1.5 | 4.5 | 0.8 | 1.6 | 9.6 |
| JT1-4-B-12 | 3.1 | 1.1 | 0.2 | 0.9 | 5.6 | 0.9 | 3.5 | 11.7 |
| JT1-4-B-13 | 2.0 | 1.0 | 0.2 | 1.7 | 2.3 | 0.7 | 4.1 | 13.5 |
| JT1-4-B-14 | 1.8 | 1.2 | 0.2 | 0.9 | 2.6 | 0.4 | 2.9 | 9.2 |
| JT1-4-B-15 | 2.7 | 0.9 | 0.2 | 0.7 | 9.4 | 1.3 | 2.5 | 8.5 |

The seed oil samples also contained 0.1% C14:0; 0.1-0.2% C16:3; 0.0-0.1% of each of C20:1Δ13, C20:3ω6 and C20:4ω6; 0.3-0.4% C22:0; no C22:1 and C22:2ω6; 0.2% C24:0 and 0.2-0.4% C24:1.

| | | | TABLE 20 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

Fatty acid composition of seed oil from T2 single seeds of *B. juncea* transformed with the T-DNA from GA7-modB. The lipids also contained 0.1-0.2% C16:1A9, C16:3 and C20:2n6, 0.5-0.6% C20:0, no C20:3n6, C20:4n6 and C22:2n6

| Seed No. | C20:4n3 | C20:5n3 | C22:3n3 | C24:0 | C22:5n6 | C22:4n3 | C24:1 | 22:5n3 | C22:6n6 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 4.2 | 0.6 | 0.1 | 0.1 | 0.0 | 1.8 | 0.3 | 12.1 | 0.0 |
| 2 | 2.5 | 0.4 | 0.1 | 0.2 | 0.0 | 1.5 | 0.4 | 12.6 | 0.0 |
| 3 | 0.5 | 0.0 | 0.0 | 0.2 | 0.0 | 0.4 | 0.4 | 1.5 | 0.0 |
| 4 | 1.9 | 0.3 | 0.2 | 0.2 | 0.0 | 1.6 | 0.4 | 13.1 | 0.0 |
| 5 | 2.1 | 0.3 | 0.1 | 0.2 | 0.0 | 2.2 | 0.3 | 14.4 | 0.0 |
| 6 | 2.7 | 0.5 | 0.2 | 0.2 | 0.0 | 1.7 | 0.3 | 13.7 | 0.0 |
| 7 | 2.9 | 0.5 | 0.2 | 0.2 | 0.0 | 2.0 | 0.3 | 14.2 | 0.0 |
| 8 | 0.5 | 0.0 | 0.1 | 0.2 | 0.0 | 0.7 | 0.3 | 2.2 | 0.0 |
| 9 | 1.5 | 0.3 | 0.1 | 0.2 | 0.0 | 1.2 | 0.4 | 12.7 | 0.0 |
| 10 | 0.5 | 0.0 | 0.0 | 0.2 | 0.0 | 0.5 | 0.3 | 1.5 | 0.0 |
| 11 | 2.5 | 0.4 | 0.1 | 0.2 | 0.0 | 1.6 | 0.4 | 13.6 | 0.0 |
| 12 | 4.3 | 0.6 | 0.1 | 0.1 | 0.0 | 2.2 | 0.3 | 12.3 | 0.0 |
| 13 | 4.1 | 0.3 | 0.1 | 0.1 | 0.0 | 2.1 | 0.3 | 12.6 | 0.0 |
| 14 | 3.0 | 0.5 | 0.2 | 0.1 | 0.0 | 1.9 | 0.3 | 14.0 | 0.0 |
| 15 | 1.7 | 0.3 | 0.2 | 0.1 | 0.0 | 1.8 | 0.3 | 11.4 | 0.0 |
| 16 | 3.1 | 0.5 | 0.2 | 0.1 | 0.0 | 1.9 | 0.3 | 13.9 | 0.0 |
| 17 | 2.0 | 0.3 | 0.2 | 0.1 | 0.0 | 1.7 | 0.3 | 12.3 | 0.0 |
| 18 | 2.3 | 0.3 | 0.2 | 0.1 | 0.0 | 2.0 | 0.3 | 13.1 | 0.0 |
| 19 | 1.7 | 0.2 | 0.1 | 0.2 | 0.0 | 1.6 | 0.3 | 10.2 | 0.0 |
| 20 | 2.1 | 0.4 | 0.2 | 0.1 | 0.0 | 1.7 | 0.3 | 13.3 | 0.0 |
| 21 | 2.3 | 0.3 | 0.2 | 0.1 | 0.0 | 1.9 | 0.3 | 12.2 | 0.0 |
| 22 | 1.7 | 0.3 | 0.2 | 0.1 | 0.0 | 1.8 | 0.3 | 12.7 | 0.0 |
| 23 | 2.2 | 0.5 | 0.3 | 0.2 | 0.0 | 1.6 | 0.4 | 17.6 | 0.0 |

*Id.* at cols. 101–110 (highlighting added).[9]  In addition to these disclosures, although the question here is not enablement, the specification explains how the claimed DPA and DHA levels could be obtained in seed oil from transgenic *Brassica* plants: by either inactivating or partially inhibiting Δ4 desaturase activity and/or increasing LPAAT activity.  *Id.* at col. 91 ll. 50–57, col. 102 ll. 35–49.  Specifically, the '084 Patent describes three different ways to produce a seed oil profile that has high DPA and low DHA as claimed in claim 1.  First, the specification teaches inactivating the Δ4 desaturase that converts DPA to DHA, which would result in DPA at the end of the pathway and no DHA production.  Trial Tr. at 1763:9–15; Ex. 14 (JX-17 ('084 Patent)).  Second, the specification teaches partially inhibiting the desaturase resulting in an accumulation of DPA and a small amount of DHA.  Trial Tr. at 1763:16–1764:4; Ex. 14 (JX-17 ('084 Patent)).  Third, the specification teaches that the LPAAT acyl transferase enzyme can compete with the Δ4 desaturase for DPA.  If the LPAAT enzyme outcompetes the Δ4 desaturase, then DPA will not be converted to DHA and the final seed oil profile will have more DPA and less DHA.  Trial Tr. at 1764:3–23; Ex. 14 (JX-17 ('084 Patent)).

---

[9]  Except for the last seed in Table 20, all seeds meet the claimed DPA range of the asserted claim of the '084 Patent.

16

Dr. Kunst confirmed that these data and explanations demonstrate that the inventors possessed the subject matter of the asserted claim of the '084 Patent. Trial Tr. at 1761:4–1764:22. The specification therefore actually discloses *Brassica* plants that produce low, non-zero levels of DHA and levels of DPA between 1–16% *and* it also describes how other seeds within those ranges can be obtained. The disclosure is therefore more than sufficient as a matter of law.

Additional support in the specification is also present in the form of experiments in which the inventors produced seed oil in the claimed ranges in *Arabidopsis* plants (with the Δ6 pathway). *See* Trial Tr. at 281:20–283:10, 476:10–13, 622:11–628:7, 763:13–764:4, 1735:25–1736:3, 1737:21–1738:7 (*Arabidopsis* is a model for *Brassica*). The results of these experiments can be found in Table 12:

TABLE 12

Fatty acid composition (% of total fatty acids) of transgenic *A. thaliana* seeds transformed with an LPAAT1 construct as well as the T-DNA from the GA7 construct for DHA production. C20:4ω6 was not detected in the seeds. The seeds also contained 0.3%-0.9% C22:0 and 0.4-1.5% C22:1.

| | C16:0 | C18:0 | C18:1 | 18:1Δ11 | C18:2 | C18:3ω6 | C18:3ω3 | C20:0 | 18:4ω3 | 20:1Δ11 | 20:1Δ1 | C20:2ω6 | C20:3ω3 | C20:4ω3 | C20:5ω3 | 22:5ω3 | C22:6ω3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NY-1 | 9.3 | 3.2 | 9.1 | 6.8 | 9.4 | 0.5 | 23.8 | 1.6 | 4.1 | 7.9 | 5.1 | 0.6 | 0.9 | 0.6 | 1.2 | 7.9 | 4.5 |
| NY-2 | 10.7 | 3.3 | 6.5 | 4.4 | 7.6 | 0.3 | 28.1 | 1.9 | 4.3 | 8.5 | 3.7 | 0.7 | 1.1 | 1.4 | 1.1 | 11.6 |
| NY-3 | 9.3 | 2.8 | 6.3 | 3.4 | 10.3 | 0.2 | 32.8 | 2.2 | 2.7 | 6.2 | 3.6 | 1.1 | 1.9 | 1.4 | 0.7 | 1.0 | 10.7 |
| NY-4 | 11.4 | 3.5 | 4.5 | 3.1 | 7.0 | 0.3 | 32.5 | 2.1 | 4.7 | 5.5 | 2.3 | 1.0 | 1.9 | 0.8 | 1.1 | 0.9 | 14.3 |
| NY-5 | 14.6 | 4.5 | 7.0 | 7.7 | 6.7 | 0.3 | 20.7 | 2.2 | 5.7 | 5.4 | 4.8 | 0.4 | 0.9 | 0.8 | 1.2 | 1.0 | 11.7 |
| NY-6 | 7.8 | 2.7 | 12.5 | 2.2 | 18.0 | 0.1 | 24.9 | 1.8 | 0.7 | 15.5 | 3.1 | 1.4 | 1.2 | 0.5 | 0.3 | 3.0 | 0.8 |
| NY-7 | 9.3 | 2.9 | 6.7 | 3.8 | 9.2 | 0.2 | 31.5 | 2.1 | 3.2 | 7.5 | 3.7 | 0.9 | 1.6 | 1.3 | 0.8 | 1.1 | 10.9 |
| NY-8 | 8.8 | 3.2 | 8.2 | 5.5 | 11.0 | 0.3 | 25.3 | 1.9 | 3.0 | 8.3 | 5.4 | 1.0 | 1.2 | 0.8 | 0.8 | 6.1 | 6.0 |
| NY-9 | 12.3 | 3.7 | 5.0 | 4.6 | 7.1 | 0.2 | 28.3 | 2.3 | 4.2 | 5.6 | 3.8 | 0.8 | 1.6 | 0.7 | 1.1 | 1.2 | 13.8 |
| NY-10 | 8.6 | 3.2 | 8.5 | 3.1 | 9.7 | 0.3 | 31.5 | 1.6 | 3.4 | 8.7 | 2.8 | 1.0 | 1.3 | 0.9 | 1.1 | 10.6 | 1.0 |
| NY-11 | 11.5 | 3.2 | 4.5 | 2.5 | 7.1 | 0.3 | 33.3 | 2.1 | 3.9 | 5.7 | 1.9 | 0.9 | 2.0 | 0.7 | 0.8 | 1.0 | 15.6 |
| NY-12 | 8.7 | 3.2 | 7.5 | 5.1 | 8.5 | 0.2 | 26.8 | 2.0 | 3.7 | 8.7 | 5.1 | 0.9 | 1.2 | 1.1 | 1.2 | 10.0 | 2.6 |
| NY-13 | 11.5 | 3.4 | 5.2 | 3.4 | 8.3 | 0.3 | 30.0 | 2.2 | 5.0 | 6.2 | 3.2 | 0.9 | 1.7 | 1.5 | 1.1 | 1.0 | 11.6 |
| NY-14 | 9.2 | 2.9 | 6.6 | 2.0 | 10.3 | 0.2 | 34.7 | 1.9 | 3.3 | 7.7 | 1.6 | 1.2 | 1.8 | 1.2 | 0.9 | 0.8 | 11.1 |
| NY-15 | 10.9 | 3.3 | 4.6 | 2.7 | 7.0 | 0.3 | 34.1 | 1.9 | 5.1 | 5.5 | 2.0 | 0.9 | 1.8 | 0.8 | 1.0 | 1.3 | 14.7 |
| NY-16 | 10.5 | 3.4 | 6.0 | 4.6 | 7.8 | 0.3 | 30.3 | 1.8 | 4.4 | 5.4 | 2.9 | 0.7 | 1.5 | 0.9 | 1.1 | 1.3 | 14.2 |
| NY-17 | 9.1 | 2.4 | 5.9 | 2.5 | 10.4 | 0.2 | 35.4 | 1.6 | 3.6 | 6.4 | 2.1 | 1.1 | 1.9 | 1.2 | 1.0 | 0.9 | 11.7 |
| NY-18 | 9.7 | 3.6 | 8.8 | 6.2 | 12.1 | 0.3 | 21.0 | 1.9 | 4.0 | 8.3 | 5.9 | 0.8 | 0.9 | 0.6 | 1.0 | 5.7 | 5.1 |
| NY-19 | 8.4 | 3.1 | 12.0 | 3.1 | 14.6 | 0.2 | 28.8 | 1.7 | 1.6 | 11.3 | 3.2 | 1.0 | 1.4 | 0.6 | 0.6 | 3.9 | 1.2 |
| NY-20 | 10.1 | 3.2 | 5.4 | 3.3 | 8.9 | 0.3 | 32.8 | 2.1 | 4.1 | 5.5 | 2.8 | 1.0 | 1.9 | 1.1 | 0.9 | 1.1 | 12.1 |
| NY-21 | 10.5 | 3.6 | 5.6 | 3.8 | 8.2 | 0.3 | 31.9 | 2.0 | 4.6 | 5.9 | 2.8 | 0.9 | 1.7 | 0.8 | 1.0 | 0.9 | 12.5 |
| NY-22 | 8.4 | 3.3 | 7.4 | 2.3 | 9.4 | 0.2 | 33.5 | 1.8 | 3.4 | 8.8 | 2.2 | 1.2 | 1.7 | 1.3 | 1.0 | 5.5 | 6.1 |

Ex. 14 (JX-17 ('084 Patent)) at cols. 88–94 (highlighting added). *Arabidopsis* is undisputedly a well-known model for *Brassica*, *see* Trial Tr. at 281:20–283:10, 476:10–13, 622:11–628:7, 763:13–764:4, 1735:25–1736:3, 1737:21–1738:7, and therefore a skilled artisan would understand that the inventors in Table 12 were demonstrating additional data reflecting the production of low,

non-zero levels of DHA and levels of DPA between 1–16%. Taken together, the plain disclosures on the face of the patent preclude any finding that the written description was inadequate.

There is no clear and convincing evidence otherwise. Dr. Murphy's expert testimony concerning lack of written description was only that while the asserted claim recited seed oil having 1–16% DPA, the specification only disclosed embodiments having 7% to 30% or 7% to 35% DPA. *Id.* at 1336:1–1338:18. But this is demonstrably incorrect. Again, the specification identifies many embodiments that fall into the claimed DPA range. *See supra* (tables 12 and 17– 20). Dr. Murphy not only neglected to consider these examples, but also failed to provide any explanation as to why these examples would not reasonably convey to the skilled artisan that the inventors possessed embodiments within the claimed DPA range. Of course, BASF cannot invalidate a patent by ignoring the plain text that directly contradicts Dr. Murphy's opinions.

Moreover, Dr. Murphy never explained *why* this was insufficient to show possession of the claimed DPA range. His conclusory testimony cannot carry the day on invalidity. *See, e.g.*, *WBIP*, 829 F.3d at 1339 ("general and conclusory testimony" does not suffice as clear and convincing evidence of invalidity (citing *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004))). And in any event, clear and convincing evidence of inadequate written description cannot be predicated on the mere fact that there is no perfect overlap between the DPA ranges disclosed in the specification and the DPA range recited in the asserted claim. *See Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1566 (Fed. Cir. 1991) ("ranges found in applicant's claims need not correspond exactly to those disclosed in parent application; issue is whether one skilled in the art could derive the claimed ranges from parent's disclosure" (citing *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985))); *see also Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1137 (Fed. Cir. 2018) ("The disclosure of a dose outside of the claimed

range does not compel a finding that the asserted claims lack adequate written description. 'It is common, and often permissible, for particular claims to pick out a subset of the full range of described features, omitting others.'" (quoting *Scriptpro, LLC v. Innovation Assocs., Inc.*, 762 F.3d 1355, 1359 (Fed. Cir. 2014))); *Application of Wertheim*, 541 F.2d 257, 265 (C.C.P.A. 1976) ("In the context of this invention, in light of the description of the invention as employing solids contents within the range of 25-60% along with specific embodiments of 36% and 50%, we are of the opinion that, as a factual matter, persons skilled in the art would consider processes employing a 35-60% solids content range to be part of appellants' invention . . . .").

Because Opponents failed to present clear and convincing evidence of lack of written description, JMOL of no invalidity is proper as to the asserted claim of the '084 Patent. Alternatively, a new trial should be held as the jury's verdict was contrary to the great weight of evidence, especially given the specification of the '084 Patent.

## IV.   CONCLUSION

For the foregoing reasons, the Court should enter judgment as a matter of law as to the MTEA claim with respect to the '792 Patent and the validity of claim 1 of the '084 Patent. Alternatively, a new trial on these matters should be granted as the evidence overwhelmingly shows that the jury's verdict was against the weight of the evidence.

DATED: January 21, 2020                     Respectfully submitted,

*/s/ Richard Ottinger*
Richard Ottinger (Virginia Bar #38842)
rottinger@vanblacklaw.com
Vandeventer Black LLP
101 West Main Street
500 World Trade Center
Norfolk, VA 23510
Telephone:  (757) 446-8600
Facsimile:  (757) 446-8670

19

Michael Ng (Admitted *Pro Hac Vice*)
michael.ng@kobrekim.com
Daniel Zaheer (Admitted *Pro Hac Vice*)
daniel.zaheer@kobrekim.com
Michael M. Rosen (Admitted *Pro Hac Vice*)
michael.rosen@kobrekim.com
Hartley M.K. West (Admitted *Pro Hac Vice*)
hartley.west@kobrekim.com
Kobre & Kim LLP
150 California Street, 19th Floor
San Francisco, California 94111
Telephone:  (415) 582-4800
Facsimile:  (415) 582-4811

Rebecca G. Mangold (Admitted *Pro Hac Vice*)
rebecca.mangold@kobrekim.com
Jonathan E. Barbee (Admitted *Pro Hac Vice*)
jonathan.barbee@kobrekim.com
Alexa Pearlman (Admitted *Pro Hac Vice*)
alexa.pearlman@kobrekim.com
George Stamatopolous (Admitted *Pro Hac Vice*)
george.stamatopolous@kobrekim.com
Kobre & Kim LLP
800 3rd Ave
New York, NY 10022
Telephone:  (212) 488-1200
Facsimile:  (212) 488-1220

Kimberly P. Cole (Admitted *Pro Hac Vice*)
kimberly.cole@kobrekim.com
Hugham Chan (Admitted *Pro Hac Vice*)
hugham.chan@kobrekim.com
Kobre & Kim LLP
1919 M Street, NW
Washington, DC 20036
Telephone:  (202) 664-1900
Facsimile:  (202) 664-1920

Matthew I. Menchel (Admitted *Pro Hac Vice*)
matthew.menchel@kobrekim.com
Laura M. Gonzalez (Admitted *Pro Hac Vice*)
laura.gonzalez@kobrekim.com
Kobre & Kim LLP
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131

20

Telephone:  (305) 967-6100
Facsimile:  (305) 967-6120

*Attorneys for Counterclaimant Commonwealth*
*Scientific and Industrial Research Organisation*

Miranda Jones (Admitted *Pro Hac Vice*)
mirandajones@porterhedges.com
Andrew B. Raber (Admitted *Pro Hac Vice*)
araber@porterhedges.com
Megan Mon-Ting Luh (Admitted *Pro Hac Vice*)
mluh@porterhedges.com
Jonna N. Summers (Admitted *Pro Hac Vice*)
jsummers@porterhedges.com
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone:  (713) 226-6000
Facsimile:  (713) 226-1331

*Attorneys for Counterclaimant Grains Research*
*and Development Corporation*

Lawrence M. Sung (Admitted *Pro Hac Vice*)
lsung@wileyrein.com
Teresa Summers (Admitted *Pro Hac Vice*)
tsummers@wileyrein.com
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
Telephone:  (202) 719-7000
Facsimile:  (202) 719-7049

*Attorney for Counterclaimant Nuseed Pty. Ltd.*

## <u>Certificate of Service</u>

I hereby certify that on January 21, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<div style="margin-left:50%">

/s/ *Richard Ottinger*
Richard Ottinger
Virginia Bar Number: 38842
rottinger@vanblacklaw.com
Vandeventer Black LLP
101 West Main Street
500 World Trade Center
Norfolk, VA 23510
Telephone: (757) 446-8600
Facsimile: (757) 446-8670

*Counsel for Counterclaimants*

</div>